No. 22-4489

---

### IN THE UNITED STATES COURT OF APPEALS
### FOR THE FOURTH COURT

————————

### UNITED STATES OF AMERICA,
*Plaintiff/Appellee,*

**v.**

### OKELLO T. CHATRIE,
*Defendant/Appellant.*

————————

**On Appeal From the United States District Court
for the Eastern District of Virginia
Richmond Division (The Hon. M. Hannah Lauck)**

————————

### JOINT APPENDIX

### VOLUME 6 of 11 (pages 1327 - 1456)

————————

**JESSICA D. ABER**
**United States Attorney**

**Kenneth R. Simon, Jr., Ass't U.S. Attorney**
**Peter S. Duffey, Ass't U.S. Attorney**
**Counsel for Appellee**
**919 East Main Street, Suite 1900**
**Richmond, VA 23219**
**(804) 819-5400**

**Nathan P. Judish, Senior Counsel**
**Computer Crime & Intel. Property Section**
**Criminal Division**
**U.S. Department of Justice**

**GEREMY C. KAMENS**
**Federal Public Defender**

**Laura J. Koenig**
**Assistant Federal Public Defender**
**Counsel for Appellant**
**701 East Broad Street, Suite 3600**
**Richmond, VA 23219**
**(804) 565-0800**

**Michael W. Price, Litigation Dir.**
**NACDL Fourth Amendment Ctr.**
**1660 L Street NW, 12th Floor**
**Washington, DC 20036**

This page intentionally left blank for double-sided pagination and printing

# **TABLE OF CONTENTS**

VOLUME 1 (pages 1 - 176)

District Court Docket Sheet (as of Jan. 17, 2023) ....................................................1

Indictment (Sept. 17, 2019, Doc. 1)........................................................................22

Defendant's Motion to Suppress Evidence Obtained From a "Geofence" General Warrant (Oct. 29, 2019, Doc. 29) ........................................................25

Government's Response in Opposition to Defendant's Motion for Suppression of Evidence Obtained Pursuant to Google Geofence Warrant (Nov. 19, 2019, Doc. 41) ...................................................................51

Defendant's Reply to Government's Response [to] Motion to Suppress Evidence Obtained From a "Geofence" General Warrant (Dec. 9, 2019, Doc. 48)....................................................................................................76

    Exh. A (First Step 2 Request to Google) (Doc. 48-1) ........................................98
    Exh. B (Second Step 2 Request to Google) (Doc. 48-2) ..................................100
    Exh. C (Third Step 2 Request to Google) (Doc. 48-3) ....................................102
    Exh. D (Transcript, *Commonwealth v. Anderson*, No. CR17-4909-00F (Va. Cir. Ct., Jan. 4, 2019)) (Doc. 48-4)............................. omitted from J.A.

Government's Notice Regarding Attachment of Google Geofence State Search Warrant to Response in Opposition to Motion to Suppress (Dec. 18, 2019, Doc. 54) ..........................................................................................104

    Affidavit for search warrant and warrant, with attachments (Doc. 54-1) ........107

Brief of Amicus Curiae Google LLC in Support of Neither Party Concerning Defendant's Motion to Suppress Evidence From a "Geofence" General Warrant (Dec. 20, 2019, Doc. 59-1) ...............................118

United States' Response to Amicus Curiae Brief of Google LLC (Jan. 10, 2020, Doc. 71)......................................................................................................148

Defendant's Response to Google's Motion to File Amicus Curiae Brief in Support of Neither Party (Jan. 10, 2020, Doc. 72) ...........................................158

## VOLUME 2 (pages 177 - 416)

Transcript, Discovery Motion Hearing (Jan. 21, 2020, Doc. 81; *see* Doc. 77 (court minutes)).................................................................................................177

Preliminary matters...........................................................................................179

Def't witness Spencer McInvaille        Direct examination...............................193
                                        Cross examination................................283
                                        Redirect examination ..........................306

Argument by the defense ....................................................................................318
Argument by the government ............................................................................332
Rebuttal by the defense......................................................................................350

Court's ruling....................................................................................................355

Defendant's Supplemental Motion to Suppress Evidence Obtained From a "Geofence" General Warrant (May 22, 2020, Doc. 104).................................363

United States' Response in Opposition to Defendant's Motion for Suppression of Evidence Obtained Pursuant to Google Geofence Warrant (June 12, 2020, Doc. 109)...................................................................393

## VOLUME 3 (pages 417 - 694)

Transcript, Suppression Motion Hearing, Day 1 (evidence) (Mar. 4, 2021, Doc. 201; *see* Doc. 198 (court minutes)).........................................................417

Preliminary matters...........................................................................................420

Def't witness Spencer McInvaille        Direct examination...............................432
                                        Cross examination................................542
                                        Redirect examination ..........................586

Def't witness Marlo McGriff             Direct examination...............................606

## VOLUME 4 (pages 695 - 1070)

Transcript, Suppression Motion Hearing, Day 2 (evidence) (Mar. 5, 2021, Doc. 202; *see* Doc. 199 (court minutes)).................................................................695

    Preliminary matters.................................................................698

    Def't witness Marlo McGriff, cont'd    Direct examination.............................699
                                         Cross examination..............................791
                                         Redirect examination .........................841

    Def't witness Sarah Rodriguez    Direct examination.............................862
                                           Cross examination..............................902
                                         Redirect examination .........................916

    Gov't witness Jeremy D'Errico    Direct examination.............................923
                                           Cross examination..............................967
                                       Redirect examination .......................1010

    Gov't witness Joshua Hylton    Direct examination...........................1016
                                           Cross examination............................1040
                                       Redirect examination .......................1063

    Concluding matters.................................................................1064

## VOLUME 5 (pages 1071 - 1326)

Defendant's Post-Hearing Brief on "Geofence" General Warrant (May 3, 2021, Doc. 205).................................................................1071

Government's Response in Opposition to Defendant's Motion for Suppression (May 21, 2020, Doc. 214; *see* Doc. 207-2)...............................1117

Defendant's Reply to Government's Response in Opposition to Motion for Suppression (June 4, 2020, Doc. 213) .........................................1164

Transcript, Suppression Hearing (arguments) (June 24, 2021, Doc. 217; *see* Doc. 215 (court minutes)).................................................................1185

Argument by the defense ................................................................1187
Argument by the government .........................................................1231
Rebuttal by the defense.................................................................1313

Concluding matters .......................................................................1322

VOLUME 6 (pages 1327 - 1456)

Memorandum Opinion (denying suppression motion) (Mar. 3, 2022, Doc. 220)................................................................................1327

Order (denying suppression motion) (Mar. 3, 2022, Doc. 221) .........................1390

Criminal Information (May 6, 2022, Doc. 224) ................................1391

Transcript, Change of Plea Hearing (May 9, 2022, Doc. 247; *see* Doc. 226) ................................................................................1394

Plea Agreement (May 9, 2022, Doc. 228) ..........................................1428

Statement of Facts (May 9, 2022, Doc. 229)......................................1444

Judgment in a Criminal Case (Aug. 19, 2022, Doc. 239)...................1449

Notice of Appeal (Aug. 25, 2022, Doc. 241)......................................1456

VOLUME 7 (pages 1457 - 1810) – DOCUMENT EXHIBITS

Exhibits Admitted at Discovery Motion Hearing (Jan. 21, 2020)

Def't Exh. 1: Geofence Warrant & Application (same as Doc. 54-1, minus ECF header) ...................................................*see* J.A. 107
Def't Exh. 2: Google Amicus Brief (Doc. 59-1) ...............................*see* J.A. 118
Def't Exh. 3: PDF of Raw Data (sealed) .........................................*see* J.A. 2093
Def't Exh. 4: Activation Video...............omitted from J.A., available on request
Def't Exh. 5: Three Paths Video (sealed)........................................*see* J.A. 2139
Def't Exh. 6: First Step 2 Request to Google .................................1457
Def't Exh. 7: Second Step 2 Request to Google...............................1459
Def't Exh. 8: Third Step 2 Request to Google ................................1461

Def't Exh. 9: Step 3 Request to Google ........................................................1463

Exhibits Admitted at Suppression Motion Hearing (Mar. 4-5, 2021)

Def't Exh. 1: Geofence Warrant & Application (same as Doc. 54-1,
   minus ECF header) .................................................................*see* J.A. 107
Def't Exh. 2: Google Amicus Brief (Doc. 59-1) ...............................*see* J.A. 118
Def't Exh. 3: PDF of Raw Data (sealed) ...........................................*see* J.A. 2093
Def't Exh. 5: Three Paths Video (sealed) ..........................................*see* J.A. 2139
Def't Exh. 6: Spencer McInvaille Report .......................................................1464
Def't Exh. 7: Spencer McInvaille Supplemental Report...............................1469
Def't Exh. 8: CSV Google Data File (.csv file)................................*see* J.A. 2139
Def't Exh. 9: Unique in Crowd Study ...........................................................1475
Def't Exh. 11: September 2018 Oracle Submission.......................................1480
Def't Exh. 18: Federal Search Warrant Application & Attachments.............1502
Def't Exh. 19: State Search Warrants & Attachments ...................................1534
Def't Exh. 21: McGriff Declaration 1 (Doc. 96-1)........................................1551
Def't Exh. 23: McGriff Declaration 3 (Doc. 147)..........................................1562
Def't Exh. 24: Rodriguez Declaration (Doc. 96-2) .......................................1579
Def't Exh. 27: Every Step You Take...............................................................1587
Def't Exh. 30: AZ Ex. 18 (admitted portions only)......................................1631
Def't Exh. 31: AZ Ex. 19 (admitted portions only)......................................1633
Def't Exh. 32: AZ Ex. 20................................................................................1639
Def't Exh. 33: AZ Ex. 24................................................................................1644
Def't Exh. 34: AZ Ex. 202..............................................................................1667
Def't Exh. 36: AZ Ex. 209..............................................................................1777
Def't Exh. 38: AZ Ex. 219..............................................................................1781
Def't Exh. 40: AZ Ex. 236..............................................................................1797
Def't Exh. 41: AZ Ex. 260..............................................................................1804

VOLUME 8 (pages 1811 - 2090) – DOCUMENT EXHIBITS, CONT'D

Exhibits Admitted at Suppression Motion Hearing (Mar. 4-5, 2021), cont'd

Def't Exh. 43: May 2018 Privacy Policy – Redline ......................................1811
Def't Exh. 43a: May 2018 Privacy Policy – Redline (with internet
   source information)..................................................................................1840
Def't Exh. 44: Jan. 2019 Privacy Policy – Redline .......................................1865
Def't Exh. 45: Oct. 2019 Privacy Policy – Redline.......................................1895
Def't Exh. 46: McGriff Blog 1 .......................................................................1926

Def't Exh. 47: McGriff Blog 2 ......................................................1929
Def't Exh. 48: 2018 Quartz Article ............................................1934
Def't Exh. 49: 2018 AP Article 1 ...............................................1941
Def't Exh. 51: 2019 NYT Article ...............................................1948
Def't Exh. 53: Blumenthal-Markey Letter to FTC........................1957

Gov't Exh. 1: CAST PowerPoint Presentation.............................1981
Gov't Exh. 2: Geofence Warrant (Doc. 54-1) ...................*see* J.A. 107
Gov't Exh. 3: Declaration of Marlo McGriff (Mar. 11, 2020)
    (same as Def't Exh. 21 (Doc. 96-1)) ..........................*see* J.A. 1551
Gov't Exh. 3a: Declaration of Sarah Rodriguez (Mar. 11, 2020)
    (same as Def't Exh. 24 (Doc. 96-2)) ..........................*see* J.A. 1579
Gov't Exh. 3b: Supplemental Declaration of McGriff (June 17, 2020)
    (Doc. 110-1)...............................................................2032
Gov't Exh. 3c: Third Declaration of Marlo McGriff (Aug. 7, 2020)
    (same as Def't Exh. 23 (Doc. 147))............................*see* J.A. 1562
Gov't Exh. 4: Joshua Hylton emails with Google .........................2034
Gov't Exh. 5: Google Privacy Policy ..........................................2048
Gov't Exh. 5a: Google Terms of Service .....................................2081
Gov't Exh. 6: Special Agent D'Errico's C.V. ...............................2088
Gov't Exh. 12: "Got to Be Mobile" Video .....................*see* J.A. 2091

VOLUME 9 (pages 2091 - 2092) – DIGITAL MEDIA EXHIBIT

Gov't Exh. 12: "Got to Be Mobile" Video (admitted only at suppression
    motion hearing)................................................. (.mp4 file)

VOLUME 10 (pages 2093 - 2138) – SEALED DOCUMENT EXHIBIT

Def't Exh. 3: PDF of Raw Data (*see* Doc. 69 (sealing order)) (admitted at
    both discovery motion hearing and suppression motion hearing).................2093

VOLUME 11 (pages 2139 - end) – SEALED DIGITAL MEDIA EXHIBITS

Def't Exh. 5: Three Paths Video (admitted at both discovery motion hearing
    and suppression motion hearing).......................................... (.mp4 file)
Def't Exh. 8: CSV Google Data File (admitted only at suppression motion
    hearing) ................................................... (.csv file, viewable in Excel)

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

UNITED STATES OF AMERICA

v.                                                    Criminal Case No. 3:19cr130

OKELLO T. CHATRIE,

Defendant.

## MEMORANDUM OPINION

### I. Introduction

Ratified in 1791, the Fourth Amendment to the United States Constitution guarantees to the people the right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. To that end, the Framers prohibited the issuance of a warrant, unless that warrant was based "upon probable cause" and unless it "particularly describ[ed] the place to be searched, and the persons or things to be seized." *Id.* The Supreme Court of the United States has since applied the principles embodied in this language to constantly evolving technology—from recording devices in public telephone booths, *Katz v. United States*, 389 U.S. 347 (1967); to thermal-imaging equipment, *Kyllo v. United States*, 533 U.S. 27 (2001); and, most recently, to cell-site location data, *Carpenter v. United States*, 138 S. Ct. 2206 (2018).

This case implicates the next phase in the courts' ongoing efforts to apply the tenets underlying the Fourth Amendment to previously unimaginable investigatory methods. In recent years, technology giant Google (and others) have begun collecting detailed swaths of location data from their users. Law enforcement has seized upon the opportunity presented by this informational stockpile, crafting "geofence" warrants that seek location data for every user

J.A. 1327

within a particular area over a particular span of time.  In the coming years, further case law will refine precisely whether and to what extent geofence warrants are permissible under the Fourth Amendment.  In the instant case, although the Motion to Suppress must ultimately be denied, the Court concludes that this particular geofence warrant plainly violates the rights enshrined in that Amendment.

## II.  Findings of Fact and Procedural History

### A.    Findings of Fact[1]

#### 1.    The Robbery at the Call Federal Credit Union

On May 20, 2019, at approximately 4:52 p.m., a bank robbery occurred at the Call Federal Credit Union (the "Bank") in Midlothian, Virginia.  The suspect held a firearm over the course of the robbery and took $195,000 from the Bank.

During the robbery, the suspect presented a teller working at the Bank a handwritten note that stated:

> I've been watching you for sometime [sic] now.  I got your family as hostage and I know where you live, [i]f you or your coworker alert the cops or anyone your family and you are going to be hurt.  I got my boys on the lookout out side [sic].  The first cop car they see am going to start hurting everyone in sight, hand over all the cash, I need at least 100k and nobody will get hurt and your family will be set free.  Think smartly everyone['s] safety is depending and you and your coworker[']s action so I hope they don't try nothing stupid.

---

[1] A "presumption of validity" exists "with respect to the affidavit supporting the search warrant."  *Franks v. Delaware*, 438 U.S. 154, 171 (1978).  Because Chatrie does not allege that the statements in the affidavits supporting the search warrants are untrue statements, but instead says that these statements do not provide enough information or that they do not contain the proper information to support the search warrants, the Court in part makes its findings of fact based on the statements made in the affidavits.  *Id.* (describing the circumstances in which the Court must hold an evidentiary hearing on a defendant's motion to suppress).

2

**J.A. 1328**

(ECF No. 54-1, at 6.)[2]  The teller told the suspect that she did not have access to that amount of money, and the suspect then displayed a silver and black firearm.  While openly holding the gun, the suspect directed the teller, other Bank employees, and the Bank customers to move to the center of the lobby and get on the floor.  The suspect then led these individuals behind the teller counter to an area that contained the Bank's safe.  Once behind the counter, the suspect forced the Bank's manager to open the safe and place $195,000 into a bag he brought with him.  After acquiring the money, the suspect left the Bank on foot, "towards an adjacent business, west of the [B]ank."  (ECF No. 54-1, at 6.)

During its investigation, law enforcement obtained the instant Geofence Warrant (hereinafter "Geofence Warrant" or "Warrant")—a novel application of search technology whose use has grown exponentially in recent years.  Google produced certain location information pursuant to the Warrant, which led the police to Okello Chatrie.  Chatrie was eventually charged with two crimes related to the robbery.[3]  He then filed a Motion to Suppress the Geofence Warrant that forms the basis of this Opinion.

---

[2] The Court employs the pagination assigned by the CM/ECF docketing system for citations to the parties' submissions.  Where a document was not filed through CM/ECF (for example, an exhibit introduced at a hearing), the Court will cite to the pages that would have been assigned through CM/ECF had they been filed through the system.

In addition, the Court acknowledges that its findings of fact differ between this Memorandum Opinion and a later issued Memorandum Opinion addressing the validity of four other warrants.  In that Opinion, the warrants set forth a lengthier, more detailed narrative explaining the officers' investigatory steps than the instant Geofence Warrant.  In determining the validity of a warrant, the "magistrate [or magistrate judge], and a reviewing court, will restrict their inquiries on probable cause to the facts set forth in the four corners of the officers' sworn affidavit." *United States v. Lipscomb*, 368 F. Supp. 3d 680, 684 (E.D. Va. 2019).  Thus, because the facts in the Geofence Warrant differ from those set out in the four other warrants, the Court's findings of fact accordingly differ as well.

[3] More precisely, (1) Forced Accompaniment During Armed Credit Union Robbery, in violation of 18 U.S.C. §§ 2113(a), (d), and (e); and, (2) Using, Carrying, or Brandishing a Firearm During and in Relation to a Crime of Violence, in violation of 18 U.S.C. § 924(c)(1)(A).

## 2.    The Record Presented to the Court by the Parties

There is a relative dearth of case law addressing geofence warrants.[4]  In this case, the

parties, especially the defense, pursued a thorough and deep record.  This Court was aided by

Amicus Google's provision of detailed information, including in-person testimony regarding the

company's acquisition, retention, and use of users' location data.  In what may be a first, Google

filed an Amicus Brief.[5]  Mr. Marlo McGriff, a Location History Manager at Google since 2016,

submitted three declarations over the course of this matter.  Ms. Sarah Rodriguez, a Team Lead

for Legal Investigations Specialists ("LIS")[6] at Google since 2018, provided one declaration.

During a hearing on March 4–5, 2021, (one of many in this case), the Court heard live testimony

from both Mr. McGriff and Ms. Rodriguez.[7]

---

[4] Specifically, this Court has identified only five other federal opinions on the subject, but all assessed the validity of the warrants *before* they were issued:  *In re Search of Information That is Stored at the Premises Controlled by Google LLC*, No. 21sc3217, 2021 WL 6196136 (D.D.C. Dec. 30, 2021); *In re Search of Information that is Stored at the Premises Controlled by Google, LLC*, 542 F. Supp. 3d 1153 (D. Kan. 2021); *In re Search Warrant Application for Geofence Location Data Stored at Google Concerning an Arson Investigation*, 497 F. Supp. 3d 345 (N.D. Ill. 2020); *In re Information Stored at Premises Controlled by Google*, 481 F. Supp. 3d 730 (N.D. Ill. 2020); and, *In re Search of Information Stored at Premises Controlled by Google*, No. 20M297, 2020 WL 5491763 (N.D. Ill. July 8, 2020).

[5] Among other things, Google argued in its brief that Location History is not a business record, but is a journal stored primarily for the user's benefit and is controlled by the user. Google states that LH information "can often reveal a user's location and movements with a much higher degree of precision than [Cell Site Location Information]."  (ECF No. 59-1, at 8.) Google argues that a geofence is certainly a "'search' within the meaning of the Fourth Amendment," because "[u]sers have a reasonable expectation of privacy in the LH information, which the government can use to retrospectively reconstruct a person's movements in granular detail."  (ECF No. 59-1, at 9.)

[6] Legal Investigations Specialists are the Google employees who receive warrants and send the returns.

[7] This testimony was delayed at the request of defense counsel during an extensive period of time because the COVID pandemic prevented live testimony.

4

The parties to this case also brought their own experts. Spencer McInvaille, an expert in digital forensic examinations, forensics, and cellular location testified for the defense, and FBI Special Agent Jeremy D'Errico, a part of the cellular analysis survey team ("CAST") spoke for the Government. Multiple rounds of briefing occurred before, during, and after the hearings held by the Court.

In order to establish as thorough a record as possible with respect to this new technology, the Court will first discuss Google's location services, as well as Google's typical response to geofence warrants.[8]

### 3.     Google's Collection and Production of Location Data

#### a.     Google's Suite of Location Services

Google collects detailed location data on "numerous tens of millions" of its users. (ECF No. 96-1, at ¶ 13; ECF No. 201, at 205.) It acquires and stores this data through one of at least three services: (1) Location History, (2) Web and App Activity ("WAA"), and (3) Google Location Accuracy ("GLA"). Google only searches Location History when it receives a geofence warrant.

#### i.     Location History

Location History appears to be the most sweeping, granular, and comprehensive tool—to a significant degree—when it comes to collecting and storing *location* data. Google developed Location History to allow users to view their Location History data through its "Timeline" feature, a depiction of a user's collected Location History points over time. (ECF No. 96-1, at ¶ 5; *see* ECF No. 202, at 79.) According to Google, this permits Google account holders to

---

[8] Other companies such as Amazon and Apple invariably retain users' location data as well. But Google, whose services function across Apple *and* Android devices (as opposed to Apple Maps for example, which functions only on iPhones), seems to be subject to more geofence requests than other companies.

J.A. 1331

"choose to keep track of locations they have visited while in possession" of their mobile device. (ECF No. 96-1, at ¶ 4.)  Importantly, Location History also supports Google's advertising revenue.[9]  For instance, McGriff testified that Location History data serves Google's advertising business by providing "store visit conversions" or "ads measurement" to businesses based on user location.  (ECF 201, at 196–97.)  Without identifying any individual user, this "store conversion" data can follow a particular ad campaign and identify "how many users who saw a particular ad campaign actually went to one of those stores."  (ECF No. 201, at 197.)  Google's "radius targeting" also allows—again without identifying any user—"a business to target ads to users that are within a certain distance of that business."  (ECF No. 201, at 198.)

Location History is powerful:  it has the potential to draw from Global Positioning System ("GPS") information, Bluetooth beacons, cell phone location information from nearby cellular towers, Internet Protocol ("IP") address information, and the signal strength of nearby Wi-Fi networks.  According to Agent D'Errico, Location History logs a device's location, on average, every two minutes.[10]  Indeed, Location History even allows Google to "estimat[e] . . . where a device is in terms of elevation."  (ECF No. 202, at 95.)  McGriff testified that this capability helps locate someone in an emergency, or try to "determine if you are on the second [or first] floor of the mall" if the Google Maps directory has launched to help a user navigate indoors.  (ECF No. 202, at 95–96.)

---

[9] Using 10K filings from Google's parent company Alphabet, FBI Agent D'Errico noted that Google's advertising revenue constituted 85.4% and 83.9% of its *entire* revenue in 2018 and 2019, respectively.

[10] Defense Expert McInvaille evaluated a sample set of data and found that, for that data, Location History logged a device's location every six minutes.  Under McInvaille's estimate, a user's movement is logged 240 times a day.  D'Errico's estimate would raise that to 720 times a day.  And Google Expert McGriff confirmed that Location History can track a user "hundreds" of times a day.  (ECF No. 202, at 159.)

J.A. 1332

Google stores this data in a repository known as the "Sensorvault" and associates each data point with a unique user account. (ECF No. 201, at 130.) The Sensorvault contains a substantial amount of information. McGriff testified that the Sensorvault assigns each device a unique device ID—as opposed to a personally identifiable Google ID—and receives and stores *all* location history data in the Sensorvault to be used in ads marketing. Google then builds aggregate models within the Sensorvault with data that is transformed so that it no longer looks like user data, and then uses the data to, for instance, assist decision-making in Google Maps. As another example, Google uses this data to depict whether certain locations are busy during particular hours. Both McGriff and Rodriguez declared that, to identify users within the relevant timeframe of a geofence, Google has to compare *all* the data in the Sensorvault in order to identify users within the relevant timeframe of a geofence. (ECF No. 96-1, at ¶ 23 ("Google must search across *all* [Location History] data," and "run a computation against every set of stored LH coordinates to determine which records match the geographic parameters in the warrant."); ECF No. 96-2, at ¶ 7 ("Google must conduct the search across *all* [Location History] data.").) Clearly, however, Google can alter the data back to identify users in response to a geofence warrant.

Still, Location history is off by default. A user can initiate, or opt into, Location History either at the "Settings" Level, or when installing applications such as Google Assistant, Google Maps, or Google Photos. Although the specific software pathway each user sees at any given moment can differ based on numerous factors, McGriff acknowledged that it was "possible that a user would have seen the option" to opt into Location History multiple times across multiple apps. (ECF No. 202, at 77–78.) For instance, Google may prompt the user to enable Location

7

J.A. 1333

History first in Google Maps, then again when he or she opens Google Photos and Google Assistant for the first time.[11]

Once a user opts into Location History, Google is "always collecting" data and storing *all* of that data in its vast Sensorvault, even "if the person is not doing anything at all with [his or her] phone." (ECF No. 201, at 114–15; *see* ECF No. 201, at 115 ("Once enabled, [Google is] now collecting [the user's] location history all the time.").) Even if a user enables Location History through an application and later deletes that app, Location History will "still collect[]" data on the user because Location History is tied to an individual's Google *account*, not to a *specific app*. (ECF No. 201, at 123–24.) Thus, after a user opts into the service, Location History tracks a user's location across every *app* and every *device* associated with the user's account. Approximately one-third of all active Google users have Location History enabled on their accounts.

