No. 22-4489

───────────────────────────────

# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

───────────────────────────────

UNITED STATES OF AMERICA
Plaintiff-Appellee,

v.

OKELLO T. CHATRIE
Defendant-Appellant.

───────────────────────────────

On Appeal from the United States District Court
for the Eastern District of Virginia
Case No. 3:19-cr-00130-MHL
Honorable M. Hannah Lauck, District Court Judge

───────────────────────────────

**BRIEF OF AMICUS CURIAE THE REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS IN SUPPORT OF DEFENDANT-APPELLANT**

───────────────────────────────

Bruce D. Brown
*Counsel of Record for Amicus Curiae*
Katie Townsend
Gabe Rottman
Grayson Clary
Emily Hockett
REPORTERS COMMITTEE FOR
  FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, D.C. 20005
Telephone: (202) 795-9300
bruce.brown@rcfp.org

# TABLE OF CONTENTS

TABLE OF AUTHORITIES................................................................. iii

INTEREST OF AMICUS CURIAE.....................................................1

SOURCE OF AUTHORITY TO FILE ..................................................2

FED. R. APP. P. 29(A)(4)(E) STATEMENT ........................................2

SUMMARY OF THE ARGUMENT ....................................................3

ARGUMENT .......................................................................................5

   I.  Geofence warrants burden important First Amendment interests, including the integrity of the newsgathering process....................................5

  II.  Geofence searches can be justified—if at all—only on the basis of a particularized warrant supported by individualized probable cause. ..............8

     A.  Fourth Amendment requirements must be scrupulously applied when First Amendment rights, including the right to gather news, are at stake.................................................8

     B.  The Fourth Amendment requires a particularized warrant to intrude on the First Amendment associational rights threatened by location tracking..................................12

     C.  Geofence warrants that expose an individual's location and associations based solely on their proximity to a suspected crime are inadequately particularized. ..........................15

CONCLUSION ...................................................................................17

CERTIFICATE OF COMPLIANCE ...................................................18

CERTIFICATE OF SERVICE..............................................................19

ii

# TABLE OF AUTHORITIES

## Cases

*Ams. for Prosperity Found. v. Bonta*,
   141 S. Ct. 2373 (2021) .......................................................................9, 11

*Ashcraft v. Conoco, Inc.*,
   218 F.3d 282 (4th Cir. 2000) ..................................................................6

*Carpenter v. United States*,
   138 S. Ct. 2206 (2018) ..................................................................4, 12, 13, 14

*Entick v. Carrington*,
   19 How. St. Tr. 1029 (C.P. 1765) .........................................................9

*Heller v. New York*,
   413 U.S. 483 (1973) ...............................................................................10

*Illinois v. Lidster*,
   540 U.S. 419 (2004) ...............................................................................14

*Kyllo v. United States*,
   533 U.S. 27 (2001) ..............................................................................5, 12

*Leaders of a Beautiful Struggle v. Balt. Police Dep't*,
   2 F.4th 330 (4th Cir. 2021) ....................................................................13

*Marcus v. Search Warrants*,
   367 U.S. 717 (1961) .............................................................................5, 9

*Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue*,
   460 U.S. 575 (1983) .................................................................................3

*NAACP v. Alabama ex rel. Patterson*,
   357 U.S. 449 (1958) ...............................................................................11

*New York v. P.J. Video, Inc.*,
   475 U.S. 868 (1986) ...............................................................................10

*Nieves v. Bartlett*,
   139 S. Ct. 1715 (2019) ...........................................................................10

*Olmstead v. United States*,
  277 U.S. 438 (1928),
  *overruled by Katz v. United States*, 389 U.S. 347 (1967) ....................................11

*Roaden v. Kentucky*,
  413 U.S. 496 (1973)..................................................................................................10

*Stanford v. Texas*,
  379 U.S. 476 (1965).........................................................................................*passim*

*United States v. Chatrie*,
  590 F. Supp. 3d 901 (E.D. Va. 2022) .....................................................................8

*United States v. Di Re*,
  332 U.S. 581 (1948)..................................................................................................5

*United States v. Jones*,
  565 U.S. 400 (2012)................................................................................................12

*United States v. Maynard*,
  615 F.3d 544 (D.C. Cir. 2010),
  *aff'd in relevant part sub nom.*, *United States v. Jones*,
  565 U.S. 400 (2012)................................................................................................13

