No. 22-4489

# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

OKELLO T. CHATRIE,
*Defendant-Appellant*.

On Appeal from the United States District Court
for the Eastern District of Virginia
Case No. 3:19-cr-00130-MHL
Honorable M. Hannah Lauck, District Court Judge

# PROPOSED BRIEF OF AMICUS CURIAE THE REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS IN SUPPORT OF REHEARING EN BANC

Bruce D. Brown
*Counsel of Record for Amicus Curiae*
Katie Townsend
Gabe Rottman
Grayson Clary
Emily Hockett
REPORTERS COMMITTEE FOR
  FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, D.C. 20005
Telephone: (202) 795-9300
bruce.brown@rcfp.org

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................... iii

INTEREST OF AMICUS CURIAE ..........................................................................1

SOURCE OF AUTHORITY TO FILE .....................................................................2

FED. R. APP. P. 29(a)(4)(E) STATEMENT ............................................................2

SUMMARY OF THE ARGUMENT ........................................................................3

ARGUMENT .............................................................................................................5

    I.   Geofence warrants undermine important First Amendment interests, including the integrity of the newsgathering process ....................................5

    II.  Geofence searches can be justified—if at all—only on the basis of a particularized warrant supported by individualized probable cause. ..............7

        A.  Fourth Amendment requirements must be strictly applied when First Amendment rights, including the right to gather news, are at stake. ......................................................................................................7

        B.  The Fourth Amendment requires a particularized warrant to intrude on the First Amendment associational rights threatened by location tracking ..................................................................................9

        C.  Geofence warrants that expose an individual's location and associations based solely on their proximity to a suspected crime are inadequately particularized. .............................................................11

CONCLUSION ........................................................................................................13

CERTIFICATE OF COMPLIANCE .......................................................................14

CERTIFICATE OF SERVICE .................................................................................15

# TABLE OF AUTHORITIES

**Cases**

*Ams. for Prosperity Found. v. Bonta*,
    141 S. Ct. 2373 (2021) ................................................................................ 7, 8

*Ashcraft v. Conoco, Inc.*,
    218 F.3d 282 (4th Cir. 2000) ...................................................................... 5, 6

*Carpenter v. United States*,
    138 S. Ct. 2206 (2018) ................................................................. 4, 9, 10, 11

*Heller v. New York*,
    413 U.S. 483 (1973) .......................................................................................8

*Illinois v. Lidster*,
    540 U.S. 419 (2004) .....................................................................................11

*Kyllo v. United States*,
    533 U.S. 27 (2001) ..................................................................................... 5, 9

*Leaders of a Beautiful Struggle v. Balt. Police Dep't*,
    2 F.4th 330 (4th Cir. 2021) .........................................................................10

*Marcus v. Search Warrants*,
    367 U.S. 717 (1961) .......................................................................................4

*Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue*,
    460 U.S. 575 (1983) .......................................................................................3

*NAACP v. Alabama ex rel. Patterson*,
    357 U.S. 449 (1958) .......................................................................................8

*New York v. P.J. Video, Inc.*,
    475 U.S. 868 (1986) .......................................................................................8

*Nieves v. Bartlett*,
    139 S. Ct. 1715 (2019) ...................................................................................8

*Stanford v. Texas*,
    379 U.S. 476 (1965) ............................................................................. *passim*

*United States v. Chatrie*,
   107 F.4th 319 (4th Cir. 2024) ...................................................................*passim*

*United States v. Di Re*,
   332 U.S. 581 (1948) ..............................................................................................5

*United States v. Jones*,
   565 U.S. 400 (2012) ........................................................................................9, 11

*United States v. Ramsey*,
   431 U.S. 606 (1977) ..............................................................................................8

*United States v. Torch*,
   609 F.2d 1088 (4th Cir. 1979) ............................................................................12

*Ybarra v. Illinois*,
   444 U.S. 85 (1979) ..........................................................................................3, 12

*Zurcher v. Stanford Daily*,
   436 U.S. 547 (1978) ....................................................................................5, 7, 8

**Other Authorities**

Amy Mitchell et al., Pew Rsch. Ctr.,
   Investigative Journalists and Digital Security (2015),
   https://perma.cc/PS6S-VZZT....................................................................................6

