**FEDERAL PUBLIC DEFENDER**
EASTERN DISTRICT OF VIRGINIA
701 East Broad Street, Suite 3600
Richmond, Virginia 23219
(804) 343-0800 (main)
(804) 565-0881 (attorney direct)
1(804) 800-4214 (e-fax)

**Geremy C. Kamens**
Federal Public Defender

**Laura J. Koenig**
Assistant Federal Public Defender

January 21, 2025

Nwamaka Anowi, Clerk
U.S. Court of Appeals for the Fourth Circuit
1100 E. Main Street, Suite 501
Richmond, VA 23219

> Re: ***United States v. Okello T. Chatrie***, No. 22-4489 (argument scheduled for **January 30, 2025), Letter Under Fed. R. App. P. 28(j)**

Dear Ms. Anowi:

Appellant Chatrie notifies the Court that on January 14, 2025, the Fifth Circuit Court of Appeals denied the government's petition for rehearing en banc in *United States v. Smith*. Ex. 1, Opinion on Petition for Rehearing En Banc, No. 23-60321 (5th Cir. Jan. 14, 2025). *Smith* is a geofence case, like *Chatrie*, involving a similar constitutional challenge to the warrant.

The Fifth Circuit panel found that individuals have an expectation of privacy in their Google Location History data and held that "geofence warrants are modern-day general warrants" that are unconstitutional under the Fourth Amendment. *United States v. Smith*, 110 F.4th 817, 840 (5th Cir. 2024). The government petitioned for rehearing and Mr. Smith filed a response at the court's direction. No judge requested that the court be polled, and the Fifth Circuit denied the petition.

Appellant Chatrie also notifies the Court that X Corp. (formerly Twitter) filed an amicus brief in support of Mr. Smith's opposition to rehearing, arguing that *Carpenter* extends to geofence warrants and that "'third parties' like Google and X . . . should not be coerced into helping governments undermine [their] users' privacy and property rights through an end run around the Fourth Amendment." Ex. 2, Amicus Br. of X Corp. at 4, *United States v. Smith*, No. 23-60321 (5th Cir. Dec. 31, 2024).

Finally, Appellant Chatrie notifies the Court that the government, in response to a post-argument inquiry in *Smith*, conferred with Google to provide an update on the changes that the company has made to the way Location History data is stored. Ex. 3, Gov. Br. at 3, *United States*

1

*v. Smith*, No. 23-60321 (5th Cir. Apr. 18, 2024). The government stated that, as of April 2024, it is "still seeking geofences," but that "the migration of Location History from Google's servers to users' devices has been underway for the past several months, and Google currently anticipates that this migration will be complete within the next several months." *Id.* Accordingly, "[o]nce this migration is complete, Google states that it will be unable to respond to geofence warrants." *Id.*

Respectfully,

_____/s._____
Laura J. Koenig
Assistant Federal Public Defender

_____/s._____
Michael Price
Litigation Director
NACDL Fourth Amendment Center

# United States Court of Appeals
# for the Fifth Circuit

---

No. 23-60321

---

United States Court of Appeals
Fifth Circuit

**FILED**

January 14, 2025

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

*Plaintiff—Appellee,*

*versus*

JAMARR SMITH; THOMAS IROKO AYODELE; GILBERT
MCTHUNEL, II,

*Defendants—Appellants.*

---

Appeal from the United States District Court
for the Northern District of Mississippi
USDC No. 3:21-CR-107-1

---

## ON PETITION FOR REHEARING EN BANC

Before KING, HO, and ENGELHARDT, *Circuit Judges*.

PER CURIAM:

Treating the petition for rehearing en banc as a petition for panel rehearing (5TH CIR. R. 35 I.O.P.), the petition for panel rehearing is DENIED. Because no member of the panel or judge in regular active service requested that the court be polled on rehearing en banc (FED. R. APP. P. 35 and 5TH CIR. R. 35), the petition for rehearing en banc is DENIED.

# *United States Court of Appeals*
### FIFTH CIRCUIT
### OFFICE OF THE CLERK

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE,**
**Suite 115**
**NEW ORLEANS, LA 70130**

January 14, 2025

MEMORANDUM TO COUNSEL OR PARTIES LISTED BELOW:

        No. 23-60321    USA v. Smith
                        USDC No. 3:21-CR-107-1


Enclosed is an order entered in this case.


