**No. 22-4489**

IN THE

# United States Court of Appeals for the Fourth Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

OKELLO CHATRIE,

*Defendant-Appellant.*

**On Remand to the United States Court of Appeals for the Fourth Circuit**

## BRIEF OF THE CENTER FOR DEMOCRACY AND TECHNOLOGY AS AMICUS CURIAE IN SUPPORT OF OKELLO CHATRIE AND REVERSAL

Samir Jain
CENTER FOR DEMOCRACY AND TECHNOLOGY
1401 K Street, NW, Suite 200
Washington, DC 20005

*Counsel for the Center for Democracy and Technology*

J. Jonathan Hawk
*Counsel of Record*
Katelyn N. Ringrose
Jordan Zaia
Tyler Henry
MCDERMOTT WILL & SCHULTE LLP
2049 Century Park East
Los Angeles, CA 90067
jhawk@mcdermottlaw.com
(310) 788-4181

*Counsel for Amicus Curiae*

September 4, 2026

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 22-4489 Caption: United States of America v. Okello Chatrie

Pursuant to FRAP 26.1 and Local Rule 26.1,

Center for Democracy and Technology
(name of party/amicus)

who is Amicus curiae, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity? ☐YES ☑NO

2. Does party/amicus have any parent corporations? ☐YES ☑NO
If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐YES ☑NO
If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☐NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ J. Jonathan Hawk Date: 9/4/26

Counsel for: Center for Democracy and Technology



Print to PDF for Filing

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................. ii

STATEMENT OF IDENTITY AND INTEREST ..................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ............................ 3

I. The Geofence Warrant in This Case Is an Unconstitutional General Warrant ........................................................... 7

II. The Warrant's Three-Step Methodology Does Not Cure Its Lack of Particularity or Probable Cause .............................. 12

III. Authorizing This Geofence Warrant Would Enable Pervasive Dragnet Surveillance and Chill Critical Associations and Activities ..................................................................... 16

A. Overbroad Geofence Warrants Risk Facilitating Broader "Reverse Warrants" That Create Serious Risks to Privacy ........................................................... 21

IV. Conclusion ......................................................................... 26

# TABLE OF AUTHORITIES

Page(s)

Cases

*Americans for Prosperity Found. v. Bonta*,
594 U.S. 595 (2021) .................... 19

*Baird v. State Bar of Ariz.*,
401 U.S. 1 (1971) (plurality opinion) .................... 19

*Calvary Chapel San Jose v. Santa Clara Cnty.*,
No. 5:23-cv-04277 (N.D. Cal. Aug. 22, 2023) .................... 18

*Carpenter v. United States*,
585 U.S. 296 (2018) .................... 10, 18

*Chatrie v. United States*,
590 F. Supp. 3d 901 (E.D. Va. 2022) .................... 9, 13, 15, 18

*Chatrie v. United States*,
146 S. Ct. 2193 (2026) .................... *passim*

*Coolidge v. New Hampshire*,
403 U.S. 443 (1971) .................... 7

*In re Ct. Order for Prod. of Recs. to Google, LLC*,
No. 2024CV30942 (Colo. Dist. Ct. Larimer Cnty. Dec. 6, 2024) .................... 22

*Marks v. Clarke*,
103 F.3d 1012 (9th Cir. 1996) .................... 4

*Maryland v. Garrison*,
480 U.S. 79 (1987) .................... 11

*McIntyre v. Ohio Elections Comm'n*,
514 U.S. 334 (1995) .................... 25

*NAACP v. Alabama ex rel. Patterson*,
357 U.S. 449 (1958) .................... 19

*Roberts v. United States Jaycees*,
468 U.S. 609 (1984) .................... 19

*United States v. Jones*,
565 U.S. 400 (2012) (Sotomayor, J., concurring) .................... 10, 20

*United States v. Smith*,
110 F.4th 817 (5th Cir. 2024) .......... 4

*United States v. Wright*,
No. 4:19-CR-149, 2023 WL 5804161 (S.D. Ga. Sept. 7, 2023) .......... 17

*Ybarra v. Illinois*,
444 U.S. 85 (1979) .......... 8

**Other Authorities**

Igor Bonifacic, *FBI Used Google Location Data to Investigate Seattle Arson Following BLM Protest*, Engadget (Feb. 5, 2022, at 12:35 ET) .......... 18

