**No. 22-4489**

---

**UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**

---

UNITED STATES OF AMERICA,
*Plaintiff/Appellee,*

v.

OKELLO CHATRIE,
*Defendant/Appellant.*

---

On Remand from the United States Supreme Court

On Appeal from the United States District Court
for the Eastern District of Virginia
Case No. 3:19-cr-00130-MHL
Honorable M. Hannah Lauck, District Court Judge

---

# BRIEF OF *AMICI CURIAE* THE INNOCENCE PROJECT AND THE CENTER ON RACE, INEQUALITY, AND THE LAW AT NEW YORK UNIVERSITY SCHOOL OF LAW IN SUPPORT OF APPELLANT

---

James C. Dugan
Ferdinand G. Suba Jr.
Corinne D. Cathcart
Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY 10019
Telephone: (212) 728-8000
jdugan@willkie.com

Matthew A. Wasserman
Maithreyi Nandagopalan
The Innocence Project
40 Worth Street, Suite 701
New York, NY 10013
Telephone: (212) 364-5340
mwasserman@innocenceproject.org
mnandagopalan@innocenceproject.org

*Counsel for Amici Curiae*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 22-4489 Caption: United States v. Okello Chatrie

Pursuant to FRAP 26.1 and Local Rule 26.1,

Innocence Project
(name of party/amicus)

who is Amicus, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity? ☐ YES ☑ NO

2. Does party/amicus have any parent corporations? ☐ YES ☑ NO
If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐ YES ☑ NO
If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES☐NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES☐NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES☐NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES☐NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Matthew A. Wasserman Date: 9/8/2026

Counsel for: The Innocence Project

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

# DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 22-4489 Caption: United States v. Okello Chatrie

Pursuant to FRAP 26.1 and Local Rule 26.1,

The Center on Race, Inequality, and the Law at New York University School of Law
(name of party/amicus)

who is Amicus, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity? ☐ YES ☑ NO

2. Does party/amicus have any parent corporations? ☐ YES ☑ NO
If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐ YES ☑ NO
If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Matthew A. Wasserman Date: 9/8/2026

Counsel for: The Center on Race, Inequality, and the Law at New York University School of Law

# TABLE OF CONTENTS

Page

INTEREST OF *AMICI CURIAE* ........ 1
SUMMARY OF ARGUMENT ........ 2
ARGUMENT ........ 5
I. Geofence Warrants Create an Unacceptable Risk of Wrongful Arrests and Wrongful Convictions. ........ 5
A. Geofence Warrants Have Already Led to Wrongful Arrests and Accusations. ........ 5
B. Geofence Warrants Necessarily Cast Suspicion on Innocent People and Compound the Problem by Giving Law Enforcement Unchecked Discretion to Interpret the Search Results. ........ 8
II. Geofence Warrants Exacerbate Cognitive Bias and Rest on Unreliable Data, Two Factors Known to Contribute to Wrongful Convictions ........ 13
A. Geofence Warrants Contribute to Cognitive Bias. ........ 13
i. Geofence Warrants Invite Tunnel Vision and Confirmation Bias. ........ 15
ii. Geofence Warrants Invite Automation Bias. ........ 19
B. Geofence Warrants Target Location Data That, Despite How Detailed and Extensive It Can Be, Is Also Often Unreliable. ........ 22
CONCLUSION ........ 28
CERTIFICATE OF COMPLIANCE ........ 29
CERTIFICATE OF SERVICE ........ 30

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Chatrie v. United States*, 146 S. Ct. 2193 (2026) ....................................................9, 10, 12, 18, 21

*In re the Search of Information Stored at Premises Controlled by Google*, Case No. 20 M 297, 2020 WL 5491763 (N.D. Ill. July 8, 2020).......................11

*In re the Search of Information that is Stored at the Premises Controlled by Google, LLC*, 542 F. Supp. 3d 1153 (D. Kan. 2021) .......................................10

*Johnson v. United States*, 333 U.S. 10 (1948) ........................................................................................21

*United States v. Chatrie*, 590 F. Supp. 3d 901 (E.D. Va. 2022), *aff'd*, 136 F.4th 100 (4th Cir. 2025) (*en banc*), *vacated and remanded sub nom. Chatrie v. United States*, 146 S. Ct. 2193 (2026)...............................................5, 10, 21, 22, 23, 26, 27

**Other Authorities**

Albert Fox Cahn, *Manhattan DA Cy Vance Made Google Give Up Info on Everyone in Area in Hunt for Antifa After Proud Boys Fight*, DAILY BEAST (Aug. 13, 2019, 12:03 PM), https://www.thedailybeast.com/manhattan-da-cy-vance-made-google-give-up-info-on-everyone-in-area-in-hunt-for-antifa-after-proud-boys-fight ..................................................................................11

Andrea Macarulla Rodriguez et al., *Google Timeline Accuracy Assessment and Error Prediction*, 3 FORENSIC SCI. RES. 240 (2018) ............................20, 23

Innocence Comm'n for Va., *A Vision for Justice: Report and Recommendations Regarding Wrongful Convictions in the Commonwealth of Virginia* 69 (2005)...........................................................17

Innocence Project, *Case Profiles: Steven Avery*, https://innocenceproject.org/cases/steven-avery/........................................17, 18

Itiel Dror & David Charlton, *Why Experts Make Errors*, 56 J. FORENSIC IDENTIFICATION 600 (2006)...................................................................13, 14

Itiel Dror, *Cognitive and Human Factors in Expert Decision Making: Six Fallacies and the Eight Sources of Bias*, 92 ANAL. CHEM. 7998 (2020) .......... 13