In certain circumstances, Google can estimate a device's location down to three meters. Location History cannot, however, pinpoint an individual's location with absolute precision. Instead, Google *estimates* a phone's coordinates. When Google, through Location History, reports a device's estimated location by placing a point on a map, it also depicts around that point a "confidence interval"—a circle of varying sizes—which indicates Google's confidence in its estimation. (ECF No. 201, at 38, 212; ECF No. 202, at 253–54.) The smaller the circle around a phone's estimated location, the more confident Google is in that phone's exact location, and *vice versa*. In general, "Google aims to accurately capture roughly 68 percent of users"

---

[11] In a highly critical 2018 evaluation of tracking through Location History and Web & App Activity, the Norwegian Consumer Council (funded by the Norwegian government) characterized this as one of an identifiable set of problematic practices, dubbing it "repeated nudging" to encourage a user to enable the app. (Mar. 4–5 Hr'g Def. Ex. 27, at 28.)

J.A. 1334

within its confidence intervals. (ECF No. 201, at 213.) "[I]n other words, there[ is] a 68 percent likelihood that a user is somewhere inside" the confidence interval. (ECF No. 201, at 213.)

### ii. Web and App Activity

Web and App Activity collects a wider variety of information than Location History. If a user opts into WAA and has authorized all other requisite device permissions, WAA collects certain data points when a user *affirmatively engages* in certain activities.[12] For example, when a user performs a Google search, Google may, through WAA, keep a record of that search so that it can "automatically suggest[]" that search to the user at a later time. (ECF No. 96-1, at ¶ 16.) Google maintains that WAA allows a user to "experience faster searches and more helpful app and content recommendations." (ECF No. 96-1, at ¶ 16.) "Some of [the data obtained through WAA] can include location information, although the source of the location information will vary depending on the activity, the device, and the user's other settings." (ECF No. 96-1, at ¶ 16.) Location History "and WAA are separate services that store data in separate databases." (ECF No. 96-1, at ¶ 16.) That is, "WAA data is not used to calculate the locations that are stored in [Location History], and completing a search across [Location History] data does not search or draw on WAA data in any way." (ECF No. 96-1, at ¶ 16.)

### iii. Google Location Accuracy

Lastly, Google Location Accuracy—only available on Android devices[13]—allows a user's phone to draw in location data from sources other than GPS information. "If a user has the GLA setting on, the Android[ device's] location services will use additional inputs, including Wi-Fi access points, mobile networks, and sensors[] to estimate the device's location." (ECF

---

[12] This stands in contrast to Location History, which constantly and *passively* logs a user's location.

[13] At the time of the robbery, Chatrie used an Android device.

**J.A. 1335**

No. 96-1, at ¶ 17.) Thus, "the device 's location information that is sent to and stored in [Location History] . . . may be calculated using not only GPS-sourced data, but also [more detailed] WiFi- or cell-sourced data from the GLA database." (ECF No. 96-1, at ¶ 17.) "In other words, GLA data might be used by the device to calculate a [more precise] location data point that is then stored in [Location History]." (ECF No. 96-1, at ¶ 17.) Like WAA, Google generally stores GLA data separate from Location History information.

Again, as a general matter, Google appears to draw only from Location History to produce records for geofence requests, as WAA and GLA do not collect enough data points to pinpoint "devices within a certain period of time within a certain radius." (ECF No. 202, at 138; *see* ECF No. 201, at 211; ECF No. 96-1, at ¶¶ 20–22.) In keeping with this principle, here, Google only produced to law enforcement information from its Location History database.

### b.    Enabling Location History

The Court reports its understanding of the software pathways necessary to enable Location History based on two sets of sources. All sources agree that Chatrie enabled his Location History on July 9, 2018. However, even with input from two knowledgeable witnesses, the record as to how users can and do—and how Chatrie in particular could and did—enable Location History is not definitive on this record.

First, Defense Expert Spencer McInvaille testified in Court using a video of a device employing what was likely the same software used by Chatrie's phone to demonstrate how one might activate Location History through the Google account setup or through an app such as Google Maps. (Jan. 21 Hr'g Def. Ex. 4 ("Opt-In Video").) McInvaille also offered a written report explaining how Chatrie may have enabled location history. In that report, McInvaille

reported that Chatrie most likely enabled LH using Google Assistant, and that it was enabled on July 9, 2018.

Second, Google Location History Product Manager Marlo McGriff filed three declarations that explain how Google collects, stores, and turns over Location History data. He also testified in person during the March 4–5 Suppression Hearing. In his second declaration, McGriff concedes that McInvaille's video exhibit depicts largely accurate pathways to enable Location History. But McGriff states that McInvaille's video is incomplete. McGriff notes that "[b]y 2017 at the latest, it was not possible for a user to unable [Location History] solely by tapping on 'YES, I'M IN' as depicted on the final screen in the McInvaille Video." (ECF No. 110-1, at ¶ 7.) Instead, "a user who tapped on 'YES, I'M IN' . . . would be presented with a second opt-in screen" described above. (ECF No. 110-1, at ¶ 7.) McGriff presents the Court with the exact text of the second opt-in screen in his Third Declaration.[14] (ECF No. 147, at ¶¶ 7–8; *see* ECF No. 147, at ¶ 10 ("The text quoted in ¶¶ 7–8 is the same text that [Chatrie] would have seen on July 9, 2018.").

No expert could say *exactly* which software pathway Chatrie would have seen when he enabled Location History, nor could Google determine which app he used to turn the service on. Google does, however, accept that Chatrie would have seen the informational text in Part II.A.3.b.ii ("Through an App") in *some* form.

### i.    Through Phone Setup

As mentioned, a user must affirmatively enable Location History before Google uses the service to log the user's whereabouts. Google first allows users to enable Location History

---

[14] McGriff complicated this seemingly straightforward proposition by acknowledging that any "device that has been sitting on a shelf for three years [would use start up language] dated to when it was baked into the device." (ECF No. 202, at 18.)

during the initial Google account setup process.  After a new user connects the phone to the

internet, agrees to the phone manufacturer's terms and conditions, and inputs the necessary

information to create a Google account, the interface displays Google's terms of service.  (*See*

ECF No. 110-1, at ¶ 5 (acknowledging that the Opt-In Video exhibit was accurate but

incomplete).)  To move past this screen, the user must scroll through a summary of Google's

privacy terms until the user reaches the bottom of the page.  This page "does [not] . . . say

anything about [L]ocation [H]istory."  (ECF No. 81, at 51.)  Near the bottom, the screen displays

blue text that reads, "MORE OPTIONS," with a downward-facing arrow next to the text.  (Opt-

In Video 3:00.)  If the user taps on "MORE OPTIONS," the interface displays additional

information about Google's location services.  (ECF No. 81, at 51.)  This additional information

informs the user that WAA and GLA are enabled by default.  Although Location History is *not*

enabled by default, the user can opt into it from this screen by checking a box.

### ii.    <u>Through an App</u>

If a user does not enable Location History while setting up his or her Google account,

Google will also prompt the user to turn the service on as soon as he or she sets up an app "that

has [Location History]-powered features."  (ECF No. 110-1, at ¶ 5; *accord* ECF No. 96-1, at

¶¶ 3–6; ECF No. 201, at 221; ECF No. 202, at 8–9.)  Such apps include Google Maps, Google

Photos, and Google Assistant.  When a user opens one of these apps for the first time, the phone

immediately directs the user to a bright blue screen that reads:  "Get the most from Google

Maps."  (Opt-In Video 4:36.)  This screen informs the user that "Google needs to periodically

store [his or her] location to improve route recommendations, search suggestions, and more."

(Opt-In Video 4:36.)  Below that, the interface offers the user the option to "LEARN MORE."

(Opt-In Video 4:36.)  If the user taps "LEARN MORE," the page redirects to "[a]ll of [Google's]

12

**J.A. 1338**

terms and conditions"—but these terms and conditions include no information specifically tailored to location information.  (ECF No. 81, at 57.)

Back at the initial blue page, the user can either select "YES, I'M IN" or "SKIP."  (Opt-In Video 4:36.)  As of July 2018, once the user selects "YES, I'M IN," the interface redirects the user to another page that displays the following text:

**Location History**

Saves where you go with your devices ∨ [15]

This data may be saved and used in any Google service where you were signed in to give you more personalized experiences.  You can see your data, delete it and change your settings at account.google.com.

NO THANKS          TURN ON

(ECF No. 147, at ¶ 7 (bold in original).)   Next to "Location History:  Saves where you go with your devices," the interface includes an "expansion arrow," depicted in the above text with a downward-facing caret.  (ECF No. 147, at ¶ 8.)  If a user "tap[s] on [this] expansion arrow," the interface "present[s the user] with additional information about" Location History.  (ECF No. 147, at ¶ 8.)  The screen then reads:

---

[15] Although the testimony is unclear on the matter, prior to 2018, this line appears to have read:  "[C]reates a private map of where you go with your signed in devices."  (ECF No. 201, at 266.)  Google changed this language in response to European regulation.

**J.A. 1339**

**Location History**

Saves where you go with your devices

Location History saves where you go with your devices. To save this data, Google regularly obtains location data from your devices. This data is saved even when you aren't using a specific Google service, like Google Maps or Search.

If you use your device without an internet connection, your data may be saved to your account once you return online.

Not all Google services save this data to your account.

This data helps Google give you more personalized experiences across Google services, like a map of where you've been, tips about your commute, recommendations based on places you've visited, and useful ads, both on and off Google.

This data may be saved and used in any Google service where you were signed in to give you more personalized experiences. You can see your data, delete it and change your settings at account.google.com.

NO THANKS          TURN ON

(ECF No. 147, at ¶ 8 (bold in original).) If the user selects "TURN ON"—either in the original screen or this expanded version—Location History is enabled. (ECF No. 147, at ¶ 9.) Importantly, a user need not interface with or employ the expansion arrow to enable Location History. In other words, a user could activate the service without knowing any of the further details of the service as explained in the above expanded version.

As noted, Chatrie enabled Location History on his device on July 9, 2018 at 12:09 a.m. Eastern Standard Time, and he appears to have done so through Google Assistant.

**J.A. 1340**

### c.    "Pausing" and Trying to Delete Location History

After a user opts in, he or she has two mechanisms to manage Google's collection and retention of his or her Location History data: "pausing" the service, or deleting the information it collected.

### i.    Pausing

As Google Location History Product Manager Marlo McGriff explained, when a user "*pauses*" his or her Location History, it merely "halts the collection of future data;" *it does not delete* information Google has already obtained. (ECF No. 202, at 84.) And deleting an app through which the user enabled Location History will not pause the service.

A user may pause Location History on an Android device in one of three locations. First, the user can pause it "through the settings on any particular app that uses Location History." (ECF No. 202, at 63.) Second, he or she can pause it by navigating "through the device level settings." (ECF No. 202, at 63.) Finally, the user can log into myactivity.google.com and change his or her location settings. For each of these options, "a user [must] actively, intentionally navigate" through each interface. (ECF No. 202, at 64.)

When a user attempts to pause Location History, the device will present a pop-up screen containing text called the "pause copy." (Mar. 4–5 Hr'g Def. Ex. 27, at 23.) The pause copy warns users that pausing Location History will "limit[] functionality of some Google products over time, such as Google Maps and Google Now." (Mar. 4–5 Hr'g Def. Ex. 27, at 23; *accord* ECF No. 202, at 66.) Yet the record suggests that apps such as Google Assistant *will* continue to function with Location History paused. For instance, McInvaille noted that, despite prompts from Google to initiate Location History because apps like Google Assistant "depen[d] on these

settings in order to work correctly," the user does not "need Location History for [Google

Assistant] to work." (ECF. No. 201, at 111, 113.)

The pause copy also does not specifically detail how app functionality might be limited.

Nor does Google inform users of the fact that the app will, indeed, continue to function without

Location History enabled, either when setting up the application or when displaying the pause

copy. McGriff confirmed that when a user "pauses" the service, it halts only the collection of

future data, and it does not (if a user has opted in) pause other location services such as Web &

App Activity. (ECF No. 202, at 84, 90.)

### ii.    Trying to Delete

In 2018, when Chatrie enabled his Location History, a user had only one option to *delete*

his or her Location History:  by visiting myactivity.google.com and viewing his or her Timeline.

Through the Timeline, a user "can review, edit, or delete [his or] her [Location History data] at

will." (ECF No. 96-1, at ¶ 15.)  But in response to an article from the Associated Press

criticizing Google's acquisition of location data, one Google employee apparently remarked

through an email:  "The current [User Interface as of August 13, 2018] *feels* like it is designed

to make things *possible*, yet *difficult* enough that people won't figure . . . out" how to turn

Location History off.[16]  (Mar. 4–5 Hr'g Def. Ex. 30, at 6 (emphasis added).)  Whether the

substance of this remark is true or not, the sentiment it expresses is certainly not inconsistent

with the record before the Court.

---

[16] On May 11, 2018, two Senators launched an investigation into Google's acquisition of location data. During the March 4–5 Suppression Hearing, Chatrie tried to suggest that this investigation—in conjunction with a critical article from news website Quartz—*caused* Google to issue an update to its privacy policy on May 25, 2018. Google's expert McGriff testified credibly, however, that the investigation and policy changes were unrelated, because "there[ was] no way Google updated its privacy policy in two weeks." (ECF No. 201, at 259.)

**J.A. 1342**

The effort to clarify this interface obviously is ongoing at Google.[17]  In May 2019, McGriff formally heralded the "autodelete" controls that made it easier for users to manage their data. (*See* Mar. 4–5 Hr'g Def. Ex. 46.)  And in December of 2019, McGriff introduced, on behalf of Google, "Incognito mode" and "Bulk delete in Timeline." (*See* Mar. 4–5 Hr'g Def. Ex. 47.)

### d.    Google's Process in Answering a Geofence Warrant

Geofence warrants represent "a novel but rapidly growing [investigatory] technique." (ECF No. 59-1, at 8.)  When law enforcement seeks a geofence warrant from Google, it (1) identifies a geographic area (also known as the "geofence," often a circle with a specified radius), (2) identifies a certain span of time, and (3) requests Location History data for all users who were within that area during that time. (*See* ECF No. 96-2, at ¶ 4.)  The requested time windows for these warrants "might span a few minutes or a few hours." (ECF No. 96-2, at ¶ 4.)

In recent years, the number of geofence warrants received by Google has increased exponentially.  Google received its first in 2016.  After that, Google "observed over a 1,500% increase in the number of geofence requests it received in 2018 compared to 2017; and the

---

[17] Since 2018, Google has added another feature to increase user control over Location History data.  It now allows a user to set an "auto delete function" that limits how long Location History information remains with Google. (Mar. 4–5 Hr'g Def. Ex. 46, at 2.)  The auto delete function now enables a user to "[c]hoose a time limit" for how long he or she wants Google to save activity data and "any data older than that will be automatically deleted from [the] account on an ongoing basis." (Mar. 4–5 Hr'g Def. Ex. 46, at 2.)  McGriff testified that Google has also now developed a practice whereby Google sends monthly or annual emails about how to change settings.  Google has no record that these emails were ever sent to Chatrie.

Still, concern about the user interface seemed to persist over time.  Chatrie presented what purported to be emails from Google employees (garnered for other litigation) noting the confusing nature of various location products.  One, in April 2019, reads:  "Speaking as a user, WTF?  More specifically I **thought** I had location tracking turned off on my phone.  However the location toggle in the quick settings was on.  So our messaging around this is enough to confuse a privacy focused Google-[software engineer].  That's not good." (Mar. 4–5 Hr'g Def. Ex. 37, at 5).  The Norwegian report called this phenomenon "[d]eceptive click-flow." (Mar. 4–5 Hr'g Def. Ex. 27, at 27).

rate . . . increased over 500% from 2018 to 2019." (ECF No. 59-1, at 8.)  In 2019, Google received "around 9,000 total geofence requests."[18]  And Google now reports that geofence warrants comprise more than twenty-five percent of *all* warrants it receives in the United States. Google, *Supplemental Information on Geofence Warrants in the United States* (last visited Mar. 1, 2022), https://bit.ly/3o7Znqc.

Google began to take issue with certain early geofence warrants because the requests were too broad.  As related by Legal Investigations Specialist Rodriguez, the warrants "sought [Location History] data that would identify *all* Google users who were in a geographical area in a given time frame." (ECF No. 96-2, at ¶ 5 (emphasis added).)  Thus, in 2018, Google held both internal discussions with its counsel and external discussions with law enforcement agencies, including the Computer Crime and Intellectual Property Section of the United States Department of Justice ("CCIPS"), to develop internal procedures on how to respond to geofence warrants. "To ensure privacy protections for Google users, . . . Google instituted a policy of objecting to any warrant that failed to include de[-]identification and narrowing measures." (ECF No. 96-2, at ¶ 5.)  Seemingly developed as a result of Google's collaboration with CCIPS, this de-identification and narrowing "protocol typically . . . entails a three-step process." (ECF No. 96-2, at ¶ 5; *see* ECF No. 202, at 553.)  As noted earlier, the Court draws its understanding of this process from an amalgam of in-person testimony and a declaration submitted by current Google Tooling and Programs Lead and former Legal Specialist Sarah Rodriguez.

---

[18] To clarify, a geofence *request* is not identical to a geofence *warrant*.  "[I]n some cases, law enforcement is[ not] aware that [it] need[s] to submit a warrant" to obtain Location History. (ECF No. 202, at 173.)  Google still considers this communication from law enforcement a "geofence request," even when not accompanied by a warrant. (ECF No. 202, at 173.)

18

**J.A. 1344**

i.    **Step 1**

*First*, at Step 1, law enforcement receives a warrant "compelling Google to disclose a *de-identified* list of all Google user[s]" whose Location History data indicates were within the geofence during a specified timeframe. (ECF No. 96-2, at ¶ 6 (emphasis added).) In response to the warrant, Google must "search . . . *all* [Location History] data to identify users" whose devices were present within the geofence during the defined timeframe. (ECF No. 96-2, at ¶ 7; ECF No. 96-1, at ¶ 23.) "Google does not know which users may have . . . saved [Location History] data before conducting th[is] search." (ECF No. 96-2, at ¶ 7.)

Rodriguez stated that, as part of this first step, Google provides the Government with responsive user records identified in the Sensorvault. Google deems a record "responsive" if a user's estimated location (*i.e.*, the stored coordinates of the phone in Location History) falls within the boundaries of the geofence. (ECF No. 96-1, at ¶ 25.) Rodriguez confirmed that, for every device whose "stored latitude/longitude coordinates fall within the radius described in the warrant," Google turns over a "'production version' of the [users'] data." (ECF No. 96-2, at ¶ 8.) This production version "includes a [de-identified] device number,[19] the latitude/longitude coordinates and timestamp of the stored [Location History] information, the map's [confidence

---

[19] When responding to geofence warrants, Google:

> de[-]identifies the data produced to the [G]overnment at this [first] step by removing the [user's distinct] Google Account ID . . . , leaving only a device number that is used only in the Location History database. This device number is only used for distinguishing devices reporting [Location History] to a user's account . . .

(ECF No. 96-2, at ¶ 9.) Unlike a Google Account ID, a Location History device number does not by itself identify which account is associated with certain location points. However, as discussed in Part II.A.6.b ("The Three Paths Video"), *infra*, piecing together an "anonymous" user's location data could reveal that user's identity.

**J.A. 1345**

interval], and the source of the stored [Location History]," (*i.e.*, "whether the location was generated via Wi-Fi, GPS, or a cell tower"). (ECF No. 96-2, at ¶ 8.)

According to Rodriguez, the sizes and timeframes of geofences "vary considerably from one request to another." (ECF No. 96-2, at ¶ 8.) Because Google produces *all* location points captured within the geofence over the timeframe, "[t]he volume of data produced at [Step 1] depends on the size and nature of the geographic area and length of time covered by the geofence request." (ECF No. 96-2, at ¶ 8.) Google does not impose specific, objective restraints on the size of the geofence, the length of the relevant timeframe, or the number of users for which it will produce data.

Indeed, Google places significant discretion on the LIS employee who initially reviews a particular geofence warrant. This "specialist" will first process and review the warrant. (ECF No. 202, at 178–79.) If the specialist believes the warrant "needs further review"—for example, if the geofence seems too large or the timeframe too long—he or she may first "engage with [the requesting] law enforcement officer to collect more information about the investigation." (ECF No. 202, at 179, 182.) From there, the specialist will "consult with [Google's] legal counsel." (ECF No. 202, at 179.) If Google's counsel objects to the warrant, Google may have a "conversation" with law enforcement to alleviate Google's concerns, or it may "require law enforcement to obtain an amended or a newly-issued warrant that addresses the issue." (ECF No. 202, at 187.) Assuming law enforcement eventually assuages Google's concerns with the warrant, Google then provides the Government with the de-identified geofence data.

### ii.    **Step 2**

*Second*, according to Rodriguez, at Step 2, the Government "reviews the de[-]identified [data] to determine the [Sensorvault] device numbers of interest." (ECF No. 96-1, at ¶ 10.) If

law enforcement needs "additional de[-]identified location information for a [certain] device" to "determine whether that device is actually relevant to the investigation," law enforcement, at this step, "can compel Google to provide additional . . . location coordinates *beyond* the time and geographic scope of the original request."[20]  (ECF No. 96-2, at ¶ 10 (emphasis added).)  These additional location points "can assist law enforcement in eliminating devices" from the investigation that were, for example, "not in the target location for enough time to be of interest, [or] were moving through the target location in a manner inconsistent with other evidence."[21] (ECF No. 96-2, at ¶ 11.)  Notably, Google imposes "no geographical limits" on this Step 2 data.  (ECF No. 202, at 184.)  Thus, if a user's location fell within the geofence at Step 1, law enforcement can obtain *all* location points for identified users over an expanded timeframe at Step 2.  This means that, at Step 2, no geographic barrier confines the information searched.

Google does, however, typically require law enforcement to narrow the number of users for which it requests Step 2 data so that the Government cannot not simply seek geographically unrestricted data for *all* users within the geofence.  Google has no firm policy as to precisely *when* a Step 2 request is sufficiently narrow.  But if law enforcement requests "a lower number of devices from St[ep] 1 to St[ep] 2," this, to some extent, demonstrates to Google that law enforcement has tailored the data it seeks.  (ECF No. 202, at 190.)  Again, assuming Google has no further objections to law enforcement's Step 2 request, Google provides law enforcement with de-identified but geographically unrestricted data.

---

[20] At Step 2, for law enforcement to expand the timeframe from which to obtain Location History data, Google generally requires that the warrant explicitly expand that timeframe *in the warrant's text*.  Otherwise, Google will object to that request.

[21] If law enforcement requests this additional data, it must typically do so within sixty days.

### iii.  **Step 3**

*Finally*, at Step 3, drawing from the de-identified data Google has produced so far, "the [G]overnment can compel Google . . . to provide *account-identifying information*" for the users "the [G]overnment determines are relevant to the investigation." (ECF No. 96-2, at ¶ 12 (emphasis added).)[22] This "account-identifying information" includes the name and email address associated with the account.  (ECF No. 96-2, at ¶ 12; ECF No. 202, at 192.)  Google seems to prefer that law enforcement request Step 3 data on fewer users than requested in Step 2, although it is "[p]ossibl[e]" that Google would approve a Step 3 request that is not narrowed after Step 2 at all.  (ECF No. 202, at 194.)

### 4.  **The Instant Geofence Warrant and Its Justifications**

#### a.  **Det. Hylton's Investigation**[23]

When Det. Hylton responded to the scene of the bank robbery on May 20, 2019, he "interviewed witnesses" and "reviewed surveillance camera video from . . . the Call Federal Credit Union Bank."  (ECF No. 202, at 330.)  Through this initial investigation, he "learned that [the] suspect had come from the southwestern corner of the Journey Christian Church [the 'Church'], . . . a building adjacent and to the east of the Call Federal Credit Union, at approximately 4:50 in the afternoon."  (ECF No. 202, at 330–31.)  He also learned of the core

---

[22] Law enforcement has sixty days from the time Google turns over Step 2 data to request Step 3 information.

[23] Although the subsequent warrants evaluated in a separate Opinion, explain officers' investigatory efforts to identify a suspect beyond reviewing security camera footage, the Geofence Warrant contains no information about those efforts.  Because the Geofence Warrant does not expressly incorporate these subsequent warrants—and indeed, it could not have because officers obtained them after drafting the Geofence Warrant—the Court will consider only the following facts in its analysis.  *See United States v. Hurwitz*, 459 F.3d 463, 470 (4th Cir. 2006) (requiring that a warrant either incorporate a supporting document by reference or attach the document to warrant itself in order for a court to read the document alongside the warrant).

22

**J.A. 1348**

facts that underlie this case—that the suspect walked into the Bank wearing a fisherman's hat and traffic vest, presented the teller with a note demanding $100,000, forced the manager at gunpoint to open the Bank's vault, took $195,000, and may have left in a blue Buick Lacrosse. Critically, through security footage, Det. Hylton observed that when the suspect first walked into Bank, he was "holding what appeared to be . . . a cell phone to the side of his face." (ECF No. 202, at 331.)   To Det. Hylton, this use of a phone suggested "that [the suspect] could have possibly been speaking with a coconspirator." (ECF No. 202, at 333.)