*United States v. Ramsey*,
  431 U.S. 606 (1977)................................................................................................10

*United States v. Torch*,
  609 F.2d 1088 (4th Cir. 1979) ...............................................................................15

*Wilkes v. Wood*,
  19 How. St. Tr. 1153 (C.P. 1763) ..........................................................................9

*Ybarra v. Illinois*,
  444 U.S. 85 (1979)............................................................................................3, 15

*Zurcher v. Stanford Daily*,
  436 U.S. 547 (1978)........................................................................................5, 9, 10

## Other Authorities

Amy Mitchell et al., Pew Rsch. Ctr., Investigative Journalists and Digital
  Security (2015),
  https://perma.cc/PS6S-VZZT ................................................................... 7

Brief Amici Curiae of the Reporters Committee for Freedom of the Press
  and 15 Media Organizations,
  *Tuggle v. United States*, 142 S. Ct. 1107 (2022) (No. 21-541) ............................ 1

Brief Amici Curiae of the Reporters Committee for Freedom of the Press
  and 19 Media Organizations,
  *Carpenter v. United States*, 138 S. Ct. 2206 (2018) (No. 16-402) ....................... 1

Brief Amici Curiae of the Reporters Committee for Freedom of the Press
  and 8 Media Organizations,
  *United States v. Moore-Bush*, 36 F.4th 320 (1st Cir. 2022)
  (Nos. 19-1582, 19-1625, 19-1583, 19-1626) .......................................... 1

Brief Amici Curiae of the Reporters Committee for Freedom of the Press,
  The Thomas Jefferson Center for the Protection of Free Expression
  and 17 Media Organizations,
  *Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193 (4th Cir. 2017)
  (No. 15-2560) ......................................................................................... 1

Brief of Amicus Curiae Google LLC in Support of Neither Party Concerning
  Defendant's Motion to Suppress Evidence from a "Geofence" General
  Warrant,
  *United States v. Chatrie*, No. 19-cr-00130 (E.D. Va. Dec. 20, 2019),
  2019 WL 8227162 (ECF No. 59-1) .................................................... 13

Charlie Savage, *CNN Lawyers Gagged in Fight with Justice Dept. over
  Reporter's Email Data*, N.Y. Times (June 9, 2021),
  https://perma.cc/8LKT-3J3V ........................................................... 6, 7

Defendant Okello Chatrie's Supplemental Motion to Suppress Evidence
  Obtained from a "Geofence" General Warrant,
  *United States v. Chatrie*, No. 19-cr-00130 (E.D. Va. May 22, 2020),
  2020 WL 4551093 (ECF No. 104) .................................................... 14

*Government Surveillance: U.S. Has Long History of Watching White House Critics and Journalists*, Newsweek (July 24, 2017), https://perma.cc/B76N-3Z6B ...................................................................5

Human Rights Watch, With Liberty to Monitor All: How Large-Scale US Surveillance Is Harming Journalism, Law, and American Democracy (2014), https://perma.cc/KUH6-4MVF .......................................................7, 8

*Introduction to the Reporter's Privilege Compendium*, Reporters Comm. for Freedom of the Press, https://perma.cc/BNT4-HHPY (last updated Nov. 5, 2021) ...............................3

Janny Scott, *Now It Can Be Told: How Neil Sheehan Got the Pentagon Papers*, N.Y. Times (Jan. 7, 2021), https://perma.cc/NFM7-B76C .............................................................4, 6

Jennifer R. Henrichsen & Hannah Bloch-Wehba, Reporters Comm. for Freedom of the Press, Electronic Communications Surveillance: What Journalists and Media Organizations Need to Know (2017), https://perma.cc/SW4K-EVAX ...........................................................6