Charlie Savage, *CNN Lawyers Gagged in Fight with Justice Dept. over
   Reporter's Email Data*, N.Y. Times (June 9, 2021),
   https://perma.cc/8LKT-3J3V ...................................................................................6

*Government Surveillance: U.S. Has Long History of Watching White House
   Critics and Journalists*, Newsweek (July 24, 2017),
   https://perma.cc/B76N-3Z6B....................................................................................5

Human Rights Watch, With Liberty to Monitor All: How Large-Scale US
   Surveillance Is Harming Journalism, Law, and American Democracy
   (2014),
   https://perma.cc/KUH6-4MVF ...............................................................................6

*Introduction to the Reporter's Privilege Compendium*,
   Reporters Comm. for Freedom of the Press,
   https://perma.cc/BNT4-HHPY (last updated Nov. 5, 2021)................................3

Janny Scott, *Now It Can Be Told: How Neil Sheehan Got the Pentagon Papers*, N.Y. Times (Jan. 7, 2021), https://perma.cc/NFM7-B76C ..................................................................................4

## INTEREST OF AMICUS CURIAE

The Reporters Committee for Freedom of the Press ("Reporters Committee" or "Amicus") is an unincorporated nonprofit association of reporters and editors founded by leading journalists and media lawyers in 1970 when the nation's news media faced an unprecedented wave of government subpoenas forcing reporters to name confidential sources. The Reporters Committee often appears as amicus curiae in federal courts, as it did at the panel stage in this case, to underline the effects of excessive surveillance on the confidential reporter-source relationships that underpin so much public-interest journalism. *See United States v. Chatrie*, 107 F.4th 319, 372–73 (4th Cir. 2024) (Wynn, J., dissenting) (citing Br. of Amicus Curiae Reporters Comm. for Freedom of the Press at 7–8).

## SOURCE OF AUTHORITY TO FILE

Amicus respectfully requests leave to file by the motion filed herewith. Counsel for Defendant Okello Chatrie consents to the filing of this brief; the United States does not object to the filing of this brief.  *See* Fed. R. App. P. 29(b)(2).

## FED. R. APP. P. 29(a)(4)(E) STATEMENT

Amicus declares that:

1. no party's counsel authored the brief in whole or in part;

2. no party or party's counsel contributed money intended to fund preparing or submitting the brief; and

3. no person, other than amicus, its members or its counsel, contributed money intended to fund preparing or submitting the brief.

## SUMMARY OF THE ARGUMENT

With the help of a geofence warrant, government investigators can comb through the location histories of millions to expose the identity of every individual present in a given area during a given time period, based on nothing more than "mere propinquity to others independently suspected of criminal activity." *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979). That ability to cast a dragnet over any location—however sensitive—without the need for individualized suspicion to search each individual swept up in it poses an obvious threat to "the ability of journalists to gather information confidentially," and, thus, to their ability to inform the public. *United States v. Chatrie*, 107 F.4th 319, 372–73 (4th Cir. 2024) (Wynn, J., dissenting).

It is a "basic assumption of our political system that the press will often serve as an important restraint on government." *Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 585 (1983). Journalists regularly rely on confidential sources in fulfilling that role, and sources often need anonymity to confide in reporters without fear that—if their identities are revealed—they will face prosecution, loss of employment, or even threats to their lives. *See Introduction to the Reporter's Privilege Compendium*, Reporters Comm. for Freedom of the Press, https://perma.cc/BNT4-HHPY (last updated Nov. 5, 2021). Geofence warrants undermine those assurances of confidentiality. On the theory

3

the panel embraced, any petty offense within three blocks of the local newspaper office would justify exposing everyone who visited it the day of the offense.

The Reporters Committee therefore writes to underscore the corrosive effect of geofences on First Amendment interests. In requiring that searches be carried out only with a particularized warrant, the Fourth Amendment prohibits intrusion on the newsgathering process absent a sound basis to believe a crime will be uncovered. Geofences afford no such protection: They open "an intimate window into a person's life," *Carpenter v. United States*, 138 S. Ct. 2206, 2217 (2018), based on nothing more than passing proximity to a possible crime. Not only could that sweep incidentally capture the next Neil Sheehan visiting the home of the next Daniel Ellsberg, *see* Janny Scott, *Now It Can Be Told: How Neil Sheehan Got the Pentagon Papers*, N.Y. Times (Jan. 7, 2021), https://perma.cc/NFM7-B76C, but also it empowers investigators to use the most trivial suspected crime near a newsroom as a pretext to learn the names of everyone who visited that day.