                        Sincerely,

                        LYLE W. CAYCE, Clerk

                        By: _____
                        Roeshawn Johnson, Deputy Clerk
                        504-310-7998

Mr. Paul Alvin Chiniche
Mr. David Crews
Mr. Nathan Paul Judish
Mr. Goodloe Tankersley Lewis
Mr. Robert Bruce McDuff
Mr. Clyde McGee IV
Mr. Mark Miller
Mr. Robert J. Mims
Mr. Michael William Price
Mr. William Farley Travis

No. 23-60321

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

JAMARR SMITH, THOMAS IROKO AYODELE, AND
GILBERT MCTHUNEL, II,

Defendants - Appellants.

On Appeal from the United States District Court
for the Northern District of Mississippi (Aycock, J.)
No. 3:21-CR-107

**BRIEF AMICUS CURIAE OF
X CORP. IN SUPPORT OF DEFENDANTS-APPELLANTS**

AMY PEIKOFF
10900 Research Blvd. 160C
Box 172
Austin, TX 78759
legalizeprivacy@icloud.com

MARK MILLER
Pacific Legal Foundation
4440 PGA Blvd., Suite 307
Palm Beach Gardens, FL 33410
Telephone: (561) 691-5000
Mark@pacificlegal.org

*Counsel for Amicus Curiae X Corp.*

## CERTIFICATE OF INTERESTED PERSONS

No. 23-60321

*United States of America v. Jamarr Smith, et al.*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made so that the judges of this Court may evaluate possible disqualification or recusal.

1. Plaintiff-Appellee United States of America.

2. Defendant-Appellant Jamarr Smith.

3. Defendant-Appellant Thomas Iroko Ayodele.

4. Defendant-Appellant Gilbert McThunel, II.

5. United States District Judge Hon. Sharion Aycock.

6. Amicus Curiae X Corp., which is owned by parent X Holdings Corp. No publicly held company owns 10% or more of its stock.

7. The following law firms and counsel have participated in the case, either in the district court or on appeal:

Robert J. Mims
Clyde McGee, IV
Paul D. Roberts
U.S. Attorney's Office
Northern District of Mississippi
900 Jefferson Avenue
Oxford, MS 38655

Nathan Paul Judish
U.S. Department of Justice
Computer Crime & Intellectual Property Section
1400 New York Avenue
Washington, DC 20530
*Counsel for Plaintiff-Appellee United States of America*

Goodloe Tankersly Lewis
Hickman, Goza & Spragins, P.L.L.C.
1305 Madison Avenue
Oxford, MS 38655
*Counsel for Defendant-Appellant Jamarr Smith*

William Farley Travis
Travis Law Offices, P.L.L.C.
8619 Highway 51 North
Southaven, MS 38671
*Counsel for Defendant-Appellant Thomas Iroko Ayodele*

Paul Alvin Chiniche
Chiniche Law Firm, P.L.L.C.
265 North Lamar Boulevard
Suite W South
Oxford, MS 38655
*Counsel for Defendant-Appellant Gilbert McThunel, II*

Mark Miller
Pacific Legal Foundation
4440 PGA Blvd., Suite 307
Palm Beach Gardens, FL 33410

Amy Peikoff
10900 Research Blvd. 160C
Box 172
Austin, TX 78759
*Counsel for Amicus Curiae X Corp.*

/s/ Mark Miller
MARK MILLER
*Counsel of Record for*
*Amicus Curiae X Corp.*

# TABLE OF CONTENTS

**Page(s)**

CERTIFICATE OF INTERESTED PERSONS ........................................i

TABLE OF AUTHORITIES.................................................................v

STATEMENT OF INTEREST OF AMICUS CURIAE...........................1

INTRODUCTION AND SUMMARY OF ARGUMENT ..........................2

ARGUMENT ...................................................................................6

I.    The Third-Party Doctrine Originated in "Secret Agent Cases,"
Cases the Common Law Would Address Under the
Doctrine of Illegal Contract. This Explains Why There
Was No "Reasonable Expectation of Privacy" in Those Cases........6

II.   The Common Law of Contract Traditionally Protected
Privacy, and So Is a Proper Lens Through Which to
Analyze the Third-Party Doctrine .................................................9