Katelyn Ringrose & Divya Ramjee, *Watch Where You Walk: Law Enforcement Surveillance and Protester Privacy*, 11 Cal. L. Rev. Online 349 (2020) .......... 25

Marlo McGriff, *Updates to Location History and New Controls Coming Soon to Maps*, The Keyword (Dec. 12, 2023) .......... 3

Meg O'Connor, *Avondale Man Sues After Google Data Leads to Wrongful Arrest for Murder*, Phoenix New Times (Jan. 16, 2020) .......... 15

Russell Brandom, *How Police Laid Down a Geofence Dragnet for Kenosha Protestors*, The Verge (Aug. 30, 2021) .......... 17

*Search Warrant for Geofence Location Data Used in Kenosha Riot Arson at Library* (No. 20-M-370) (E.D. Wis. Sept. 3, 2020) .......... 18

Simon Lermen et al., *Large-Scale Online Deanonymization with LLMs*, arXiv:2602.16800 (Feb. 18, 2026) .......... 14

Thomas Brewster, *DHS Ordered OpenAI To Share User Data In First Known Warrant For ChatGPT Prompts*, Forbes (Oct. 20, 2025) .......... 23, 24

Yves-Alexandre de Montjoye et al., *Unique in the Crowd: The Privacy Bounds of Human Mobility,* 3 Sci. Rep. 1376 (2013) .......... 13, 14

Zack Whittaker, *Minneapolis Police Tapped Google to Identify George Floyd Protesters*, TechCrunch (Feb. 6, 2021, at 8:00 PT) .......... 17

Zack Whittaker, *'Reverse' Searches: The Sneaky Ways That Police Tap Tech Companies for Your Private Data*, TechCrunch (Apr. 2, 2024) .......... 24

## STATEMENT OF IDENTITY AND INTEREST

Pursuant to Federal Rule of Appellate Procedure 29(a)(2), the Center for Democracy and Technology ("CDT") respectfully submits this brief with consent of all parties as amicus curiae in support of the Defendant-Appellant's Brief filed by the National Association of Criminal Defense Lawyers ("NACDL") on behalf of Okello Chatrie ("Defendant-Appellant").[1]

CDT is a non-profit, non-partisan, public interest organization that has worked for more than 30 years to promote the constitutional and democratic values of privacy, equality, free expression, and individual liberty in the digital age. CDT regularly advocates before legislatures, regulatory agencies, and federal and state courts at all levels in efforts to protect against invasive and unwarranted government surveillance.

Here, CDT's interest is to advocate against any erosion of individuals' constitutional privacy rights in the digital age. It thus

[1] Pursuant to Fed. R. App. P. 29(a)(4)(E), amicus curiae affirms no party or counsel for a party in the pending case authored this brief in whole or in part or made a monetary contribution intended to fund the preparation or submission of the proposed brief. No person or entity other than the amicus or its counsel made a monetary contribution to fund the preparation or submission of the proposed brief.

submits this amicus brief in support of Mr. Chatrie's request to hold the geofence warrant at issue, and its execution by law enforcement, unconstitutional under the Fourth Amendment.

A warrant such as the one issued and executed here does not comport with Fourth Amendment principles against unreasonable searches and seizures, particularly in the context of modern technologies and the Supreme Court's recent decision in *Chatrie v. United States*, 146 S. Ct. 2193 (2026). If this Court finds otherwise, there is a real risk such an opinion would serve to broadly: (1) permit law enforcement to conduct searches into constitutionally protected spaces such as individuals' Location History without particularized warrants and without probable cause; and, (2) permit courts to delegate their vital role in safeguarding Fourth Amendment rights to law enforcement officers executing a warrant, including granting them authority to amend the warrant's scope without seeking further judicial oversight and approval. The impact of such a ruling on the privacy rights of hundreds of thousands, if not millions, of people in their digital information should not be underestimated.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The Supreme Court's opinion in *Chatrie* resolved an important threshold question, confirming that "[a]n individual has a reasonable expectation of privacy in records about his cell phone's location, and police intrude upon that constitutionally protected interest when they demand the information—even though for only a limited time, and from a third-party tech company." *Chatrie*, 146 S. Ct. at 2199. *Chatrie* nonetheless expressly left for this Court in the first instance the "further question whether, given the warrant issued, the search was reasonable, meaning that each of its steps was properly described with particularity and found to be supported by probable cause." *Id.*