Itiel E. Dror, *Biased and Biasing: The Hidden Bias Cascade and Bias Snowball Effects*, 15 BEHAV. SCI. 490 (2025) .......... 13

Itiel E. Dror et al., *Cognitive Bias in Forensic Pathology Decisions*, 66 J. FORENSIC SCI. 1750 (2021) .......... 15, 16

Itiel E. Dror et al., *Contextual Information Renders Experts Vulnerable to Making Erroneous Identifications*, 156 FORENSIC SCI. INT'L 74 (2006) .......... 16

Jennifer Valentino-deVries, *Tracking Phones, Google Is a Dragnet for the Police*, N.Y. TIMES (Apr. 13, 2019), https://www.nytimes.com/interactive/2019/04/13/us/google-location-tracking-police.html .......... 8, 11

Jon Schuppe, *Google tracked his bike ride past a burglarized home. That made him a suspect.*, NBC NEWS (Mar. 7, 2020, 6:22 AM), https://www.nbcnews.com/news/us-news/google-tracked-his-bike-ride-past-burglarized-home-made-him-n1151761 .......... 6, 7

Kate Goddard et al., *Automation Bias: A Systematic Review of Frequency, Effect Mediators, and Mitigators*, 19 J. AM. MED. INFORM. ASSOC. 121 (2012) .......... 14, 19

Keith A. Findley & Michael S. Scott, *The Multiple Dimensions of Tunnel Vision in Criminal Cases*, 2006 WIS. L. REV. 291 (2006) .......... 14, 15, 17, 18

Meg O'Connor, *Avondale Man Sues After Google Data Leads to Wrongful Arrest for Murder*, PHX. NEW TIMES (Jan. 16, 2020, 9:11 AM), https://www.phoenixnewtimes.com/news/google-geofence-location-data-avondale-wrongful-arrest-molina-gaeta-11426374/ .......... 5, 6, 18, 26

President's Council of Advisors on Sci. & Tech., *Forensic Science in the Criminal Courts: Ensuring Scientific Validity of Feature-Comparison Methods* 49 (2016) .......... 17

Raja Parasuraman & Dietrich H. Manzey, *Complacency and Bias in Human Use of Automation: An Attentional Integration*, 52 HUM. FACTORS 381 (2010) .......... 19

Saul M. Kassin et al., *The Forensic Confirmation Bias*: *Problems, Perspectives, and Proposed Solutions*, 2 J. APPLIED RSCH. MEM. & COGNITION 42 (2013) .......... 13, 16

State of Ill., *Report of the Governor's Commission on Capital Punishment* 7 (2002) .......... 16

Vanessa Meterko, Innocence Project, *What is Cognitive Bias and How Does It Contribute to Wrongful Conviction* (Aug. 19, 2021), https://innocenceproject.org/news/what-is-cognitive-bias-how-it-contributes-to-wrongful-conviction/ .......... 14

## INTEREST OF *AMICI CURIAE*[1]

The Innocence Project is a nonprofit organization dedicated to providing pro bono legal and investigative services to innocent people wrongfully convicted of crimes. To date, the Innocence Project has freed or exonerated 257 innocent individuals, who were wrongfully incarcerated for a total of 4,102 years. In addition to fighting to exonerate those already wrongfully convicted, it also seeks to prevent future injustices through reform initiatives that improve accuracy in our criminal legal system. Dragnet technologies like geofence warrants impose an unreasonable burden of suspicion on innocent individuals and create an unacceptable risk of wrongful arrests and convictions.

The Center on Race, Inequality, and the Law at New York University School of Law[2] (the "Center") confronts and upends the array of American laws, policies, and practices that lead to racial oppression and injustice. By illuminating the history and impact of racism on law and society, the Center is able to find solutions to the injustice it causes and take action to advance freedom and fairness, for everyone.

---

[1] Counsel for *amici curiae* certify that no person or entity, other than *amici curiae*, their members, or their counsel, contributed money to the preparation or submission of this brief or authored this brief in whole or in part. Furthermore, the parties have consented to the filing of this brief.

[2] The Center on Race, Inequality, and the Law is affiliated with New York University School of Law, but does not purport to present the school's institutional views, if any, in this *amicus curiae* brief or otherwise.

The Center supports efforts to ensure actors in the criminal legal system are held accountable when they exercise discretion in ways that undermine the fair administration of justice. Geofence warrants, like the one in this case, allow law enforcement officials unchecked discretion to sift through vast amounts of unparticularized data and request additional data for individuals of their choosing, without any judicial oversight.

*Amici curiae* share a compelling interest in mitigating the risks of wrongful conviction and challenging investigative practices likely to produce wrongful convictions. Accordingly, *amici* submit this brief to urge the Court to hold that the execution of the geofence warrant here violated the Fourth Amendment.

## SUMMARY OF ARGUMENT

Geofence warrants overwhelmingly target innocent people's information, rely on data fraught with reliability problems, and have already led to wrongful arrests. This is no surprise, as geofence warrants seek data not from a particular suspect but from all Location History-enabled devices located in a certain geographic area at a certain time. The warrant in this case exemplifies how the process for geofence warrants, unlike traditional warrants, lacks probable cause and particularity at each of its three stages. Geofence warrants can thus ensnare innocent people who happened to have a device near the time and place of a suspected crime. Geofence

warrants are dangerous dragnets that capitalize on the ubiquity of data gathering by companies like Google, often at the expense of innocent people.