After Det. Hylton completed his on-site investigation, he pursued at least two other leads. First, a purportedly estranged romantic partner called the police and told them that she "kn[e]w who did th[e] robbery," and that the suspect was her "ex-boyfriend." (ECF No. 202, at 334.) Law enforcement found this ex-boyfriend, interviewed him, examined his cell phone, and ultimately determined that he was not the suspect.  Next, an employee at another branch of the Bank alerted the police about an individual who drove a blue Buick Lacrosse and wore a traffic vest.  Det. Hylton ultimately determined that this individual was likewise not the suspect.

Having unearthed no further leads from his investigation, Det. Hylton then turned to geofence technology.  He had sought three other geofence warrants in the past.  Before seeking those warrants, he had consulted with prosecutors, who approved them.  Magistrates—including one federal magistrate judge—approved all three as well.  Those warrants were, according to Det. Hylton, "mostly similar" to the one at bar. (ECF No. 202, at 328; *compare* Mar. 4–5 Hr'g Def. Ex. 18 ("Prior Federal Geofence Warrant") *and* Mar. 4–5 Hr'g Def. Ex. 19 ("Prior State Geofence Warrant") *with* ECF No. 54-1.)  Indeed, all but one adopted a roughly 150-meter radius, although a "few of them had more locations because [there were] more robberies to

**J.A. 1349**

investigate." (ECF No. 202, at 328; *see* Prior Federal Geofence Warrant; Prior State Geofence Warrant.)

On June 14, 2019, roughly three weeks after the robbery, Det. Hylton applied for and obtained the instant Geofence Warrant from Chesterfield County Magistrate David Bishop.

### b.    Magistrate Bishop

Chatrie contests the sufficiency of Magistrate Bishop's qualifications. Although the Court will address that issue more fully later in this Opinion, the Court briefly notes that Chesterfield County Magistrate "David Bishop graduated from Pensacola Christian College with a Bachelor's of Science in Criminal Justice in May 2016."[24] (ECF No. 156, at 1.) Around two years later, on June 12, 2018, the Executive Secretary of the Supreme Court of Virginia appointed Bishop as a magistrate. Magistrate Bishop completed his statutorily required probationary period on March 12, 2019. He was released for service on October 24, 2018.

Three months after Magistrate Bishop finished his probationary period, Det. Hylton presented Magistrate Bishop with the instant Geofence Warrant. When Magistrate Bishop reviewed the Warrant, he asked no questions of Det. Hylton, nor did he "seek to modify anything in the affidavit." (ECF No. 202, at 362.) Based on Det. Hylton's understanding, Magistrate Bishop simply "read [the Warrant] and signed it."[25] (ECF No. 202, at 362.) The record suggests that this was the first geofence warrant Magistrate Bishop had signed.

---

[24] The Virginia Code imposes one educational requirement on the Commonwealth's magistrates: they must possess a bachelor's degree "from an accredited institution of higher education." Va. Code § 19.2-37. The Code does not further define what qualifies as an "accredited institution" for the purpose of magistrates. Chatrie disputes whether Magistrate Bishop's alma mater, Pensacola Christian College, is sufficiently "accredited" under the Virginia Code. (ECF No. 135, at 6–9.) The Court will speak to this later in the Opinion.

[25] Det. Hylton did note, however, that because Magistrate Bishop did not read the Warrant in front of him, Magistrate Bishop "*could* have consulted with someone" about it. (ECF No. 202, at 362 (emphasis added).)

**J.A. 1350**

      c.     **The Instant Geofence Warrant**

The Warrant drew a geofence with a 150-meter radius—with a *diameter* of 300 meters, longer than three football fields—in an urban environment which included the Bank and the nearby Journey Christian Church.[26]  All told, the geofence encompassed 17.5 acres.  The eastern side of the geofence abutted but did not include Price Club Boulevard.  The southern side encompassed a wooded area behind the Bank.  The northern side encircled the Church's parking lot, and the western side captured a wooded area to the west of the Bank.  The Warrant included the following photograph of the area with the geofence superimposed over it:



_____

[26] Thus, the total area of the geofence is 70,686 square meters—about three and a half times the *footprint* of a New York city block.  Michael Kolomatsky, *How Big Is an Acre, Anyway?* N.Y. Times (July 26, 2018), https://nyti.ms/345CjS7.  Of course, this portion of suburban Richmond, Virginia does not have the density (or height) comparable to that of seven New York City blocks.

**J.A. 1351**

The Warrant sought location data for every device present within the geofence from 4:20 p.m. to 5:20 p.m. on the day of the robbery. In keeping with Google's established approach, the Geofence Warrant described a three-step process by which law enforcement would "attempt to narrow down" the list of users for which the Government would obtain the most invasive information. (ECF No. 54-1, at 4.)

At Step 1, "Google w[ould] provide 'anonymized information' regarding the Accounts that are associated with a device that was inside the described geographical area" from 4:20 p.m. to 5:20 p.m. (ECF No. 54-1, at 4.) At Step 2, "Law enforcement w[ould] return a list [of accounts] that they ha[d] attempted to narrow down." (ECF No. 54-1, at 4.) Google would then "produce contextual data points with points of travel outside of the geographical area." (ECF No. 54-1, at 4.) During Step 2, the warrant expanded the timeframe to include thirty minutes before and thirty minutes after the initial hour-long window, so that the Step 2 window was two hours long in total. (ECF No. 54-1, at 4.) Finally, at Step 3, after Government review, Google would "provide identifying account information/CSI[27] for the accounts requested" by law enforcement. (ECF No. 54-1, at 4–5.)

In explaining why "Google [should] provide Geo[f]encing data," Det. Hylton noted in the warrant's accompanying affidavit that:

---

[27] The warrant included in the definition of "identifying account information/CSI" the following:

> user name and subscriber information to include date of birth if available, account type and account number, email addresses associated with the account, electronic devices associated with the account and their identifying make, model and other identifying numbers, telephone numbers associated with the account including telephone numbers used to set up the account, verify the account or to receive assistance with the account, and Google Voice phones numbers associated with the account.

(ECF No. 54-1, at 4.)

> when people act in concert with one another to commit a crime, they frequently
> utilize cellular telephones and other such electronic devices, to communicate with
> each other through WiFi, Bluetooth, GPS, voice calls, text messages, social media
> accounts, applications, emails, and/or cell towers in the area of the [crime].

(ECF No. 54-1, at 6.)  Specifically, he noted that when reviewing the Bank's surveillance

footage, he observed that the perpetrator "had a cell phone in his right hand and appeared to be

speaking with someone on the device." (ECF No. 54-1, at 6.)  He further explained that:

> Google has . . . developed a proprietary operating system for mobile devices,
> including cellular phones, known as Android.  Nearly every cellular phone using
> the Android operating system has an associated Google account, and users are
> prompted to add a Google account when they first turn on a new Android device.
>
> Based on [his] training and experience, [he has learned] that Google collects and
> retains location data from Android-enabled mobile devices when a Google account
> user has enabled Google location services.  Google can also collect location data
> from non-Android devices if the device is registered to a Google account and the
> user has location services enabled.

ECF No. 54-1, at 7.)  Therefore, he explained, "the requested data/information would have been

captured by Google during the requested time." (ECF No. 54-1, at 6.)  Det. Hylton noted several

ways law enforcement could use this information.  For example, "location data . . . may tend to

identify potential witnesses and/or suspects." (ECF No. 54-1, at 7.)  In turn, this geographic and

timeline information may tend to "inculpat[e] or exculpate[e] persons of interest." (ECF No.

54-1, at 7.)

    Inexplicably, on June 19, 2019—*the day before he sent the Warrant to Google*—Det.

Hylton submitted his return for the Warrant to the Chesterfield County Circuit Court.  A search

warrant return "notifies the Court when [an officer] *execute[s]* a search warrant," and the officer

"report[s] back to the Court what items [he or she] gathered during the search." (ECF No. 202,

at 366–68 (emphasis added).)  In the return, he stated that he had executed the warrant on June

14, 2019.  Yet he had not yet sent the Warrant to Google.  Moreover, in describing the items

*already seized* under the Warrant—again, he had not yet executed it—Det. Hylton wrote for

what would be a sizable amount of precise location information on at least nineteen device users:

"Data." (Mar. 4–5 Hr'g Gov't Ex. 2, at 9; *see* ECF No. 202, at 367, 369); *see also United States*

*v. Williams*, 592 F.3d 511, 520 (4th Cir. 2010) ("While the [Fourth Amendment's] protection

cannot demand perfection, any tolerance of imperfection does not give officers free reign to

ransack and take what they like." (citation and quotation marks omitted)).

### 5.    Google Receives the Geofence Warrant

The next day, on June 20, 2019, Det. Hylton sent Google the Warrant that Magistrate

Bishop had approved.  Pursuant to Step 1, Google produced anonymized Location History data

for all accounts associated with phones present within the geofence from 4:20 p.m. to

5:20 p.m.—nineteen users in total.[28]  Associated with these nineteen users were 210 individual

location points, along with the confidence interval for each point.  In this case, law enforcement

ran this information through a program to produce a visual representation of the data.  *See* Part

II.A.6.a, *infra.*

A few days after Google provided him the Step 1 information, Det. Hylton emailed

Google.  The record then strongly suggests that he did not "attempt to narrow down" the list of

devices for which he requested further data.  In contravention to Google's policy, and without

consulting Magistrate Bishop, Det. Hylton requested "additional location data" (Step 2 data) *and*

"subscriber information" (Step 3 data) "for *all* 19 device numbers produced in [S]tep 1." (ECF

---

[28] Google provides this information in a table, sorted into seven columns: "Device ID,"
"Date," "Time," "Latitude," "Longitude," "Source," and "Maps [Confidence Interval]." (*See,*
*e.g.*, Mar. 4–5 Hr'g Def. Ex. 3, at 7.)  Google LIS Rodriguez testified that the Device ID is not an
identifier for "any other specific Google account." (ECF No. 202, at 176.)  It is not cross-
referenced by Google outside of Location History, but if an individual device were responsive to
two different geofence warrants, the ID would be the same in both.  Law enforcement does not
return this information to Google nor, in this case, did it return the data to the Chesterfield
County Court.

**J.A. 1354**

No. 48-1, at 1; *accord* ECF No. 96-2, at ¶ 15; ECF No. 202, at 195, 345.)  He noted that, because "the sought Google devices [were] fairly low in number," he requested Step 2 and 3 data for *all* nineteen users "in an effort to rule out possible co-conspirators."  (ECF No. 48-1, at 1; *see* ECF No. 202, at 195.)  He admitted, however, that "device numbers 1–9 may fit the more likely profile of [the] parties involved."  (ECF No. 48-1.)  Six days after sending the email, Det. Hylton called Google and left two voicemails seeking a response.

A Google specialist then called Det. Hylton.  As described by Rodriguez, the LIS "explained the issues" with Det. Hylton's request—namely, that the request "did not appear to follow the three sequential steps or the narrowing required by the search warrant."  (ECF No. 96-2, at ¶ 16; *see* Mar. 4–5 Hr'g Tr. 189, 197.)  "Det. Hylton asked . . . what information would be produced in [S]tep 2 and . . . [S]tep 3."  (ECF No. 96-2, at ¶ 16.)  The Google specialist explained the nature of the data to be turned over during these steps and emphasized to Det. Hylton "the importance of [S]tep 2 in narrowing."  (ECF No. 96-2, at ¶ 16; *see* ECF No. 202, at 197.)  The specialist, however, does not appear to have provided Det. Hylton with any "specific directive[s] . . . about how much [Det. Hylton] had to narrow" his request.  (ECF No. 202, at 197.)  On July 9, 2019, Det. Hylton emailed Google, requesting Step 2 data on the *nine* users identified in his prior email.  Google then provided him that information in the same format as Step 1 data had been returned.  It does not appear that Det. Hylton explained to Google precisely why he requested Step 2 data for these nine particular accounts.  Neither Det. Hylton nor Google consulted with a magistrate or judge before Google disclosed this data.

"On or about July 10, 2019, and July 11, 2019, Google received emails from [Det.] Hylton requesting [Step 3] information . . . on [three] device numbers."  (ECF No. 96-2, at ¶ 19.)  Google provided him with this information—"the account subscriber information associated with

the 3 device numbers"—on July 11.  (ECF No. 96-2, at ¶ 20.)  Again, it is not apparent from the record whether Det. Hylton demonstrated to Google why he requested Step 3 data for these three accounts, nor did he seek the magistrate's approval before obtaining the data.

Finally, "[o]n or about July 12, 2019," Det. Hylton emailed Google "requesting *additional* device or phone number information that could be associated with one of the accounts" for which Google had produced Step 3 data.  (ECF No. 96-2, at ¶ 21 (emphasis added).)  This would have been an unauthorized Step 4.  A Legal Investigations Specialist called Det. Hylton, that day and told him that "no further information was produced under" the Geofence Warrant.  (ECF No. 96-2, at ¶ 21.)

### 6.    Data Derived from the Warrant

#### a.    Law Enforcement's Demonstrative

Upon receipt of the geofence data, law enforcement "imported [the Step 1 information] into mapping software" so that law enforcement could visualize the data points.  (Mar. 4–5 Hr'g Gov. Ex. 1, at 15.)  That program rendered the following depiction:



**J.A. 1356**

The visualization, created by Agent D'Errico, plots each point's confidence interval—the area in which Google is 68 percent confident a given individual is located—with a blue shaded circle.

Here, the largest confidence interval for a user located within the geofence had a radius of roughly 387 meters (longer than four football fields)—more than twice as large as the original geofence.[29] Thus, the Geofence Warrant *could* have captured the location of someone who was hundreds of feet outside the geofence. Within this confidence interval—in addition to the Bank and the Church—are several buildings (with an unknown number of floors), including a Ruby Tuesday restaurant, a Hampton Inn Hotel, several units of the Genito Glen apartment complex, a self-storage business, a senior living facility, two busy streets (Hull Street and Price Club Boulevard), and what appear to be several residences near the southeast edge of the confidence interval. Near the time of the robbery, the individual whose account produced this large confidence interval could have been present at any of these locations instead of within the geofence.

Indeed, given that Google returns locations via these estimated location points, both McInvaille and D'Errico confirmed geofences can return both false positives (someone who is not in the geofence reported as being there) and false negatives (someone in the geofence not

---

[29] The Court acknowledges that as a matter of fact, it is unlikely that this user would have been located far outside the geofence. As FBI Agent D'Errico testified during the March 4–5 Suppression Hearing, this user first reported a location point within the geofence with a confidence interval of around 84 meters. The next location point, reported only thirty seconds later, was the point with the 387-meter confidence interval—but the user's reported location was in exactly the same spot as the prior point. It is thus unlikely that the user would have traveled from an area in or near the geofence to a location significantly outside of it within thirty seconds. FBI Agent D'Errico did note, however, that these location points were "indicative . . . that the device [was] moving," and that "for some reason, . . . a new center coordinate was not obtained by that phone." (ECF No. 202, at 255.) Nevertheless, the notion that geofences *can* capture information from users who are not even in the vicinity of the relevant area troubles the Court and evinces how broad a sweep these warrants may have.

J.A. 1357

reported).  Chatrie created a video based on the returns of this geofence warrant suggesting that a false positive was returned here.

**b.**     **The Three Paths Video**

Chatrie's video depicting the movement of three phones was based on the data obtained through the Warrant at Step 2.  At the March 4–5 Suppression Hearing, Chatrie introduced a video that plotted the locations of three anonymous individuals whose location data Google turned over at Step 2— "Mr. Blue," "Mr. Green," and "Ms. Yellow."  (ECF No. 201, at 63, 67; *see* Mar. 4–5 Hr'g Def. Ex. 5 ("Three Paths Video").)

At the beginning of the two-hour, geographically unlimited, window for which the Government requested Step 2 location data, a cluster of location points for Mr. Blue appeared at a nearby apartment complex.  At 4:34 p.m., Mr. Blue seemed to leave the apartment complex, and at 4:35 p.m., Mr. Blue's location estimate appeared inside the geofence, roughly seventeen minutes before the robbery occurred.  However, at 4:36 p.m.—twenty-seven seconds later—Mr. Blue appeared outside the geofence on Price Club Boulevard, and by 4:37 p.m., Mr. Blue appeared to be driving down Hull Street.  Mr. Blue then drove south and stopped at another residence—clustering location data for five minutes—and eventually drove back toward the original apartment complex, where he remained for the rest of the two-hour window.  Because Mr. Blue appeared within the geofence for such a brief period of time—and because he appeared within the fence just as he appeared to drive on a nearby street—Defense Expert McInvaille testified that Mr. Blue may have been a "false positive"—he may not have actually stepped foot within the geofence.  (ECF No. 201, at 43–44, 65.)

Mr. Green's location points initially clustered at a hospital for a period of about thirty-five minutes.  Eventually, Mr. Green drove south along Old Courthouse Road, ultimately

appearing inside the geofence at 4:41 p.m.  Around two minutes later—and nine minutes before the robbery—Mr. Green's estimated location appeared in a residential neighborhood, clustering around one home for the remainder of the two-hour window.

Finally, Ms. Yellow clustered location points at a house from 3:51 p.m. to 4:11 p.m.  At 4:18 p.m., she clustered several points near a school, and by 4:26 p.m., she appeared to drive toward the Bank.  At 4:31 p.m., she first appeared in the geofence, her location estimate surfacing inside the Bank.  She reported two more location points inside the Bank, and by 4:36—eighteen minutes before the robbery—appeared to be driving away from the Bank.  She drove south, arrived at the house from which she started, and remained there for the rest of the two-hour window.

Defense Expert McInvaille testified that he was able to access publicly available information such as tax records related to the homes in which Mr. Blue, Mr. Green, and Ms. Yellow appeared to spend significant time.  He explained that these records, in conjunction with other publicly available information such as social media accounts, would have allowed him to determine these individuals' likely identities with only a few data points.  Law enforcement would, of course, have similar or enhanced research capabilities to identify users based on these "de-identified" location points.

* * *

Ultimately, the Step 3 information law enforcement obtained led the authorities to Chatrie.

### B.    <u>Procedural History</u>

On September 17, 2019, a grand jury indicted Chatrie on two counts:  (1) Forced Accompaniment During Armed Credit Union Robbery, in violation of 18 U.S.C. §§ 2113(a), (d),

**J.A. 1359**

and (e); and, (2) Using, Carrying, or Brandishing a Firearm During and in Relation to a Crime of

Violence, in violation of 18 U.S.C. § 924(c)(1)(A). The police issued a warrant, and a magistrate

judge signed a Petition and Order for Writ of Habeas Corpus ad Prosequendum ordering that

Chatrie, then an inmate at Riverside Regional Jail, appear in the United States District Court for

the Eastern District of Virginia to answer for the charges.

On October 1, 2019, Chatrie appeared before the magistrate judge and waived his right to

a detention hearing. The magistrate judge ordered Chatrie detained pending trial. On that same

day, Chatrie appeared for an arraignment and pleaded not guilty to the charged offenses.

On October 29, 2019, Chatrie filed the instant Geofence Motion to Suppress. (ECF

No. 29.) The United States responded, (ECF No. 41), and Chatrie replied, (ECF No. 48). On

December 23, 2019, the Court granted Google leave to file an amicus brief. (ECF No. 73.) In

response to Chatrie's Federal Rule of Civil Procedure 17(c) subpoenas, Google also filed a total

of four declarations by two Google employees: three by Marlo McGriff, and (2) one by Sarah

Rodriguez. (ECF Nos. 96-1, 96-2, 110-1,[30] 147.)

On November 9, 2020, around one week before the scheduled Suppression Hearing,

Google filed a Motion for Leave to Present Remote Testimony. On November 11, 2020, Chatrie

responded in opposition. In this response, Chatrie argued that "[i]n person testimony from the

Google employees [was] critical to the Court's resolution of Mr. Chatrie's geofence warrant,"

and that "Google's continued intrusion into this case warrants a finding from this Court that the

---

[30] On June 17, 2020, Google sought leave to file a Supplemental Declaration of Marlo McGriff (the "Motion for Leave"). The Court granted the Motion for Leave over Chatrie's objection. Given the close proximity in time, the Court continued the then-scheduled July 2, 2020 geofence hearing. The Court found that "the ends of justice [were] best served by granting a short continuance" because "the Geofence Motion to Suppress presents substantial issues of first impression that require the Court to consider a full and accurate record concerning the technology at issue." (ECF No. 115, at 4.) The Court continued the hearing to November 17, 2020.

34

**J.A. 1360**

Google witnesses are hostile/adverse witnesses." (ECF No. 166, at 1, 6.) After the Court held a status conference on the Motion for Leave to Present Remote Testimony, Chatrie filed a Motion to Continue the November 17, 2020 hearing, seeking to continue the hearing to a time when Google would be able to attend in person. On December 18, 2020, the Court granted Chatrie's Motion to Continue and scheduled the Suppression Hearing for March 4, 2021.

Considering the novel and complex questions of law at issue, the Court allowed the parties to provide supplemental briefing on discovery provided by Google and the March 4–5, 2021 Suppression Hearing. Among others, witnesses from Google—McGriff and Rodriguez—provided the Court with a relatively exhaustive picture of Google's typical response to geofence warrants. Now, after careful consideration of the issues and with the aid of the parties' thorough briefing, the Court concludes that, although this warrant is invalid for lack of particularized probable cause, the Court cannot suppress the resulting evidence because the *Leon* good faith exception applies.

### III. Analysis

Chatrie seeks to suppress evidence obtained from the June 14, 2019 Geofence Warrant that covered 70,686 square meters of land around the Bank, located in a busy part of the Richmond metro area. Despite the Court's concerns about the validity of this warrant and the adoption of unsupervised geofence warrants more broadly, the Court will deny Chatrie's Motion to Suppress because the officers sought the warrant in good faith.

### A.    The Court Will Briefly Address Fourth Amendment Standing

Because the Court will independently deny Chatrie's motion to suppress by considering the validity of the Geofence Warrant, the Court "need not wade into the murky waters of standing," *i.e.*, whether Chatrie has a reasonable expectation of privacy in the data sought by the

warrant. *United States v. James*, No. 18cr216, 2018 WL 6566000, at *4 (D. Minn. Nov. 26, 2018); *see Byrd v. United States*, 138 S. Ct. 1518, 1530 (2018) (Fourth Amendment standing "is not a jurisdictional question and hence need not be addressed before addressing other aspects of the merits of a Fourth Amendment claim.").

Nonetheless, the Court notes its deep concern (underlying both Fourth Amendment standing, and the third-party doctrine discussed below) that current Fourth Amendment doctrine may be materially lagging behind technological innovations. As Fourth Amendment law develops in a slow drip, "technology [continues to] enhance[] the Government's capacity to encroach upon areas normally guarded from inquisitive eyes." *Carpenter v. United States*, 138 S. Ct. 2206, 2214 (2018). Relevant here, although *law enforcement* limited the warrant's window to two hours, Google—despite efforts to constrain law enforcement access to its data—retains constant, near-exact location information for each user who opts in. *See* Part II.A.3.a, *supra*. The Government thus has an almost unlimited pool from which to seek location data, and "'[w]hoever the suspect turns out to be,' they have 'effectively been tailed'" since they enabled Location History. *Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 341 (4th Cir. 2021) (en banc) (quoting *Carpenter*, 138 S. Ct. at 2218).

Indeed, the "'retrospective quality of [geofence] data' enables police to 'retrace a person's whereabouts,'" and "[p]olice need not even know in advance whether they want to follow a particular individual, or when." *Id.* at 342 (quoting *Carpenter*, 138 S. Ct. at 2218). Until recently, the ease with which law enforcement might access such precise and essentially real-time location data was unimaginable. And it is this expansive, detailed, and retrospective nature of Google location data that is unlike, for example, surveillance footage, and that perhaps

36

**J.A. 1362**

causes such data to "cross[] the line from merely augmenting [law enforcement's investigative capabilities] to impermissibly enhancing" them. *Id.* at 341.

What is more, the Court is disturbed that individuals other than criminal defendants caught within expansive geofences may have no functional way to assert their own privacy rights. Consider, for example, a geofence encompassing a bank, a church, a nearby residence, and a hotel. Ordinarily, a criminal perpetrator would not have a reasonable expectation of privacy in his or her activities within or outside the publicly accessible bank. *See United States v. Knotts*, 460 U.S. 276, 281 (1983) ("A person travelling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another."). He or she thus may not be able to establish Fourth Amendment standing to challenge a time-limited acquisition of his location data at the bank.

But the individual in his or her residence likely *would* have a heightened expectation of privacy. *Silverman v. United States*, 365 U.S. 505, 511 (1961) ("At the very core [of the Fourth Amendment] stands the right of a [person] to retreat into his [or her] own home and there be free form unreasonable government intrusion."). Yet because that individual would not have been alerted that law enforcement obtained his or her private location information, and because the criminal defendant could not assert that individual's privacy rights in his or her criminal case, *United States v. Rumley*, 588 F.3d 202, 206 n.2 (4th Cir. 2009), that innocent individual would seemingly have no realistic method to assert his or her own privacy rights tangled within the warrant. Geofence warrants thus present the marked potential to implicate a "right without a remedy." *Hawkins v. Barney's Lessee*, 30 U.S. 457, 463 (1831) ("There can be no right without a remedy to secure it.").

**J.A. 1363**

As this Court sees it, analysis of geofences does not fit neatly within the Supreme Court's existing "reasonable expectation of privacy" doctrine as it relates to technology. That run of cases primarily deals with *deep*, but perhaps not *wide*, intrusions into privacy. *See, e.g.*, *Kyllo v. United States*, 533 U.S. 27, 34 (2001) (considering the validity of using thermal imaging on one's home); *United States v. Jones*, 565 U.S. 400, 402–03 (2012) (construing "the attachment of a [GPS] tracking device to an individual's vehicle" for twenty-eight days); *Carpenter*, 138 S. Ct. at 2217 n.3 (considering whether "accessing seven days of [an individual's cell site location information] constitutes a Fourth Amendment search").