**Regulations**

28 C.F.R. § 50.10 .......................................................................................7

## INTEREST OF AMICUS CURIAE

The Reporters Committee for Freedom of the Press ("Reporters Committee" or "Amicus") is an unincorporated nonprofit association of reporters and editors that works to safeguard the rights of a free press. The Reporters Committee often appears as amicus curiae in federal courts to underline the effect of surveillance on the confidential reporter-source relationships that underpin so much public-interest journalism. *See, e.g.*, Brief Amici Curiae of the Reporters Committee for Freedom of the Press and 15 Media Organizations, *Tuggle v. United States*, 142 S. Ct. 1107 (2022) (No. 21-541); Brief Amici Curiae of the Reporters Committee for Freedom of the Press and 8 Media Organizations, *United States v. Moore-Bush*, 36 F.4th 320 (1st Cir. 2022) (Nos. 19-1582, 19-1625, 19-1583, 19-1626) (en banc); Brief Amici Curiae of the Reporters Committee for Freedom of the Press and 19 Media Organizations, *Carpenter v. United States*, 138 S. Ct. 2206 (2018) (No. 16-402); Brief Amici Curiae of the Reporters Committee for Freedom of the Press, The Thomas Jefferson Center for the Protection of Free Expression and 17 Media Organizations, *Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193 (4th Cir. 2017) (No. 15-2560).

## SOURCE OF AUTHORITY TO FILE

Counsel for Plaintiff-Appellee and Defendant-Appellant have consented to the filing of this brief.  *See* Fed. R. App. P. 29(a)(2).

## FED. R. APP. P. 29(A)(4)(E) STATEMENT

Amicus declares that:

1. no party's counsel authored the brief in whole or in part;

2. no party or party's counsel contributed money intended to fund preparing or submitting the brief; and

3. no person, other than amicus, its members or its counsel, contributed money intended to fund preparing or submitting the brief.

## SUMMARY OF THE ARGUMENT

With the help of a so-called geofence warrant, government investigators can comb through the location histories of millions to expose the identity of every individual present in a given area during a specific window of time, based on nothing more than their "mere propinquity to others independently suspected of criminal activity." *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979). That ability to cast a dragnet over any location, however sensitive, without the need for individualized suspicion to search each of the individuals swept up in it, poses an obvious threat to the integrity of the newsgathering process, and with it the freedom of the press.

It is a "basic assumption of our political system that the press will often serve as an important restraint on government." *Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 585 (1983). Journalists regularly rely on communications with confidential sources in performing that role, and sources often need anonymity to confide in reporters without fear that they may—if their identities are revealed—be at risk of prosecution, loss of employment, or even threats to their lives. *See Introduction to the Reporter's Privilege Compendium*, Reporters Comm. for Freedom of the Press, https://perma.cc/BNT4-HHPY (last updated Nov. 5, 2021). The sweeping investigative technique at issue in this case undermines those assurances of confidentiality. On the theory the government advanced below, a routine mugging in downtown Washington, D.C. would justify

a geofence around the surrounding three and a half blocks, capturing anyone who visited the offices of *The Washington Post* around the time of the crime.

Amicus therefore writes to underscore the corrosive effect of geofence warrants on First Amendment interests. In requiring that searches be carried out only with a particularized warrant, supported by probable cause, the Fourth Amendment prohibits intrusion on the newsgathering process absent a sound basis to believe a crime will be uncovered. Geofence warrants afford no such protection: They enable law enforcement to open "an intimate window into a person's life," *Carpenter v. United States*, 138 S. Ct. 2206, 2217 (2018), based on nothing more than passing proximity to a potential crime. Not only could a suspicionless sweep incidentally capture the next Neil Sheehan visiting the home of the next Daniel Ellsberg, *see* Janny Scott, *Now It Can Be Told: How Neil Sheehan Got the Pentagon Papers*, N.Y. Times (Jan. 7, 2021), https://perma.cc/NFM7-B76C, but also geofence warrants are ripe for pretextual use by investigators who could use any suspected criminal activity close to a place where people can be expected to gather and exercise constitutionally protected rights—a newsroom, for instance—to learn who has visited it.

Such an "unrestricted power of search and seizure" would be a powerful "instrument for stifling liberty of expression," casting a chilling pall on the reporter-source contacts on which effective journalism often relies. *Marcus v.*

*Search Warrants*, 367 U.S. 717, 729 (1961). This Court should reject that construction of the Fourth Amendment; reaffirm that its requirements apply with "scrupulous exactitude" when First Amendment freedoms also are at stake, *Zurcher v. Stanford Daily*, 436 U.S. 547, 564 (1978) (quoting *Stanford v. Texas*, 379 U.S. 476, 485 (1965)); and reverse the denial of the motion to suppress.