Such "unrestricted power of search and seizure" would be a powerful "instrument for stifling liberty of expression," casting a chilling pall on the reporter-source contacts on which effective journalism often relies. *Marcus v. Search Warrants*, 367 U.S. 717, 729 (1961). This Court should grant rehearing en banc of the panel decision to reject that construction of the Fourth Amendment and reaffirm that its requirements apply with "scrupulous exactitude" when First

4

Amendment freedoms also are at stake. *Zurcher v. Stanford Daily*, 436 U.S. 547, 564 (1978) (quoting *Stanford v. Texas*, 379 U.S. 476, 485 (1965)).

## ARGUMENT

I. **Geofence warrants undermine important First Amendment interests, including the integrity of the newsgathering process.**

Experience teaches that a "too permeating police surveillance" will predictably intrude on the newsgathering process—exposing stories pursued, journalistic methods employed, and the identities of sources consulted. *United States v. Di Re*, 332 U.S. 581, 595 (1948). And because in-person meetings play a crucial role in reporter-source relationships, location tracking, in particular, has long been a tool employed by officials hoping to investigate and ultimately chill communications with the media. *See Government Surveillance: U.S. Has Long History of Watching White House Critics and Journalists*, Newsweek (July 24, 2017), https://perma.cc/B76N-3Z6B (noting the CIA's track record of "follow[ing] newsmen . . . in order to identify their sources"). But the "more sophisticated systems" of tracking now "in use or in development," *Kyllo v. United States*, 533 U.S. 27, 36 (2001), have expanded investigators' field of view dramatically.

"If reporters were routinely required to divulge the identities of their sources, the free flow of newsworthy information would be restrained and the public's understanding of important issues and events would be hampered in ways inconsistent with a healthy republic." *Ashcraft v. Conoco, Inc.*, 218 F.3d 282, 287

5

(4th Cir. 2000). And while in-person meetings have always played a role in reporter-source relationships, those interactions have taken on special importance in a climate of pervasive electronic surveillance. In recent leak investigations, government tactics offered a vivid reminder that the electronic trail left by journalists' interactions with their sources is only a secret court order away from exposure. *See, e.g.*, Charlie Savage, *CNN Lawyers Gagged in Fight with Justice Dept. over Reporter's Email Data*, N.Y. Times (June 9, 2021), https://perma.cc/8LKT-3J3V. When any digital breadcrumb could put a source's identity at risk, in-person meetings provide an essential safety valve. Adapting to that reality, as a 2015 report from the Pew Research Center documented, "[w]hen it comes to the specific actions journalists may or may not take to protect their sources, the most common technique by far . . . is to meet them in person." Amy Mitchell et al., Pew Rsch. Ctr., Investigative Journalists and Digital Security at 8–9 (2015), https://perma.cc/PS6S-VZZT; *see also* Human Rights Watch, With Liberty to Monitor All: How Large-Scale US Surveillance Is Harming Journalism, Law, and American Democracy at 4 (2014), https://perma.cc/KUH6-4MVF.

The investigative technique at issue in this case threatens to erode that safe harbor too. Geofence warrants can incidentally reveal a wealth of sensitive information about the confidential associations of individuals swept up in their net. *See Chatrie*, 107 F.4th at 372–73 (Wynn, J., dissenting). Worse yet, the breadth of

6

these warrants raises an obvious risk that they will be used pretextually: Any low-level, suspected crime near a newspaper office could, on the panel's view, provide an adequate justification to identify everyone who visited it at a given time. The dangers of overbreadth and misuse pose an obvious threat to "the ability of journalists to gather information confidentially and effectively." *Id.*

## II. Geofence searches can be justified—if at all—only on the basis of a particularized warrant supported by individualized probable cause.

### A. Fourth Amendment requirements must be strictly applied when First Amendment rights, including the right to gather news, are at stake.