III.  This Approach Makes It Possible to Limit the Third-Party
Doctrine's Application Without Resorting to
"Balancing . . . Weighty or Incommensurate Principles" .............12

CONCLUSION ..............................................................................13

CERTIFICATE OF COMPLIANCE....................................................14

CERTIFICATE OF SERVICE............................................................15

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Byrd v. United States,*
     584 U.S. 395 (2018)................................................................5

*Carpenter v. United States,*
     585 U.S. 296 (2018)........................................................ *passim*

*Katz v. United States,*
     389 U.S. 347 (1967).....................................................3, 5, 10

*Lange v. California,*
     594 U.S. 295 (2021)..................................................6, 11–12

*Smith v. Maryland,*
     442 U.S. 735 (1979).......................................................3, 7–8

*United States v. Jones,*
     565 U.S. 400 (2012) ...........................................1, 5, 10, 12

*United States v. Miller,*
     425 U.S. 435 (1976).......................................................3, 7–8

*United States v. Smith,*
     110 F.4th 817 (5th Cir. 2024) ...........................................2

## U.S. Constitution

U.S. Const. amend. IV........................................................ *passim*

## Rule

Fed. R. App. P. 29(b)...............................................................1

## Other Authorities

5 Williston, Samuel & Lord, Richard A.,
     A Treatise on the Law of Contracts (4th ed. 2009) ..............8

Amar, Akhil Reed, *Fourth Amendment First Principles*,
107 Harv. L. Rev. 757 (1994) ............................................ 5–6

Brandeis, Louis D. & Warren, Samuel D.,
*The Right to Privacy*, 4 Harv. L. Rev. 193 (1890) ......................... 9–10

Cuddihy, William J., The Fourth Amendment: Origins and
Original Meanings 602-1791 (Oxford Univ. Press 2009) ..................... 4

Del Rosso, Cristina & Bast, Carol M., *Protecting Online
Privacy in the Digital Age:* Carpenter v. United States
*and the Fourth Amendment's Third-Party Doctrine*,
28 Cath. U. J. L. & Tech. 89 (2020) ..................................... 9

Greenwald, Glenn, *NSA collecting phone records of millions
of Verizon customers daily,* The Guardian (June 6, 2013),
https://www.theguardian.com/world/2013/jun/06/nsa-
phone-records-verizon-court-order ...................................... 7

Kerr, Orin S., *The Case for the Third-Party Doctrine*,
107 Mich. L. Rev. 561 (2009) ............................................ 6–7

Peikoff, Amy L., *Of Third-Party Bathwater: How to Throw
Out the Third-Party Doctrine While Preserving
Government's Ability to Use Secret Agents*,
88 St. John's L. Rev. 349 (2014) ....................................... 9

Wade, John W. et al., Prosser, Wade and Schwartz's Cases
and Materials on Torts (The Foundation Press 1994) ..................... 10

## STATEMENT OF INTEREST OF AMICUS CURIAE[1]

"Awareness that the government may be watching chills associational and expressive freedoms." *United States v. Jones*, <u>565 U.S. 400, 416</u> (2012) (Sotomayor, J., concurring). X Corp. ("X"), an American technology company headquartered in Bastrop, Texas, strives to protect the associational and expressive freedoms of users of its real-time information-sharing app. X understands that this means also ensuring its users' Fourth Amendment rights are respected regarding the data X collects and processes.

While providing services to users, X collects, processes, and stores multiple classes of data which might be subject to "reverse searches" by law enforcement, including location data.[2] X believes contractual promises, like those it makes in its Terms of Service, should be recognized as relevant to the Fourth Amendment protection its users' data receives.

---

[1] This brief is submitted under <u>Federal Rule of Appellate Procedure 29(b)</u> with the consent of all parties. Undersigned counsel for Amicus Curiae certifies that this brief was not authored in whole or part by counsel for any of the parties; no party or party's counsel contributed money for the brief; and no one other than Amicus and their counsel has contributed money for this brief.

[2] X may infer the location of its users using multiple signals, including the user-specified location, the user's IP address, and—for the subset of users who consent—device-provided location data like that at issue in the instant case.