The answer should be "no"—the three-step warrant[2] used by law enforcement here does *not* comply with important Fourth Amendment

[2] When the geofence warrant was sought here, Location History was automatically logged as often as every two minutes. Google has since shifted Location History to on-device storage, eliminating its access to that data. Marlo McGriff, *Updates to Location History and New Controls Coming Soon to Maps*, The Keyword (Dec. 12, 2023), https://blog.google/products-and-platforms/products/maps/updates-to-location-history-and-new-controls-coming-soon-to-maps/.
Nonetheless, as the Supreme Court noted, "Google is not the only tech company that has received geofence warrants." *Chatrie*, 146 S. Ct. at 2201 n.3.

safeguards against unreasonable searches and seizures for two main reasons.

*First*, this warrant was a general warrant—something undeniably unconstitutional. *See United States v. Smith*, 110 F.4th 817, 836 (5th Cir. 2024). The warrant at step one purported to "authorize the search of everything or everyone in sight" across an urban area of approximately 17.5 acres, i.e., it sought the location data of everyone in a broad and dense geographic area during a specified period of time. *Id.* No warrant can permissibly do that within Fourth Amendment guardrails, as it amounts to a "search of 'all persons present' for evidence of a crime [without] reason to believe that all of those present will be participants in the suspected criminal activity." *Id.* (citing *Marks v. Clarke*, 103 F.3d 1012, 1029 (9th Cir. 1996)). To allow a warrant as sweeping as this one would facilitate "the exact sort of 'general, exploratory rummaging' that the Fourth Amendment was designed to prevent." *Id.* (citations omitted).

The warrant's three-step process does nothing to cure the lack of particularity and probable cause. As Justices Jackson and Sotomayor

explained in their concurrence in *Chatrie*, the warrant at steps two and three enables law enforcement to obtain ever more, increasingly granular information, providing merely that "officers would '*attempt* to narrow down the list'" of devices subject to those steps, without any "explicit requirement that they do so" and without providing "any criteria that the officers would use in their narrowing efforts." *Chatrie*, 146 S. Ct. at 2217–18 (Jackson, J., concurring) (emphasis in original). That enables "officers [to] conduct[] key portions of the search outside the supervision of 'a neutral and detached magistrate,' … obtain[ing] additional sensitive information … without having to convince a magistrate that there was probable cause …" *Id.* It leaves "too much to the discretion of the officers executing the order, giving them a 'roving commission' to collect more data absent any justification to a magistrate." *Id.*

Underlying these issues are two pivotal questions: will technologies and modern data practices facilitate an inversion of the Fourth Amendment, permitting suspicionless governmental searches of sensitive information to develop suspicion that does not exist when the search is conducted? Will court scrutiny of technology-driven searches be diminished because the court can delegate to law enforcement broad

discretion to alter the scope and the targets of their searches during their investigation without judicial oversight?

The answer must be "no." Location data can reveal individuals' most intimate activities and religious, political, romantic, and other private associations that extend far beyond the actual wrongdoer. And the Fourth Amendment, in rejecting the reviled practices of general warrants and writs of assistance, reserves a vital role for courts to set proper bounds and limits on when law enforcement can lawfully intrude upon persons and their constitutionally protected spaces in furtherance of investigations into criminal activity. As the Supreme Court in *Chatrie* recognized, the Fourth Amendment's reasonableness standard "subjects the officials' assessment of a search's propriety to the 'deliberate, impartial judgment of a judicial officer.'" *Chatrie*, 146 S. Ct. at 2215.

Upholding the warrant here could also lay the path for broader "reverse searches" and digital dragnets that expose Americans' actions, associations, curiosities, and thoughts to government surveillance without individualized suspicion. Put simply, this warrant is incompatible with the Fourth Amendment and upsets the balance

between the government and its citizens that underlies democratic society.

## I. The Geofence Warrant in This Case Is an Unconstitutional General Warrant

The warrant here authorized law enforcement to search first and identify a suspect later. At step one, it required Google to search the Location History of every user whose device appeared within approximately 17.5 acres area during the specified period. The warrant did *not* identify any person, account, or device for which there existed probable cause. The warrant instead authorized a search of every person in a broad urban area in efforts to discover who *might* be a suspect. That "general exploratory rummaging" is the very thing forbidden by the Fourth Amendment. *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971).