Beyond casting suspicion on persons without probable cause and particularity, geofence warrants may also fail to identify the actual perpetrator of a crime. They depend on data captured via smartphones or other devices that have a Location History feature enabled. For crimes committed by persons who do not have that feature enabled or are not carrying such devices at all, geofence warrants are essentially useless. Geofence warrants are prone to generate false leads and cast suspicion on innocent people while leading police to turn a blind eye to perpetrators who may be incidentally or purposefully evading location history tracking.

Geofence warrants also allow law enforcement to exercise discretion without proper guardrails. In particular, at the second step of the three-step process, law enforcement decides, without objective criteria or judicial oversight, how or even whether to narrow the anonymized Location History data collected at the first step before obtaining additional anonymized data from Google. Then, at the third step, officers are again free to determine which accounts from the second step to target for deanonymized personal information, again without specific criteria, a magistrate's review, or any obligation to narrow the list at all.

Law enforcement's decisions during these steps are susceptible to cognitive biases known to contribute to wrongful convictions: tunnel vision, confirmation bias,

and automation bias. As law enforcement seeks to use innovative technology to improve its capabilities, officers risk over-relying on such technology despite its shortcomings and putting innocent people at risk when they act with unchecked discretion. Geofence warrants may seem objective—the data is collected from a given geographic area in a given time frame with no regard to individualized suspicion—but these same characteristics can encourage investigative tunnel vision, where police selectively interpret other evidence to confirm *what* and *who* geofence data has already led them to suspect, and automation bias, where investigators privilege technologically generated location data over exculpatory analog evidence.

Finally, geofence warrants are an unreliable investigative tool. The location data tends to be imprecise, and at least one empirical study has found that Google's confidence intervals sometimes overstate its accuracy. Moreover, even when data obtained via geofence warrants accurately captures a device's location, it may fail to locate the account owner. These factors make geofence warrants particularly ripe for producing wrongful arrests and potentially wrongful convictions.

For these reasons, *amici* urge the Court to hold that the geofence warrant in this case violated the Fourth Amendment.

## ARGUMENT

### I. Geofence Warrants Create an Unacceptable Risk of Wrongful Arrests and Wrongful Convictions.

#### A. Geofence Warrants Have Already Led to Wrongful Arrests and Accusations.

Geofence warrants target and potentially expose to law enforcement the location data of individuals who are not suspected of criminal activity. Because they require a search of *every* user account with Location History[3] activated, retrieve data based only on proximity, and then afford unchecked discretion to law enforcement to narrow which users to pursue, they create a profound risk of targeting innocent people who were in the wrong place at the wrong time.

Indeed, this has already happened. Investigators have, for instance, arrested one innocent person despite compelling evidence the phone connected to his account was in someone else's possession at the relevant time, and targeted another simply because his routine bicycling route placed him within a geofence. Meg O'Connor, *Avondale Man Sues After Google Data Leads to Wrongful Arrest for Murder*, PHX. NEW TIMES (Jan. 16, 2020, 9:11 AM), https://www.phoenixnewtimes.com/news/google-geofence-location-data-avondale-

[3] Location History refers to the tool developed by Google that "appears to be the most sweeping, granular, and comprehensive tool—to a significant degree—when it comes to collecting and storing *location* data." *United States v. Chatrie*, 590 F. Supp. 3d 901, 907 (E.D. Va. 2022).

wrongful-arrest-molina-gaeta-11426374/. Jon Schuppe, *Google tracked his bike ride past a burglarized home. That made him a suspect.*, NBC NEWS (Mar. 7, 2020, 6:22 AM), https://www.nbcnews.com/news/us-news/google-tracked-his-bike-ride-past-burglarized-home-made-him-n1151761.

Jorge Molina was wrongly arrested, spent six days in jail, and lost his job and car due to a geofence warrant. In 2018, police officers in Avondale, Arizona arrested 23-year-old Molina on a first-degree murder charge following a fatal shooting, relying on Location History data obtained from Google via a geofence warrant. O'Connor, *supra*. The data showed a device logged into Molina's Google account in the area at the time of the murder. *Id.* Within a day of Molina's arrest, however, police were alerted to compelling alibi evidence: text messages and Uber receipts confirming Molina had attended a movie with friends and was two miles away from the crime scene at the time of the shooting. *Id.* There were other indications that the Location History data might not reflect Molina's true whereabouts: on one date, the data showed a device logged into Molina's account at the retirement community where his mother worked at the same time as records documented him making a purchase on the other side of town. *Id.*

Police also learned that Molina's stepfather had a history of violence and had been using Molina's old phone, which had remained logged into Molina's email and social media accounts. *Id.* Rather than investigating the abundant exculpatory

evidence before proceeding with an arrest, police relied on the geofence warrant to arrest Molina, interrogate him, keep him in jail for several days, and issue a press release naming him as the suspect. *Id.*

Zachary McCoy was also wrongfully identified as the lead suspect in a crime due to a geofence warrant. In 2020, McCoy received a notice from Google saying that police in Gainesville, Florida had sought information about his account. Schuppe, *supra*. Local police alighted on McCoy because a Google geofence warrant yielded location data that "seemed suspicious" to police, showing him passing near a burglarized home three times in an hour. *Id.* Yet McCoy had nothing to do with the burglary; he lived less than a mile from the burglarized house and was an avid cyclist, and his frequent loops around the neighborhood were captured on an exercise-tracking app that used Google's location services. *Id.* Upon identifying him as suspicious based on his device's trajectory, police then sought a vast trove of personal and otherwise protected information: they tried to access not only the app's data around the time of the burglary, but *all* data associated with McCoy's Google account, including his use of products like Gmail and YouTube. *Id.* Despite Location History data placing McCoy near the scene of the crime, he was innocent.