At base, these matters are best left to legislatures. *See* Zach Whittaker, *A Bill to Ban Geofence and Keyword Search Warrants in New York Gains Traction*, TechCrunch (Jan. 13, 2022), https://tcrn.ch/35mLHkP (discussing a recently introduced New York bill that would ban the use of geofence warrants statewide). This case has arisen because no extant legislation prevents Google or its competitors from collecting and using this vast amount of data. And, as discussed below, despite its ongoing efforts to improve, Google appears to do so under the guise of consent few people understand how to disable. Even with consent, it seems clear that most Google users do not know how the consent flow to control their collection of data works, nor do they know Google is logging their location 240 times a day. It is not within this Court's purview to decide such issues, but it urges legislative action. Thoughtful legislation could not only protect the privacy of citizens, but also could relieve companies of the burden to police law enforcement requests for the data they lawfully have.

### B. Because the Government Lacked Particularized Probable Cause as to Every Google User in the Geofence, the Warrant Violates the Fourth Amendment

At base, this particular Geofence Warrant is invalid. The Fourth Circuit has clearly articulated that warrants, like this one, that authorize the search of every person within a

38

**J.A. 1364**

particular area must establish probable cause to search every one of those persons. Here, however, the warrant lacked any semblance of such particularized probable cause to search each of its nineteen targets, and the magistrate thus lacked a substantial basis to conclude that the requisite probable cause existed. And to the extent the Government would argue that Steps 2 and 3 cure the warrant's defects as to probable cause, such an argument is unavailing here. The Government itself contends that law enforcement demonstrated probable cause to obtain *all* the data sought without any narrowing measures (*i.e.*, de-anonymized and geographically unlimited data from everyone within the geofence). In any event, Steps 2 and 3—undertaken with no judicial review whatsoever—improperly provided law enforcement and Google with unbridled discretion to decide which accounts will be subject to further intrusions. These steps therefore cannot buttress the rest of the warrant, as they fail independently under the Fourth Amendment's particularity prong.

### 1.   Legal Standard:  The Warrant Requirement

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. Stated another way, the Fourth Amendment requires that a warrant (1) be supported by probable cause; (2) particularly describe the place to be searched and the things to be seized; and, (3) be issued by a neutral, disinterested magistrate.[31] *Dalia v. United States*, 441 U.S. 238, 255 (1979) (internal quotations and citations omitted). If a warrant is invalid, the proper remedy in a criminal action is "ordinarily" to suppress the evidence derived from it. *United States v. Thomas*, 908 F.3d 68, 72 (4th Cir. 2018).

---

[31] Because this third prong intersects with the Court's good faith analysis, the Court discusses it more fully in Part III.C.2, *infra*.

J.A. 1365

a.   **Probable Cause**

Whether probable cause for a search exists is a "practical, common-sense" question, asking whether "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). It requires only "the kind of fair probability on which reasonable and prudent people, not legal technicians," would rely. *United States v. Jones*, 952 F.3d 153, 158 (4th Cir. 2020) (citing *Florida v. Harris*, 568 U.S. 237, 244 (2013)). Officers must present sufficient information to the magistrate judge[32] to allow him or her to exercise independent judgment. *Gates*, 462 U.S. at 239. The magistrate cannot simply ratify the bare conclusions of others. *Id.* "When reviewing the probable cause supporting a warrant, a reviewing court must consider only the information presented to the magistrate who issued the warrant." *United States v. Wilhelm*, 80 F.3d 116, 118 (4th Cir. 1996) (citations omitted). "[T]he duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed." *United States v. Hodge*, 354 F.3d 305, 309 (4th Cir. 2004).

More specifically, a warrant must be "no broader than the probable cause on which it is based." *United States v. Hurwitz*, 459 F.3d 463, 473 (4th Cir. 2006) (quoting *United States v. Zimmerman*, 277 F.3d 426, 432 (3d Cir. 2002)). Indeed, the United States Court of Appeals for the Fourth Circuit has established that warrants that authorize the search of "all persons on [a] premise[s]" must show probable cause "to believe that *all* persons on the premises at the time of the search are involved in the criminal activity." *Owens ex rel. Owens v. Lott*, 372 F.3d 267, 276 (4th Cir. 2004) (emphasis added) (second alteration in original), *overturned on other grounds by Pearson v. Callahan*, 129 S. Ct. 808 (2009). In other words, these warrants must demonstrate

---

[32] In the federal system, the magistrates who review and sign search warrants are judges who must have law degrees. This is not necessarily the case in state judicial systems.

"good reason to suspect or believe that anyone present at the anticipated scene will probably be a participant in the criminal activity." *Owens*, 372 F.3d at 276 (internal quotation marks omitted).

At base, probable cause demands that law enforcement possess "a reasonable ground for belief of guilt . . . *particularized* with respect to the person to be searched or seized." *Maryland v. Pringle*, 124 S. Ct. 795, 800 (2003) (emphasis added); *see Ybarra v. Illinois*, 444 U.S. 85, 91 (1979) ("Where the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person.") A "person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person." *Ybarra*, 444 U.S. at 91.

### b.   **Particularity**

A warrant must also be sufficiently "particular[]." *Hurwitz*, 459 F.3d at 470. Thus, a warrant must "confine the executing [officers'] discretion by allowing them to seize only evidence of a particular crime." *United States v. Cobb*, 970 F.3d 319, 328 (4th Cir. 2020), as amended (Aug. 17, 2020) (quoting *United States v. Fawole*, 785 F.2d 1141, 1144 (4th Cir. 1986)). The warrant must therefore "identif[y] the items to be seized by their relation to designated crimes," and the "description of the items [must] leave[] nothing to the discretion of the officer executing the warrant." *United States v. Williams*, 592 F.3d 511, 519 (4th Cir. 2010) (citation omitted). "So long as the warrant describes the items to be seized with enough specificity that the executing officer is able to distinguish between those items which are to be seized and those that are not . . . the particularity standard is met." *United States v. Blakeney*, 949 F.3d 851, 862 (4th Cir. 2020) (internal citations and quotations omitted).[33]

---

[33] The Framers included the particularity requirement to "end the practice, abhorred by the colonists, of issuing general warrants," which authorized officers to carry out an "exploratory rummaging in a person's belongings." *United States v. Dargan*, 738 F.3d 643, 647 (4th Cir. 2013) (internal citation and quotations omitted). Such "general warrants" placed "the liberty of

41

**J.A. 1367**

2. **The Geofence Warrant Fails to Establish Particularized Probable Cause to Search Every Google User Within the Geofence**

Although cloaked by the complexities of novel technology, when stripped of those complexities, this *particular* Geofence Warrant lacks sufficient probable cause.[34] The United States Supreme Court has explained that warrants must establish probable cause that is "particularized with respect to the person to be searched or seized." *Pringle*, 124 S. Ct. at 800. This warrant did no such thing. It first sought location information for *all* Google account owners who entered the geofence over the span of an hour.[35] For those Google accounts, the warrant further sought "contextual data points with points of travel outside of the" Geofence for yet another hour—and those data points retained *no* geographical restriction. (ECF No. 54-1, at 4.) Astoundingly, the Government claims that law enforcement established probable cause to obtain *all* information (Steps 1, 2, and 3) from *all* users within the geofence without any

---

every [person] in the hands of every petty officer" and were therefore denounced as "the worst instrument of arbitrary power." *Stanford v. Texas*, 379 U.S. 476, 481 (1965).

[34] In considering whether the Geofence Warrant is valid, the Court assumes for the sake of analysis that the Government's collection of data here is a "search." *See In re Search of Information Stored at Premises Controlled by Google*, 481 F. Supp. 3d at 736 (noting that by obtaining a warrant and arguing for the validity of that warrant, "the [G]overnment is treating its proposed capture of information as a search"). Indeed, this is the position Google advances in its amicus brief.

[35] To be clear, the Court sees individuals from whose accounts the Government obtained data as functional subjects of the search, even though the warrant authorized officers to obtain data only from Google's servers. In the same way that users' devices generate IP address information and typically share that information with a third party, so too do users' phones generate Location History data and share that information with Google. *See, e.g., United States v. Broy*, 209 F. Supp. 3d 1045, 1053 (C.D. Ill. 2016) (treating the defendant's IP address as if it is were defendant's property that he disclosed to a third party).

In other words, regardless of which entity's files the Government looked through, the users ultimately retain at least some joint interest in the location data their phones generate. As discussed in Part III.B.4, *infra*, however, because the Court ultimately finds that Det. Hylton acted in good faith, whether these individuals have an expectation of *privacy* in that data must be decided another day. *Cf., e.g., Broy*, 209 F. Supp. 3d at 1053 (finding no reasonable expectation of privacy because the defendant disclosed his IP address to a third party).

42

**J.A. 1368**

narrowing measures.[36]   Yet the warrant simply did not include any facts to establish probable

cause to collect such broad and intrusive data from each one of these individuals.

Law enforcement attempted to justify the warrant by claiming that such a sweeping

search "may [have] tend[ed] to identify potential witnesses and/or suspects." (ECF No. 54-1,

at 7.)  Even if this Court were to assume that a warrant would be justified on the grounds that a

search would yield *witnesses* (some of whom had already been interviewed) instead of

perpetrators, the Geofence Warrant is completely devoid of any suggestion that all—or even a

substantial number of—the individuals searched had participated in or witnessed the crime.  *Cf.*

*Owens*, 372 F.3d at 276.  To be sure, a fair probability may have existed that the Geofence

Warrant would generate the *suspect's* location information.[37]  However, the warrant, on its face,

also swept in unrestricted location data for private citizens who had no reason to incur

Government scrutiny.

Indeed, it is difficult to overstate the breadth of this warrant, particularly in light of the

narrowness of the Government's probable cause showing.  Law enforcement knew only that the

perpetrator "had a cell phone in his right hand and appeared to be speaking with someone on the

device." (ECF No. 54-1, at 6.)  After the police failed to located the suspect via reviewing

camera footage, speaking with witnesses, and pursuing two leads, law enforcement simply drew

---

[36] Instead, it appears that law enforcement implemented narrowing measures in this
Warrant at the behest of Google.  (*See* ECF No. 202, at 275–76 (discussing "go bys," template
documents that outline "specific information that [Google] need[s] in order to process the search
warrant").)

[37] For instance, Det. Hylton stated in his affidavit that:  (1) surveillance tapes revealed
that the suspect used a phone; (2) in the officer's "training and experience, when people act in
concert . . . they frequently utilize cellular telephones;" (3) Google "provides electronic
communication services to subscribers, including email services;" (4) Google "has also
developed a proprietary operating system for mobile devices, including cellular phones, known
as Android;" and, (5) studies show that "91% of American adults own a cellular phone with 56%
being smartphones." (ECF No. 54-1, at 6–7.)

J.A. 1369

a circle with a 150-meter radius that encompassed the Bank, the entirety of the Church, and the Church's parking lot.[38]  The Government then requested location information for *every device* within that area.  *See Carpenter*, 138 S. Ct. 2206, 2216 (2018) (describing cell phone location information as "encyclopedic").

What is more, in one instance, this Geofence Warrant captured location data for a user who may not have been *remotely* close enough to the Bank to participate in or witness the robbery.  Because the radius of one of the users' confidence intervals stretched to around 387 meters, the Geofence Warrant might have reported that user's location data to the Government, notwithstanding the fact that he may have simply been present in any number of nearby locations.  For example, that person may have been dining inside the Ruby Tuesday restaurant nearby.  The person may have been staying at the Hampton Inn Hotel, just north of the Bank.  Or, he or she could have been inside his or her own home in the Genito Glen apartment complex or the nearby senior living facility.  He or she may have been moving furniture into the nearby self-storage business.  Indeed, the person may have been simply driving along Hull Street or Price Club Boulevard.  Yet the Government obtained the person's location data just the same.  The Government claims that footage depicting the perpetrator holding a phone to his ear—and nothing else—justified this sweeping warrant.  That, however, is simply not "[]reasonable."  U.S. Const. amend. IV.

To further underscore the breadth of this search, Chatrie's expert Spencer McInvaille pointed out a likely "false positive" from the warrant—"Mr. Blue."  McInvaille testified that this

---

[38] The Government has made passing references to "several [additional] pieces of evidence" that might have guided the contours of the Geofence Warrant.  (*E.g.*, ECF No. 202, at 272.)  But neither the warrant nor its supporting affidavit referred to this evidence.  It is therefore irrelevant to the validity of the warrant.  *See Groh v. Ramirez*, 540 U.S. 551, 557–58 (2004) (declining to consider material contained in a warrant's *application* where the warrant did not incorporate the application by reference).

"false positive" individual may not have ever stepped within the geofence—he may have simply

driven "outside of the original geofence" on a nearby road, but could have nonetheless appeared

"as if [he] were inside the geofence." (ECF No. 201, at 43–44, 65.) Because Google's location

estimate for that person could have been "incorrect," Google may have *thought* the person had

stepped foot in the target area. (ECF No. 201, at 43–44.) The Government therefore obtained

two hours of unrestricted location data for an individual who perhaps had only driven within the

outer vicinity of the crime scene.[39]

This Geofence Warrant therefore suffers from the same probable cause defect as that at

issue in *In re Search of Information Stored at Premises Controlled by Google*, 481 F. Supp. 3d

730 (N.D. Ill. 2020). In that case, the Government sought "to erect three geofences." *Id.* 732.

Two encompassed the same location during different timeframes, and the other captured a

second location. *Id.* Each geofence lasted for forty-five minutes. *Id.* The court remarked that

"the proposed warrant would admittedly capture the device IDs . . . for all who entered the

geofences, which surround locations as to which there is no reason to believe that anyone – other

than the Unknown Subject – entering those locations is involved in the subject offense or in any

other crime." *Id.* at 752. There, just as here, the warrant provided the Government "unlimited

---

[39] The fact that data points obtained during Steps 1 and 2 are anonymized when Google reports them does not completely quell this Court's concerns about the invasiveness of this warrant. Even "anonymized" location data—from innocent people—can reveal astonishing glimpses into individuals' private lives when the Government collects data across even a one or two hour period. As noted above, during the March hearing, McInvaille identified three anonymous accounts captured within the geofence—"Mr. Blue," "Mr. Green," and "Ms. Yellow." (ECF No. 201, at 63–71.)

McInvaille testified that, using two hours of only "anonymized" data obtained through the warrant, he could observe each account's reported location, track each account to his or her home, and pinpoint each account's personal identity using publicly available resources even without any Step 3 information. *See* Herbert B. Dixon Jr., *Your Cell Phone is a Spy!*, Am. Bar Ass'n (July 29, 2020), https://bit.ly/3nRuCVq ("Although user data are anonymized, users' identities can nonetheless be determined by following their movements back to their homes and other places.").

**J.A. 1371**

discretion to obtain from Google the device IDs . . . of anyone whose Google-connected devices traversed the geofences (including their vaguely defined margins of error), based on nothing more than the 'propinquity' of these persons to the Unknown Subject at or near the time" of the criminal activity. *Id.* at 753. As that court (and the Supreme Court in *Ybarra*) recognized—and as this Court now concludes—the Fourth Amendment's probable cause requirement demands more than "mere propinquity" to a crime. *Id.* at 752; *Ybarra*, 444 U.S. at 91.

Despite the Government's reliance on *United States v. McLamb*, that case is inapposite. There, the Fourth Circuit upheld a warrant that allowed law enforcement to obtain identifying information of "any user entering a username and password into" an internet-based dark website where users could download or upload child pornography. *United States v. McLamb*, 880 F.3d 685, 689 (4th Cir. 2018). But there, a user's "mere propinquity" to the website *did* necessarily establish probable cause: any user visiting the site likely participated in the criminal conduct of viewing or sharing child pornography. *Id.* Here, on the other hand, a Google user's proximity to the bank robbery does not necessarily suggest that the user participated in the crime. *McLamb* therefore does not inform this case.[40]

Nor does the Government's reliance on *United States v. James* persuade. The *James* court considered a warrant to collect cell tower information (so-called "tower dumps") to determine whether "a particular cellular phone number (ostensibly held by the robber) could be identified during the timeframes of each of the respective robberies." 2018 WL 6566000, at *1.

---

[40] But one can readily imagine other instances when one's "mere propinquity" to a location, as in *McLamb*, likely *would* provide probable cause to obtain location data for each individual within a geofence. This would *not* necessarily involve improper use of location data. For example, the FBI appears to have employed geofence technology to locate participants in the January 6 Capitol riots. Mark Harris, *How a Secret Google Geofence Warrant Helped Catch the Capitol Riot Mob*, Wired (Sept. 30, 2021), https://bit.ly/3HktvWU. In that situation, one's presence within the Capitol *would* perhaps, by itself, provide probable cause that an individual was present without permission and was therefore committing a crime.

J.A. 1372

Law enforcement sought the cell tower data based on the notion that a cell phone number present

at the location and time of all six robberies created sufficient probable cause that the number

belonged to the robber. *Id.* Ultimately, the court concluded that "there was a fair probability that

data from the cellular towers" would contain identifying information about the perpetrator and

that therefore the warrants sufficed to allege probable cause. *Id.* at *4. As another court has

noted however, *James* did not account for whether probable cause existed to search through the

*other* individuals' location information. *In re Search of Information Stored at Premises

Controlled by Google*, 481 F. Supp. 3d at 751; *see also id.* at 752 (distinguishing another tower

dump decision from the geofence context because the court discussing the tower dump "stopped

the analysis once the court found probable cause in the 'nexus' between the offense and *all* the

requested cell phone records, without analyzing whether probable cause existed to obtain all of

those records." (quoting *In re Search of Cellular Telephone Towers*, 945 F. Supp. 2d 769 (S.D.

Tex. 2013)). *James* therefore stopped short of considering whether "particularized" probable

cause existed, and it is precisely that lack of narrowly-tailored probable cause that is fatal to this

Geofence Warrant.[41]

The Court cautions that it declines to consider today whether a geofence warrant may

*ever* satisfy the Fourth Amendment's strictures. *See In re Search Warrant Application for*

---

[41] Throughout this litigation, the parties—and Google—drew or resisted analogies to tower dumps. As explained above, however, the lead tower dump cases like *James* do not persuade this Court. Those decisions either decide that individuals' proximity to certain towers *alone* creates probable cause to search them, or altogether neglect to consider such particularity concerns. *James*, 2018 WL 6566000, at *4; *see also United States v. James*, 3 F.4th 1102, 1106 (8th Cir. 2021) (affirming the district court's adoption of the magistrate judge's original opinion on the same grounds). Indeed, the Eighth Circuit in *James* expressly warned that in holding valid the warrants at issue—which connected a robber to a *series* of crimes—was *not* holding "that it is now fair game to search the records from 'cell phone towers near the location of *every* crime.'" *Id.* at 1106. The Court similarly concludes here that the commission of a single crime—by itself, and with no narrowing measures or guardrails—is not sufficient to search geofence records "near the location of *every* crime." *Id.*

**J.A. 1373**

*Geofence Location Data Stored at Google Concerning an Arson Investigation*, 497 F. Supp. 3d 345, 361–62 (N.D. Ill. 2020) ("[I]t is nearly impossible to pinpoint a search where only the perpetrator's privacy interests are implicated."). Consider, for example, one of the few other federal court opinions to address a geofence warrant—*In re Search of Information That Is Stored at the Premises Controlled by Google LLC*, No. 21sc3217, 2021 WL 6196136 (D.D.C. Dec. 30, 2021) [hereinafter "DDC Opinion"]. There, law enforcement devised a two-step process to narrow the list of individuals whose data they would obtain. *Id.* at *5–6. At Step 1, Google would identify all accounts who entered the geofence within the relevant time periods. *Id.* For each of these accounts, Google would turn over only anonymized data. *Id.*

The Government would then review that data, identify likely suspects based on the "mov[ement]" of the users' devices through the geofence, and, crucially, identify to the *court* the devices the Government believed belonged to the perpetrator. *Id.* The *court* could then, at its discretion, order Google to disclose to the Government personally identifying information for devices that belonged to likely suspects. *Id.* In essence, to obtain a warrant authorizing disclosure of de-anonymized data, the Government was required to demonstrate that location data for a *particular* user or set of users would provide evidence of the crime. And crucially, the warrant left ultimate discretion as to which users' information to disclose to the reviewing court, not to Google or law enforcement.

In certain situations, then, law enforcement likely *could* develop initial probable cause to acquire from Google *only* anonymous data from devices within a narrowly circumscribed geofence at Step 1. *See Hurwitz*, 459 F.3d at 473 (a warrant must be "no broader than the probable cause on which it is based"). From there, officers likely could use that narrow, anonymous information to develop probable cause particularized to specific users. Importantly,

officers likely could then present that particularized information to a magistrate or magistrate judge to acquire successively broader and more invasive information. Although the *instant* warrant is invalid, where law enforcement establishes such narrow, particularized probable cause through a series of steps with a court's authorization in between, a geofence warrant may be constitutional.[42]

At bottom however, particularized probable cause "cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another or to search the premises where the person may happen to be." *Ybarra*, 444 U.S. at 91. The Court finds unpersuasive the United States' inverted probable cause argument—that law enforcement may seek information based on probable cause that some unknown person committed an offense, and therefore search every person present nearby. In essence, the Government's argument rests on precisely the same "mere propinquity to others" rationale the Supreme Court has already rejected as an appropriate basis for a warrant. *Id.* This warrant therefore cannot stand.

---

[42] The warrant in the DDC Opinion differed in additional ways. For instance, that warrant appears to have sought only location data that fell *within* the geofence across time periods notably shorter than the geofence at bar. *See* DDC Op. at *12 ("[T]he geofence only provides cell phone user's whereabouts in a single area for a handful of minutes on the days in question, not the sum-total of their daily movements."). Here, by contrast, the Government sought two hours of location data *not* bound within the geofence. *Cf.* DDC Op. *12 ("[T]he warrant does not seek location data for days or even hours to track the whereabouts of the perpetrators, but rather location data that is tailored and specific to the time of the [alleged crimes] only." (second alteration in original) (quotation marks and citation omitted)).

In addition to restricting officers' discretion when selecting which accounts for which to obtain personally identifying information, limiting the pool of data returned to only location points *within* the geofence helps assuage this Court's concerns with respect to particularized probable cause, and, more broadly, concerns that broad swaths of anonymous data can be used to pinpoint numerous individuals' identities.

49

**J.A. 1375**

### 3. This Geofence Warrant's Three-Step Process Does Not Cure Its Defects

To the extent the Government would attempt to argue in the alternative that this warrant's three-step process cures any defects with the warrant's particularized probable cause, such an argument is unavailing.[43]  Even if this narrowing process cured any of the warrant's shortcomings as to particularized probable cause, this process cannot independently buttress the warrant for an entirely separate reason:  clear lack of particularity.  Warrants must "particularly describ[e] the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.  In other words, "[a] warrant that meets the particularity requirement leaves the executing officer with no discretion as what to seize." *In re Search of Information Stored at Premises Controlled by Google*, 481 F. Supp. 3d 730, 754 (N.D. Ill. 2020) (citing *Stanford v. Texas*, 379 U.S. 476, 485 (1965)).  But Steps 2 and 3 of this warrant leave the executing officer with *unbridled* discretion and lack any semblance of objective criteria to guide how officers would narrow the lists of users.

This warrant, for instance, contains no language objectively identifying *which* accounts for which officers would obtain further identifying information.  Nor does the warrant provide objective guardrails by which officers could *determine* which accounts would be subject to further scrutiny.  Nor does the warrant even simply limit the *number* of devices for which agents could obtain identifying information.  Instead, the warrant provided law enforcement unchecked discretion to seize more intrusive and personal data with each round of requests—without ever needing to return to a neutral and detached magistrate for approval.

---

[43] The Court recognizes that the Government primarily argues that it possessed probable cause to obtain *all* data sought regardless of the three-step process.

50

**J.A. 1376**

The facts here underscore the breadth of discretion law enforcement possessed under this warrant.[44] After receiving anonymized information on the nineteen targeted users at Step 1, Det. Hylton requested the additional location information (Step 2) and subscriber information (Step 3) "for all 19 device numbers produced in [S]tep 1." (ECF No. 96-2, at ¶ 15.) In response, a Google specialist "called Detective Hylton and explained the issues in the Detective's email as the request did not appear to follow the three sequential steps or the narrowing required by the search warrant."[45] (ECF No. 96-2, at ¶ 16.) During that call, "[t]he LIS specialist also explained the importance of [S]tep 2 in narrowing." (ECF No. 96-2, at ¶ 16.) Det. Hylton eventually narrowed his requests. Yet he did not specify to Google why he was choosing these particular users.

*Google's* insistence on narrowing the list does not render this warrant sufficiently particular. For one thing, this warrant's clear text does not specifically allow Google to limit the group of accounts that would be subject to further scrutiny. (*See* ECF No. 54-1, at 4–5 (noting only that Google "shall produce" further information).) But even if it did, Fourth Amendment discretion must be confined to the signing magistrate, not the executing officers or a third party. *United States v. Chadwick*, 433 U.S. 1, 9 (1977) ("The judicial warrant has a significant role to play in that it provides the detached scrutiny of a neutral magistrate . . . ."), *abrogated on other*

---

[44] The facts also raise a concern about how even good faith effort by law enforcement can impinge upon constitutional boundaries through a lack of understanding as to what this warrant actually produces and how it does so. While all performed in good faith—especially given this novel and complex process—Det. Hylton returned the warrant before it was served, improperly requested Step 2 and 3 information simultaneously, failed at first to narrow his request at Step 2, and incorrectly tried to add a Step 4 to the process. While the Google LIS allowed only what was permitted under the warrant (which Det. Hylton did not resist), Fourth Amendment protections should not be left in the hands of a private actor.