## ARGUMENT

I.  **Geofence warrants burden important First Amendment interests, including the integrity of the newsgathering process.**

Experience teaches that a "too permeating police surveillance" will predictably intrude on the newsgathering process—exposing stories pursued, journalistic methods employed, and the identities of sources consulted. *United States v. Di Re*, 332 U.S. 581, 595 (1948). And because in-person meetings play a crucial role in reporter-source relationships, location tracking, in particular, has long been a tool employed by officials hoping to investigate and ultimately chill communications with the media. *See Government Surveillance: U.S. Has Long History of Watching White House Critics and Journalists*, Newsweek (July 24, 2017), https://perma.cc/B76N-3Z6B (noting the CIA's track record of "follow[ing] newsmen . . . in order to identify their sources"). But the "more sophisticated systems" of tracking now "in use or in development," *Kyllo v. United States*, 533 U.S. 27, 36 (2001), have expanded investigators' field of view dramatically.

"If reporters were routinely required to divulge the identities of their sources, the free flow of newsworthy information would be restrained and the public's understanding of important issues and events would be hampered in ways inconsistent with a healthy republic." *Ashcraft v. Conoco, Inc.*, 218 F.3d 282, 287 (4th Cir. 2000). The reporting of the landmark Pentagon Papers disclosures, for instance, involved repeated confidential meetings between Neil Sheehan of *The New York Times* and his source, Daniel Ellsberg, at each other's homes. *See* Scott, *supra*. The value of the reporting that would be lost if journalists could not credibly guard the confidentiality of those contacts cannot be overstated.

While in-person meetings have always played a role in reporter-source relationships, those interactions have taken on special importance in a climate of pervasive electronic surveillance. *See generally* Jennifer R. Henrichsen & Hannah Bloch-Wehba, Reporters Comm. for Freedom of the Press, Electronic Communications Surveillance: What Journalists and Media Organizations Need to Know (2017), https://perma.cc/SW4K-EVAX. In leak investigations in the prior administration, government tactics offered a vivid reminder that the electronic trail left by journalists' interactions with their sources is only a secret court order away from exposure to investigators. *See, e.g.*, Charlie Savage, *CNN Lawyers Gagged in Fight with Justice Dept. over Reporter's Email Data*, N.Y. Times (June 9,

6

2021), https://perma.cc/8LKT-3J3V.[1]  When any stray digital breadcrumb could

put a source's identity at risk, in-person meetings provide a crucial safety valve.

Indeed, as a 2015 report from the Pew Research Center documented,

"[w]hen it comes to the specific actions journalists may or may not take to protect

their sources, the most common technique by far . . . is to meet them in person."

Amy Mitchell et al., Pew Rsch. Ctr., Investigative Journalists and Digital Security

at 8–9 (2015), https://perma.cc/PS6S-VZZT.  And a 2014 study conducted by

Human Rights Watch likewise found that growing awareness of the scope of

government monitoring has led journalists "to adopt elaborate steps to protect

sources and information," up to and including "abandoning all online

communication and trying exclusively to meet sources in person."  Human Rights

Watch, With Liberty to Monitor All: How Large-Scale US Surveillance Is

Harming Journalism, Law, and American Democracy at 4 (2014),

https://perma.cc/KUH6-4MVF.  As one reporter put it:  "Maybe we need to get

---

[1]     Because of the important First Amendment interests at stake in protecting
the confidentiality of reporter-source contacts, the Justice Department in the
current administration recently strengthened its regulations prohibiting the use of
"compulsory legal process for the purpose of obtaining information from or
records of members of the news media acting within the scope of newsgathering,"
with limited exceptions.  28 C.F.R. § 50.10(a)(2).  While the new regulations mark
an important shift in the Department's approach, they lack the lasting force of a
federal statute and provide, of course, no protection against investigations
conducted by instruments of state or local governments.

back to going to sources' houses." *Id.* at 35. But the investigative technique at issue in this case threatens to erode that safe harbor for confidentiality too.