Since the founding, the protections of the First and Fourth Amendments have been closely intertwined. Just as "Founding-era Americans understood the freedom of the press to include the right of printers and publishers not to be compelled to disclose the authors of anonymous works," *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2390 (2021) (Thomas, J., concurring) (citation and internal quotation marks omitted), the prohibition on unreasonable searches and seizures was widely understood as a response to abusive English practices targeting the publishers of dissident publications. *See Stanford*, 379 U.S. at 482.

The Supreme Court has insisted, in that light, that Fourth Amendment review must be especially rigorous when First Amendment interests hang in the balance. *See Zurcher*, 436 U.S. at 564. In some settings, those interests demand a searching application of the Fourth Amendment's usual standards, because "[t]he

7

necessity for a prior judicial determination of probable cause will protect against gross abuses," *New York v. P.J. Video, Inc.*, 475 U.S. 868, 874 (1986) (quoting *Heller v. New York*, 413 U.S. 483, 492–93 (1973)), and "the preconditions for a warrant" will deny officers the discretion to "rummage at large" or "deter normal editorial and publication decisions," *Zurcher*, 436 U.S. at 565–66.  In other contexts, because "the First Amendment operates independently of the Fourth and provides different protections," *Nieves v. Bartlett*, 139 S. Ct. 1715, 1731 (2019) (Gorsuch, J., concurring in part and dissenting in part), the Supreme Court has underlined that searches implicating distinctive First Amendment interests may require stricter safeguards than the Fourth Amendment alone would provide, *see, e.g.*, *P.J. Video*, 475 U.S. at 873 (exigency exception to the warrant requirement does not apply where seizing expressive materials "would effectively constitute a 'prior restraint'"); *United States v. Ramsey*, 431 U.S. 606, 624 (1977) (reserving the question whether warrantless searches of mail at the border, permissible under the Fourth Amendment, would nevertheless violate the First Amendment).

      The power to expose any individual visiting a newsroom squarely implicates those overlapping First and Fourth Amendment protections for "privacy in one's associations." *Ams. for Prosperity*, 141 S. Ct. at 2382 (quoting *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958)).  Like the power to read a traveler's letters or seize a seller's books, access to a comprehensive location

8

history is the sort of power systematically likely to burden First Amendment rights. And that much is true whether in a particular case the record reflects Sheehan visiting Ellsberg or a resident going about routine errands. The rule governing that surveillance must be framed with the "scrupulous exactitude" the Supreme Court requires where the government's discretion could, if left unregulated, be abused in future cases to tread on First Amendment interests. *Stanford*, 379 U.S. at 485.

> B. The Fourth Amendment requires a particularized warrant to intrude on the First Amendment associational rights threatened by location tracking.

The Supreme Court's precedents on location-tracking provide the appropriate approach to the analysis—and reflect acute attention to the First Amendment interests at stake. Having long recognized that "[a]wareness that the government may be watching chills associational and expressive freedoms," *United States v. Jones*, 565 U.S. 400, 416 (2012) (Sotomayor, J., concurring), the Supreme Court affirmed in *Carpenter* that confidential associations remain entitled to Fourth Amendment protection when reflected in an individual's "particular movements." 138 S. Ct. at 2217. That concern is heightened when surveillance reaches inside homes or other sensitive locations. *See Kyllo*, 533 U.S. at 40.

Under *Carpenter*, the government intrudes on a reasonable expectation of privacy when it gathers data that "provides an intimate window" into an individual's "associations," *Carpenter*, 138 S. Ct. at 2217 (citation omitted);

9

information that individuals leave behind without meaningful voluntary choice, *see id.* at 2220; and when new technology allows the government to conduct surveillance that, historically, had been "difficult and costly and therefore rarely undertaken" using previously available means, *id.* at 2217 (citation omitted).

Applying that test to persistent aerial surveillance over Baltimore, this Court found that it intruded on a reasonable expectation of privacy because it creates "a 'detailed, encyclopedic,' record of where everyone came and went within the city during daylight hours." *Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330, 341 (4th Cir. 2021) (en banc) (quoting *Carpenter*, 138 S. Ct. at 2216). That record inevitably threatened to expose confidential associations because it "enable[d] deductions about 'what a person does repeatedly, what he does not do, and what he does ensemble.'" *Id.* at 342 (citation omitted). And this Court reached that conclusion even though the aerial surveillance had limits: It did not operate at night and could not follow people inside buildings. *Id.* The data accessible through geofences is even more comprehensive—it is "collected more often and is more precise than CSLI as described in *Carpenter*," *Chatrie*, 107 F.4th at 348 (Wynn, J., dissenting); it is capable, too, of reaching into any newsroom.