## INTRODUCTION
## AND SUMMARY OF ARGUMENT

In its petition for rehearing, the government argues the Panel's holding "was an undue expansion" of the Supreme Court's holding in *Carpenter v. United States*, 585 U.S. 296 (2018). *See* Pet. for Reh'g at 7–8. On the government's view, the third-party doctrine applies in this case, and therefore the Fourth Amendment was not implicated when (1) appellants shared their locations with "third-party" Google, and then (2) Google shared that information with the government. *See id.* at 7–12. The government is wrong; the Panel's decision correctly interprets and applies the limitations of the third-party doctrine established in *Carpenter*. *See United States v. Smith*, 110 F.4th 817, 834, 836 (5th Cir. 2024) ("*Carpenter's* application to the third-party doctrine in this case is straightforward . . . per *Carpenter*, the third-party doctrine does not apply.").

Nevertheless, disagreements about the application of the third-party doctrine post-*Carpenter* do not surprise. As Justice Gorsuch noted, the *Carpenter* majority left lower courts "two amorphous balancing tests, a series of weighty and incommensurable principles to consider in them,

and a few illustrative examples." *Carpenter*, 585 U.S. at 397 (Gorsuch, J., dissenting).

The first test is the infamous *Katz* "reasonable expectation of privacy" test. *See Katz v. United States*, 389 U.S. 347, 360 (1967) (Harlan, J., concurring). The second is new, formulated by a *Carpenter* majority evidently reluctant to further extend the third-party doctrine—previously extended in the 1970s cases *Smith*[3] and *Miller*[4]—to its logical extreme. Narrowing those cases' holdings, the *Carpenter* majority established "a *second Katz*-like balancing inquiry, asking whether the fact of disclosure to a third party outweighs privacy interests in the 'category of information' so disclosed." *Carpenter*, 585 U.S. at 397 (Gorsuch, J., dissenting, citing majority).

As a result, judges are left asking: How long is the "long term" to which data must correspond before an expectation of privacy in it becomes "reasonable"? How "sensitive" must the data be? How "intrusive" the invasion? How "voluntary" must the sharing be to outweigh other "reasonableness" factors? *See* Pet. for Reh'g at 8–9

---

[3] *Smith v. Maryland*, 442 U.S. 735 (1979).
[4] *United States v. Miller*, 425 U.S. 435 (1976).

(arguing three voluntariness factors from *Carpenter* are inapplicable to Google geofence warrants). Should courts focus on "capabilities" of technology, or look only at "results," of the data shared in each case? And so on.

Besides causing judicial headaches, the third-party doctrine enables government to gather rafts of information without first obtaining a warrant based on probable cause and particularized suspicion. This undermines property rights and privacy—necessary for enjoying associational and expressive freedoms—and contradicts the Founders' understanding of our Fourth Amendment protections. *See* William J. Cuddihy, The Fourth Amendment: Origins and Original Meanings 602-1791 776 (Oxford Univ. Press 2009) ("[individualized warrants] preponderated as the orthodox protocol of search and seizure in 1791") (citation omitted).

Moreover, it prevents "third parties" like Google and X from acting according to their own judgment in relation to both government and their users. X believes it should not be coerced into helping governments undermine its users' privacy and property rights through an end run around the Fourth Amendment.

4

This amicus brief urges this Court to either deny en banc review or, should it grant review, to ultimately affirm the Panel's holding regarding the third-party doctrine. Should the Court choose the latter path, it should clarify this area of constitutional law by tethering its decision to the Fourth Amendment's original meaning: all searches of private property require warrants based on probable cause and particularized suspicion, *Jones,* 565 U.S. at 404–10 (holding a search occurred when government obtained information by trespassing on a constitutionally protected "effect"), and a search occurs when government accesses "houses, papers, [or] effects," U.S. Const. amend. IV, that belong to a person under the law. *Byrd v. United States*, 584 U.S. 395, 403–04 (2018) ("[*Katz*] supplements, rather than displaces, the traditional property-based understanding of the Fourth Amendment.") (internal citation and quotation omitted).