Under the Fourth Amendment, a warrant is valid only if it is carefully tailored to its justification and particularly describes the place to be searched and the persons or things to be seized. This warrant did neither. It covered approximately 17.5 acres in an urban area, including a church and nearby private residences. It collected location data spanning a two-hour time period, well beyond the duration of the

crime under investigation. It swept in *every* device in that area without regard to the conduct of any particular user, and without having any indication of any user being connected to the robbery aside from merely being present in the general vicinity.

It goes without saying that a person's proximity to suspected criminal activity does not, without more, establish probable cause to search that person. *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979) ("A person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause."). Yet the warrant before the Court now treated every person within the geofence—which went far beyond the bank where the crime at issue occurred—as a potential target and compelled Google to search a vast repository of constitutionally protected location records to identify devices that just so happened to appear in the vicinity.

The intrusiveness of that search was staggering. And its breadth could have been even greater than the geographic area specified in the warrant. Despite technologies offering significant potential precision,[3]

[3] The estimated location of devices stored in Location History accounts, which was searched and obtained for the geofence warrant, was based on multiple potential inputs, including cell site location information

geofences can include "false positives," listing someone as being within the geofence when they were actually outside it. And in this case the confidence interval for devices was dozens—and in one case hundreds—of meters in size, meaning "the Geofence Warrant could have captured the location of someone who was hundreds of feet outside the geofence." *Chatrie*, 590 F. Supp. 3d at 922 (emphasis added). This balloons the geographic scope of the surveillance, and potentially pulls in guests staying at a hotel, patrons at a restaurant, numerous private residences, a senior living facility, and a pair of busy streets. *Id.* at 922-23. By the warrant's own terms, those persons were not intended to be subject to the search; but they could have ended up being so.

Moreover, for all persons impacted by the warrant, details provided to law enforcement via Location History cannot be understated. Location

("CSLI"), global positioning system ("GPS") signals, Wi-Fi networks, and Bluetooth devices. For specific instances the degree of granularity of location information generated can vary based on which of these inputs were available and how they contributed to generating location data. Sometimes the location of a device can be refined to a several meter radius, allowing someone reviewing the data to distinguish which side of the street a user was on or what building they entered; in some cases it could even reveal the floor or specific area of a building, such as a store in a shopping mall or a certain office within a hospital. But other times, as occurred with this geofence warrant, there is a larger radius of where precisely a phone might be located.

History reaches further than the records in *Carpenter*. There, cell-site data placed a suspect within one-eighth to four square miles of that suspect's actual location, and cell site data logged his phone location 101 times per day. *Chatrie*, 146 S. Ct. at 2208. By contrast, Location History fixes someone's phone within twenty meters of the user's actual location, and logs the phone's location every two minutes, i.e., 720 times a day. *Id.* Location History goes even further still in estimating elevation. It thereby enables law enforcement to distinguish between a user's presence in a doctor's office on the first floor of a building, versus being in a private apartment on the tenth floor. *Id.* at 2208-10.

These persons' location data "provides an intimate window into a person's life," exposing "familial, political, professional, religious, and sexual associations." *Carpenter v. United States*, 585 U.S. 296, 311 (2018); *see United States v. Jones*, 565 U.S. 400, 415 (2012) (Sotomayor, J., concurring) (even short-term monitoring reveals trips to "the psychiatrist, the plastic surgeon, the abortion clinic"). Accessing it undeniably gives the government "a virtual panopticon with which to scrutinize its citizens' activities." *Chatrie*, 146 S. Ct. at 2210.

The Fourth Amendment requires a search "carefully tailored to its justifications" and forbids a "wide-ranging exploratory" search. *Chatrie*, 146 S. Ct. at 2216 (quoting *Maryland v. Garrison*, 480 U.S. 79, 84 (1987)). Courts assessing reasonableness must consider both the technology involved and the scope of the search it authorizes. A warrant aimed at obtaining that wealth of data, and with it, that view into people's private lives, must be drawn with corresponding care to protect privacy interests and to avoid searching individuals' private spaces when no suspicion attaches to them at all. The Supreme Court recognized in *Chatrie* that, because of the sensitivity of Location History data, it is essential that if any geofence warrant is approved, such an order must rigorously narrow as much as possible both the geographic locations swept in and the time period covered. *Id.* at 2216. The geofence warrant here failed in both respects.