These cases exemplify geofence warrants' lack of particularized probable cause. In both cases, prior to the initial search, the police did not know who Molina or McCoy were and had no probable cause to access their Location History data.

These cases also illustrate the issues with geofence warrants discussed below: the inclusion of innocent people in broad nets of suspicion; cognitive biases leading investigators to neglect traditional investigative techniques and ignore evidence of innocence; and reliance on misleading or ambiguous technological data. In part because courts frequently seal geofence warrants, the true number of wrongful arrests and wrongful convictions they have caused remains unknown. Jennifer Valentino-deVries, *Tracking Phones, Google Is a Dragnet for the Police*, N.Y. TIMES (Apr. 13, 2019), https://www.nytimes.com/interactive/2019/04/13/us/google-location-tracking-police.html. As law enforcement continues to widely use and rely on such warrants, and companies like Google continue to collect more data, the risk of wrongful arrests and convictions grows.

### B. Geofence Warrants Necessarily Cast Suspicion on Innocent People and Compound the Problem by Giving Law Enforcement Unchecked Discretion to Interpret the Search Results.

Geofence warrants that provide for unchecked law enforcement discretion differ fundamentally from traditional warrants because they do not rest on evidence establishing probable cause as to a particular person. Rather than beginning with individualized suspicion, geofence warrants like the one here invert the constitutionally mandated warrant process, starting with a broad dragnet and relying on *subsequent* discretionary law enforcement review to "narrow" the search results. This transforms a tool meant to be predicated on probable cause into one based on

mere proximity to a crime scene. No stage of the warrant process at issue here meets the standard of probable cause and particularity required by the Fourth Amendment.

The Supreme Court held unequivocally that a geofence warrant is a Fourth Amendment search and remanded for determination of whether the warrant here satisfied the requirements of probable cause and particularity at *each* stage of the search process. *Chatrie v. United States*, 146 S. Ct. 2193, 2215 (2026). The warrant followed a three-step process then typical of geofences: First, Google would provide anonymized location data for all phones within a given time period, in this case one hour surrounding the robbery; second, "officers would attempt to narrow down the list," and Google would provide *additional* anonymized data; and third, officers "would again attempt to narrow down the list" and Google would "turn over *identifying* information for each user on the final list, including his name and phone number." *Id*. at 2202–03 (quotations omitted) (emphasis added). The latter steps involve discretionary judgments that allow the Government to obtain further information on, and ultimately identify, individuals who may have been near a crime scene but otherwise bear no connection to the crime.

Geofence warrants can be staggering in scope. The warrant here compelled Google to search the company's entire "Sensorvault" database, which contained Location History data from hundreds of millions of users, to identify devices estimated to be within the boundaries of the geofence. *See United States v. Chatrie*,

590 F. Supp. 3d 901, 908 (E.D. Va. 2022), *vacated*, 146 S. Ct. 2193 (2026).[4] Necessarily, this process requires searching the location data of millions of innocent people with no connection to the crime. And the consequences for those innocent individuals whose devices are determined to be within or near the boundaries of a geofence can be very serious.

Even when considering only the devices estimated to fall within a geofence, these warrants can and often do encompass areas and time frames broad enough to include many people who neither were involved in nor witnessed a crime—as Zachary McCoy's case illustrates. The warrant in this case, for example, "was not limited to the bank" where the robbery occurred, but "also included a nearby church." *Chatrie*, 146 S. Ct. at 2211 n.10. In other cases, law enforcement agencies have sought geofence warrants covering several acres, sometimes in densely populated cities, capturing businesses or residences entirely unrelated to the crime, or encompassing large, well-trafficked roads. *See, e.g.*, *In re the Search of Information that is Stored at the Premises Controlled by Google, LLC*, 542 F. Supp. 3d 1153, 1158 (D. Kan. 2021) (describing geofence warrant application where geographic boundary included two public streets and business located in target building but unrelated to crime); *In re the Search of Information Stored at Premises Controlled*

[4] In 2023, Google announced it would store Location History on users' devices instead of in the Sensorvault. 146 S. Ct. at 2201 n.2.

*by Google*, Case No. 20 M 297, 2020 WL 5491763, at *1 (N.D. Ill. July 8, 2020) (denying geofence warrant application where requests covered two areas with 100-meter radii, including densely populated areas with restaurants, businesses, and a residential complex). These expansive dragnets all but ensure innocent individuals become criminal suspects based solely on their proximity to a location at a particular time.

Police's purported efforts to narrow geofence warrant returns at steps two and three are often not sufficient to avoid ensnaring the innocent—and without judicial oversight or specific and explicitly delineated criteria, they cannot be. Zachary McCoy and Jorge Molina are not alone. In Minnesota, for instance, "the name of an innocent man was released to a local journalist after it became part of the police record." Valentino-deVries, *supra*. He became a target because a geofence placed him "within 170 feet of a burglary" and later said he "thought he might have appeared because he was a cabdriver." *Id.* Similarly, the Manhattan district attorney sought information "for all devices used in parts of the Upper East Side" of New York—purportedly to identify people involved in a brawl in the area. Albert Fox Cahn, *Manhattan DA Cy Vance Made Google Give Up Info on Everyone in Area in Hunt for Antifa After Proud Boys Fight*, DAILY BEAST (Aug. 13, 2019, 12:03 PM), https://www.thedailybeast.com/manhattan-da-cy-vance-made-google-give-up-info-on-everyone-in-area-in-hunt-for-antifa-after-proud-boys-fight/. In response to that

warrant, "Google provided information that investigators used—along with images given to a private facial recognition company—to target two people who turned out to be innocent bystanders." *Id.*