[45] Det. Hylton received this remonstration despite having executed three geofence warrants prior to this one.

**J.A. 1377**

*grounds by California v. Acevedo*, 500 U.S. 565 (1991). Stated plainly, Steps 2 and 3 "put[] no

limit on the [G]overnment's discretion to select the device IDs from which it may then derive

identifying subscriber information from among the anonymized list of Google-connected devices

that traversed the geofences." *In re Search of Information Stored at Premises Controlled by*

*Google*, 481 F. Supp. 3d at 754. These Steps accordingly fail to provide the executing officer

with clear standards from which he or she could "reasonably . . . ascertain and identify . . . the

place to be searched [or] the items to be seized." *Blakeney*, 949 F.3d at 861. The Government

therefore cannot rely on Steps 2 and 3 to supply this warrant with particularized probable cause,

as these steps independently fail under the Fourth Amendment's particularity requirement.

### 4.    The Third-Party Doctrine

Lastly, the Court simply cannot determine whether Chatrie "voluntarily" agreed to

disclose his Location History data based on this murky, indeterminate record. But the Court

expresses its skepticism about the application of the third-party doctrine to geofence technology.

Under this doctrine, "a person [generally] has no legitimate expectation of privacy in information

he [or she] voluntarily turns over to third parties." *Smith v. Maryland*, 442 U.S. 735, 743–44

(1979). However, in *Carpenter v. United States*, the Supreme Court refined this principle and

held than an individual *does* possess an expectation of privacy in seven days of cell-site location

information collected by a wireless carrier. 138 S. Ct. at 2217 & n.3. Here, the Government

argues that Chatrie cannot claim a reasonable expectation of privacy in his Location History data

because (1) he "voluntarily disclosed" the information to Google; and, (2) the two hours of

location data sought here do not implicate the same privacy concerns as the seven days obtained

in *Carpenter*. (ECF No. 41, at 11; *see* ECF No. 41, at 9–13.)

**J.A. 1378**

The Court thinks otherwise. Common sense underscores Supreme Court Justice Sonia Sotomayor's observation in *United States v. Jones* about "voluntary" collection of electronic information unbeknownst to the subject of the warrant. As to the third-party doctrine, Justice Sotomayor observed that:

> it may be necessary to reconsider the premise that an individual has no reasonable expectation of privacy in information voluntarily disclosed to third parties [because] [t]his approach is ill suited to the digital age. . . . I for one doubt that people would accept without complaint the warrantless disclosure to the government of a list of every Web site they had visited in the last week, or month, or year.

*Jones*, 565 U.S. at 417–18 (Sotomayor, J., concurring). At base, the topic is complex. And considering the messiness of the current record as to how and when Chatrie "gave consent," the Court cannot—and need not—reach a firm decision on the issue. But the Court remains unconvinced that the third-party doctrine would render hollow Chatrie's expectation of privacy in his data, even for "just" two hours. Google Location History information—perhaps even more so than the cell-site location information at issue in *Carpenter*—is "detailed, encyclopedic, and effortlessly compiled." *Carpenter*, 138 S. Ct. at 2216; *see id.* at 2219 ("There is a world of difference between the limited types of personal information addressed in *Smith* and *Miller* and the exhaustive chronicle of location information casually collected by wireless carriers today."). Although, unlike in *Carpenter*, Chatrie apparently took some affirmative steps to enable location history, those steps likely do not constitute a full assumption of the attendant risk of permanently disclosing one's whereabouts during almost every minute of every hour of every day.

This is especially so given the limited and partially hidden warnings provided by Google. In the Google Assistant set-up process, the device likely provided Chatrie a single pop-up screen informing him that "[t]his data may be saved and used in any Google service where [he was] signed in to give [him] more personalized experiences," and that he "can see [his] data, delete it

53

**J.A. 1379**

and change [his] settings at account.google.com." (ECF No. 147, at ¶ 7; *see* ECF No. 96-1, at ¶ 7; ECF No. 201, at 102; ECF No. 202, at 21.) However, the consent flow did not detail, for example, how frequently Google would record Chatrie's location (every two to six minutes); the amount of data Location History collects (essentially *all* location information); that even if he "stopped" location tracking it was only "paused," meaning Google retained in its Sensorvault all his past movements; or, how precise Location History can be (*i.e.*, down to twenty or so meters).[46] (ECF No. 201, at 122, 136; ECF No. 202, at 71.)

While the Court recognizes that Google puts forth a consistent effort to ensure its users are informed about its use of their data, a user simply cannot forfeit the protections of the Fourth Amendment for years of precise location information by selecting "YES, I'M IN" at midnight while setting up Google Assistant, even if some text offered warning along the way. The record here makes plain that these "descriptive texts" are less than pellucid. Although the Court cannot reach a final decision on the issue today based on the current record here, Chatrie likely could not have, in a "meaningful sense, . . . voluntarily 'assumed the risk' of turning over a comprehensive dossier of his physical movements" to law enforcement. *Carpenter*, 138 S. Ct. at 2220 (quoting *Smith*, 442 U.S. at 745); *see id.* at 2217 ("A person does not surrender all Fourth Amendment protection by venturing into the public sphere.").

---

[46] As Google's expert Marlo McGriff testified, Location History also allows Google to estimate a device's *elevation*. Thus, if New York City law enforcement obtained a geofence warrant with a roughly 150-meter radius (similar in size to the one at issue here) that encircled the Empire State Building, even if it were not fully precise, the police might be able to obtain location data for many thousands of people.

**C.    Because Det. Hylton Consulted with Government Attorneys in the Face of Novel Technology and Obtained Similar Warrants in the Past, and Because the Warrant Was Not Otherwise "So Facially Deficient," the Good-Faith Exception Applies**

Despite the warrant's defects, the Court ultimately cannot find that excluding the instant evidence would serve to deter future improper law enforcement conduct.  This is particularly so in light of rapidly advancing technology and lack of judicial guidance on this novel investigatory technique, and where, as here, prosecutors and magistrates approved three similar warrants.

**1.    Legal Standard**

The exclusionary rule "is neither 'a personal constitutional right' nor is it 'designed to redress the injury occasioned by an unconstitutional search.'"  *United States v. Manafort*, 323 F. Supp. 3d 795, 805 (E.D. Va. 2018) (quoting *Davis v. United States*, 564 U.S. 229, 236 (2011)).  Rather, the exclusionary rule "is a prudential doctrine created . . . to compel respect for" constitutional rights.  *Davis*, 564 U.S. at 236–37 (2011).  "[T]he exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence."  *McLamb*, 880 F.3d at 690 (internal quotation marks and citation omitted).  Where suppression would not produce deterrent benefits, the exclusionary rule does not apply.  *United States v. Leon*, 468 U.S. 897, 909 (1984).

For that reason, evidence obtained pursuant to a search warrant issued by a neutral magistrate need not be excluded if the officer's reliance on the warrant was "objectively reasonable."  *Id.* at 922–23.  Generally, the fact that a neutral magistrate has issued a warrant "suffices to establish" that a law enforcement officer has "acted in good faith in conducting the search."  *Id.* at 922.  Therefore, searches carried out pursuant to a warrant "rarely require any deep inquiry into reasonableness."  *Id.*

**J.A. 1381**

The Fourth Circuit has nonetheless set out four categories of cases in which the good-faith exception will not apply:

> (1) if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth; (2) if the issuing magistrate wholly abandoned his [or her] judicial role[;] . . . (3) if the affidavit supporting the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) if under the circumstances of the case the warrant is so facially deficient—*i.e.*, in failing to particularize the place to be searched or the things to be seized-that the executing officers cannot reasonably presume it to be valid.

*United States v. Doyle*, 650 F.3d 460, 467 (4th Cir. 2011) (internal quotation marks and citations omitted).  When considering a motion to suppress the fruits of a novel investigative technique, courts generally decline to hold a warrant "facially deficient where the legality of an investigative technique is unclear and law enforcement seeks advice from counsel before applying for the warrant." *McLamb*, 880 F.3d at 691.  Further, "consultation [with Government attorneys prior to seeking a warrant] is a relevant consideration in determining whether the warrant was facially deficient." *United States v. Matthews*, 12 F.4th 647, 657 (7th Cir. 2021).

### 2. Because Det. Hylton Relied on the Approval of Prior Warrants in the Face of Novel Technology, the Good-Faith Exception Applies

#### a. Det. Hylton

Despite the warrant failing under Fourth Amendment scrutiny, the *Leon* good faith exception shields the resulting evidence from suppression.  The warrant lacked particularized probable cause, but it was not "*so* lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Leon*, 468 U.S. at 923 (emphasis added).  This is particularly so because "the legality of [this] investigative technique [was] unclear," and Det. Hylton sought "advice from counsel before applying for the warrant." *McLamb*, 880 F.3d at 691.  When Det. Hylton applied for the Geofence Warrant, no court had yet ruled on the

legality of such a technique. And as this Court's preceding analysis demonstrates, the permissibility of geofence warrants is a complex topic, requiring a detailed, nuanced understanding and application of Fourth Amendment principles, which police officers are not and cannot be expected to possess. *See* Part III.B.2, *supra*.[47]

In the face of this legal uncertainty, Det. Hylton relied on his past experience seeking geofence warrants—he had sought three before applying for this one. Magistrates and prosecutors had approved all three. *See Matthews*, 12 F.4th at 656 (noting the "general principle that attorney involvement supports a finding of good faith"). Det. Hylton testified that these prior warrants were "mostly similar" to the one at bar—all but one incorporated a roughly 150-meter radius, although a "few of them had more locations because of the more robberies to investigate." (ECF No. 202, at 328.) Even accounting for his miscues, in light of the complexities of this case, Det. Hylton's prior acquisition of three similar warrants, and his consultation with Government attorneys before obtaining those warrants, the Court cannot say that Det. Hylton's reliance on the instant warrant was objectively unreasonable. *See McLamb*, 880 F.3d at 691. While magistrate approval and consultation with the prosecution alone cannot and should not mechanically trigger the good-faith exception, exclusion here likely would not "meaningfully deter" improper law enforcement conduct. *Herring v. United States*, 555 U.S. 135, 144 (2009).[48]

---

[47] The Court therefore rejects Chatrie's argument that "one who had even a rudimentary understanding of the Fourth Amendment's particularity and breadth requirements" would know that this warrant was insufficient. (ECF No. 205, at 42.)

[48] This is particularly so because Det. Hylton's "consultation with [G]overnment attorneys [in the face of untested investigatory techniques] is precisely what *Leon*'s 'good faith' expects of law enforcement." *McLamb*, 880 F.3d at 691.

**J.A. 1383**

b.    **Magistrate Bishop**

Nor can this Court conclude that Magistrate Bishop wholly abandoned his role as a detached magistrate as Chatrie argues. *See Doyle*, 650 F.3d at 470. This exception to good faith primarily looks to whether the magistrate "overstep[ped] his [or her] judicial responsibilities and compromise[d] his judicial neutrality," *United States v. Gary*, 420 F. Supp. 2d 470, 486 (E.D. Va. 2006) (quoting *United States v. Servance*, 394 F.3d 222, 231 (4th Cir. 2005), *vacated on other grounds by Servance v. United States*, 544 U.S. 1047 (2005)), by, for example, actively participating in an investigation, *Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319, 327 (1979); retaining a pecuniary interest in issuing the warrant, *Connally v. Georgia*, 429 U.S. 245, 249–51 (1977) (per curiam); "rubber stamp[ing]" a warrant that contained a "bare bones" affidavit, *Wilhelm*, 80 F.3d at 121 (4th Cir. 1996); or, failing to make an independent assessment as to the validity of the warrant, *United States v. McKneely*, 810 F. Supp. 1537, 1547 (D. Utah 1993), *rev'd on other grounds by United States v. McKneely*, 6 F.3d 1447 (10th Cir. 1993).

Chatrie has, perhaps, shown that Magistrate Bishop *should have* considered the implications of the Warrant more carefully. But ultimately, he has "produced no evidence to show that the magistrate did not read the affidavit or that he read it so cursorily as to have wholly abandoned his neutral and detached role." *Gary*, 420 F. Supp. 2d at 487; (*see* ECF No. 202, at 361–62 (noting that the magistrate reviewed the warrant for around fifteen or thirty minutes).) Nor did he "suggest that the magistrate acted in a partisan manner or aligned himself with the police. Consequently, . . . the second [*Leon* exception] does not bar application of the good-faith exception." *Gary*, 420 F. Supp. 2d at 487. Chatrie further argues that "[t]he magistrate's utter lack of concern regarding the obvious flaws in the warrant constituted a complete abandonment of his role as . . . neutral arbiter." (ECF No. 205, at 41.) But the Fourth Circuit has instructed

58

**J.A. 1384**

that such "an allegation that a search warrant application contained grossly insufficient information is best analyzed under the third *Leon* exception." *United States v. Wellman*, 663 F.3d 224, 229 (4th Cir. 2011). And for the reasons explained above, that exception does not warrant suppression either.

Finally, the Court must address Chatrie's challenge to Magistrate Bishop's qualifications. Chatrie contends that Magistrate Bishop did not possess the requisite statutory qualifications to make the instant probable cause determination. The Court first observes that, in Virginia, any United States citizen who is a resident of the Commonwealth is eligible to be appointed as a magistrate with certain limitations not relevant here. Va. Code § 19.2-37. To qualify today, a magistrate need only have "a bachelor's degree from an accredited institution of higher education." Va. Code § 19.2-37(B). And "[a] person initially appointed as a magistrate prior to July 1, 2008, who continues in office without a break in service is *not* required to have a bachelor's degree from an accredited institution of higher education." Va. Code § 19.2-37(B) (emphasis added). No law degree is required. Indeed, "[n]o person appointed as a magistrate on or after July 1, 2008, *may* engage in the practice of law." Va. Code § 19.2-37(F) (emphasis added).

Magistrate Bishop graduated from Pensacola Christian College with a Bachelor of Science Degree in Criminal Justice in May of 2016. He was appointed as a Virginia magistrate roughly two years later in June 2018, began certification school in July 2018, and was formally appointed and "released for independent service on October 24, 2018." (ECF No. 156, at ¶ 3.) His nine-month probationary period pursuant to Virginia Code § 19.2-38 ended on March 12, 2019. In other words, Magistrate Bishop had been serving as a non-probationary magistrate just

**J.A. 1385**

*three months* before he signed this sweeping and powerfully intrusive Geofence Warrant on June 14. And he had graduated from college just three years earlier.

Chatrie does not rest on Magistrate Bishop's lack of a law degree. He instead avers that Magistrate Bishop's undergraduate degree was not sufficiently "accredited" under Virginia law. (ECF No. 135, at 6–9.) As noted, Pensacola Christian College does not appear to be officially licensed in Florida. (*See* Ex. B 24, ECF No. 135-2 ("Pensacola Christian College operates in the state of Florida as an independent institution of higher learning that is exempt from state commission oversight as per Florida statutes.").) Further, it does not appear to be accredited by a regional higher-education accrediting agency. *See, e.g.*, Southern Association of Colleges and Schools Commission on Colleges, *Accredited and Candidate List January 2022* (last visited Mar. 1, 2022), https://bit.ly/3cb3ICF. Yet the Transnational Association of Christian Colleges and Schools ("TRACS")[49] accredited the college in 2013. *Pensacola Christian College*, TRACS (last visited Mar. 1, 2022), https://bit.ly/3C22S5j.

Chatrie contends that the TRACS accreditation means little, as "[t]he most widely respected agencies are regional [accrediting] bodies," while "national accrediting agencies are significantly less prestigious." (ECF No. 135, at 7.) He points out that elsewhere, the Virginia Code and Virginia Administrative Code specify that certain professionals receive degrees accredited by specific agencies (typically distinguishing between regional and national entities), and that professionals with similar levels of expertise are typically required to obtain a degree from a regionally accredited school. *See* Va. Code § 54.1-4400; 18 Va. Admin. Code 115-40-22, 160-40-280. If the Court is to read anything into this, however, it is precisely the opposite

---

[49] TRACS is a national agency recognized by the Council for Higher Education Accreditation and the United States Department of Education. *CHEA- and USDE- Recognized Accrediting Organizations*, CHEA (last visited Mar. 1, 2022), https://bit.ly/3og0sLw.

conclusion from Chatrie's. The notion that Virginia lawmakers narrow the permissive group of accrediting agencies *elsewhere* merely signals that the lawmakers know how to limit the pool of accrediting bodies but chose not to do so here. *Cf. Alexis v. Barr*, 960 F.3d 722, 735 n.1 (5th Cir. 2020) (Dennis, J., dissenting) (noting that where a statute defined a term more specifically in one place but not the other, lawmakers had "intentionally omitted" that more specific definition in the other usage). Under Virginia Code § 19.2-37 then, Magistrate Bishop's degree likely suffices.

To the extent Chatrie also attacks Magistrate Bishop's decision because he "would have had, at most, only a few months of experience evaluating warrant applications on his own when he signed the geofence warrant," that argument cannot prevail given Virginia's statutory scheme. (ECF No. 135, at 9.) Virginia magistrates must complete a training program, pass a certification examination, and serve a nine-month probationary period before hearing cases without supervision. Va. Code § 19.2-38. Magistrate Bishop had done this, and he had been certified by the Commonwealth of Virginia's Office of Executive Secretary. As a general principle, "[s]tates are entitled to some flexibility and leeway in their designation of magistrates, so long as all are neutral and detached and capable of the probable-cause determination required of them." *Shadwick v. City of Tampa*, 407 U.S. 345, 354 (1972). In the ordinary course then, Virginia sufficiently trains its magistrates to determine probable cause.

Frankly, however, it is not clear to the Court that *any* person just three years out of college should be burdened with the responsibility of approving or rejecting a warrant of this complexity and magnitude. The Court certainly does not impute any bad faith or improper action by Magistrate Bishop (or the Commonwealth). This case has shown, however, the myriad ways that geofencing instigates a massive intrusion into individual rights, and it does so without

notice to potentially thousands of persons with phones within it. It seems less than evident that all law enforcement officers have a clear understanding of the invasive scope of these warrants either. Nor do most magistrates, with or without a law degree. Ultimately, it is for the General Assembly to review or change its magistrate practice given this new technology, and one hopes they would.

In any event, even if Magistrate Bishop's degree or lack of experience did not qualify him to make this consequential finding, the good faith exception would still apply. The Fourth Circuit recently concluded in *McLamb* that the good faith exception is not categorically inapplicable even if the instant "warrant . . . reache[s] beyond the boundaries of a magistrate judge's jurisdiction" where suppression would not "produce an appreciable deterrence on law enforcement." 880 F.3d at 691 (internal quotation marks omitted). The Court finds that suppression based on a technical defect of the magistrate's credentials would not serve to deter improper law enforcement conduct. In a typical investigation, officers simply cannot be required to consult a magistrate's resume before approaching that magistrate to obtain a warrant.

### IV. Conclusion

Despite the Court finding good faith here, the Court nonetheless strongly cautions that this exception may not carry the day in the future. This Court will not simply rubber stamp geofence warrants. If the Government is to continue to employ these warrants, it must take care to establish particularized probable cause. As the legal landscape confronts newly developed technology and further illuminates Fourth Amendment rights in the face of geofence practices, future geofence warrants may require additional efforts to seek court approval in between Steps, or to limit the geographic and temporal information sought. But in light of the complex legal issues that lead to this Court's conclusion, the Court cannot say that Det. Hylton's reliance on the

**J.A. 1388**

Geofence Warrant was objectively unreasonable. Accordingly, the *Leon* good faith exception applies, and the Court will deny Chatrie's motion to suppress evidence obtained as a result of the Geofence Warrant.

For the foregoing reasons, the Court will deny the Motion to Suppress. (ECF No. 29.) An appropriate Order shall issue.

Date: 3-3-2022
Richmond, Virginia

/s/
M. Hannah Lauck
United States District Judge

**J.A. 1389**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

UNITED STATES OF AMERICA

v.                                                  Criminal Case No. 3:19cr130

OKELLO T. CHATRIE,

Defendant.

## ORDER

For the reasons stated in the accompanying Memorandum Opinion, the Court DENIES

Chatrie's Motion to Suppress.  (ECF No. 29.)

It is SO ORDERED.

Date: 3-3-2022
Richmond, Virginia

/s/
M. Hannah Lauck
United States District Judge

**J.A. 1390**



IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | No. 3:19-CR-130 |
| | ) | |
| v. | ) | Count 1: 18 U.S.C. §§ 2113(a), (d), |
| | ) | (Credit Union Robbery) |
| OKELLO T. CHATRIE, | ) | |
| | ) | Count 2: 18 U.S.C. § 924(c)(1)(A) (Use, |
| Defendant. | ) | Carry, and Brandish a Firearm During and |
| | ) | in Relation to a Crime of Violence) |
| | ) | |
| | ) | Forfeiture Allegation |
| | ) | |

## CRIMINAL INFORMATION

### COUNT ONE
(Armed Credit Union Robbery)

On or about May 20, 2019, in the Eastern District of Virginia, the defendant, OKELLO

T. CHATRIE, by force, violence, and intimidation, did take from the person and presence of

another, namely J.W. and K.C., employees of the Call Federal Credit Union located at 3640 Call

Federal Drive, Midlothian, Virginia, 23112, approximately $195,000 in United States currency,

belonging to, and in the care, custody, control, management and possession of the Call Federal

Credit Union, the accounts of which were then insured by the National Credit Union

Administration Board, and in committing such offense, the defendant, OKELLO T. CHATRIE,

did put in jeopardy the life of another person by the use of a dangerous weapon, that is a firearm.

(In violation of Title 18, United States Code, Sections 2113(a) and 2113(d)).

### COUNT TWO
(Use, Carry, and Brandish a Firearm During and in Relation to a Crime of Violence)

On or about May 20, 2019, in the Eastern District of Virginia, the defendant, OKELLO

T. CHATRIE, did knowingly and unlawfully use, carry, and brandish a firearm during and in

**J.A. 1391**

relation to a crime of violence for which he may be prosecuted in a court of the United States, that is, armed credit union robbery, as charged in Count One of this Information, which is re-alleged as if fully set forth here.

(In violation of Title 18, United States Code, Sections 924(c)(1)(A)(i) and (ii)).

### FORFEITURE ALLEGATION

Pursuant to Federal Rule of Criminal Procedure 32.2, the defendant, OKELLO T. CHATRIE, is notified that if convicted of Count One of this Indictment, the defendant shall forfeit to the United States, any property, real or personal, which constitutes or is derived from proceeds traceable to such violation.

This property includes, but is not limited to:

A sum of money of at least $196,932.01, which represents the total proceeds of the offense charged, to be partially offset by $102,293 seized from 1317 Willis Street, Richmond, Virginia 23224 on August 13, 2019.

If the property subject to forfeiture cannot be located, the United States will seek an order forfeiting substitute assets.

The defendant is further notified that upon conviction of the offenses alleged in Count One or Count Two of this Indictment, the defendant shall forfeit any firearms and ammunition involved in or used in any knowing violation of such offenses.

Property subject to forfeiture includes, but is not limited to:

A 9 mm Taurus G2C pistol, serial number TLW87541; and

all accompanying ammunition.

2

**J.A. 1392**

(In accordance with Title 18, United States Code, Sections 924(d) and 981(a)(1)(C) as incorporated by Title 28, United States Code, Section 2461(c)).


JESSICA D. ABER
United States Attorney


By:

Kenneth R. Simon, Jr.
Peter S. Duffey
Assistant United States Attorneys

**J.A. 1393**

USCA4 Appeal: 22-4489    Doc: 19-6        Filed: 01/20/2023      Pg: 76 of 138
Case 3:19-cr-00130-MHL    Document 247    Filed 10/04/22   Page 1 of 34 PageID# 3600

1

```
1              IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF VIRGINIA
2                      RICHMOND DIVISION

3

    _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
4                                     )
                                      )
5   UNITED STATES OF AMERICA          )
                                      )
6   v.                                )   Criminal No.
                                      )   3:19CR130
7   OKELLO T. CHATRIE                 )
                                      )   May 9, 2022
8   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ )

9

10

11        COMPLETE TRANSCRIPT OF GUILTY PLEA
         BEFORE THE HONORABLE M. HANNAH LAUCK
12            UNITED STATES DISTRICT JUDGE

13

14

15

16  APPEARANCES:

17  Kenneth R. Simon, Jr., Assistant U.S. Attorney
    Office of the U.S. Attorney
18  SunTrust Building
    919 East Main Street, Suite 1900
19  Richmond, Virginia  23219

20          Counsel for the United States

21  Laura J. Koenig, Assistant Federal Public Defender
    Office of the Federal Public Defender
22  701 E. Broad Street, Suite 3600
    Richmond, Virginia  23219

23
            Counsel for the Defendant
24
              DIANE J. DAFFRON, RPR
25            OFFICIAL COURT REPORTER
           UNITED STATES DISTRICT COURT
```

**J.A. 1394**

```
 1              (The proceedings in this matter commenced at

 2    2:36 p.m.)

 3              THE CLERK:  Case No. 3:19CR130, United States

 4    of America versus Okello T. Chatrie.

 5              Mr. Kenneth R. Simon, Jr. and Mr. Peter S.

 6    Duffey represent the United States.  Ms. Laura J.

 7    Koenig represents the defendant.

 8              Are counsel ready to proceed?

 9              MR. SIMON:  The United States is ready, Your

10    Honor.

11              MS. KOENIG:  Defense is ready, Your Honor.

12              Good afternoon.

13              THE COURT:  Can you announce the case,

14    please.

15              MR. SIMON:  Good afternoon, Judge.

16              THE COURT:  Good afternoon.

17              MR. SIMON:  We are here for the plea

18    agreement and plea hearing of the defendant in

19    relation to a two-count criminal information charging

20    the defendant in Count One with armed credit union

21    robbery in violation of Title 18, United States Code,

22    Sections 2113(a) and (d).  And in Count Two, he's

23    charged with carrying and brandishing a firearm during

24    and in relation to that crime of violence in Count

25    One.
```

USCA4 Appeal: 22-4489    Doc: 19-6    Filed: 01/20/2023    Pg: 78 of 138
Case 3:19-cr-00130-MHL   Document 247   Filed 10/04/22   Page 3 of 34 PageID# 3602

3

1    There is a waiver of indictment in this case,

2    a signed plea agreement, a statement of facts, as well

3    as a consent order of forfeiture.