Geofence warrants can incidentally reveal a wealth of sensitive information about the confidential associations of individuals swept up in their net, from a meeting between a journalist and a source to attendance at a church. *See United States v. Chatrie*, 590 F. Supp. 3d 901, 918 (E.D. Va. 2022) (noting that the geofence in this case had a diameter of "300 meters, longer than three football fields" and swept in a church). And because search engine records provide "an almost unlimited pool from which to seek location data," no location—however sensitive—is beyond their reach. *Id.* at 925. Worse yet, the breadth of geofence warrants raises an obvious risk that they will be used pretextually: Any low-level, suspected crime near a newspaper office, church, or a public library could, on the government's view, provide an adequate justification to identify everyone who visited those locations at a given time. The dangers of overbreadth and misuse pose an obvious threat to the ability of journalists to promise their sources confidentiality and gather the news effectively.

## II. Geofence searches can be justified—if at all—only on the basis of a particularized warrant supported by individualized probable cause.

A. Fourth Amendment requirements must be scrupulously applied when First Amendment rights, including the right to gather news, are at stake.

Since the founding, the protections of the First and Fourth Amendments have been closely intertwined. Just as "Founding-era Americans understood the freedom of the press to include the right of printers and publishers not to be compelled to disclose the authors of anonymous works," *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2390 (2021) (Thomas, J., concurring) (citation and internal quotation marks omitted), the prohibition on unreasonable searches and seizures was widely understood as a response to abusive English practices targeting the publishers of dissident publications. *See Stanford*, 379 U.S. at 482. As the Supreme Court has often observed, two of the landmark cases that informed the Fourth Amendment—*Entick v. Carrington*, 19 How. St. Tr. 1029 (C.P. 1765), and *Wilkes v. Wood*, 19 How. St. Tr. 1153 (C.P. 1763)—were press cases. *See Marcus*, 367 U.S. at 724, 728. And whether a given case involves the press or not, Lord Camden's insight that a "discretionary power given to messengers to search wherever their suspicions may chance to fall" is "totally subversive of the liberty of the subject" continues to inform interpretation of the Fourth Amendment today. *Id.* at 728–29 (quoting *Wilkes*, 19 How. St. Tr. at 1167).

The Supreme Court has insisted, in that light, that Fourth Amendment review must be especially rigorous when First Amendment interests hang in the balance. *See Zurcher*, 436 U.S. at 564. In some settings, those interests demand a searching application of the Fourth Amendment's usual standards, because "[t]he

necessity for a prior judicial determination of probable cause will protect against gross abuses," *New York v. P.J. Video, Inc.*, 475 U.S. 868, 874 (1986) (quoting *Heller v. New York*, 413 U.S. 483, 492–93 (1973)), and "the preconditions for a warrant" will deny officers the discretion to "rummage at large" or "deter normal editorial and publication decisions," *Zurcher*, 436 U.S. at 565–66.  In other contexts, because "the First Amendment operates independently of the Fourth and provides different protections," *Nieves v. Bartlett*, 139 S. Ct. 1715, 1731 (2019) (Gorsuch, J., concurring in part and dissenting in part), the Court has underlined that search authorities implicating distinctive First Amendment interests may require stricter safeguards than the Fourth Amendment alone would provide.

In *United States v. Ramsey*, 431 U.S. 606 (1977), for instance, having concluded that the Fourth Amendment permits warrantless searches of mail at the border, the Supreme Court reserved the separate question of whether such searches would "impermissibly chill[] the exercise of free speech" if not for a statutory reasonable-suspicion requirement and a ban on reading any correspondence contained therein, *id.* at 624.  To similar effect, the Supreme Court has held that other warrant exceptions—the "'exigency' exception," for instance—must yield to First Amendment interests where, say, forgoing a warrant before seizing books or films "would effectively constitute a 'prior restraint.'"  *P.J. Video*, 475 U.S. at 873 (citing *Roaden v. Kentucky*, 413 U.S. 496 (1973)).  Across diverse contexts, then,

the First and Fourth Amendments work together to ensure that warrantless, discretionary search regimes do not abridge the freedoms of speech and the press.