Individuals do not make a meaningful voluntary choice to leave that kind of exhaustive data behind. At the time of the search at issue in this case, Google's location tracking was enabled by a "one click" prompt that "lacked sufficient

10

information for users to knowingly opt into Location History." *Id.* at 359 (Wynn, J., dissenting). And there can likewise be no question that geofence searches evade the limits traditionally imposed on location tracking by "limited police resources and community hostility." *Illinois v. Lidster*, 540 U.S. 419, 426 (2004). Companies like Google collect the location histories of millions of users—"not just those belonging to persons who might happen to come under investigation." *Carpenter*, 138 S. Ct. at 2218. Access to this information makes the painstaking work of stakeouts unnecessary because "police need not even know in advance whether they want to follow a particular individual, or when. Whoever the suspect turns out to be, he has effectively been tailed every moment of every day[.]" *Id.* As a result, geofences dissolve the traditional "practical" checks on improper monitoring of the press. *Jones*, 565 U.S. at 429 (Alito, J., concurring). That power offends a reasonable expectation of privacy and requires a particularized warrant.

  C. Geofence warrants that expose an individual's location and associations based solely on their proximity to a suspected crime are <u>inadequately particularized.</u>

Warrants authorizing searches and seizures with First Amendment implications must "describe the things to be seized . . . [with] the most scrupulous exactitude." *Stanford*, 379 U.S. at 485 (citation omitted). This Court has explained that the particularity determination "is a pragmatic one" and that "[t]he degree of specificity required when describing the goods to be seized may

11

necessarily vary according to the circumstances." *United States v. Torch*, 609 F.2d 1088, 1090 (4th Cir. 1979) (citation omitted). Here, those circumstances include the obvious risk that a geofence warrant will expose confidential associations.

In *Ybarra v. Illinois*, the Supreme Court foreclosed that result, making clear that "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person." 444 U.S. at 91. Were it otherwise—if the government were only required to show probable cause to believe that the dataset it sought to obtain would contain the suspected criminal's location somewhere in its sweep—there would be no limit on the permissible breadth of geofence searches. An index of an entire neighborhood, or for that matter an entire city, would be even more certain to catch the suspect in its net. That result is untenable; upholding this warrant would authorize a digital-age version of the same search the Supreme Court held unconstitutional in *Ybarra*.

\*\*\*

The technology at issue in this case poses an intolerable threat to "the ability of journalists to gather information confidentially," and with it the freedom to gather news. *Chatrie*, 107 F.4th at 372–73 (Wynn, J., dissenting). This Court should reaffirm that particularized warrants, supported by individualized probable cause, play an essential role in protecting the rights of a free press. "No less a

12

standard could be faithful to First Amendment freedoms." *Stanford*, 379 U.S. at 485.

## CONCLUSION

For the foregoing reasons, the Reporters Committee respectfully urges the Court to grant rehearing en banc.

Dated: August 29, 2024                    Respectfully submitted,

<u>*/s/ Bruce D. Brown*</u>
*Counsel of Record for Amicus Curiae*
Katie Townsend
Gabe Rottman
Grayson Clary
Emily Hockett
REPORTERS COMMITTEE FOR
   FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, D.C. 20005
Telephone: (202) 795-9300
Facsimile: (202) 795-9310

13

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitations of Fed. R. App. P. 29(b)(4) because it contains 2,517 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated: August 29, 2024                 */s/ Bruce D. Brown*
                                       Bruce D. Brown
                                       *Counsel of Record for Amicus Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on August 29, 2024, I caused the foregoing Proposed Brief of Amicus Curiae the Reporters Committee for Freedom of the Press to be electronically filed with the Clerk of the Court using CM/ECF, which will automatically send notice of such filing to all counsel of record.

Dated: August 29, 2024                     */s/ Bruce D. Brown*
                                            Bruce D. Brown
                                            *Counsel of Record for Amicus Curiae*