On this view—and even on an alternative originalist view centering on the Amendment's promise that searches and seizures be "reasonable," *see* Akhil Reed Amar, *Fourth Amendment First Principles*, 107 Harv. L. Rev. 757 (1994)—this connection is achieved by recourse to the common law. Cases involving "reverse searches" of data held by third parties

should be viewed through the lens of the common law of contract as understood by our Founders. *See Lange v. California*, 594 U.S. 295, 309 (2021) (noting the common law may be instructive as to what sort of searches the Founders would consider reasonable, and the Fourth Amendment must be interpreted to "provide *at a minimum* the degree of protection it afforded when it was adopted" (internal citations and quotations omitted)). This approach will provide a clear, bright-line rationale for limiting the third-party doctrine's scope in a manner both consistent with *Carpenter* and appropriate for our technological age.

## ARGUMENT

### I.    The Third-Party Doctrine Originated in "Secret Agent Cases," Cases the Common Law Would Address Under the Doctrine of *Illegal Contract*. This Explains Why There Was No "Reasonable Expectation of Privacy" in Those Cases

The third-party doctrine in its undiluted form says the Fourth Amendment is not implicated when: (1) you share information with a third party—for example, your bank, your phone company, Google, or X—even for a limited purpose; and (2) the third party then shares the information with the government. Orin S. Kerr, *The Case for the Third-Party Doctrine*, 107 Mich. L. Rev. 561, 563 (2009). It is important, however, to recall the historical underpinnings of the doctrine to

understand its appropriate scope. The genesis of the doctrine is a series of "secret agent" cases involving criminal organizations. *Id.* at 567–68. Think of Tony Soprano divulging information about his illegal businesses to a "business associate" turned government informant, and a prosecutor using the informant's disclosures to indict and convict Soprano. But then, in the 1970s in *Smith* and *Miller*, the scope of the doctrine was expanded to apply not only to mafia dons, but also to any ordinary, innocent citizen who shares information with third parties, whether while doing business, or simply enjoying life.

Alarm bells did not ring immediately. Back then we shared exponentially less information with third parties than we do today. But the digital age brought about a new set of alarming consequences the Warren Court could never have anticipated. In 2013 the world learned, for example, that the National Security Agency had continuously collected phone record metadata of *all* Verizon customers for *several years*.[5] Attempts to chisel away at the third-party doctrine followed, but without overturning *Smith* and *Miller* outright. *Carpenter,* with its

---

[5] *See* Glenn Greenwald, *NSA collecting phone records of millions of Verizon customers daily,* The Guardian (June 6, 2013), htttp://www.theguardian.com/world/2013/jun/06/nsa-phone-records-verizon-court-order.

unwieldy balancing test, is a prime example. Still, *Carpenter*'s holding is consistent with the original meaning and protections of the Fourth Amendment and, when applied correctly, requires finding a Fourth Amendment violation here. Amicus X believes this Court, in ruling on this issue, should distinguish *Smith* and *Miller,* both of which failed to justify the third-party doctrine in its undiluted form.

Justification is due because, although few would expect to retain a legitimate expectation of privacy when they entrust information to confederates in *criminal* activity, the same cannot be said of ordinary individuals sharing information with service providers in their daily lives. The distinction lies in the common-law doctrine of *illegal contract*, which deems unenforceable any agreement made intentionally to achieve an illegal end. *See* 5 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts § 12:1 (4th ed. 2009).

If Tony Soprano makes an "arrangement" with a "business associate," any collateral promises are unenforceable, including promises to keep it a secret. But terms of service agreements between users and Google or X would not be deemed illegal contracts, merely because some users might be subject to government investigation. Accordingly,

promises made to users by these companies are enforceable under common law, just as records entrusted to a bailee still belong to the bailor. *Carpenter*, <u>585 U.S. at 399</u> (Gorsuch, J., dissenting). Both users and bailors retain privacy and property interests entitled to Fourth Amendment protection. Nothing less is "reasonable." *See* Amy L. Peikoff, *Of Third-Party Bathwater: How to Throw Out the Third-Party Doctrine While Preserving Government's Ability to Use Secret Agents*, 88 St. John's L. Rev. 349, 374–76 (2014); Cristina Del Rosso & Carol M. Bast, *Protecting Online Privacy in the Digital Age:* Carpenter v. United States *and the Fourth Amendment's Third-Party Doctrine*, 28 Cath. U. J. L. & Tech. 89, 95–96 (2020) ("the third-party doctrine enables the . . . government to engage in surveillance and monitoring of one's daily life, similar to the general warrant that the Fourth Amendment ultimately intended to prevent.") (citation omitted).