First, it swept in every device across 17.5 acres of dense, urban area, including a church and private residences. *Id.* at 2211 n.10. And did so across an unnecessarily long period of time. The warrant then let officers decide for themselves—exercising their own discretion, without any judicial oversight or approval—whether and how to "narrow down"

the list of users whose data they would obtain. Those officers could devise new criteria never presented to a court, have Google filter search results using those criteria, and obtain *additional* data from that search, further revealing the movements of people law enforcement wanted to track *beyond the geofence* and whose identities they wanted to unmask. Neither the magistrate nor the warrant guided, constrained, or even reviewed those choices. *Id.* at 2225 n.4.

The warrant authorized a suspicionless dragnet, delving into constitutionally protected private spaces of numerous people. The parameters of this search were needlessly broad, and cannot be salvaged by labeling the initial results as "anonymous" or promising to narrow them later in law enforcement's unchecked discretion.

## II. The Warrant's Three-Step Methodology Does Not Cure Its Lack of Particularity or Probable Cause

The three-step process contemplated in the warrant does not cure its constitutional defects. To the contrary, it compounds them. The warrant imposed no criteria governing any narrowing, no requirement that officers return to the magistrate, and no standard for deciding which devices could be tracked beyond the geofence or which users could be identified.

Step two in the warrant even acted to expand the search, not narrow it. After selecting devices of interest, law enforcement obtained data showing the movements of those users before and after the geofence period and outside its geographic limits. Those additional records revealed travel by users to and from private residences, a school, and a hospital. The magistrate did not separately determine that probable cause supported searching those additional places and times, and the warrant supplied no criteria limiting the officers' selections.

The government leans heavily on anonymization to justify its sweeping and needlessly broad collection of constitutionally protected location data. But anonymization provides no meaningful protection under these circumstances. Persistent, high-precision location data can reveal a person's routines, home, workplace, and associations before the government formally requests a name. Pairing that pattern with a public social-media account could identify the user. *Chatrie*, 590 F. Supp. 3d at 924; *see also* Yves-Alexandre de Montjoye et al., *Unique in the Crowd: The Privacy Bounds of Human Mobility*, 3 Sci. Rep. 1376 (2013) (showing that mobility traces are highly unique, and that a small quantity of an individual's location data can be used to uniquely identify

most individuals); *see also* Simon Lermen et al., *Large-Scale Online Deanonymization with LLMs*, arXiv:2602.16800 (Feb. 18, 2026), *https://arxiv.org/abs/2602.16800* (showing that "large language models can be used to perform at-scale deanonymization"). Anonymization therefore may have, at most, delayed formal identification; but it did not prevent the government from learning intimate and identifying facts about the people whose data it reviewed. And "[w]here the Fourth Amendment applies, it applies—regardless of "'the quality or quantity of information' the government obtains." *Chatrie*, 146 S. Ct. at 2210 (internal quotation marks omitted).

Step three then allowed the government to obtain subscriber information for users selected by the officers themselves, again without judicial oversight. The warrant required no particularized showing that any selected user was connected to the robbery and no further review by a neutral magistrate. And the same officers conducting the search had a free hand to pick whose data warranted additional scrutiny and whose identity Google would disclose. Put another way, the final list came from the government alone, without a particularized showing or court involvement. It could include bystanders whose only connection was

standing near a crime scene. *Chatrie*, 590 F. Supp. 3d at 930-31; *see* Meg O'Connor, *Avondale Man Sues After Google Data Leads to Wrongful Arrest for Murder*, Phoenix New Times (Jan. 16, 2020).

The warrant failed at every step. Step one authorized an indiscriminate search via a general warrant of every device within the geofence. Step two *expanded* the search across additional places and times based on unchecked discretion delegated to law enforcement, with the issuing court removing itself from its vital role in protecting individuals from unreasonable searches and seizures. Step three again delegated unchecked discretion to law enforcement, permitting officers to unmask otherwise anonymous users based on criteria known only to the officers themselves, who were essentially drawing the scope and identifying the targets of their searches without judicial oversight or approval.

None of those steps were constrained by particularized probable cause or meaningful judicial supervision, and the three steps did nothing to cure the warrant's facial constitutional defects.