Despite the potentially life-altering consequences of such searches, these judgments are made without meaningful judicial review, lack substantive parameters or requirements, and ultimately result in *more* information about potentially innocent individuals being provided to the Government. As Justice Jackson explained, the "lack of magisterial oversight is dangerous" because "officers could obtain additional, sensitive information at steps two and three without having to convince a magistrate that there was probable cause to believe this particular information would uncover evidence related to the crime." *Chatrie*, 146 S. Ct. at 2217–18 (Jackson, J., concurring). Such a process allows officers a "roving commission" to collect data without judicial oversight reviewing their justifications. *Id*. Even if this Court determines the first step of a geofence warrant may be constitutional, subsequent steps should require a separate determination by a magistrate and a specific delineation of what facts support probable cause for *each* account targeted. Otherwise, it is virtually inevitable that innocent people's data will be exposed, and they will be arrested, prosecuted, and even wrongfully convicted.

### II. Geofence Warrants Exacerbate Cognitive Bias and Rest on Unreliable Data, Two Factors Known to Contribute to Wrongful Convictions.

#### A. Geofence Warrants Contribute to Cognitive Bias.

Geofence warrants do not merely risk sweeping innocent people into the net of suspicion. By contributing to cognitive biases that lead investigators to ignore exculpatory evidence, they create conditions under which innocent people may be unable to escape suspicion. Cognitive bias is "an outcome, a by-product, of people's cognitive architecture and of how the brain processes information," which need not reflect prejudice, misconduct, or bad faith. Itiel E. Dror, *Biased and Biasing: The Hidden Bias Cascade and Bias Snowball Effects*, 15 Behav. Sci. 490, 491 (2025).

In the criminal legal system, cognitive bias describes how "an individual's pre-existing beliefs, expectations, motives, and situational context influence the collection, perception, and interpretation of evidence during the course of a criminal case." *Id.* (quoting Saul M. Kassin et al., *The Forensic Confirmation Bias: Problems, Perspectives, and Proposed Solutions*, 2 J. Applied Rsch. Mem. & Cognition 42, 45 (2013)). Researchers have documented these effects across forensic and investigative disciplines. *See, e.g.*, Itiel Dror, *Cognitive and Human Factors in Expert Decision Making: Six Fallacies and the Eight Sources of Bias*, 92 Anal. Chem. 7998 (2020); Itiel Dror & David Charlton, *Why Experts Make Errors*, 56 J. Forensic Identification 600 (2006). Cognitive bias is also a well-known contributor

to wrongful convictions. *See* Vanessa Meterko, Innocence Project, *What is Cognitive Bias and How Does It Contribute to Wrongful Conviction* (Aug. 19, 2021), https://innocenceproject.org/news/what-is-cognitive-bias-how-it-contributes-to-wrongful-conviction/.

Law enforcement's use of geofence warrants is susceptible to at least three forms of cognitive bias: tunnel vision, confirmation bias, and automation bias. Tunnel vision and confirmation bias lead investigators to seek out and overweight evidence that confirms their initial suspicions, while failing to gather or underweighting evidence that points elsewhere. *See* Keith A. Findley & Michael S. Scott, *The Multiple Dimensions of Tunnel Vision in Criminal Cases*, 2006 Wis. L. Rev. 291, 292, 309 (2006). They pose particular risk in contexts of subjective decision-making, such as steps two and three of the geofence warrant process. Automation bias describes humans' tendency to over-rely on computer-generated information even when it is unreliable or contradicted by other evidence. *See* Kate Goddard et al., *Automation Bias: A Systematic Review of Frequency, Effect Mediators, and Mitigators*, 19 J. Am. Med. Inform. Ass'n 121, 121 (2012). It can lead officers to overestimate the precision of Location History data and zero in on people identified via geofence while ignoring other possible suspects.

#### i. Geofence Warrants Invite Tunnel Vision and Confirmation Bias.

Tunnel vision describes a phenomenon where investigators evaluate new evidence through the lens of a theory they already believe, even if wrong. It is the "compendium of common heuristics and logical fallacies," to which all people are susceptible, that can lead investigators to "focus on a suspect, select and filter the evidence that will 'build a case' for conviction, while ignoring or suppressing evidence that points away from guilt." Findley & Scott, *supra*, at 292 (quoting Dianne L. Martin, *Lessons About Justice from the "Laboratory" of Wrongful Convictions*, 70 UMKC L. Rev. 847, 848 (2002)). Once a conclusion takes hold, supporting information "is elevated in significance, viewed as consistent with the other evidence, and deemed relevant and probative." *Id.* "Inconsistent evidence, by contrast, is easily overlooked or dismissed as irrelevant, incredible, or unreliable." *Id.* These dynamics operate independently of an officer's intentions or diligence. Tunnel vision is "more often the product of the human condition as well as institutional and cultural pressures, than of maliciousness or indifference." *Id.*

Confirmation bias refers to the related tendency to "seek or interpret evidence in ways that support existing beliefs, expectations, or hypotheses." Findley & Scott, *supra*, at 309. Researchers have demonstrated the phenomenon among experts performing fingerprint comparisons and other forensic judgments. Itiel E. Dror et al., *Cognitive Bias in Forensic Pathology Decisions*, 66 J. Forensic Sci. 1750, 1752

(2021). In one study, expert fingerprint examiners reexamined prints they themselves had previously declared a match. After receiving contextual information suggesting their prior identification was mistaken, four of five expert examiners changed their conclusions. Itiel E. Dror et al., *Contextual Information Renders Experts Vulnerable to Making Erroneous Identifications*, 156 Forensic Sci. Int'l 74, 76 (2006). Bias can cascade across evidence as well. Polygraph examiners told that a suspect confessed are more likely to score the suspect deceptive, and eyewitnesses told the same are more likely to identify that suspect, even after initially identifying someone else. Kassin et al., *supra*, at 45–46.