4    THE COURT:  Can you please just put the

5    maximum possible penalties on the record?

6    MR. SIMON:  Yes, Judge.  And with respect to

7    Count One, the maximum penalty for that offense is 25

8    years' imprisonment, a $250,000 fine, a $100 special

9    assessment, and a supervised release term of three

10   years' imprisonment.

11   For Count Two, a mandatory minimum of seven

12   years' imprisonment, a maximum term of life, a

13   $250,000 fine, a supervised release term of five

14   years, and a $100 special assessment.

15   THE COURT:  All right.  Are you prepared to

16   proceed?

17   MS. KOENIG:  We are, Your Honor.

18   THE COURT:  All right.  Why don't you both

19   approach.

20   All right.  Mr. Chatrie, I'm going to ask you

21   a series of questions to make sure you understand the

22   nature and the consequences of this plea.  I'm going

23   to ask you these questions under oath.  If you were to

24   be untruthful in response to anything I ask, you could

25   be subject to different or additional penalties,

USCA4 Appeal: 22-4489    Doc: 19-6    Filed: 01/20/2023    Pg: 79 of 138
Case 3:19-cr-00130-MHL   Document 247   Filed 10/04/22   Page 4 of 34 PageID# 3603

4

1  including perjury.  Do you understand?

2          THE DEFENDANT:  Yes, ma'am.

3          THE COURT:  All right.  So we're going to

4  place you under oath.

5          (Sworn by the Clerk.)

6          THE COURT:  All right.  So, Mr. Chatrie, the

7  first thing I want to go over with you is the fact

8  that you have a right to go forward by way of

9  indictment, not the criminal information that's in

10  front of the Court.  That would require a separate

11  finding of probable cause by a grand jury.

12          I understand you know that right, and you're

13  waiving it, and have signed a document to that effect

14  today.  Is that true?

15          THE DEFENDANT:  Yes, ma'am.

16          THE COURT:  And did you have plenty of time

17  to speak to your counsel with respect to that issue?

18          THE WITNESS:  Yes, ma'am.

19          THE COURT:  And, Ms. Koenig, you had

20  sufficient time to advise as to that?

21          MS. KOENIG:  I did, Your Honor.

22          THE COURT:  All right.  Now, sir, I want to

23  be sure you understand that at any time during this

24  plea hearing, you can speak with your attorney.  If

25  you don't understand the question that I'm asking,

USCA4 Appeal: 22-4489    Doc: 19-6    Filed: 01/20/2023    Pg: 80 of 138
Case 3:19-cr-00130-MHL    Document 247    Filed 10/04/22    Page 5 of 34 PageID# 3604

5

1    interrupt me and speak to her before you give me any

2    kind of answer.

3            I also want you to know that you may choose

4    to withdraw your guilty pleas at any time before I

5    accept them today.  Once I accept your guilty plea you

6    cannot withdraw them except for what's called a just

7    and fair reason.  And that's a very high and difficult

8    standard to meet under the law.  Do you understand

9    that?

10            THE DEFENDANT:  Yes, ma'am.

11            THE COURT:  All right.  Now, I need to start

12    by asking, are you the person named in the

13    information?  Are you correctly named?  Are you Okello

14    T. Chatrie?

15            THE DEFENDANT:  Yes, Your Honor.

16            THE COURT:  Have you drunk any alcohol or

17    taken any drugs, prescription or otherwise, in the

18    past 24 hours?

19            THE DEFENDANT:  No, ma'am.

20            THE COURT:  Have you ever been treated for

21    any mental or emotional disorder or addiction of any

22    kind?

23            THE DEFENDANT:  No, ma'am.

24            MS. KOENIG:  Your Honor, Mr. Chatrie is going

25    through counseling right now for PTSD, and there may

USCA4 Appeal: 22-4489    Doc: 19-6    Filed: 01/20/2023    Pg: 81 of 138
Case 3:19-cr-00130-MHL   Document 247   Filed 10/04/22   Page 6 of 34 PageID# 3605

6

1   be a diagnosis of complex trauma.  I can't remember

2   off the top of my head right now, but he is undergoing

3   counseling for that.  But that does not, in my

4   experience with Mr. Chatrie, impact his competency or

5   his ability to understand the plea or being able to

6   proceed today.

7            THE COURT:  All right.  So, Mr. Chatrie, one

8   thing I'm going to ask is for you please to speak into

9   the microphone.  It's the only way my court reporter

10  can hear you.

11           But I understand you are receiving some

12  counseling; is that true?

13           THE DEFENDANT:  Yes, ma'am.

14           THE COURT:  Is there anything about the

15  counseling or your need for counseling that would

16  affect your ability to understand what we're doing

17  today?

18           THE DEFENDANT:  No, ma'am.

19           THE COURT:  Is there anything that would make

20  you not be able to make a clear choice today?

21           THE DEFENDANT:  No, ma'am.

22           THE COURT:  I don't see that as I look at

23  you, and your lawyer has just said so, but I need to

24  follow-up.

25           All right, sir.  This is so thorough, I have

1   to ask you.  I know you can speak English because

2   we're doing it, but can you read and write the English

3   language?  These are all written documents.

4          THE DEFENDANT:  Yes, ma'am.

5          THE COURT:  All right.  How old are you, sir?

6          THE DEFENDANT:  Twenty-seven, Your Honor.

7          THE COURT:  Pardon me?

8          THE DEFENDANT:  I'm 27, Your Honor.

9          THE COURT:  Okay.  And how far have you gone

10   in school?

11          THE DEFENDANT:  Grade 11.

12          THE COURT:  All right.  I want to confirm

13   that you know the charges and the maximum possible

14   penalties.  The AUSA announced them in the criminal

15   information and the maximum possible penalties.

16        First, let me ask you, Ms. Koenig are, you in

17   agreement with what he put on the record?

18        MS. KOENIG:  Yes, Your Honor, maximum

19   sentence of 25 years on the armed robbery charge, and

20   a minimum sentence of seven years to a maximum of life

21   on the 924(c).

22          THE COURT:  All right.  The 924(c), does it

23   have to be consecutive?

24         MS. KOENIG:  It does, Your Honor.

25          THE COURT:  All right.  So, Mr. Chatrie, do

1    you understand what the AUSA said and what the maximum

2    possible penalties are?

3          THE DEFENDANT:  Yes, Your Honor.

4          THE COURT:  All right.  And you understand

5    that Count Two would have to be consecutive to

6    anything imposed as to Count One?

7          THE DEFENDANT:  Yes, Your Honor.

8          THE COURT:  Okay.  Now, I want to be sure

9    that you understand that these are felony pleas, and

10   that by pleading guilty to them you're giving up

11   valuable civil rights, and those include the right to

12   vote, or hold public office, or possess any kind of

13   firearm.  Do you understand that?

14         THE DEFENDANT:  Yes, Your Honor.

15         THE COURT:  And if there are any immigration

16   issues, it could involve removal or deportation and

17   affect your ability to come back into the United

18   States on a legal basis.  Do you understand that?

19         THE DEFENDANT:  Yes, Your Honor.

20         THE COURT:  All right.  Now, have you had a

21   sufficient opportunity to discuss the charges and the

22   sentencing possibilities with your attorney before you

23   came into this the courtroom today?

24         THE DEFENDANT:  Yes, Your Honor.

25         THE COURT:  Did you ask Ms. Koenig everything

**J.A. 1401**

1   about your case, including about the decision of

2   whether or not to plead guilty and any defenses that

3   you might have?

4           THE DEFENDANT:  I think I did, Your Honor.

5           THE COURT:  You think you did?

6           THE DEFENDANT:  Yeah.

7           THE COURT:  Well, I'm going to -- this is a

8   big day, so if you have any other questions, this is

9   the time to ask her, and I'll leave.  You don't have

10  to do it right here in front of me.

11          THE DEFENDANT:  I think I asked her enough,

12  you know, pertaining to --

13          THE COURT:  All right.

14          All right.  Ms. Koenig, are you comfortable

15  with the representation of him so far?

16          MS. KOENIG:  Yes, Your Honor.

17          THE COURT:  Do you think there's anything

18  else that Mr. Chatrie has to know before we go through

19  this process?

20          MS. KOENIG:  No, Your Honor.

21          THE COURT:  All right.

22          Have you discussed with your attorney,

23  Mr. Chatrie, how any sentence will be determined?

24  Have you talked about the sentencing guidelines?

25          THE DEFENDANT:  Yes, Your Honor.

 1            THE COURT:  And are you entirely satisfied

 2    with what your attorney has done for you?  Do you

 3    believe Ms. Koenig has done all she can so that you

 4    can make an informed decision in this matter?

 5            THE DEFENDANT:  I know she did, Your Honor.

 6            THE COURT:  Good.  I'm not surprised.

 7        Do you understand, though, that the decision

 8    of whether or not to plead guilty can only be yours?

 9    It can't be that of your attorney or of anybody else

10    that you know.

11            THE DEFENDANT:  Yes, Your Honor.

12            THE COURT:  All right.  Now, I need to go

13    through with you in great detail all the rights you're

14    waiving if I take your guilty plea.  And the most

15    obvious one is your absolute right to plead not guilty

16    and to demand the government prove its case.  And you

17    have a right to make the government prove its case

18    whether or not you think you're guilty.  Do you

19    understand that?

20            THE DEFENDANT:  Yes, Your Honor.

21            THE COURT:  And do you know that when you

22    plead guilty, you are admitting every element of the

23    offense and that you're admitting that the government

24    can prove them?  Do you understand that?

25            THE DEFENDANT:  Yes, ma'am.

1          THE COURT:  So the trial rights you'd be

2   waiving are these:

3          The right to see and hear all the evidence

4   against you; the right to confront and cross-examine

5   any witness; the right to the effective assistance of

6   counsel at all stages, so that would include a trial;

7   the right to use subpoenas to gather and present

8   evidence, and you'd have the right not to present

9   evidence.  You'd have the right to a speedy public

10  trial, during which you could testify or you could

11  decide not to testify, and if you decided not to

12  testify, the Judge would instruct the jury that

13  nothing could be concluded from your remaining silent

14  because you have a right to remain silent.

15         The Judge would also be sure that the jury

16  knew that the verdict would have to be unanimous, and

17  that the government has to prove every element of the

18  offense.

19         Do you understand also that by pleading

20  guilty, you're admitting all the essential elements of

21  the offense, and you're waiving all these trial rights

22  I just explained to you, and you're saying, in affect,

23  you did this, and you can never say again you did not?

24  Do you understand that?

25         THE DEFENDANT:  Yes, Your Honor.

12

1    THE COURT:  Are you intending to plead guilty

2 to this charge because, in fact, you are guilty of it?

3    THE DEFENDANT:  Yes, Your Honor.

4    THE COURT:  Do you understand that if I take

5 your plea, the only issue remaining in this court will

6 be what sentence is to be imposed, and that will be

7 made in this court by me at a later date?  Do you

8 understand that?

9    THE DEFENDANT:  Yes, Your Honor, fully.

10    THE COURT:  Pardon me?

11    THE DEFENDANT:  I fully understand it.

12    THE COURT:  Okay.  Good.

13    Now, I do want to review the plea agreement

14 with you.  What I have is a 15-paged numbered

15 document, and there was a place for you to have signed

16 on page 15, Mr. Chatrie.  Did you sign there?

17    THE DEFENDANT:  Yes, Your Honor.

18    THE COURT:  And Ms. Koenig on 15?

19    MS. KOENIG:  Yes, Your Honor.

20    THE COURT:  And the government on page 14?

21    MR. SIMON:  Yes, Judge.

22    THE COURT:  Now, I want to go over with you,

23 Mr. Chatrie, what I think are the essential terms of

24 the plea to make sure it agrees with what you think

25 the deal is here.

**J.A. 1405**

USCA4 Appeal: 22-4489    Doc: 19-6    Filed: 01/20/2023    Pg: 88 of 138
Case 3:19-cr-00130-MHL    Document 247    Filed 10/04/22    Page 13 of 34 PageID# 3612

13

1          THE DEFENDANT:  Okay.

2          THE COURT:  As I understand it, you're

3    agreeing to waive indictment and plead guilty to the

4    two counts that we have been talking about.

5          You're agreeing to plead guilty because you

6    are guilty, and you're admitting the facts in the

7    statement of facts and that they establish guilt.

8          You understand that your lawyer has rendered

9    effective assistance of counsel.  You're satisfied of

10   that.  And you know you're waiving all the trial

11   rights that I just went over in great detail.

12          You're agreeing that you are pleading

13   conditionally, and that you waive your right to

14   challenge the conviction on direct appeal except that

15   you are preserving the right to appeal the District

16   Court's March 3, 2022, memorandum opinion and order

17   denying the motion to suppress evidence obtained under

18   the geofence warrant, ECF Nos. 220 and 221.

19          You understand and agree that you will pay

20   the monetary penalties that are imposed by the Court,

21   including restitution, which will be due immediately

22   and subject to immediate enforcement.

23          You understand that you're agreeing to pay a

24   mandatory special assessment of $100 per felony count,

25   which is a total of $200.

USCA4 Appeal: 22-4489    Doc: 19-6    Filed: 01/20/2023    Pg: 89 of 138
Case 3:19-cr-00130-MHL    Document 247    Filed 10/04/22    Page 14 of 34 PageID# 3613

14

1          You're agreeing that restitution is
2   mandatory, and you're agreeing to the entry of a
3   restitution order for the full amount of the victims'
4   losses as determined by the Court.
5          And in paragraph 11, the victim is named as
6   the Call Federal Credit Union, and the amount is
7   $196,932.01.
8          You're agreeing that you understand that
9   forfeiture is part of the process and you're agreeing
10  to forfeit all interest in any robbery or
11  firearms-related asset that you own or have had direct
12  or indirect control over.
13         In paragraph 12, what is listed is a Taurus
14  9mm semiautomatic pistol and also $102,293 in U.S.
15  currency seized in Richmond on August 13th of 2019.
16         You're agreeing to waive any interest in any
17  administrative or judicial forfeiture proceeding,
18  civil or criminal.  You're also agreeing to waive
19  constitutional and statutory challenges to forfeiture
20  in any manner.  And you're agreeing to fully
21  participate in the forfeiture process, including
22  making your financial information available.
23         It's understood that the failure to
24  participate in the financial investigation as
25  described in the plea agreement may constitute a

USCA4 Appeal: 22-4489    Doc: 19-6    Filed: 01/20/2023    Pg: 90 of 138
Case 3:19-cr-00130-MHL   Document 247   Filed 10/04/22   Page 15 of 34 PageID# 3614

15

1  failure to accept responsibility under the guidelines

2  3E1.1.  And you're agreeing to identify assets valued

3  at more than $5,000 that have been transferred to

4  third parties.

5       It's noted that by pleading guilty there may

6  be consequences for any immigration status if you're

7  not a citizen of the United States or for citizenship

8  status if you are a naturalized citizen, and that

9  includes the issues that we talked about, including an

10 understanding that a guilty plea for a conviction of

11 robbery of a credit union by force and use in carrying

12 and brandishing a firearm during and in relation to a

13 crime of violence make it such that removal is

14 presumptively mandatory.

15      It is also the case if you are a naturalized

16 citizen you acknowledge that certain convictions,

17 which may include these convictions, may expose you to

18 a denaturalized station under federal law.

19      In exchange, pursuant to 11(c)(1)(B), Federal

20 Rule of Criminal Procedure, the United States and you

21 are stipulating, will recommend to the Court the

22 following provisions of the sentencing guidelines that

23 are listed in paragraph 5 of your plea agreement.

24 They're all under 2B3.1.  And there's an agreement

25 that the base offense level will be 20, that there

USCA4 Appeal: 22-4489   Doc: 19-6   Filed: 01/20/2023   Pg: 91 of 138
Case 3:19-cr-00130-MHL   Document 247   Filed 10/04/22   Page 16 of 34 PageID# 3615

16

1   will be a two-level increase for taking property from

2   a financial institution.  There will be a four-level

3   increase for persons abducted to facilitate commission

4   of the offense, and a two-level increase for loss of

5   more than $95,000.

6          The United States and you are agreeing that

7   you have assisted the government in the investigation

8   and your own misconduct by timely notifying of an

9   intention to plead guilty.  And so if you qualify for

10  the two-level decrease in the offense level for

11  acceptance of responsibility under 3E1.1 and your

12  offense level is 16 or greater, the government agrees

13  to file a motion to ask for an additional point off

14  for acceptance of responsibility.

15         The United States and you are stipulating and

16  will recommend that the Court impose no other specific

17  offense characteristics, and will say they do not

18  apply, and no other chapter 3 adjustments apply.

19         The resulting adjusted offense level for

20  Count One is 25, criminal history category I,

21  resulting in a guideline range of 57 to 71 months.

22  Taken together with a consecutive of 80 months of

23  imprisonment on Count Two, the parties agree that the

24  appropriate advisory guideline range is 141 to 155

25  months' imprisonment.

**J.A. 1409**

USCA4 Appeal: 22-4489    Doc: 19-6    Filed: 01/20/2023    Pg: 92 of 138
Case 3:19-cr-00130-MHL    Document 247    Filed 10/04/22    Page 17 of 34 PageID# 3616

17

1              The United States is agreeing that it will

2     not argue for a sentence above 155 months'

3     imprisonment, and you are agreeing to argue for no

4     less than 130 months' imprisonment, which would

5     include a motion for a downward variance.  The United

6     States is making clear it does not believe that a

7     downward variance is appropriate.

8              Now, the thing you have to remember is all of

9     that is a recommendation.  It's not binding on me for

10    purposes of sentencing.

11             So except for with respect to the motion to

12    suppress, you know that you have a right to appeal the

13    sentence.  You are waiving the conviction and the

14    sentence.  You are waiving your right to appeal the

15    conviction except as to the motion to suppress and any

16    sentence within the statutory maximum that we have

17    described during the process of this hearing.

18             The United States is agreeing that it will

19    not further criminally prosecute you in the Eastern

20    District of Virginia for the specific conduct in the

21    information, the indictment, or the statement of

22    facts, except if there is a crime of violence or

23    conspiracy to commit or aid and abet a crime of

24    violence not charged in the information as an offense.

25             The United States is agreeing that at the

18

```
 1    appropriate time they will move to dismiss the

 2    indictment against you.  They are agreeing, with

 3    respect to the paragraph about forfeiture, that they

 4    will not use any truthful and complete information

 5    provided by you for additional offenses except for any

 6    crime of violence and that, pursuant to the

 7    guidelines, no truthful information that you provide

 8    will be used in determining your applicable guideline

 9    range.

10          What would constitute a breach is also

11    discussed and, that includes if you were to withdraw

12    from the agreement or commit or attempt to commit any

13    federal, state, or local crime, any additional one, or

14    intentionally give materially false information, in

15    which case the United States will be released from the

16    obligations under the agreement, but you could not

17    withdraw these guilty please.

18          Is that your understanding of the agreement

19    here?

20          THE DEFENDANT:  Yes, ma'am.

21          THE COURT:  Other than that, have there been

22    any other promises or even any threats to get you to

23    plead guilty?

24          THE DEFENDANT:  No, ma'am.

25          THE COURT:  Do you understand that the
```

USCA4 Appeal: 22-4489    Doc: 19-6    Filed: 01/20/2023    Pg: 94 of 138
Case 3:19-cr-00130-MHL   Document 247   Filed 10/04/22   Page 19 of 34 PageID# 3618

19

1  recommendations, as detailed as they are with respect

2  to your sentencing, they aren't binding on me?  Do you

3  know that?

4          THE DEFENDANT:  Yes, Your Honor.

5          THE COURT:  And do you understand that even

6  though you've waived your right to appeal the sentence

7  except as provided in your agreement, the United

8  States has not waived its right to appeal?  Do you

9  understand that?

10          THE DEFENDANT:  Yes, Your Honor.

11          THE COURT:  So do you understand it's the

12  Eastern District of Virginia that has agreed not to

13  prosecute you for any non-violent offenses related to

14  the charges that you're intending to plead guilty to,

15  and it doesn't apply to another jurisdiction?  Do you

16  understand that?

17          THE DEFENDANT:  Can you repeat that for me,

18  please?

19          THE COURT:  Ms. Koenig, do you want to talk

20  to him?

21          MS. KOENIG:  I do, Your Honor.

22          (Ms. Koenig and the defendant are

23  conferring.)

24          THE DEFENDANT:  Yes, I understand, Your

25  Honor.

USCA4 Appeal: 22-4489    Doc: 19-6    Filed: 01/20/2023    Pg: 95 of 138
Case 3:19-cr-00130-MHL   Document 247   Filed 10/04/22   Page 20 of 34 PageID# 3619

20

1          THE COURT:  You understand it?  Okay.

2          And do you understand with respect to

3    forfeiture you have to provide truthful information,

4    which can affect your acceptance of responsibility if

5    you do not?  Do you understand that?

6          THE DEFENDANT:  Yes, Your Honor.

7          THE COURT:  Now, I do want to go over the

8    consent order of forfeiture with you.  That's a

9    three-page document.  And there was a place for you to

10   have signed on page 3.  Did you sign there,

11   Mr. Chatrie?

12         THE DEFENDANT:  Yes, Your Honor.

13         THE COURT:  And Ms. Koenig?

14         MS. KOENIG:  Yes, Your Honor.

15         THE COURT:  And the government on page 3?

16         MR. SIMON:  That's correct, Judge.

17         THE COURT:  All right.  It lists in paragraph

18   1 a sum of money in the amount of $195,000, and in the

19   subparagraph B, it specifically lists $102,293.00 of

20   currency that was seized in Richmond, as we just went

21   over, and the Taurus 9mm automatic pistol.

22         Now, Ms. Koenig, did you have sufficient

23   information to review this issue with your client,

24   forfeiture, before you came into the courtroom?

25         MS. KOENIG:  I did, Your Honor.

USCA4 Appeal: 22-4489    Doc: 19-6       Filed: 01/20/2023    Pg: 96 of 138
Case 3:19-cr-00130-MHL   Document 247   Filed 10/04/22   Page 21 of 34 PageID# 3620

21

1          THE COURT:  And, Mr. Chatrie did you have a

2   sufficient time to ask all the questions you had about

3   that before you signed the document?

4          THE DEFENDANT:  Yes, Your Honor.

5          THE COURT:  All right.  Now, I do want to

6   talk about the sentencing guideline process.  We're

7   going to go through a presentence report and that will

8   determine your recommended sentence pursuant to the

9   Sentence Guideline Act, which involves considering all

10  of your criminal activity even if it's not listed in

11  the information.  Do you understand that?

12         THE DEFENDANT:  Yes, Your Honor.

13         THE COURT:  And do you know that the Court

14  has a series of factors that it must consider under

15  the guidelines?  It includes information about whether

16  you accept responsibility, but includes other factors

17  that can affect the recommended range up or down.  Do

18  you understand that?

19         THE DEFENDANT:  Yes, Your Honor.

20         THE COURT:  All right.  And do you know that

21  the Court must examine your prior criminal history, if

22  there is any, and that has an affect on the

23  recommended range of punishment?

24         THE DEFENDANT:  Yes, Your Honor.

25         THE COURT:  And do you know that the

USCA4 Appeal: 22-4489    Doc: 19-6    Filed: 01/20/2023    Pg: 97 of 138
Case 3:19-cr-00130-MHL    Document 247    Filed 10/04/22    Page 22 of 34 PageID# 3621

22

1    guidelines are not mandatory and a judge can impose a

2    sentence above or below the recommended range within

3    reason?

4              THE DEFENDANT:  Yes, Your Honor.

5              THE COURT:  All right.  So what happens is if

6    I accept your guilty pleas, I'll refer your case to

7    the probation office for preparation of what's called

8    "the presentence report," and it's through that

9    reporting process that the guidelines would be

10   calculated.  A probation officer would speak to you,

11   and your attorney, and the government, and would look

12   at the guidelines, and look at your background, and

13   these events, and then print out a report that has a

14   recommended sentencing range within it.

15             I mention that because I would be very

16   surprised if Ms. Koenig had not given you an estimate

17   of what the guidelines might be, but even her estimate

18   is only a prediction and no promise because that

19   report hasn't even been started yet.  Do you

20   understand that?

21             THE DEFENDANT:  Yes, Your Honor.

22             THE COURT:  All right.  Do you understand

23   that there are circumstances where a court can depart

24   or vary upward from the recommended range?

25             THE DEFENDANT:  Yes, Your Honor.

**J.A. 1415**

1          THE COURT:  A process for that to happen must

2    occur.  And do you also understand that a court can

3    vary downward or depart downward based on any motion?

4    And I understand that has been preserved for you to

5    file that motion.  Do you understand that?

6          THE DEFENDANT:  Yes, Your Honor.

7          THE COURT:  And do you know, though, that

8    even if it's filed, it does not have to be accepted?

9    The Court has to review it independently and make a

10   finding it's for a good cause.

11         THE DEFENDANT:  Yes, Your Honor.

12         THE COURT:  All right.  Now, Ms. Koenig, are

13   you satisfied that it's in your client's best interest

14   to accept the terms of the plea agreement rather than

15   to proceed to trial?