The power to expose any individual present at a newsroom, a church, or a political rally squarely implicates those overlapping First and Fourth Amendment protections for "privacy in one's associations." *Ams. for Prosperity*, 141 S. Ct. at 2382 (quoting *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958)). Like the power to read a traveler's letters or seize a seller's books, access to a comprehensive record of an individual's location is the sort of search power likely to systematically burden the exercise of First Amendment rights. And that much is true whether in a given case the record reflects Neil Sheehan visiting Daniel Ellsberg or a person going about routine errands. Both cases involve one's "right to be let alone—the most comprehensive of rights," *Olmstead v. United States*, 277 U.S. 438, 478 (1928) (Brandeis, J., dissenting), *overruled by Katz v. United States*, 389 U.S. 347 (1967), absent a proper reason for individualized suspicion, of which a geofence warrant requires none. As such, the rule governing that surveillance must be framed with the "scrupulous exactitude" the Supreme Court requires where the government's discretion could, if left unregulated, be abused in future cases to tread on First Amendment interests. *Stanford*, 379 U.S. at 485.

B.    The Fourth Amendment requires a particularized warrant to intrude on the First Amendment associational rights threatened by location tracking.

The Supreme Court's precedents on location-tracking provide the appropriate approach to the analysis—and they reflect acute attention to the First Amendment interests that geofence warrants implicate. Having long recognized as a general matter that "[a]wareness that the government may be watching chills associational and expressive freedoms," *United States v. Jones*, 565 U.S. 400, 416 (2012) (Sotomayor, J., concurring), the Supreme Court affirmed in *Carpenter* that confidential associations remain entitled to Fourth Amendment protection when reflected in an individual's "particular movements." 138 S. Ct. at 2217. That concern is all the more pronounced when the surveillance in question reaches inside private homes or other sensitive locations. *See Kyllo*, 533 U.S. at 40.

Under *Carpenter*, the government intrudes on a reasonable expectation of privacy when it gathers data that "provides an intimate window" into an individual's "associations," *Carpenter*, 138 S. Ct. at 2217 (citation omitted); information that individuals leave behind without meaningful voluntary choice, *see id.* at 2220; and when new technology allows the government to conduct surveillance that, historically, had been "difficult and costly and therefore rarely undertaken" using previously available means, *id.* at 2217 (citation omitted).

Applying that test to persistent aerial surveillance over the city of Baltimore during daytime hours, this Court found that it intruded on a reasonable expectation of privacy because it creates "a 'detailed, encyclopedic,' record of where everyone came and went within the city during daylight hours." *Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330, 341 (4th Cir. 2021) (en banc) (quoting *Carpenter*, 138 S. Ct. at 2216). That record inevitably threatened to expose confidential associations because it "enable[d] deductions about 'what a person does repeatedly, what he does not do, and what he does ensemble.'" *Id.* at 342 (quoting *United States v. Maynard*, 615 F.3d 544, 562 (D.C. Cir. 2010), *aff'd in relevant part sub nom.*, *United States v. Jones*, 565 U.S. 400 (2012)). And this Court reached that conclusion even though the aerial surveillance had limits: It did not chronicle movements at night and could not follow people inside buildings. *Id.* The data accessible to investigators through geofence searches is even more comprehensive—"considerably more precise than other kinds of location data, including the CSLI considered in *Carpenter*," and capable of reaching into any home, church, or newsroom. Brief of Amicus Curiae Google LLC in Support of Neither Party Concerning Defendant's Motion to Suppress Evidence from a "Geofence" General Warrant at 10, *United States v. Chatrie*, No. 19-cr-00130 (E.D. Va. Dec. 20, 2019), 2019 WL 8227162 (ECF No. 59-1).

Individuals do not make a meaningful voluntary choice to leave that kind of exhaustive data behind. Google prompts its users to opt in to sharing their location histories when they open the Google Maps app for the first time. "It says, 'Get the most from Google Maps' and then it gives the user two options: 'YES I'M IN' or 'SKIP.' . . . The pop-up does not use the phase [sic] 'Location History,' but clicking on 'YES I'M IN' enables the function." Defendant Okello Chatrie's Supplemental Motion to Suppress Evidence Obtained from a "Geofence" General Warrant at 15–17, *United States v. Chatrie*, No. 19-cr-00130 (E.D. Va. May 22, 2020), 2020 WL 4551093 (ECF No. 104). Users who click that uninformative prompt have not relinquished all expectation of privacy in their location history from that point on and would not naturally expect that selecting it might mean handing over hundreds of data points per day about their every move.