## II.   The Common Law of Contract Traditionally Protected Privacy, and So Is a Proper Lens Through Which to Analyze the Third-Party Doctrine

"The Right to Privacy,"[6] written by future Supreme Court justice Louis Brandeis and partner Samuel Warren, has been credited with

---

[6] Louis D. Brandeis & Samuel D. Warren, *The Right to Privacy*, 4 Harv. L. Rev. 193 (1890).

giving rise to a distinct "right of privacy." *See, e.g.,* John W. Wade et al., Prosser, Wade and Schwartz's Cases and Materials on Torts 947 (The Foundation Press 1994). In their article, they argued that existing laws protecting rights to property and contract, or defending against breaches of trust or confidence, did not *adequately* protect privacy when new technologies made possible invasions of another's privacy, without committing physical trespass, without privity of contract, and without any relationship of trust or confidence. Brandeis & Warren, *The Right to Privacy*, 4 Harv. L. Rev. at 213.

Once courts began recognizing this "right to privacy," however, preexisting legal protections for privacy seemed to be gradually eroded or forgotten. By the late 1960s, an individual's enjoyment of privacy vis-à-vis government was held in *Katz* to depend on a judge finding one had a "reasonable expectation of privacy." *Katz*, 389 U. S. at 360 (Harlan, J., concurring).

Justice Antonin Scalia reversed this trend, reminding us in *United States v. Jones*, 565 U.S. 400 (2012), that the *Katz* privacy test was "*added to,* not *substituted for*, the common-law trespassory test." *Id.* at 409. We unfortunately cannot know how he would have ruled in

*Carpenter*. And while some Justices searched in *Carpenter* for an interest to justify finding the relevant data was Carpenter's, whether a *contract* might be sufficient did not arise on the facts of that case.[7] Amicus X invites this Court to consider Appellants' rights under their contracts with Google as relevant to the Fourth Amendment protection their location data deserves, not only because the doctrine of illegal contract helps us better understand the third-party doctrine, but also because the

---

[7] Each of the dissenting Justices who believed *Carpenter* presented no Fourth Amendment violation further inquired into whether petitioner Carpenter possessed a property interest in the data at issue.

Justice Kennedy found Carpenter did not own, create, or control the records at issue and therefore a subpoena sufficed. *Carpenter*, 585 U.S. at 329–30 (Kennedy, J., dissenting). Justice Thomas said the issue was not "'whether' a search occurred," but rather "*whose* property was searched." *Id.* at 342 (Thomas, J., dissenting). However, "[n]either the terms of [the] contracts nor any provision of law makes the records [Carpenter's]." *Id.* Thomas noted Carpenter argued based on statute, not "property, tort, or contract law." *Id.* at 354. Justice Alito wrote, "Carpenter indisputably lacks any meaningful property-based connection to the cell-site records. . . ." *Id.* at 384 (Alito, J., dissenting).

Justice Gorsuch found a statutory basis for Carpenter's cell-site records to "qualify as *his* papers or effects under existing law." *Id.* at 405 (Gorsuch, J., dissenting). "Those interests," he continued, "might even rise to the level of a property right." *Id.* at 406. Nonetheless, Gorsuch dissented because Carpenter failed to "invoke the law of property or any analogies to the common law." *Id.*; s*ee also id.* at 399 ("[e]ntrusting your stuff to others is a *bailment* [a type of contract] . . .[a] bailee normally owes a legal duty [to the bailor] to keep [your stuff] safe, according to the terms of the parties' contract" express or implied.). Fourth Amendment rights are not extinguished when entrusting your documents to a third party; rather, "[t]hese ancient principles" protect your interests, even in digital records. *Id.* at 400.

common law of contract as understood by the Founders helps clarify the baseline that the Fourth Amendment protects. *Lange*, 594 U.S. at 309.

## III. This Approach Makes It Possible to Limit the Third-Party Doctrine's Application Without Resorting to "Balancing . . . Weighty or Incommensurate Principles"

The common law of contract provides a principled reason, rooted in our legal traditions, to limit the third-party doctrine's application—and to thereby stop treating ordinary business relationships as criminal enterprises.