## III. Authorizing This Geofence Warrant Would Enable Pervasive Dragnet Surveillance and Chill Critical Associations and Activities

If this Court were to find a warrant as sweeping as this to be valid, it would set a dangerous precedent threatening to normalize suspicionless fishing expeditions. It would approve of law enforcement's efforts to self-identify, sift through and seize sensitive data of innocent bystanders, based on no justification other than the data purportedly being necessary to help law enforcement identify a suspect when they otherwise may have no leads.

This cannot be permitted simply because the data here is in digital form. In the physical world we would not allow a law enforcement officer to compel every person who walked past a particular street corner, entered a house of worship, or attended a political rally to provide their identity. Yet geofence warrants and other reverse-search warrants seek to do just that merely because the data being searched is in digital form, and approving of such warrants would risk institutionalizing a significant, unconstitutional intrusion.

Geofence warrants can also significantly endanger the free exercise of activities that are integral to a free and democratic society, and that the First and Fourth Amendments were established to protect. Indeed,

"Location History-even two hours of it-allows officers to target one-off events of potential interest: a gun show, say, or a political rally," which can easily amount to compelled disclosure of the identities of groups of people associating or attendees at events within the geofenced area. *Chatrie*, 146 S. Ct. at 2210. This in turn can have a broader unconstitutional chilling effect on people's participation in activities protected by the First Amendment as well as other highly sensitive activities.

In this regard, geofence warrants in other matters have already been used to target sensitive locations including private residences, hospitals, workplaces, and numerous protests. *See, e.g.*, *United States v. Wright*, No. 4:19-CR-149, 2023 WL 5804161, at *9 (S.D. Ga. Sept. 7, 2023); Zack Whittaker, *Minneapolis Police Tapped Google to Identify George Floyd Protesters*, TechCrunch (Feb. 6, 2021, at 8:00 PT), https://techcrunch.com/2021/02/06/minneapolis-protests-geofence-warrant/; Russell Brandom, *How Police Laid Down a Geofence Dragnet for Kenosha Protestors*, The Verge (Aug. 30, 2021), https://www.theverge.com/22644965/kenosha-protests-geofence-warrants-atf-android-data-police-jacob-blake; *Search Warrant for*

*Geofence Location Data Used in Kenosha Riot Arson at Library* (No. 20-M-370) (E.D. Wis. Sept. 3, 2020), https://www.documentcloud.org/documents/21052213-google-geofence-warrant-used-in-kenosha-riot-arson-at-library/; Igor Bonifacic, *FBI Used Google Location Data to Investigate Seattle Arson Following BLM Protest*, Engadget (Feb. 5, 2022, at 12:35 ET), https://www.engadget.com/fbi-google-geofence-warrant-seattle-police-union-arson-173540099.html. In multiple cases—including before this Court—geofence warrants were used to target a house of worship. *Chatrie*, 590 F. Supp. 3d at 918; Complaint at 4, *Calvary Chapel San Jose v. Santa Clara Cnty.*, No. 5:23-cv-04277 (N.D. Cal. Aug. 22, 2023). Allowing the government to wield such surveillance powers would fail to recognize that a "central aim of the Framers was to place obstacles in the way of a too permeating police surveillance." *Carpenter*, 585 U.S. at 305. If geofence warrants are permitted to be drawn broadly, as approval of the warrant at issue would allow, it will be impossible to limit this type of sweeping surveillance.

The Supreme Court has "long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding

right to associate with others," *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 606 (2021) (quoting *Roberts v. United States Jaycees,* 468 U.S. 609, 622 (1984)), that "[e]ffective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association," and "the vital relationship between freedom to associate and privacy in one's associations." *NAACP v. Alabama ex rel. Patterson,* 357 U.S. 449, 460, 462 (1958). Indeed, "inviolability of privacy in group association may in many circumstances be indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs." *Id.* at 462. It follows that "compelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of association as [other] forms of governmental action." *Id.*; *see also Baird v. State Bar of Ariz.,* 401 U.S. 1, 6 (1971) (plurality opinion).