Wrongful-conviction inquiries have repeatedly identified these cognitive biases as causes of investigative error. *See* Findley and Scott, *supra*, at 293–94. In 2002, former Illinois Governor George Ryan's Commission on Capital Punishment examined thirteen cases in which innocent people were sentenced to death before exoneration. The Commission found "[a]ll 13 cases were characterized by relatively little solid evidence connecting the charged defendants to the crimes." State of Ill., *Report of the Governor's Commission on Capital Punishment* 7 (2002). It identified "the dangers of tunnel vision or confirmatory bias" as a central concern. *Id.* at 21. Similarly, the Innocence Commission for Virginia found tunnel vision can cause police to "jump to the conclusion that a particular suspect is guilty" and then "focus solely on one person to the exclusion of other viable suspects." Innocence Comm'n

for Va., *A Vision for Justice: Report and Recommendations Regarding Wrongful Convictions in the Commonwealth of Virginia* 69 (2005). The risks are particularly great with subjective methods and decisions that lack objective criteria for evaluating evidence. *See, e.g.*, President's Council of Advisors on Sci. & Tech., *Forensic Science in the Criminal Courts: Ensuring Scientific Validity of Feature-Comparison Methods* 49 (2016).

Steven Avery's wrongful conviction illustrates how tunnel vision and confirmation bias, left unchecked, can produce devastating results. In 1985, Avery was convicted of rape based primarily on an eyewitness identification later shown to be unreliable. Findley & Scott, *supra*, at 299–300. Investigators targeted Avery even though another man, Gregory Allen, matched the victim's description and was suspected in a series of sexual assaults in the area. *Id.* at 299–301, 303. Allen was considered enough of a threat that local police maintained daily surveillance on him; at least two employees in the district attorney's office believed he had committed the rape. *Id.* at 303. Yet the sheriff's department and prosecutor "steadfastly refused to consider that Avery might not be guilty, or to investigate Allen." *Id.* When the police department suggested Allen might be the perpetrator, the sheriff insisted Allen had been ruled out. *Id.* Avery presented sixteen alibi witnesses at trial and was convicted anyway, serving over eighteen years for a crime he did not commit. *Id.* at

301–02; *see also* Innocence Project, *Case Profiles: Steven Avery*, https://innocenceproject.org/cases/steven-avery/.

Confirmation bias and tunnel vision pose particular dangers at steps two and three of the geofence warrant process, where officers select users for further scrutiny without clear criteria governing that choice. Once officers focus on a particular user, corroborating details can be elevated and contradictory information discounted. *See* Findley & Scott, *supra*, at 292, 309. The warrant here, for instance, instructed officers to compare the location data against "the known time and location information that is specific to this crime," but supplied nothing to guide which devices should survive that comparison. *Chatrie*, 146 S. Ct. at 2217 (Jackson, J., concurring). Officers were left to determine which anonymized users appeared most consistent with their developing theory of the crime—precisely the circumstance in which tunnel vision and confirmation bias exert their strongest influence.

Jorge Molina's arrest despite substantial exculpatory evidence exemplifies the risk of unchecked discretion. He spent six days in jail despite documented alibi evidence and the existence, as in Avery's case, of another suspect whom detectives considered a more likely culprit. *See* O'Connor, *supra*. The Location History attributed to Molina at times placed him in two locations at once, but police did not bother accounting for this. *Id.* Nor did they contact or interview the alternative suspect before arresting Molina. *Id.* They did not have to: nothing in the warrant

process required them to articulate why Molina remained a suspect, address the evidence pointing elsewhere, or justify further intrusion to a magistrate.

#### ii. Geofence Warrants Invite Automation Bias.

Police officers tend to treat technological output as more reliable than it actually is. *See* Goddard et al., *supra*, at 121. This overreliance can produce "decisions that are not based on a thorough analysis of all available information but that are strongly biased by the automatically generated advice." Raja Parasuraman & Dietrich H. Manzey, *Complacency and Bias in Human Use of Automation: An Attentional Integration*, 52 Hum. Factors 381, 391 (2010). Decision-makers may believe they are exercising independent judgment while actually relying on automated output. Goddard et al., *supra*, at 123–24.

Controlled studies have documented automation bias in various fields, affecting both naïve and expert participants. Parasuraman & Manzey, *supra*, at 397. Automation bias "cannot be prevented by training or explicit instructions to verify the recommendations of an aid," and it can affect individuals and teams alike. *Id.* If explicit instructions to verify automated outputs do not reliably eliminate the effect, no amount of professional training or investigative experience can be expected to in the geofence context.

Automation bias can distort judgment in both directions. Errors of commission occur when users act on incorrect automated outputs. Errors of omission

occur when users fail to detect a problem because an automated system does not flag it. *Id.* at 391. Geofence warrants create opportunities for both. A returned device may appear more inculpatory than the underlying data justify, leading officers to pursue an innocent user. Conversely, if the perpetrator is absent from the returned pool, investigators may erroneously concentrate on the users the technology did identify, never recognizing the true suspect was never in the dataset.