16         MS. KOENIG:  Yes, Your Honor.

17         THE COURT:  Are you satisfied that

18   Mr. Chatrie fully understands the charges against him?

19         MS. KOENIG:  I am.

20         THE COURT:  Are you satisfied that

21   Mr. Chatrie has been competent and fully able to

22   cooperate with you throughout the course of this

23   matter?

24         MS. KOENIG:  Yes, Your Honor.

25         THE COURT:  Are you satisfied there are no

USCA4 Appeal: 22-4489    Doc: 19-6    Filed: 01/20/2023    Pg: 99 of 138
Case 3:19-cr-00130-MHL    Document 247    Filed 10/04/22    Page 24 of 34 PageID# 3623

24

1    meritorious defenses that can be raised, or if there

2    are, that it is in his best interest to enter into the

3    plea agreement and preserve certainly the right to

4    appeal the motion to suppress?

5              MS. KOENIG:  Yes, Your Honor.

6              THE COURT:  Are you satisfied that all of

7    your client's rights have been preserved throughout

8    these proceedings?

9              MS. KOENIG:  Yes, Your Honor.

10             THE COURT:  Do you know of any reason why I

11   should not accept a plea?

12             MS. KOENIG:  I do not.

13             THE COURT:  All right.

14             So, Mr. Chatrie, this is where I ask you how

15   do you plead to Count One, which charges you with

16   robbery of a credit union, in violation of 18 U.S.C.

17   2113(a) and (d); guilty or not guilty?

18             THE DEFENDANT:  Guilty as charged, Your

19   Honor.

20             THE COURT:  All right.  And how do you plead

21   to Count Two, which charges you with using, carrying,

22   and brandishing a firearm during and in relation to a

23   crime of violence in violation of Title 18 U.S.C.

24   Section 924(c)(1)(A), guilty or not guilty?

25             THE DEFENDANT:  Guilty as charged.

USCA4 Appeal: 22-4489    Doc: 19-6    Filed: 01/20/2023    Pg: 100 of 138
Case 3:19-cr-00130-MHL   Document 247   Filed 10/04/22   Page 25 of 34 PageID# 3624

25

1          THE COURT:  All right.  Now, sir, to make a

2     finding as to guilt, I need to review the statement of

3     facts with you that have been offered as part of the

4     plea.  That is a four-page document?

5          MS. KOENIG:  Five pages, Your Honor.

6          THE COURT:  Five-page document.

7          MS. KOENIG:  I think there's some extra

8     spacing on page 4.

9          THE COURT:  Right.  And there was a place for

10    you to have signed, Mr. Chatrie, on page 5?

11         THE DEFENDANT:  Yes, Your Honor.

12         THE COURT:  You signed.  And Ms. Koenig also?

13         MS. KOENIG:  Yes, Your Honor.

14         THE COURT:  And then the government on page

15    3?

16         MR. SIMON:  That's correct, Judge.

17         THE COURT:  All right.  Now, I have reviewed

18    the information in the statement of facts, and it is

19    sufficient to support a finding of guilt, but before I

20    do that, I want to ask you, Ms. Koenig, is there

21    anything in these facts that you think is wrong, that

22    should be changed, or added in, or taken out?

23         MS. KOENIG:  No, Your Honor.  We've already

24    made any edits that needed to be made.

25         THE COURT:  Okay.  How about you,

**J.A. 1418**

USCA4 Appeal: 22-4489    Doc: 19-6    Filed: 01/20/2023    Pg: 101 of 138
Case 3:19-cr-00130-MHL    Document 247    Filed 10/04/22    Page 26 of 34 PageID# 3625

26

1    Mr. Chatrie?  Anything in these facts that you think

2    is wrong, that should be changed, or added in, or

3    taken out?

4            THE DEFENDANT:  No, Your Honor.

5            THE COURT:  Did you sign the document because

6    the information in it is true?

7            THE DEFENDANT:  Yes, Your Honor.

8            THE COURT:  All right.  So, sir, this is

9    where I could make my finding of guilt, and it's your

10   last opportunity to withdraw your guilty pleas.  Are

11   you prepared for me to go ahead and make my finding?

12           THE DEFENDANT:  Yes, Your Honor.

13           THE COURT:  All right.  So it is the finding

14   of the Court in the case of the *United States versus*

15   *Okello T. Chatrie* that Mr. Chatrie is fully competent

16   and capable of entering an informed plea, that he is

17   aware of the nature of the charges and the

18   consequences of the pleas, and that the pleas of

19   guilty to Counts One and Two in the information are

20   knowing and voluntary and supported by an independent

21   basis in fact containing each of the essential

22   elements of the offense.  The pleas are therefore

23   accepted, and Mr. Chatrie is now adjudged guilty of

24   those offenses.

25           So, sir, this is where I order the probation

USCA4 Appeal: 22-4489    Doc: 19-6       Filed: 01/20/2023    Pg: 102 of 138
Case 3:19-cr-00130-MHL   Document 247   Filed 10/04/22   Page 27 of 34 PageID# 3626

27

1   office to prepare your presentence report, as I

2   indicated.  And I want to be sure that you understand

3   the scheduling order that I will enter, but Ms. Koenig

4   is going to go over that in detail about when things

5   are due and when events happen.

6         I always mention, though, a couple parts of

7   the process because I think they're important.  One is

8   that, as I said, you'll be interviewed by a probation

9   officer as that person prepares your presentence

10  report.  And what I want you to know is that you may

11  have your lawyer with you during any conversation with

12  your probation officer.  Do you understand that?

13        THE DEFENDANT:  Yes, Your Honor.

14        THE COURT:  And I also want you to know that

15  there's a period of time before the final presentence

16  report is issued where you can lodge objections or try

17  to change information in the report.  And if you don't

18  do it by the deadline, you waive it.  You can't do it

19  afterward.  But the process includes a requirement

20  that both sides speak to each other and see if they

21  can agree to any changes.  And it's only if they

22  cannot agree that a formal motion is put in front of

23  me, and then we have a separate hearing on that

24  dispute.  Do you understand that?

25        THE DEFENDANT:  Understood.

 1          THE COURT:  All right.  Okay.  So we need to

 2   set a date.  I'm going to allow you all to sit down

 3   while we do that.

 4          MS. KOENIG:  Your Honor, I wanted to ask the

 5   Court to strongly consider a sentencing date that is

 6   as soon as possible under the guideline procedure.

 7          Mr. Chatrie has been in local custody since

 8   September of 2019 because it took a long time to

 9   litigate the important issues in the case.  The

10   defense has already prepared the mitigation that we

11   would anticipate presenting.  I have a psychological

12   forensic evaluation that I have already provided to

13   the government as a part of the negotiations process.

14          Certainly local custody is not where one

15   wants to be for almost three years.  Mr. Chatrie's --

16   I think his mental health issues have been

17   dramatically exacerbated by the lengthy amount of time

18   that the lawyers have needed in the case to present

19   the case.

20          And so we all are very familiar with the

21   facts of the case.  And while the probation office

22   does accurately need to calculate the guidelines,

23   Mr. Chatrie doesn't have any prior criminal

24   convictions.  So it's not a matter of having to track

25   down old records or things like that.  So I am asking

USCA4 Appeal: 22-4489   Doc: 19-6   Filed: 01/20/2023   Pg: 104 of 138
Case 3:19-cr-00130-MHL   Document 247   Filed 10/04/22   Page 29 of 34 PageID# 3628

29

 1   the Court to strongly consider setting the sentencing

 2   as soon as we can.

 3           THE COURT:  Does the United States object to

 4   that?  Have you all discussed this?

 5           MR. SIMON:  Judge, we've heard the request.

 6   We have not discussed in detail sort of recognizing

 7   that it's up to the Court and to the probation office,

 8   the probation office's resources, how close in time we

 9   can have the sentencing.

10           I'd only request that we consider also the

11   need to make sure that the victims in this case can

12   appear if they'd like to but also provide statements.

13   So I think, you know, at least 45, 60 days would be

14   ideal.  I think regularly it's a 90-day period, but

15   it's really going to be up to the probation office,

16   and we'd want to make sure that they have enough time

17   to get it done.

18           THE COURT: All right.  All right.  Well, we

19   do have a representative from the probation office

20   here.  Mr. Zychowski, do you have any sense of a

21   relatively quicker process that we could go through,

22   how long it might take?  So I want everybody to know

23   that because of COVID, the probation office is

24   stretched.  And so we've actually been going out 120

25   days.  I don't think we need that.  But,

USCA4 Appeal: 22-4489    Doc: 19-6    Filed: 01/20/2023    Pg: 105 of 138
Case 3:19-cr-00130-MHL   Document 247   Filed 10/04/22   Page 30 of 34 PageID# 3629

30

1    Mr. Zychowski, do you have a sense of when you might
2    be able to do it, meaning the office, not you
3    personally?
4            THE PROBATION OFFICER:  Well, I will be
5    assigned this investigation.  Does the attorney have a
6    suggested time frame?
7            MS. KOENIG:  Your Honor, I wasn't necessarily
8    meaning to suggest that we need to go shorter than the
9    75 days that's provided for the scheduling order.  I
10   definitely do not want to go past the 90 days of the
11   scheduling order, but I think that 75 days, which
12   includes the 35 days, for the process in terms of the
13   presentation and objections, if there are any.  But I
14   do think that 40 days, given the fact that this Court
15   has authored very extensive factual opinions in this
16   case about the facts that aid Mr. Zychowski, I think,
17   greatly in not having to go through voluminous
18   discovery, as well as not having a criminal history,
19   and I can give Mr. Zychowski the forensic
20   psychological evaluation.  That would hopefully aid us
21   to be able to get to about 75 days.
22           THE COURT:  All right.  Does that sound
23   possible to you, Mr. Zychowski?  There is an extensive
24   record here that ultimately has resulted in findings
25   of fact, and an opinion, too, really, so it is the

1   case that you would have more of a start maybe than in

2   most cases.

3           THE PROBATION OFFICER:  A head start, yes.

4   The only delay that I would anticipate is verifying

5   personal information because we don't get a lot of

6   that information until we interview the defendant

7   because of the jail's schedule to do an interview.

8   But I think she had already foreseen that.

9           MS. KOENIG:  Yes.  And I'm laughing a little

10  bit because Mr. Zychowski has to track me down

11  sometimes to pin down some availability where I can

12  block out a couple of hours of time.  But I will

13  promise Mr. Zychowski, I will promise to the Court, I

14  will promise to Mr. Chatrie and the government that I

15  will make myself available to do those interviews in a

16  speedy manner.

17          THE COURT:  And you'll help him make sure

18  that the facility makes Mr. Chatrie available; is that

19  correct?

20          MS. KOENIG:  I'll do my very best, Your

21  Honor, yes.

22          THE COURT:  All right.  So I'll tell you both

23  that if you're having problems with the facility, I am

24  happy to do whatever it is I can within my power to

25  make them make Mr. Chatrie available.  All right?

**J.A. 1424**

1          THE PROBATION OFFICER:  Thank you, Judge.  I

2    just want to point out, it's not -- it's never her

3    delay.  It is the jail's limited schedule given the

4    video technology equipment that they have.  So it's

5    more of a delay getting that scheduled than her

6    personally.

7          THE COURT:  Right.  It was good of her to

8    fall on her sword, but I know that it's been

9    difficult, in any event.

10         So, does somebody know when 75 days is?  I

11   may.

12         MS. KOENIG:  Your Honor, that would put us

13   about July 23, which is a Saturday.  So that won't

14   work.  So maybe the following week.

15         Mr. Simon is indicating that he is not

16   available that week but perhaps the week of

17   August 1st.

18         THE COURT:  How about the August 2nd?

19         MR. SIMON:  That works for us, Judge.

20         MS. KOENIG:  That works for the defense, Your

21   Honor.

22         THE COURT:  All right.  Are we going to have

23   witnesses, do you think?

24         MR. SIMON:  We don't intend at this time to

25   have witnesses but would leave time open possibly.

**J.A. 1425**

USCA4 Appeal: 22-4489    Doc: 19-6       Filed: 01/20/2023    Pg: 108 of 138
Case 3:19-cr-00130-MHL    Document 247    Filed 10/04/22    Page 33 of 34 PageID# 3632

33

1   We're going to talk to folks, and we may need to put

2   on some evidence.

3            THE COURT:  All right.  Well, how about I set

4   it for 11 o'clock so we have time to have evidence or

5   argument?

6            MS. KOENIG:  Thank you, Your Honor.

7            THE COURT:  All right.  I am going to find

8   that the waiver of indictment and the consent order of

9   forfeiture are knowingly and voluntarily signed and,

10  as to indictment, waived.  So we'll enter those on the

11  record.

12           All right.  Is there anything else that we

13  need to cover?

14           MR. SIMON:  Nothing further from the United

15  States, Judge.

16           MS. KOENIG:  No, Your Honor.  Thank you.

17           THE COURT:  And, Mr. Zychowski, I appreciate

18  your making yourself available.  And certainly we will

19  all -- this group I know will work together to make

20  sure we can get things done as quickly as possible.

21           THE PROBATION OFFICER:  Thank you, Your

22  Honor.

23           THE COURT:  So, Mr. Chatrie, I will see you

24  on August 2nd at 11 o'clock.  In the meantime, you

25  will be held under the same conditions under which you

USCA4 Appeal: 22-4489    Doc: 19-6    Filed: 01/20/2023    Pg: 109 of 138
Case 3:19-cr-00130-MHL   Document 247   Filed 10/04/22   Page 34 of 34 PageID# 3633

34

1   have been held.  And I encourage you to stay in close

2   contact with Ms. Koenig so the presentence report

3   process can be as accurate and as quick as possible.

4   All right?

5           THE DEFENDANT:  Thank you, Your Honor.

6           THE COURT:  Thank you.  All right.  We can

7   call court.

8           (The proceedings were adjourned at 3:15 p.m.)

9

10      I, Diane J. Daffron, certify that the foregoing is

11    a correct transcript from the record of proceedings

12    in the above-entitled matter.

13

14                  /s/
        _____  _____

15      DIANE J. DAFFRON, RPR, CCR      DATE

16

17

18

19

20

21

22

23

24

25

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Richmond Division

UNITED STATES OF AMERICA

v.

OKELLO T. CHATRIE,

Defendant.

No. 3:19-cr-130-MHL

## PLEA AGREEMENT

Jessica D. Aber, United States Attorney for the Eastern District of Virginia; undersigned

counsel for the United States; the defendant, Okello T. Chatrie; and the defendant's counsel have

entered into an agreement pursuant to Rule 11 of the Federal Rules of Criminal Procedure.  The

terms of this Plea Agreement are as follows:

**1.      Offense and Maximum Penalties**

The defendant agrees to waive indictment and plead guilty to Counts One and Two of the

Criminal Information.  Count One charges the defendant with Robbery of a Credit Union, in

violation of 18 U.S.C. §§ 2113(a), (d).  The maximum penalties for this offense are a term of 25

years of imprisonment, a fine of $250,000, full restitution as outlined below, forfeiture of assets

as outlined below, a special assessment pursuant to 18 U.S.C. § 3013, and a supervised release

term of 3 years.  Count Two charges the defendant with Using, Carrying, and Brandishing a

Firearm During and in Relation to a Crime of Violence, in violation of 18 U.S.C. § 924(c)(1)(A).

The penalties for this offense are a mandatory minimum term of imprisonment of 7 years and a

maximum term of life imprisonment, a fine of $250,000, full restitution as outlined below,

forfeiture of assets as outlined below, a special assessment pursuant to 18 U.S.C. § 3013, and a

supervised release term of 5 years.

**J.A. 1428**

The defendant understands that any supervised release term is in addition to any prison term the defendant may receive, and that a violation of a term of supervised release could result in the defendant being returned to prison for the full term of supervised release.

**2. Detention Pending Sentencing**

The defendant understands that this case is governed by 18 U.S.C. §§ 3143(a)(2) and 3145(c). These provisions provide that a judicial officer shall order that a person who has been found guilty of an offense of this kind be detained unless there are statutory justifications why such person's detention would not be appropriate.

**3. Factual Basis for the Plea**

The defendant will plead guilty because the defendant is in fact guilty of the charged offenses. The defendant admits the facts set forth in the Statement of Facts filed with this Plea Agreement and agrees that those facts establish guilt of the offenses charged beyond a reasonable doubt. The Statement of Facts, which is hereby incorporated into this Plea Agreement, constitutes a stipulation of facts for purposes of Section 1B1.2(c) of the Sentencing Guidelines.

**4. Assistance and Advice of Counsel**

The defendant is satisfied that the defendant's attorney has rendered effective assistance. The defendant understands that by entering into this Plea Agreement, defendant surrenders certain rights as provided in this agreement. The defendant understands that the rights of criminal defendants include the following:

a. the right to plead not guilty and to persist in that plea;

b. the right to a jury trial;

c. the right to be represented by counsel—and, if necessary, have the court appoint counsel—at trial and at every other stage of the proceedings; and

**J.A. 1429**

    d.    the right at trial to confront and cross-examine adverse witnesses, to be protected from compelled self-incrimination, to testify and present evidence, and to compel the attendance of witnesses.

**5.    Sentencing Guidelines, Recommendations, and Roles**

The defendant understands that the Court has jurisdiction and authority to impose any sentence within the statutory maximum described above, but that the Court will determine the defendant's actual sentence in accordance with 18 U.S.C. § 3553(a). The defendant understands that the Court has not yet determined a sentence and that any estimate of the advisory sentencing range under the U.S. Sentencing Commission's Sentencing Guidelines Manual the defendant may have received from the defendant's counsel, the United States, or the Probation Office, is a prediction, not a promise, and is not binding on the United States, the Probation Office, or the Court. Additionally, pursuant to the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), the Court, after considering the factors set forth in 18 U.S.C. § 3553(a), may impose a sentence above or below the advisory sentencing range, subject only to review by higher courts for reasonableness. The United States makes no promise or representation concerning what sentence the defendant will receive, and the defendant cannot withdraw a guilty plea based upon the actual sentence.

Further, in accordance with Federal Rule of Criminal Procedure 11(c)(1)(B), the United States and the defendant stipulate and will recommend to the Court that the following provisions of the Sentencing Guidelines apply:

| Guideline(s) | Description | Offense Level |
|---|---|---|
| § 2B3.1(a) | Base offense level | +20 |
| § 2B3.1(b)(1) | Taking Property from a Financial Institution | +2 |
| § 2B3.1(b)(4) | Persons Abducted to Facilitate Commission of Offense | +4 |
| § 2B3.1(b)(7)(C) | Loss of more than $95,000 | +2 |

3

**J.A. 1430**

The United States and the defendant further agree that the defendant has assisted the government in the investigation and prosecution of the defendant's own misconduct by timely notifying authorities of the defendant's intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the Court to allocate their resources efficiently. If the defendant qualifies for a two-level decrease in offense level pursuant to U.S.S.G. § 3E1.1(a) and the offense level prior to the operation of that section is a level 16 or greater, the government agrees to file, pursuant to U.S.S.G. § 3E1.1(b), a motion prior to, or at the time of, sentencing for an additional one-level decrease in the defendant's offense level.

Further, in accordance with Federal Rule of Criminal Procedure 11(c)(1)(B), the United States and the defendant stipulate and will recommend to the Court that no other specific offense characteristics apply and no other Chapter 3 adjustments apply. The resulting adjusted offense level for Count One is 25, criminal history category I, resulting in a guideline range of 57-71 months. Taken together with the consecutive sentence of 84 months' imprisonment on Count Two, the parties agree that the appropriate advisory guideline range is 141-155 months' imprisonment. Moreover, pursuant to this agreement, the United States will not argue for a sentence above 155 months' imprisonment, and the defendant agrees to argue for no less than 130 months' imprisonment, which would include a motion for a downward variance. To be clear, the United States does not agree that any downward variance is appropriate here, and these agreements are not binding on the Court.

The United States and the defendant have not agreed on any further sentencing issues, whether related to the Sentencing Guidelines or the factors listed in 18 U.S.C. § 3553(a), other than those set forth above or elsewhere in this Plea Agreement. Any stipulation on a Guidelines

J.A. 1431

provision does not limit the parties' arguments as to any other Guidelines provisions or sentencing factors under Section 3553(a), including arguments for a sentence within or outside the advisory Guidelines range found by the Court at sentencing.

### 6.     Preservation of Appeal, FOIA, and Privacy Act Rights

The defendant agrees that he is pleading guilty conditionally. The defendant waives his right to challenge his conviction on direct appeal except that, pursuant to Federal Rule of Criminal Procedure 11(a)(2), the defendant preserves his right to appeal the District Court's March 3, 2022 Memorandum Opinion and Order denying the defendant's Motion to Suppress Evidence obtained under the Geofence Warrant (ECF Nos. 220, 221).

The defendant also understands that 18 U.S.C. § 3742 affords a defendant the right to appeal the sentence imposed.  Nonetheless, the defendant knowingly waives the right to appeal the conviction, except as noted above, and any sentence within the statutory maximum described above (or the manner in which that sentence was determined) on the grounds set forth in 18 U.S.C. § 3742 or on any ground whatsoever other than an ineffective assistance of counsel claim that is cognizable on direct appeal, in exchange for the concessions made by the United States in this Plea Agreement.  This agreement does not affect the rights or obligations of the United States as set forth in 18 U.S.C. § 3742(b).  The defendant also hereby waives all rights, whether asserted directly or by a representative, to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including without limitation any records that may be sought under the Freedom of Information Act, 5 U.S.C. § 552, or the Privacy Act, 5 U.S.C. § 552a.

**J.A. 1432**

### 7.    Immunity from Further Prosecution in This District

The United States will not further criminally prosecute the defendant in the Eastern District of Virginia for the specific conduct described in the Information, Indictment, and Statement of Facts, except that the United States may prosecute the defendant for any crime of violence or conspiracy to commit, or aiding and abetting, a crime of violence not charged in the Information, Indictment, and as an offense. In such a prosecution, the United States may allege and prove conduct described in the Information, Indictment, and or Statement of Facts. "Crime of violence" has the meaning set forth in 18 U.S.C. § 16.

### 8.    Dismissal of Other Counts

As a condition of the execution of this agreement and the Court's acceptance of the defendant's plea of guilty, the United States will move to dismiss the Indictment against this defendant at the conclusion of this defendant's sentencing hearing.

### 9.    Payment of Monetary Penalties

The defendant understands and agrees that, pursuant to 18 U.S.C. § 3613 and 18 U.S.C. § 3572, all monetary penalties imposed by the Court, including restitution, will be due immediately and subject to immediate enforcement by the United States as provided for in Section 3613. If the Court imposes a schedule of payments, the defendant understands that the schedule of payments is merely a minimum schedule of payments and not the only method, nor a limitation on the methods, available to the United States to enforce the judgment. Until all monetary penalties are paid in full, the defendant will be referred to the Treasury Offset Program so that any federal payment or transfer of returned property to the defendant will be offset and applied to pay the defendant's unpaid monetary penalties. If the defendant is incarcerated, the defendant agrees to participate voluntarily in the Bureau of Prisons' Inmate Financial

6

**J.A. 1433**

Responsibility Program, regardless of whether the Court specifically directs participation or imposes a schedule of payments. Defendant agrees to make good-faith efforts toward payment of all monetary penalties imposed by the Court.

### 10. Special Assessment

Before sentencing in this case, the defendant agrees to pay a mandatory special assessment of $100 per felony count of conviction, pursuant to 18 U.S.C. § 3013(a)(2)(A).

### 11. Restitution

The defendant agrees that restitution is mandatory pursuant to 18 U.S.C. § 3663A(c)(1), and the defendant agrees to the entry of a Restitution Order for the full amount of the victims' losses as determined by the Court. Pursuant to 18 U.S.C. § 3663A(c)(2), the defendant further agrees that an offense listed in Section 3663A(c)(1) gave rise to this Plea Agreement and, as such, victims of the conduct described in the charging instrument, Statement of Facts, or any related or similar conduct shall be entitled to restitution. Without limiting the amount of restitution that the Court must impose, the parties agree that, at a minimum, the following victims have suffered the losses identified below and are entitled to restitution:

| Victim Name and Address | Restitution Amount |
|---|---|
| Call Federal Credit Union<br>3640 Call Federal Drive, Midlothian, Virginia 23112 | $196,932.01 |

The defendant understands that forfeiture and restitution are separate and distinct financial obligations that must be imposed upon a criminal defendant. The defendant further understands that restitution will be enforced pursuant to 18 U.S.C. § 3572, 18 U.S.C. § 3613, and 18 U.S.C. § 3664(m).

**J.A. 1434**

12.    **Forfeiture Agreement**

The defendant understands that the forfeiture of assets is part of the sentence that must be imposed in this case.  The defendant agrees to forfeit all interests in any robbery or firearms-related asset that the defendant owns or over which the defendant exercises control, directly or indirectly.  This includes any property that is traceable to, derived from, fungible with, or a substitute for the following: proceeds of the offense and any firearm or ammunition used in or involved in the offense.   The defendant agrees that the assets subject to forfeiture include, but are not limited to, the following specific property:

a.    Taurus G2C, 9mm semi-automatic pistol, bearing serial number TLW87541

b.    $102,293 in U.S. Currency seized in Richmond, Virginia on August 13, 2019

The defendant understands that if the assets subject to forfeiture are not available to the United States to be forfeited, the Court must enter a forfeiture money judgment in the amount of the unavailable assets. *United States v. Blackman*, 746 F.3d 137 (4th Cir. 2014).

The defendant further agrees to waive all interest in the asset(s) in any administrative or judicial forfeiture proceeding, whether criminal or civil, state or federal.  The defendant agrees to consent to the entry of orders of forfeiture for such property and waives the requirements of Federal Rules of Criminal Procedure 32.2 and 43(a) regarding notice of the forfeiture in the charging instrument, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment.  Defendant admits and agrees that the conduct described in the charging instrument and Statement of Facts provides a sufficient factual and statutory basis for the forfeiture of the property sought by the government.