There can likewise be no question that geofence searches evade the limits traditionally imposed on location tracking by "limited police resources and community hostility." *Illinois v. Lidster*, 540 U.S. 419, 426 (2004). Search engines such as Google collect the location histories of millions of users—"not just those belonging to persons who might happen to come under investigation." *Carpenter*, 138 S. Ct. at 2218. Access to this information makes the work of painstaking stakeouts unnecessary: With the location histories of millions within reach, "police need not even know in advance whether they want to follow a

14

particular individual, or when. Whoever the suspect turns out to be, he has effectively been tailed every moment of every day[.]" *Id.* That result offends a reasonable expectation of privacy and requires a particularized warrant.

C. Geofence warrants that expose an individual's location and associations based solely on their proximity to a suspected crime are inadequately particularized.

Warrants authorizing searches and seizures with First Amendment implications must "describe the things to be seized . . . [with] the most scrupulous exactitude." *Stanford*, 379 U.S. at 485 (citation omitted). This Court has explained that the particularity determination "is a pragmatic one" and that "[t]he degree of specificity required when describing the goods to be seized may necessarily vary according to the circumstances." *United States v. Torch*, 609 F.2d 1088, 1090 (4th Cir. 1979) (citation omitted). Here, those circumstances include the obvious risk that a geofence warrant will expose the confidential associations of individuals with no connection to a suspected crime beyond loose proximity.

In *Ybarra v. Illinois*, the Supreme Court foreclosed that result, making clear that "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person." 444 U.S. at 91. Just as probable cause to believe that the bartender of the Aurora Tap Tavern, where the search in *Ybarra* took place, was selling heroin did not mean the police could search the pockets of every patron present, *see id.*, probable

cause to believe that someone present near a bank during a robbery does not license a search of every incidental passerby. Were it otherwise—if the government were only required to show probable cause to believe that the dataset to be pulled would contain the suspected criminal's location somewhere in its sweep—there would be no limit on the permissible breadth of geofence searches. An index of the entire neighborhood, or for that matter the entire city, would be even more certain to catch the suspect in its net. That result is untenable; upholding this warrant would authorize a digital-age version of the same search that the Supreme Court held unconstitutional in *Ybarra*.

***

The technology at issue in this case poses an intolerable threat to confidential association, and with it the freedom to gather the news. Geofence searches follow citizens into the most sensitive of locations with hardly a grain of individualized suspicion. They would allow the government to keep—among other predictable subjects of that expansive authority—reporters and their sources under regular supervision. The press could not, under such scrutiny, provide the vigorous check on government that the Constitution recognizes and protects. This Court should reaffirm that particularized warrants, supported by individualized probable cause, play an essential role in protecting First Amendment rights from

unjustified surveillance. "No less a standard could be faithful to First Amendment freedoms." *Stanford*, 379 U.S. at 485.

## CONCLUSION

For the foregoing reasons, the Reporters Committee respectfully urges the Court to reverse the denial of Defendant-Appellant's motion to suppress.

Dated: January 27, 2023                    Respectfully submitted,

                                           */s/ Bruce D. Brown*
                                           *Counsel of Record for Amicus Curiae*
                                           Katie Townsend
                                           Gabe Rottman
                                           Grayson Clary
                                           Emily Hockett
                                           REPORTERS COMMITTEE FOR
                                              FREEDOM OF THE PRESS
                                           1156 15th St. NW, Suite 1020
                                           Washington, D.C. 20005
                                           Telephone: (202) 795-9300
                                           Facsimile: (202) 795-9310

**CERTIFICATE OF COMPLIANCE**

1.      This brief complies with the type-volume limitations of Fed. R. App.

P. 29(a)(5) and Fed. R. App. P. 32(a)(7) because it contains 3,509 words,

excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has

been prepared in a proportionally spaced typeface using Microsoft Word in 14-

point Times New Roman font.


Dated: January 27, 2023                    */s/ Bruce D. Brown*
                                           Bruce D. Brown
                                           *Counsel of Record for Amicus Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on January 27, 2023, I caused the foregoing Brief of Amicus Curiae the Reporters Committee for Freedom of the Press to be electronically filed with the Clerk of the Court using CM/ECF, which will automatically send notice of such filing to all counsel of record.


Dated: January 27, 2023                    */s/ Bruce D. Brown*
                                           Bruce D. Brown
                                           *Counsel of Record for Amicus Curiae*