Contracts between users and companies like Google and X are enforceable under common law. When their terms include a promise to protect a user's data, that promise should not be terminable by government fiat. The law should recognize such contracts as legitimate means for protecting one's property and privacy. As Justice Sotomayor writes regarding one "weighty or incommensurable principle[]" courts must "balance" post-*Carpenter*, "it may be necessary to reconsider the premise that an individual has no reasonable expectation of privacy in information *voluntarily* disclosed to third parties." *Jones*, 565 U.S. at 417 (Sotomayor, J., concurring) (emphasis added). What should matter for Fourth Amendment purposes is not solely whether sharing is voluntary,

but also how the common law views the context in which the sharing occurs—including whether the parties' agreement protects the user's right to the information at issue.

## CONCLUSION

The Panel correctly held that Appellants' Fourth Amendment rights were violated; if the Court elects to rehear the case, then it should reach the same conclusion. In doing so, adopting this brief's argument would help return the third-party doctrine closer to its original, proper scope. Moreover, it would re-establish the proper relationship between government and companies like Google and X, which would no longer be coerced into helping the government violate their users' rights.

DATED: December 23, 2024.

Respectfully submitted,

By  /s/ Mark Miller

AMY PEIKOFF
10900 Research Blvd. 160C
Box 172
Austin, TX 78759
legalizeprivacy@icloud.com

MARK MILLER
Pacific Legal Foundation
4440 PGA Blvd., Suite 307
Palm Beach Gardens, FL 33410
Telephone: (561) 691-5000
Mark@pacificlegal.org

*Counsel for Amicus Curiae X Corp.*

## CERTIFICATE OF COMPLIANCE WITH RULE 32(g)(1)

Certificate of Compliance with Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements

1.    This brief complies with the type-volume limitation of <u>Fed. R. App. P. 29(b)(4)</u> because:

   <u>✓</u>   this brief contains 2,599 words, excluding the parts of the brief exempted by <u>Fed. R. App. P. 32(a)(7)(b)(iii)</u>, *or*

   <u>   </u>   this brief uses a monospaced typeface and contains [*state number of*] lines of text, excluding the parts of the brief exempted by <u>Fed. R. App. P. 32(a)(7)(B)(iii)</u>.

2.    This brief complies with the typeface requirements of <u>Fed. R. App. P. 32(a)(5)</u> and the type style requirements of <u>Fed. R. App. P. 32(a)(6)</u> because:

   <u>✓</u>   this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in 14-point Century Schoolbook, *or*

   <u>   </u>   this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

DATED: December 23, 2024.

<u>/s/ Mark Miller</u>
MARK MILLER
*Counsel for Amicus Curiae*
*X Corp.*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 23, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Mark Miller
MARK MILLER
*Counsel for Amicus Curiae*
*X Corp.*

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

UNITED STATES OF AMERICA, *Plaintiff-Appellee*

V.                                                    CASE NO: 23-60321

JAMARR SMITH, GILBERT MCTHUNEL, II,
AND THOMAS AYODELE, *Defendants-Appellants*

## GOVERNMENT/APPELLEE'S RESPONSE TO COURT'S INQUIRY [93]

Comes now the United States of America, by and through the United States

Attorney and the undersigned Assistant United States Attorney and responds as

follows:

On April 8, 2024, this Court filed a letter inquiring:

[W]ill the United States seek geofence warrants in the future? Also,
please provide an explanation of the changes that Google is making that
will affect the availability of future geofence warrants.

Letter from Deputy Clerk, Peter Conners to Counsel for the Appellee, (April

8, 2024). [Docket No. 93].

The Government has conferred with Google and is prepared to respond.

*Google Geofence Warrants*

Google, LLC received 982 geofence warrants in 2018, 8,396 geofence

warrants in 2019 and 11,554 geofence warrants in 2020. Zach Whittaker, *Google

Says Geofence Warrants Make Up One-quarter of All US Demands, Tech Crunch*,

(Aug. 19, 2021), https://techcrunch.com/2021/08/19/google-geofence-warrants/.
Between 2018 and 2022, approximately 25 percent of all warrants Google received
were geofence warrants. Skye Witley, *Google's Location Data Move Will Reshape
Geofence Warrant Use*, Bloomberg Law (Dec. 20, 2023),
(https://news.bloomberglaw.com/privacy-and-data-security/googles-location-data-
move-will-reshape-geofence-warrant-use).