Due protections for the privacy of one's associations, however, are unconstitutionally side-stepped where associations are revealed via an overbroad, insufficiently particularized warrant looking for all visitors to a *place*. As the Supreme Court recognized in *Chatrie*, "[e]ven short-term monitoring of a person's physical movements can provide a wealth of

detail about [his] familial, political, professional, religious, and sexual associations." *Chatrie*, 146 S. Ct. at 2210 (quoting *United States v. Jones*, 565 U.S. 400, 415 (2012) (Sotomayor, J., concurring)). And the government's ability to catalog our presence at sensitive locations is especially at risk from a geofence, which "enables police officers to focus on precisely those sites—to see, in a given time block, who shows up." *Chatrie*, 146 S. Ct. at 2210. The dragnet nature of a geofence amplifies this risk, allowing the government not only to hone in on those locations that implicate constitutionally protected activities, but also to catalog *everyone* at them.

Even the mere threat of such surveillance power being wielded could have severe harms. Were people to believe that such information could be revealed *en masse* pursuant to broad geofence demands, they may simply choose to *not* exercise their First Amendment rights to free expression and association. They may choose to *not* attend a religious ceremony or political rally where they could be associated by the government with a group espousing unpopular, albeit lawful, messages. They may avoid going to an event out of concern that, if any others at or near that event act inappropriately, their location data could be obtained

and reviewed as part of a broader investigation into those other people—including the possibility that they are incorrectly accused of wrongdoing based merely on their presence at the event—or investigations pursued as a pretense for fishing and cataloging members of a disfavored group. To prevent such a chilling effect, any geofence that were to be approved must include strict bounds and strong limits that the public can trust to ward off impropriety. This warrant, sweeping in nature and deferential to law enforcement by design, simply cannot provide such an assurance.

### A. Overbroad Geofence Warrants Risk Facilitating Broader "Reverse Warrants" That Create Serious Risks to Privacy

Upholding the warrant in this case risks emboldening law enforcement to seek other forms of overbroad "reverse warrants." Indeed, the proliferation of geofence warrants has already set a dangerous precedent for additional forms of reverse warrants and digital dragnets.

The Fourth Amendment requires that a warrant "particularly describe" the place to be searched and the persons or things to be seized; however, the "reverse" logic inherent in "reverse warrants" turns this constitutional mandate on its head. Instead of targeting a specific individual based on pre-existing evidence, such warrants authorize broad, indiscriminate and suspicionless sweeps to discover suspects

among innocent masses of people who are all equally subjected to surveillance.

"Reverse searches" have already moved beyond geofence warrants to even more speculative demands, such as reverse keyword warrants. These warrants compel search engines to identify every user who searched for particular terms—a "thought police" practice that is fundamentally speculative as it equates digital curiosity or basic information-gathering with criminal intent. The government has already attempted to exploit the speculative nature of reverse keyword search warrants, as evidenced by demands that were denied because they include terms that are generic in nature and could generate millions of results. *In re Ct. Order for Prod. of Recs. to Google, LLC*, No. 2024CV30942 (Colo. Dist. Ct. Larimer Cnty. Dec. 6, 2024). A permissive ruling for geofence warrants and the features of "reverse searches" more generally could open the door to these highly speculative and aggressive demands. By transforming the mere act of seeking information into a ground for state suspicion, keyword warrants create a significant chilling effect on free expression, research, and even personal thought and curiosity.

A corollary to reverse keyword searches with potentially even more profound dangers are reverse warrants for AI chatbot prompts. Despite the novelty of AI chatbot services, use of reverse warrants for ChatGPT prompts has already been publicly documented. Thomas Brewster, *DHS Ordered OpenAI To Share User Data In First Known Warrant For ChatGPT Prompts*, Forbes (Oct. 20, 2025), https://www.forbes.com/sites/thomasbrewster/2025/10/20/openai-ordered-to-unmask-writer-of-prompts/. While chatbots perform a similar role to search engines in providing responsive information to a query, users' prompts can be far more detailed and revealing, and designed to facilitate an ongoing "dialogue," potentially regarding the user's most intimate thoughts and ideas.