Although Google's Location History data may seem infallible, carrying as it does the imprimatur of a global technological behemoth and lacking the potential motivation and capacity to lie of a human informant, it is not always accurate. It can be highly imprecise depending on how it was generated. *See* Andrea Macarulla Rodriguez et al., *Google Timeline Accuracy Assessment and Error Prediction*, 3 Forensic Sci. Res. 240, 241–42, 249 (2018) (documenting substantially greater error for Wi-Fi and 2G and 3G cell-network sources than for GPS); *see also* Part II.B, *infra*. Its variable accuracy makes the risk of automation bias especially consequential. Officers inclined to trust the objective-seeming data may focus on the most suspicious-looking candidate among the users Google returns—even if, like Zachary McCoy, that person is innocent—overlooking that the true suspect may not be present at all. And if the data produced at step one includes coordinates very close to the location of interest but with a large margin of error, automation bias may lead

officers to give such imprecise location matches more weight than they deserve when determining whom to target at steps two and three.

Officers may also simply fail to narrow the pool, using the automatically generated information as grounds for a fishing expedition on everyone returned. Indeed, at steps two and three in this case, law enforcement initially sought unbounded Location History data and account information for all nineteen devices identified at step one. *Chatrie*, 146 S. Ct. at 2218 (Jackson, J., concurring) (citing *Chatrie*, 590 F. Supp. 3d at 921). Nothing in the warrant prohibited that request. Officers narrowed the list "only because Google insisted on it." *Id.* Even after that intervention, they requested additional data for nine devices at step two, obtaining with no judicial oversight data that exposed movements to and from residences, a school, and a hospital. *Id.* (citing 590 F. Supp. 3d at 923).

The Government may characterize successive narrowing as the process by which individualized suspicion emerges. But suspicion generated through an intrusion cannot retroactively supply the probable cause needed to authorize that same intrusion. *See Johnson v. United States*, 333 U.S. 10, 16–17 (1948) (rejecting the Government's attempt "to justify the arrest by the search and at the same time to justify the search by the arrest"). Rather, a magistrate must determine whether the data produced at each step is of sufficient relevance and quality to provide probable cause for each targeted user *before* the next step. *See Chatrie*, 146 S. Ct. at 2216

(requiring warrant to satisfy particularity and probable cause "at each step of the search process"). This is also a critical safeguard against automation bias.

### B. Geofence Warrants Target Location Data That, Despite How Detailed and Extensive It Can Be, Is Also Often Unreliable.

Even when Location History data is broadly accurate, it can produce both false positives and false negatives: someone not in the targeted area may be reported as present, and someone present may not be captured at all. *See Chatrie*, 590 F. Supp. 3d at 923. Location data sources that vary in accuracy and precision, confidence intervals calibrated to capture only a subset of devices' true locations, users being logged into Google accounts on multiple devices, and the prerequisites for inclusion in the Sensorvault database all contribute to these errors. Geofence warrants allow law enforcement officials to use this expansive yet flawed dataset to winnow suspects and obtain more information on certain individuals, with no judicial oversight. Law enforcement officials' unchecked discretion to select suspects and obtain more intrusive information, based on data that is unreliable and prone to indiscriminately ensnaring innocent individuals, is not reasonable and does not constitute probable cause.

First, although Location History data can sometimes estimate devices' locations with extreme accuracy, it is not always reliable; different sources of such data vary widely in precision. These sources include the Global Positioning System

(GPS), Bluetooth beacons, Wi-Fi networks, cellular towers, and Internet Protocol address information. *Id.* at 908. Some of this data is highly precise: under certain circumstances, Google can estimate a device's location within three meters or determine which floor of a multi-story building it is on. *Id.* at 908–09. Generally, GPS is the most accurate source of location data. *See* Rodriguez et al., *supra*, at 245 (noting that among Google location methods, GPS had "highest hit ratio" for capturing a device's true location within the listed margin of error).

Other data sources are considerably less precise, and coordinates presented to four decimal places may still be off by hundreds of meters from the device's true location. One study found that when GPS is unavailable, Google's hit rate (the proportion of cases where the true location fell within Google's confidence interval) was only 38% for 3G networks and 33% for 2G networks. *Id.* Cell tower data can be especially imprecise, particularly in rural areas, where it might provide location estimates miles away from an individual's true location. *Id.* at 249–50.

Because Location History data can be imprecise and its accuracy can vary based on its source, Google generates a confidence interval for each set of estimated location coordinates. Google's responses to geofence warrants contain estimated latitude and longitude coordinates for each device retrieved within the perimeter of the geofence as well as a confidence interval for that data point. *Chatrie*, 590 F. Supp. 3d at 909, 915. The confidence interval is provided as a circle around the identified

coordinates, representing a margin of error for the device's true location. *Id.* at 909. The smaller the radius of the confidence interval, the more precise Google believes the location estimate to be; the larger the radius, the less precise the estimate.

When Google cannot identify a device's location with precision and lists a large confidence interval, the device's true location might be hundreds of meters outside the geofence—which itself may already span a large area. *See id.* at 918 n.26 (noting the geofence's total area was 70,686 square meters). Geofence warrants can thus include people nowhere near the target location. Indeed, the geofence warrant here captured a user whose true location "may not have been remotely close enough to the Bank to participate in or witness the robbery" because the "confidence intervals stretched to 387 meters," more than twice the radius of the geofence itself. *Id.* at 922, 930. The area within the confidence intervals for that user included residences, a church, a hotel, a senior living facility, and two busy streets, any of which could have been the user's true location. *Id.* at 922–23.