8

**J.A. 1435**

**13.    Waiver of Further Review of Forfeiture**

The defendant further agrees to waive all constitutional and statutory challenges to

forfeiture in any manner (including direct appeal, habeas corpus, or any other means) to any

forfeiture carried out in accordance with this Plea Agreement on any grounds, including that the

forfeiture constitutes an excessive fine or punishment.  The defendant also waives any failure by

the Court to advise the defendant of any applicable forfeiture at the time the guilty plea is

accepted as required by Rule 11(b)(1)(J).  The defendant agrees to take all steps as requested by

the United States to pass clear title to forfeitable assets to the United States, and to testify

truthfully in any judicial forfeiture proceeding.  The defendant understands and agrees that all

property covered by this agreement is subject to forfeiture as proceeds of the offense and

property used or involved in the offenses.

**14.    The Defendant's Obligations Regarding Assets and Financial Investigation**

The defendant agrees to fully participate in the United States' pre- and post-judgment

financial investigation.  Such participation includes the identification of assets in which the

defendant has any legal or equitable interest to determine what assets may be available for

payment to restitution, forfeiture, and/or any fine imposed in this case.  The defendant agrees that

the defendant's financial information is subject to investigation and disclosure pre-judgment to

the same extent as financial information will be subject to discovery after judgment is imposed.

The defendant understands that 31 U.S.C. § 3711(h)(1) permits the United States to obtain the

defendant's credit report after sentencing and expressly authorizes the United States to obtain the

defendant's credit report prior to sentencing in this case.  The defendant understands that the

United States has sole discretion over whether it will obtain defendant's credit report pursuant to

this Plea Agreement.  If the United States determines that it will obtain defendant's credit report

**J.A. 1436**

prior to sentencing pursuant to this Plea Agreement, the defendant authorizes the United States, and the United States agrees, to provide a copy to defense counsel upon request. The defendant understands that failure to participate in the financial investigation as described in this paragraph may constitute the defendant's failure to accept responsibility under U.S.S.G § 3E1.1.

Within 14 days of a request by the United States, or other deadline agreed upon by the parties, the defendant agrees to provide all information about all of the defendant's assets and financial interests to the United States and the Probation Office and, if requested, submit to a debtor's examination, complete a financial disclosure statement under penalty of perjury, and/or undergo any polygraph examination the United States may choose to administer concerning such assets and financial interests. The defendant also agrees to provide or consent to the release of the defendant's tax returns for the previous five years. The defendant understands that assets and financial interests subject to disclosure include assets owned or held directly or indirectly, individually or jointly, in which the defendant has any legal interests, regardless of title, including any interest held or owned under any other name, trusts, and/or business entities presently and since date of the first offense giving rise to this Plea Agreement, or giving rise to the charges presently pending against the defendant, whichever is earlier.

The defendant shall identify all assets valued at more than $5,000 that have been transferred to third parties since the date of the first offense giving rise to this Plea Agreement, including the location of the assets and the identities of third parties to whom they were transferred. The defendant agrees not to transfer any assets valued at more than $5,000 without approval of the Asset Recovery Unit of the U.S. Attorney's Office until the fine, forfeiture, and restitution ordered by the Court at sentencing are paid in full or otherwise terminated by operation of law. The defendant agrees to take all steps requested by the United States to obtain

J.A. 1437

from any other parties by any lawful means any records of assets contemplated by this paragraph in which the defendant has or had an interest. Until the fine, forfeiture, and restitution ordered by the Court are paid in full or otherwise terminated by operation of law, the defendant agrees to notify the Asset Recovery Unit of the U.S. Attorney's Office of a change in address within 30 days of such change.

The United States will not use any truthful and complete information provided by the defendant pursuant to this paragraph for additional criminal offenses against the defendant in the Eastern District of Virginia, except in any prosecution for a crime of violence or conspiracy to commit, or aiding and abetting, a crime of violence (as defined in 18 U.S.C. § 16). Pursuant to U.S.S.G. § 1B1.8, no truthful information that the defendant provides pursuant to defendant's obligations under this paragraph will be used in determining the applicable guideline range, except as provided in Section 1B1.8(b). Nothing in this agreement, however, restricts the Court's or Probation Officer's access to information and records in the possession of the United States. Furthermore, nothing in this agreement prevents the United States in any way from prosecuting the defendant should the defendant knowingly provide false, untruthful, or perjurious information or testimony, or from using information provided by the defendant in furtherance of any forfeiture action or restitution enforcement action, whether criminal or civil, administrative or judicial.

**15.    Impact of Guilty Plea on Immigration or Citizenship Status**

The defendant recognizes that pleading guilty may have consequences for defendant's immigration status, if defendant is not a citizen of the United States, or for defendant's citizenship status, if defendant is a naturalized citizen. Under federal law, a broad range of crimes are removable offenses, including offenses that qualify as aggravated felonies, crimes

11

**J.A. 1438**

involving moral turpitude, and conduct involving controlled substances and firearms, among many other categories of criminal activity. Indeed, if defendant is not a citizen of the United States, defendant's guilty plea to and conviction for Robbery of a Credit Union by Force and Using, Carrying, and Brandishing a Firearm During and in Relation to a Crime of Violence make it such that removal is presumptively mandatory. Likewise, if defendant is a naturalized citizen, defendant acknowledges that certain convictions, which may include defendant's conviction, may expose defendant to denaturalization under federal law. Because removal, denaturalization, and other immigration consequences are the subjects of a separate proceeding, defendant understands that no one, including defendant's attorney, the U.S. Attorney's Office, or the U.S. District Court, can predict to a certainty the effect of defendant's conviction on defendant's immigration or citizenship status. Defendant nevertheless affirms that defendant knowingly and voluntarily agrees to plead guilty regardless of any present or future immigration consequences that defendant's plea may entail, even if the consequence is defendant's automatic removal from the United States or denaturalization followed by automatic removal from the United States.

**16.     Breach of the Plea Agreement and Remedies**

This Plea Agreement is effective when signed by the defendant, the defendant's attorney, and an attorney for the United States. The defendant agrees to entry of this Plea Agreement at the date and time scheduled with the Court by the United States (in consultation with the defendant's attorney). If the defendant withdraws from this agreement, or commits or attempts to commit any additional federal, state, or local crimes, or intentionally gives materially false, incomplete, or misleading testimony or information, or otherwise violates any provision of this agreement, then:

**J.A. 1439**

a. The United States will be released from its obligations under this agreement. The defendant, however, may not withdraw the guilty plea entered pursuant to this agreement.

b. The defendant will be subject to prosecution for any federal criminal violation, including, but not limited to, perjury and obstruction of justice, that is not time-barred by the applicable statute of limitations on the date this agreement is signed. Notwithstanding the subsequent expiration of the statute of limitations, in any such prosecution, the defendant agrees to waive any statute-of-limitations defense.

c. Any prosecution, including the prosecution that is the subject of this agreement, may be premised upon any information provided, or statements made, by the defendant, and all such information, statements, and leads derived therefrom may be used against the defendant. The defendant waives any right to claim that statements made before or after the date of this agreement, including the Statement of Facts accompanying this agreement or adopted by the defendant and any other statements made pursuant to this or any other agreement with the United States, should be excluded or suppressed under Fed. R. Evid. 410, Fed. R. Crim. P. 11(f), the Sentencing Guidelines, or any other provision of the Constitution or federal law.

Any alleged breach of this agreement by either party shall be determined by the Court in an appropriate proceeding at which the defendant's disclosures and documentary evidence shall be admissible and at which the moving party shall be required to establish a breach of this Plea Agreement by a preponderance of the evidence.

17. **Nature of the Agreement and Modifications**

This written agreement constitutes the complete plea agreement between the United States, the defendant, and the defendant's counsel. The defendant and the defendant's attorney acknowledge that no threats, promises, or representations have been made, nor agreements reached, other than those set forth in writing in this Plea Agreement or any associated documents filed with the Court, to cause the defendant to plead guilty. Any modification of this Plea

13

**J.A. 1440**

Agreement shall be valid only as set forth in writing in a supplemental or revised plea agreement signed by all parties.

Jessica D. Aber
United States Attorney

By: _____

Kenneth R. Simon, Jr.
Assistant United States Attorney

By: _____

Peter S. Duffey
Assistant United States Attorney

14

**J.A. 1441**

Defendant's Signature: I hereby agree that I have consulted with my attorney and fully understand all rights with respect to the pending criminal Information, Indictment, and. Further, I fully understand all rights with respect to 18 U.S.C. § 3553 and the provisions of the Sentencing Guidelines Manual that may apply in my case. I have read this Plea Agreement and carefully reviewed every part of it with my attorney. I understand this agreement and voluntarily agree to it.

Date: __5 / 9 / 22__                    _____
                                        Okello T. Chatrie
                                        Defendant

Defense Counsel's Signature: I am counsel for the defendant in this case. I have fully explained to the defendant the defendant's rights with respect to the pending Information, Indictment, and. Further, I have reviewed 18 U.S.C. § 3553 and the Sentencing Guidelines Manual, and I have fully explained to the defendant the provisions that may apply in this case. I have carefully reviewed every part of this Plea Agreement with the defendant. To my knowledge, the defendant's decision to enter into this agreement is an informed and voluntary one.

Date: __5 / 9 / 22__                    _____
                                        Laura Koenig
                                        Counsel for the Defendant

15

**J.A. 1442**

U. S. DEPARTMENT OF JUSTICE
Statement of Special Assessment Account

This statement reflects your Special Assessment only. There may be other penalties imposed at sentencing.

| ACCOUNT INFORMATION | |
|---|---|
| CRIM. ACTION NO.: | 3:19-cr-130-MHL |
| DEFENDANT'S NAME: | Okello T. Chatrie<br><br>Defendant |
| PAY THIS AMOUNT: | $200.00 |

INSTRUCTIONS:

1.  **MAKE CHECK OR MONEY ORDER PAYABLE TO:**

    CLERK, U.S. DISTRICT COURT

2.  **PAYMENT MUST REACH THE CLERK'S OFFICE BEFORE YOUR SENTENCING DATE.**

3.  **PAYMENT SHOULD BE SENT TO:**

|  | In-Person (9 AM to 4 PM) | By Mail: |
|---|---|---|
| **Alexandria Cases:** | | **Clerk, U.S. District Court**<br>**401 Courthouse Square**<br>**Alexandria, VA 22314** |
| **Richmond Cases:** | | **Clerk, U.S. District Court**<br>**701 East Broad Street, Suite 3000**<br>**Richmond, VA 23219** |
| **Newport News Cases:** | | **Clerk, U.S. District Court**<br>**2400 West Ave., Suite 100**<br>**Newport News, VA 23607** |
| **Norfolk Cases:** | | **Clerk, U.S. District Court**<br>**600 Granby Street**<br>**Norfolk, VA 23510** |

4.  **INCLUDE DEFENDANT'S NAME ON CHECK OR MONEY ORDER.**

5.  **ENCLOSE THIS COUPON TO ENSURE PROPER AND PROMPT APPLICATION OF PAYMENT.**

J.A. 1443

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Richmond Division

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Criminal No. 3:19-cr-130-MHL |
| OKELLO T. CHATRIE, | |
| Defendant. | |

## STATEMENT OF FACTS

The United States and the defendant agree that the factual allegations contained in this Statement of Facts and in Counts One and Two of the Criminal Information are true and correct, and that the United States could have proven them beyond a reasonable doubt.

1.      On or about May 20, 2019, in the Eastern District of Virginia, the defendant, OKELLO T. CHATRIE, by force, violence, and intimidation, did take from the person and presence of another, namely J.W. and K.C., employees of the Call Federal Credit Union located at 3640 Call Federal Drive, Midlothian, Virginia, 23112, approximately $195,000 in United States currency, belonging to, and in the care, custody, control, management and possession of the Call Federal Credit Union, the accounts of which were then insured by the National Credit Union Administration Board, and in committing such offense, the defendant, OKELLO T. CHATRIE, did put in jeopardy the life of another person by the use of a dangerous weapon, that is a firearm, in violation of Title 18, United States Code, Sections 2113(a) and 2113(d)).

2.      On or about May 20, 2019, in the Eastern District of Virginia, the defendant, OKELLO T. CHATRIE, did knowingly and unlawfully use, carry, and brandish a firearm during

1

**J.A. 1444**

and in relation to a crime of violence for which he may be prosecuted in a court of the United States, that is, credit union robbery by force and violence, and intimidation, as charged in Count One of the Criminal Information, which is re-alleged as if fully set forth here, in violation of Title 18, United States Code, Sections 924(c)(1)(A)(i) and (ii).

3.    At approximately 4:50 p.m. eastern standard time, on May 20, 2019, CHATRIE entered the Call Federal Credit Union in Midlothian, Virginia, with a firearm. While CHATRIE stood in line, victim-teller J.B. asked another teller, J.W., to assist CHATRIE when he reached the counter.

4.    When CHATRIE reached J.W.'s station, he presented a handwritten note. That note read, in part, "I got your family as hostage and I know where you live, If you or your coworker alert the cops or anyone your family and you are going to be hurt . . . I need at least 100k." After J.W. told him that she did not have access to that amount of money, CHATRIE pulled out a silver and black handgun. Waving the firearm around, he then directed J.W., other Call Federal Credit Union employees, and customers to move to the center of the lobby and get on the floor. Once there, CHATRIE led victims behind the teller counter and into a back room where the Credit Union's safe was located.

5.    Once in the back room, CHATRIE ordered everyone to their knees at gunpoint and demanded that the bank manager open the safe.    The Credit Union manager, fearing for his life, obliged by opening the safe and handing over $195,000 in United States currency.

6.    Additional investigation by law enforcement revealed that CHATRIE purchased a silver and black 9mm G2C Taurus semiautomatic pistol, bearing serial number TLW87541, on April 29, 2019, at Bob Moates Sports Shop, Inc., 10418 Hull Street Rd, Midlothian, VA 23112.

7.    Upon assessing location information associated with CHATRIE's Google account

2

obtained pursuant to a GeoFence warrant, law enforcement determined that CHATRIE's travel on May 20, 2019, showed that CHATRIE: (1) was near the church prior to the robbery at the same time that the church witness recalled seeing the suspicious individual; (2) inside the credit union during the robbery; and (3) immediately left the area following the robbery via the area near the church.

8.    On August 12, 2019, law enforcement sought and obtained a federal search warrant for the residences located at XXXX Mason Dale Drive and XXXX Willis Street.   When executing these search warrants in the early morning of August 13, 2019, law enforcement recovered evidence of value related to the Call Federal Credit Union robbery from XXXX Mason Dale Drive and XXXX Willis Street.   At the XXXX Mason Dale Drive residence, law enforcement recovered two robbery-style demand notes from the bedroom belonging to the defendant.   At XXXX Willis Street, law enforcement recovered nearly $100,000 in United States Currency (including bills wrapped in bands signed by the victim-bank teller), a silver and black Taurus G2C, 9mm semi-automatic pistol, bearing serial number TLW87541, a money counter, and a safe.

9.    After being placed under arrest and advised of his *Miranda* rights, CHATRIE admitted to the armed robbery of the Call Federal Credit Union on May 20, 2019, and admitted to using the Taurus G2C, 9mm semi-automatic pistol, bearing serial number TLW87541 during the May 20, 2019 armed robbery.

JESSICA D. ABER
United States Attorney

By: _____

Kenneth R. Simon, Jr.
Peter S. Duffey

3

**J.A. 1446**

Assistant United States Attorneys

I have consulted with my counsel regarding this Statement of Facts.   I knowingly and

voluntarily agree that each of the above-recited facts is true and correct and that had this matter

gone to trial the United States could have proven each one beyond a reasonable doubt.

4

**J.A. 1447**

_5/9/22_
Date

_Okello T. Chatrie_ (signature)
Okello T. Chatrie
Defendant


I am counsel for defendant, Okello T. Chatrie.   I have carefully reviewed this Statement of

Facts with him and, to my knowledge, his decision to agree to this Statement of Facts is an

informed and voluntary decision.

_5/9/22_
Date

_Laura Koenig_ (signature)
Laura Koenig
Counsel for Defendant

5

**J.A. 1448**

AO 245B (Rev. 09/19) (VAE 01/22)  Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT
## Eastern District of Virginia
Richmond Division

|  |  |
|---|---|
| UNITED STATES OF AMERICA | ) **JUDGMENT IN A CRIMINAL CASE** |
| v. | ) Case Number:  3:19CR00130-001 |
| OKELLO T. CHATRIE, | ) USM Number:  93789-083 |
| Defendant. | ) |
|  | ) Defendant's Attorney:  Laura J. Koenig, Esq. |

The defendant pleaded guilty to Counts 1 and 2 of the Criminal Information.  The defendant is adjudged guilty of these offenses:

| Title and Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. § 2113(a) and 2113(d) | ARMED CREDIT UNION ROBBERY | 5/20/2019 | 1 |
| 18 U.S.C. § 924(c)(1)(A)(i) and (ii) | USE, CARRY, AND BRANDISH A FIREARM DURING AN IN RELATION TO A CRIME OF VIOLENCE | 5/20/2019 | 2 |

The defendant is sentenced as provided in pages 2 through 7 of this Judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

The Indictment is dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.  If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

August 10, 2022
Date of Imposition of Judgment

Signature of Judge

M. Hannah Lauck, United States District Judge
Name and Title of Judge

8 – 19 – 2022
Date

USCA4 Appeal: 22-4489    Doc: 19-6    Filed: 01/20/2023    Pg: 132 of 138
Case 3:19-cr-00130-MHL    Document 239    Filed 08/19/22    Page 2 of 7 PageID# 3540

AO 245B (Rev. 09/19) (VAE 11/21) Judgment in a Criminal Case
Sheet 2 - Imprisonment

Page 2 of 7

| Case Number: | 3:19CR00130-001 |
|---|---|
| Defendant's Name: | CHATRIE, OKELLO T. |

# IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of **ONE HUNDRED FORTY-ONE (141) MONTHS.** This terms consists of FIFTY-SEVEN (57) MONTHS on Count 1 and EIGHTY-FOUR (84) MONTHS on Count 2, to be served consecutively. The defendant shall receive credit for time served on these charges.

The Court makes the following recommendations to the Bureau of Prisons:
1. The defendant shall receive mental health treatment while incarcerated, with a focus on trauma;
2. The defendant shall receive substance abuse treatment while incarcerated if he volunteers and qualifies for it;
3. The defendant shall participate in a General Educational Development (GED) program while incarcerated;
4. Designate the defendant to FCI Fort Dix; if this facility is not available, designate the defendant to FCI Petersburg.

The court makes the following recommendations to the Bureau of Prisons:

☒   The defendant is remanded to the custody of the United States Marshal.

# RETURN

I have executed this judgment as follows: _____

_____

Defendant delivered on _____ to_____

at_____, with a certified copy of this Judgment.

_____
UNITED STATES MARSHAL

By          _____
DEPUTY UNITED STATES MARSHAL

AO 245B (Rev. 09/19) (VAE 11/21) Judgment in a Criminal Case

Sheet 3 – Supervised release

Page 3 of 7

| | |
|---|---|
| **Case Number:** | 3:19CR00130-001 |
| **Defendant's Name:** | CHATRIE, OKELLO T. |

# SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of **THREE (3) YEARS.** This term consists of THREE (3) YEARS on each of Counts 1 and 2, to be served concurrently.

## MANDATORY CONDITIONS

1. You must not commit another federal, state or local crime.
2. You must not unlawfully possess a controlled substance.
3. You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
   ☐ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4. ☒ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5. ☐ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6. ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, et seq.) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7. ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

| Case Number: | 3:19CR00130-001 |
|---|---|
| Defendant's Name: | CHATRIE, OKELLO T. |

# STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1.  You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2.  After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3.  You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4.  You must answer truthfully the questions asked by your probation officer.
5.  You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6.  You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7.  You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8.  You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9.  If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
13. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov

Defendant's Signature _____    Date

**J.A. 1452**

| | |
|---|---|
| Case Number: | 3:19CR00130-001 |
| Defendant's Name: | CHATRIE, OKELLO T. |

# SPECIAL CONDITIONS OF SUPERVISION

1. Upon completion of his term of imprisonment, the defendant is to be surrendered to a duly-authorized immigration official of the Department of Homeland Security, United States Immigration and Customs Enforcement for a deportation review in accordance with established procedures provided by the Immigration and Naturalization Act, 8 U.S.C. § 1101 et seq. As a further condition of supervised release, if ordered deported, the defendant shall not enter the United States unless granted permission by the Secretary of Homeland Security.

2. The defendant shall provide the probation officer access to any requested financial information.

3. The defendant shall not incur new credit charges or open additional lines of credit without the approval of the probation officer.

4. The defendant shall apply all monies received from income tax refunds, lottery winnings, inheritances, judgments, settlements, and any anticipated or unexpected financial gains to the outstanding court-ordered financial obligation, or in a lesser amount to be determined by the Court, upon the recommendation of the probation officer.

5. The defendant shall participate the Treasury Offset Program (TOP) as directed by the probation officer.

6. The defendant shall pay the balance owed on any court-ordered financial obligations in installments of not less than $50.00 per month, or 25% of his net monthly income, whichever greater, starting 60 days after supervision begins until paid in full.

7. If the defendant tests positive for a controlled substance or shows signs of alcohol abuse, he shall participate in a program approved by the United States Probation Office for substance abuse, which program may include residential treatment and testing to determine whether the defendant has reverted to the use of drugs or alcohol, with partial costs to be paid by the defendant, all as directed by the probation officer

8. The defendant shall participate in a program approved by the United States Probation Office for mental health treatment, with costs of these programs to be paid by the defendant, all as directed by the probation officer.

9. The defendant shall waive all rights of confidentiality regarding substance abuse and mental health treatment in order to allow for the release of information to the United States Probation Office and authorize communication between the probation officer and the treatment provider(s).

10. The defendant shall participate in a General Educational Development (GED) program approved by the United States Probation Office until he has earned his certificate of completion.

11. The defendant shall participate in vocational, educational, and/or job readiness programs as directed by this Court and identified by the United States Probation Office.

AO 245B (Rev. 09/19) (VAE 11/21) Judgment in a Criminal Case
Sheet 5 – Criminal Monetary Penalties

Page 6 of 7

| | | |
|---|---|---|
| Case Number: | 3:19CR00130-001 | |
| Defendant's Name: | CHATRIE, OKELLO T. | |

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | Restitution | Fine | AVAA Assessment* | JVTA Assessment** |
|---|---|---|---|---|---|
| **TOTALS** $ | **200.00** $ | **196,932.01** $ | 0.00 $ | 0.00 $ | 0.00 |

☐ The determination of restitution is deferred until _____. An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☒ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

This amount shall be offset by the money collected at the defendant's house during execution of the search warrant.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss*** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| CALL FEDERAL CREDIT UNION 3640 CALL FEDERAL DRIVE MIDLOTHIAN, VIRGINA 23112 | | $196,932.01 | |
| **TOTAL** | | **$196,932.01** | |

☐ Restitution amount ordered pursuant to plea agreement $

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☒ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

    ☒ the interest requirement is waived for the ☐ fine ☒ restitution.

    ☐ the interest requirement for the ☐ fine ☐ restitution is modified as follows:

\* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
\*\* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
\*\*\* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

J.A. 1454

AO 245B (Rev. 09/19) (VAE 11/21) Judgment in a Criminal Case
Sheet 6 – Schedule of Payments

| | |
|---|---|
| Case Number: | 3:19CR00130-001 |
| Defendant's Name: | CHATRIE, OKELLO T. |

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

**A**  ☐  Lump sum payment of $_____ due immediately, balance due
   ☐ not later than _____                , or
   ☐ in accordance with ☐ C, ☐ D, ☐ E, or ☐ F below; or

**B**  ☒  Payment to begin immediately (may be combined with ☐ C, ☒ D, or ☐ F below); or

**C**  ☐  Payment in equal       *(e.g., weekly, monthly, quarterly)* installments of $       over a period of       *(e.g., months or years)*, to commence       *(e.g., 30 or 60 days)* after the date of this judgment; or

**D**  ☒  Payment in equal monthly installments of **$50.00**, to commence **60 days** after release from imprisonment to a term of supervision; or

**E**  ☐  Payment during the term of supervised release will commence within       *(e.g., 30 or 60 days)* after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F**  ☐  Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

☐ Joint and Several

| Case Number<br>Defendant and Co-Defendant Names<br>*(including defendant number)* | Total Amount | Joint and Several<br>Amount | Corresponding Payee,<br>if appropriate |
|---|---|---|---|
| | | | |

☐ The defendant shall pay the cost of prosecution.

☐ The defendant shall pay the following court cost(s):

☒ The defendant shall forfeit the defendant's interest in the following property to the United States:

  See *Consent Order of Forfeiture* entered by the Court on May 9, 2022, which is incorporated by reference into this judgment.

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **)** | |
| | **)** | |
| **v.** | **)** | **Case No. 3:19cr130** |
| | **)** | **The Honorable M. Hannah Lauck** |
| **OKELLO T. CHATRIE,** | **)** | |
| **Defendant** | **)** | |

**<u>NOTICE OF APPEAL</u>**

Okello Chatrie, through counsel, notes his appeal to the United States Court of Appeals for

the Fourth Circuit from the final order in this case entered on August 19, 2022 (ECF No. 239).

Respectfully Submitted,
OKELLO T. CHATRIE

By: _____/s/_____
Counsel

Laura Koenig
Va. Bar No. 86840
Counsel for Defendant
Office of the Federal Public Defender
701 E Broad Street, Suite 3600
Richmond, VA 23219-1884
Ph. (804) 565-0881
Fax (804) 648-5033
laura_koenig@fd.org

1

**J.A. 1456**