Google uses its Location History information to respond to geofence warrants;
it has stated that Location History information is the only information stored by
Google that is associated with specific users and sufficiently granular to be
responsive to a geofence warrant. ROA.139. On December 12, 2023, Google
announced that it will migrate Location History data from storage in its centralized
database to storage on individual users' devices. Marlo McGriff, *Updates to
Location History and New Controls Coming Soon to Maps*, Google Maps Blog (Dec.
12, 2023), https://blog.google/products/maps/updates-to-location-history-and-new-
controls-coming-soon-to-maps/. Users can also choose to backup their location data
on Google's servers; this backup will be encrypted and not available to Google. *Id*.

Currently, the Government is still seeking Google geofences. However,
Google confirmed to the United States this week that once Location History data has
been migrated to a user's device, it cannot be captured by a geofence warrant.
Google states that the migration of Location History from Google's servers to users'

devices has been underway for the past several months, and Google currently anticipates that this migration will be complete within the next several months. Once this migration is complete, Google states that it will be unable to respond to geofence warrants.

### Other Geofence Warrants

As this Court asked whether the United States will seek geofence warrants in the future, the United States notes that it may in the future seek geofence warrants from sources other than Google. For example, cell tower dumps are essentially a form of geofence, and in *United States v. James*, 3 F.4th 1102 (8th Cir. 2021), the Eighth Circuit held that a series of cell tower dump warrants used to solve a series of robberies complied with the Fourth Amendment. The Fourth Amendment analysis applicable to other forms of geofence warrants will likely share much in common with that of Google geofence warrants, but it will also depend on specific facts and circumstances associated with the information sought in the other geofence warrants.

### Appellants' Contentions in its Reply Brief Regarding Google's Announcement of the Migration

The Appellants contend in their reply brief that Google's migration of Location History information solidifies their position that this is personal, private location data protected by the Fourth Amendment. This argument misses the mark. Appellants had no reasonable expectation of privacy in Google's records of their

Location History because they voluntarily conveyed their location to Google in exchange for receiving the benefits of Google services. Because Google location service is an opt-in service, Appellants took affirmative steps to disclose their location information to Google. ROA.134. Moreover, they agreed that Google would have access to their location information for purposes ranging from providing them with targeted advertising or assistance with driving directions to Google's development of new services. ROA.134; *See* Google Privacy Policy (available at https://policies.google.com/privacy/archive/20190122).  The fact that Google is now making major changes to Location History such that users will no longer disclose their Location History to Google does not retroactively provide users with Fourth Amendment protection for information that they previously voluntarily disclosed to Google.

For the above-stated reasons, the judgment of the district court should be affirmed in all respects.

Respectfully submitted, this the 18th day of April, 2024.

CLAY JOYNER
United States Attorney
MS Bar No. 10316

By: */s/ Clyde McGee IV*
CLYDE MCGEE IV
MS Bar No. 102229
Assistant United States Attorney
Northern District of Mississippi
900 Jefferson Avenue
Oxford, Mississippi 38655
Telephone: (662) 234-3351
Criminal Division Fax: (662) 234-0657

*/s/Robert J. Mims*
ROBERT J. MIMS
MS Bar No. 9913
Assistant United States Attorney

## <u>CERTIFICATE OF SERVICE</u>

I, Clyde McGee IV, Assistant United States Attorney for the Northern District of Mississippi, hereby certify that I have this day filed this Response to the Court's Inquiry with the Court's CM/ECF filing system which caused an email to be sent with an electronic link to a true copy of said brief to the following:

Goodloe T. Lewis, MSB# 9889
Attorney of Record for Jamarr Smith
Defendant/Appellant
Email:  glewis@hickmanlaw.com

Paul Chiniche, MSB #101582
Attorney of Record for Gilbert McThunel, II
Defendant/Appellant
Email:  pc@chinichelawfirm.com

William F. Travis, MSB #8267
Attorney of Record for Thomas Ayodele
Defendant/Appellant
Email:  bill@southavenlaw.com

This the 18th day of April, 2024.


By: */s/ Clyde McGee IV*
CLYDE MCGEE IV
MS Bar No. 102229
Assistant United States Attorney
Northern District of Mississippi


*/s/Robert J. Mims*
ROBERT J. MIMS
MS Bar No. 9913
Assistant United States Attorney