Equally concerning is the emergence of reverse internet protocol ("IP") warrants, which compel platforms to unmask individuals who have visited a specific web page or viewed a particular video. Through this form of reverse warrant, law enforcement can effectively monitor the intellectual and spiritual lives of the public, targeting the fundamental right to associate and access information anonymously. For example, courts have begun permitting this form of surveillance through warrants

requesting the identities of all viewers who have watched specific YouTube videos. Zack Whittaker, *'Reverse' Searches: The Sneaky Ways That Police Tap Tech Companies for Your Private Data*, TechCrunch (Apr. 2, 2024), https://techcrunch.com/2024/04/02/reverse-searches-police-tap-tech-companies-private-data/. These reverse warrants could unmask hundreds or thousands of individuals that watched a particular video.

And like the house of worship pulled into the geofence in *Chatrie*, mere proximity to an investigation or incidentally discovered traits—such as asking ChatGPT to create a joke about the President—can serve as the basis for surveillance under these reverse warrants. Brewster, *DHS Ordered OpenAI To Share User Data*, supra. If such innocuous activities could serve as the basis, or pretext for, surveillance, the dangers would be immense. It could allow the government to, in effect, electronically rifle through the pews of a church by cataloging everyone who viewed a speech on YouTube from a pastor being investigated for tax fraud, or keep digital tabs on a campaign rally by tracking everyone who watched the speech of a politician accused of inciting violence. This proliferation of reverse warrants stands to chill the exercise of First

Amendment rights and undermine anonymity—not only anonymity in one's movement and location as is the case of *Chatrie*—but anonymity in one's curiosity and imagination. This Court has long ruled that the right to anonymous speech and association is protected by the First Amendment, noting that "[a]nonymity is a shield from the tyranny of the majority." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 357 (1995); *see* Katelyn Ringrose & Divya Ramjee, *Watch Where You Walk: Law Enforcement Surveillance and Protester Privacy*, 11 Cal. L. Rev. Online 349 (2020).

The risks of content-based collection—searches centered on what a person is reading, watching, asking, or thinking—are uniquely dangerous. They threaten individuals' privacy absent any evidence of wrongdoing. This Court should recognize that a procedural "narrowing" of data, such as the three-step process for geofence warrants, is unlikely to protect the public, particularly when the narrowing is left to the discretion of law enforcement with no judicial oversight. And if this Court permits dragnets simply because the dragnet is of a digital nature, it would risk creating a society where the fear of being monitored by the state chills the very behaviors—intellectual curiosity, free practice of

religion, and political dissent—that the Founders designed the Constitution to protect.

## IV. Conclusion

This Court should find that the warrant here is invalid under the Fourth Amendment for the reasons set forth above.

DATED: September 4, 2026

Respectfully submitted,

Samir Jain
CENTER FOR DEMOCRACY AND TECHNOLOGY
1401 K Street, NW, Suite 200
Washington, DC 20005

*Counsel for the Center for Democracy and Technology*

J. Jonathan Hawk
*Counsel of Record*
Katelyn N. Ringrose
Jordan Zaia
Tyler Henry
MCDERMOTT WILL & SCHULTE LLP
2049 Century Park East
Los Angeles, CA 90067
jhawk@mcdermottlaw.com
(310) 788-4181

*Counsel for Amicus Curiae*

**No. 22-4489**

IN THE

# United States Court of Appeals for the Fourth Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

OKELLO CHATRIE,

*Defendant-Appellant.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), I, J. JONATHAN HAWK, hereby certify that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) because it contains 4,837 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century font.

DATED: September 4, 2026

Respectfully submitted,

By: /s/ J. JONATHAN HAWK

Counsel for Amicus Curiae

**No. 22-4489**

IN THE

**United States Court of Appeals for the Fourth Circuit**

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

OKELLO CHATRIE,

*Defendant-Appellant.*

## CERTIFICATE OF SERVICE

Under Federal Rule of Appellate Procedure 25(d) and Fourth Circuit Local Rule 25(a), I, J. JONATHAN HAWK, hereby certify that I electronically filed the foregoing with the United States Court of Appeals for the Fourth Circuit using the Court's Electronic Filing System (ECF) on September 4, 2026. I further certify that I am a certified Filer as a member of the bar of this Court, and that I served a copy of the foregoing through ECF on the following parties:

United States Attorney's Office for the Eastern District of Virginia
919 East Main Street, Suite 1900
Richmond, Virginia 23219

National Association of Criminal Defense Lawyers
1660 L St., NW 12th Floor
Washington, DC 20036

DATED: September 4, 2026

Respectfully submitted,

By: /s/ J. JONATHAN HAWK

Counsel for Amicus Curiae