Second, because Google's reported confidence intervals are not designed to capture all users or devices, a device's true location can in fact fall *outside* the confidence interval. Google sets confidence intervals with the goal of capturing approximately 68% of users within them, meaning that, for a given confidence interval, there is a 32% chance the device's true location is outside the listed radius. *Id.* at 909. As discussed above, the radius of these confidence intervals can already

be as large as hundreds of meters. *Id.* at 922–23. Couple this with the nearly one-in-three chance the true location of a device is even farther away despite appearing within the geofence, and law enforcement could easily target someone who was never anywhere near the crime scene.

As previously explained, at step one geofence warrants allow law enforcement officials to obtain coordinates and confidence intervals for all individuals within the area specified in the warrant. Then, at steps two and three, law enforcement officials are left to exercise their unchecked judgment about which data points they should discard and which they should request more information about. This exercise of judgment happens without any judicial oversight. Yet because the data can be imprecise, and because there is a significant chance a device was not located within the confidence interval, geofence warrant data will often ensnare innocent individuals who were never in fact near the area specified in the warrant. There can be no adequate probable cause to support the warrant where law enforcement officials exercise unfettered discretion over unreliable data belonging mostly to innocent people, entirely outside the review of a judge or other neutral arbiter.

That this tool can be extraordinarily accurate in some cases increases the danger of unchecked police discretion over the data in all circumstances. The subset of cases where Location History does effectively pinpoint a device's location can lure officials to overestimate its accuracy in instances where it may be inaccurate or

imprecise. Location History data invites officers to rely on potentially misleading data to conduct investigations and arrests, creating a serious risk that innocent people will be unreasonably surveilled, investigated, and falsely accused or convicted—even if they never set foot near a crime scene.

Third, even when the location data does accurately capture a device's location, the presence of a device in the vicinity of a crime scene does not necessarily place the account *owner* there. Location History tracks logged-in Google accounts, not individuals, and Google allows users to be logged in on multiple devices at once. *Chatrie*, 590 F. Supp. 3d at 909 ("Location History tracks a user's location across every app and every device associated with the user's account."). A law enforcement official therefore might pursue suspects based on the assumption that a device's presence near the scene of a crime necessarily indicates the account owner was also present, even though it might have been their family member, friend, roommate, or even a stranger who picked up a lost phone.

This type of error is precisely what exposed Jorge Molina to a wrongful accusation of homicide, police's public broadcasting of his name and face as the murder suspect, and the loss of his livelihood. O'Connor, *supra*. Although Molina ultimately was not charged and avoided a wrongful conviction, he has had to live with the psychological ramifications of his wrongful arrest for a crime punishable by death: nightmares about "sitting alone in that jail cell," where he was held for six

days, and fear that "his phone may track him to another crime scene" or that he might "be treated as a killer by people who recognize his widely spread mugshot." *Id.* And he has said the arrest has made it difficult for him to find a new job ever since, as his arrest record remains unsealed. *Id.* Geofence warrants' potential to first point law enforcement to innocent people, and then blind them to exculpatory evidence, makes such outcomes virtually inevitable.

Finally, even if the technology itself was entirely accurate and reliable, and even if device locations perfectly corresponded with account owners' locations, a geofence warrant might still in some cases point police only to innocent people. If the true culprit is not a Google user or has not activated Location History, then, by definition, everyone whose device shows up in Location History results for the geofence warrant will be innocent. In such a circumstance, even though all devices located by a geofence warrant would belong to people unconnected to the crime, their presence in the search results will nonetheless expose them to a pall of suspicion and potentially illegal searches and seizures. This is particularly true given that law enforcement officials typically turn to geofence warrants in the absence of individualized suspicion. *See, e.g.*, *Chatrie*, 590 F. Supp. 3d at 917 ("Having unearthed no further leads from his investigation, Det. Hylton then turned to geofence technology.").

Geofence warrants allow law enforcement to exercise discretion to identify and investigate potential criminal subjects culled from flawed data with no judicial review. Coupled with the cognitive biases of tunnel vision, confirmation bias, and automation bias, geofence warrants create conditions ripe for wrongful arrests and convictions.

## CONCLUSION

For these reasons, *amici curiae* urge this Court to hold that each step of the geofence warrant here violated the Fourth Amendment.

Dated: September 8, 2026

Respectfully submitted,

/s/ Matthew A. Wasserman

Matthew A. Wasserman
Maithreyi Nandagopalan
The Innocence Project
40 Worth Street, Suite 701
New York, NY 10013
Telephone: (212) 364-5340
mwasserman@innocenceproject.org
mnandagopalan@innocenceproject.org

James C. Dugan
Ferdinand G. Suba Jr.
Corinne D. Cathcart
Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY 10019
Telephone: (212) 728-8000
jdugan@willkie.com

*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B)(i) because it contains 6,344 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

Dated: September 8, 2026

/s/ Matthew A. Wasserman
Matthew A. Wasserman
The Innocence Project
40 Worth Street, Suite 701
New York, NY 10013
Telephone: (212) 364-5340
mwasserman@innocenceproject.org

*Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 8th day of September, 2026, the foregoing Brief of *Amici Curiae* was filed electronically through the Court's CM/ECF system. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system.

Dated: September 8, 2026

/s/ Matthew A. Wasserman
Matthew A. Wasserman
The Innocence Project
40 Worth Street, Suite 701
New York, NY 10013
Telephone: (212) 364-5340
mwasserman@innocenceproject.org

*Counsel for Amici Curiae*