**Appeal No. 22-4489**

# United States Court of Appeals for the Fourth Circuit

UNITED STATES OF AMERICA,

*Plaintiff–Appellee,*

v.

OKELLO T. CHATRIE,

*Defendant–Appellant.*

On Remand from the Supreme Court of the United States (No. 25-112)

On Appeal from the United States District Court
for the Eastern District of Virginia (No. 3:19-cr-130-MHL)

**BRIEF OF *AMICI CURIAE* RESTORE THE FOURTH, INC.
& ELECTRONIC PRIVACY INFORMATION CENTER
SUPPORTING DEFENDANT-APPELLANT OKELLO T. CHATRIE**

Tom McBrien**
Megan Iorio**
ELECTRONIC PRIVACY
INFORMATION CENTER
1519 New Hampshire Ave., N.W.
Washington, DC 20036
(202) 483-1140
mcbrien@epic.org
iorio@epic.org

Mahesha P. Subbaraman*
SUBBARAMAN PLLC
80 S. 8th Street, Suite 900
Minneapolis, MN 55402
(612) 315-9210
mps@subblaw.com

*Counsel for Amici Curiae*
*Restore the Fourth, Inc.* & Electronic Privacy Information Center***

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 22-4489 Caption: United States of America v. Okello T. Chatrie

Pursuant to FRAP 26.1 and Local Rule 26.1,

Restore the Fourth, Inc.
(name of party/amicus)

who is Amicus Curiae, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity? ☐ YES ☑ NO

2. Does party/amicus have any parent corporations? ☐ YES ☑ NO
If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐ YES ☑ NO
If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☐NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/Mahesha P. Subbaraman Date: September 8, 2026

Counsel for: Restore the Fourth, Inc. (Amicus)



Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 22-4489 Caption: United States v. Chatrie

Pursuant to FRAP 26.1 and Local Rule 26.1,

Electronic Privacy Information Center
(name of party/amicus)

who is amicus, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity? ☐YES ☑NO

2. Does party/amicus have any parent corporations? ☐YES ☑NO
If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐YES ☑NO
If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐ YES ☑ NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐ YES ☑ NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐ YES ☑ NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐ YES ☑ NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Megan Iorio Date: 9/8/2026

Counsel for: Electronic Privacy Information Center



Print to PDF for Filing Reset Form

# Table of Contents

DISCLOSURE STATEMENTS

Table of Authorities ........ ii

Amici Identity, Interest, & Authority to File ........ 1

Summary of the Argument ........ 3

Argument ........ 4

I. English common law and colonial America reviled general warrants, which permitted blanket exploratory searches and seizures absent real judicial review ........ 4

II. Post-revolution America banned general warrants through the Fourth Amendment, state constitution analogues, and many state court decisions ........ 16

III. The geofence warrant in *Chatrie* is an impermissible general warrant and, in this regard, the Court should not lose sight of the step-zero problem here ........ 26

Conclusion ........ 28

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

# Table of Authorities

Page(s)

**Cases**

*Ashley v. Peterson*, 25 Wis. 621 (1870) .... 25

*Barnes v. Felix*, 605 U.S. 73 (2025) .... 1

*Bell v. Clapp*, 10 Johns. 263 (N.Y. Sup. Ct. 1813) .... 21

*Boyd v. United States*, 116 U.S. 616 (1886) .... 16, 25, 27, 28

*Brinegar v. United States*, 338 U.S. 160 (1949) .... 27

*Carpenter v. United States*, 585 U.S. 296 (2018) .... 1, 2, 8

*Chatrie v. United States*, 146 S. Ct. 2193 (2026) .... 1, 4, 26, 27

*Commw. v. Haynes*, 116 A.3d 640 (Pa. Super. Ct. 2015) .... 8, 10

*Conner v. Commw.*, 3 Binn. 38 (Pa. 1810) .... 22

*Entick v. Carrington* (C.P. 1765),
19 COMPLETE COLLECTION OF STATE TRIALS 1029
(T. B. Howell ed., 1816) .... 3, 14, 15, 26

*Faretta v. California*, 422 U.S. 806 (1975) .... 5

*Fisher v. McGirr*, 67 Mass. 1 (1854) .... 23, 24

*Frisbie v. Butler*, 1 Kirby 213 (Conn. Super. Ct. 1787) .... 18

*Grumon v. Raymond*, 1 Conn. 40 (1814) .... 19

*Huckle v. Money* (C.P. 1763),
2 G. WILSON, REPORTS OF CASES ARGUED & ADJUDGED
IN THE KING'S COURTS AT WESTMINSTER 205 (1799) .... 14

*In re Wilkes* (C.P. 1763),
19 COMPLETE COLLECTION OF STATE TRIALS 981
(T. B. Howell ed., 1816) .... 11

*Kansas v. Glover*, 589 U.S. 376 (2020) .... 1

*Larthet v. Forgay*, 2 La. Ann. 524 (1847) .... 25

*Leach v. Money* (K.B. 1765),
19 COMPLETE COLLECTION OF STATE TRIALS 1001
(T. B. Howell ed., 1816)......14

*Luis v. United States*, 578 U.S. 5 (2016)......27

*Marcus v. Search Warrant*, 367 U.S. 717 (1961)......4

*Payton v. New York*, 445 U.S. 573 (1980)......4, 18

*People v. Holcomb*, 3 Park. Crim. 656 (N.Y. Sup. Ct. 1858)......25

*Riley v. California*, 573 U.S. 373 (2014)......1, 8, 10

*Sandford v. Nichols*, 13 Mass. 286 (1816)......20

*Stanford v. Texas*, 379 U.S. 476 (1965)......4

*Torres v. Madrid*, 592 U.S. 306 (2021)......1

*United States v. Chatrie*, 107 F.4th 319 (4th Cir. 2024)......2

*United States v. Chatrie*, 590 F. Supp. 3d 901 (E.D. Va. 2022)......9, 26

*Wilkes v. Wood* (C.P. 1763),
19 COMPLETE COLLECTION OF STATE TRIALS 1153
(T. B. Howell ed., 1816)......3, 13

**Constitutional Provisions (Federal & State)**

U.S. CONST. amend. IV......*passim*

DEL. CONST. DECL. OF RIGHTS §17 (1776)......17

MD. CONST. DECL. OF RIGHTS §23 (1776)......17

N.C. CONST. DECL. OF RIGHTS §11 (1776)......17

VA. DECL. OF RIGHTS §10 (1776)......17

**Other Authorities**

1 ANNALS OF CONG. (1789)......18

1 DEBATES IN THE SEVERAL STATE CONVENTIONS
(J. Elliot ed. 1836)......16

1 J. WILKES, ENGLISH LIBERTY: OR, THE BRITISH LION ROUSED (1769) .......... 12, 13

1 M. HALE, HISTORY OF PLEAS OF THE CROWN (1736) .......... 7

1 TRANSCRIPT OF THE REGISTERS OF THE COMPANY OF STATIONERS (E. Arber ed., 1875) .......... 4

2 DEBATES IN THE SEVERAL STATE CONVENTIONS (J. Elliot ed. 1836) .......... 16

2 W. HAWKINS, TREATISE OF THE PLEAS OF THE CROWN (1721) .......... 7

3 A. PARKER, REPORTS OF DECISIONS IN CRIMINAL CASES IN THE COURTS OF OYER & TERMINER OF THE STATE OF NEW YORK (1858) .......... 25

3 DEBATES IN THE SEVERAL STATE CONVENTIONS (J. Elliot ed. 1836) .......... 17

3 HISTORICAL COLLECTIONS (J. Rushworth ed. 1680) .......... 5

4 DEBATES IN THE SEVERAL STATE CONVENTIONS (J. Elliot ed. 1836) .......... 17

4 E. COKE, INSTITUTES OF THE LAWS OF ENGLAND (1644) .......... 7

4 W. BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND (1769) .......... 15

A COLLECTION OF THE CONSTITUTIONS OF THE THIRTEEN UNITED STATES (J. Bryce ed., 1783) .......... 17

BATTLE OF THE QUILLS; OR WILKES ATTACKED & DEFENDED (1768) .......... 13, 14

Editorial Note—Legal Papers of John Adams, vol. 2, MASS. HIST. SOC'Y .......... 8

HOUSE OF COMMONS RESOLUTIONS FOR THE IMPEACHMENT OF SIR WM. SCROGGS (1680) .......... 6

J. Quincy, REPORTS OF CASES ARGUED & ADJUDGED IN THE SUPERIOR COURT OF JUDICATURE OF THE PROVINCE OF MASSACHUSETTS BAY BETWEEN 1761 & 1772 (1865) .......... 10

John Adams's 'Abstract of the Argument'
(ca. Apr. 1761), FOUNDERS ONLINE ........................................... 8, 9, 10

MICHAEL DALTON, THE COUNTRY JUSTICE (1690) ................................... 5

Oliver R. Barrett, *A Brief for Sir Edward Coke*,
28 A.B.A. J. 609 (1942) ........................................................................ 6

STAR-CHAMBER CASES (M. Crompton ed. 1630) .................................... 5

THE NORTH BRITON (1763) ...................................................................... 11

Thomas Hutchinson's Draft of a Writ of Assistance
(Dec. 1761), FOUNDERS ONLINE ............................................................ 8

THOMAS MAY, THE CONSTITUTIONAL HISTORY
OF ENGLAND (1863) ...................................................... 11, 12, 13, 15

*Treaty of Paris, John Wilkes, & North Briton Number 45*,
HISTORY OF PARLIAMENT (Apr. 23, 2013) ......................................... 11

# Amici Identity, Interest, & Authority to File

## A. Amici Identity

Restore the Fourth, Inc. ("RT4") is a non-partisan nonprofit dedicated to robust enforcement of the privacy rights protected by the Fourth Amendment to the U.S. Constitution. RT4 advances this mission through local chapters across the nation whose membership includes lawyers, academics, advocates, and ordinary citizens. RT4 files friend-of-the-court briefs in key Fourth Amendment litigation. *See, e.g.*, Brief of *Amicus Curiae* Restore the Fourth, Inc. in Support of Neither Party, *Barnes v. Felix*, 605 U.S. 73 (2025) (No. 23-1239); Brief of *Amicus Curiae* Restore the Fourth, Inc. in Support of Petitioner, *Torres v. Madrid*, 592 U.S. 306 (2021) (No. 19-292).

The Electronic Privacy Information Center ("EPIC") is a public interest research center in Washington, D.C., focusing on emerging privacy, civil liberties, and civil rights issues. EPIC often participates as a friend-of-the-court in cases concerning constitutional rights and new and emerging technologies. *See, e.g.*, Brief of *Amici Curiae* EPIC, *et al.* in Support of Respondent, *Kansas v. Glover*, 589 U.S. 376 (2020) (No. 18-556); Brief of *Amici Curiae* EPIC, *et al.* in Support of Petitioner, *Carpenter v. United States*, 585 U.S. 296 (2018) (No. 16-402); Brief of *Amici Curiae* EPIC, *et al.* in Support of Petitioners, *Riley v. California*, 573 U.S. 373 (2014) (Consolidated Nos. 13-132, 13-212).

RT4 and EPIC each filed amicus briefs supporting Petitioner in *Chatrie v. United States*, 146 S. Ct. 2193 (2026) (No. 25-112).

## B. Amici Interest

RT4 is interested in *Chatrie* on remand because "Founding-era understandings" matter when applying the Fourth Amendment to new "surveillance tools." *Carpenter v. United States*, 585 U.S. 296, 305 (2018). Review of the *Chatrie* geofence warrant should thus account for "stark similarities to the reviled general warrants that the Fourth Amendment was intended to bar." *United States v. Chatrie*, 107 F.4th 319, 372 (4th Cir. 2024) (panel op.) (Wynn, J., dissenting).

EPIC is interested in *Chatrie* on remand because *Chatrie* raises issues of exceptional importance to EPIC's mission. While geofence warrants may involve novel technologies, the Fourth Amendment principles here are clear, long-standing, and fundamental to privacy in the digital age. Search warrants require particularized probable cause and must not function as general, discretion-laden warrants that the Fourth Amendment was adopted to prohibit.

## C. Amici Authority-to-File

RT4 sought and received all parties' consent to this filing.

RT4 and EPIC further affirm under FRAP 29(a)(4)(E) that no party, nor counsel for any party, in this appeal: (1) wrote this brief in part or in whole; or (2) contributed money to fund the preparation or the submission of this brief. Only RT4 and EPIC, including their respective members and counsel, have contributed money to fund the preparation and submission of this brief in this appeal.

## Summary of the Argument

Geofence warrants authorize blanket searches of location data belonging to hundreds of millions of persons without particularized suspicion. Geofence warrants also leave privacy-invading decisions to law enforcement and technology companies (rather than judges), while sweeping innocent bystanders into criminal investigations based on mere proximity. The Fourth Amendment does not permit any of this. Indeed, the Amendment bars such gross abuses through its express commands about when warrants may issue.

The Framers devised these commands to root out "general warrants." English royalty used general warrants as instruments of oppression, empowering royal officers to search-and-seize as they pleased without judicial oversight. Common law jurists and scholars waged a century-long battle against general warrants, culminating in *Wilkes v. Wood* and *Entick v. Carrington*, which eliminated general warrants in England. These rulings blazed a trail that would inspire post-Revolution America to adopt the Fourth Amendment.

This founding-era history matters on remand in *Chatrie,* as does the history of the many states that banned general warrants through their own constitutions and courts. This history shows that neither liberty nor privacy is possible without strict rejection of warrants that sweep too broadly, that lack sworn particulars, and that allow law enforcement to do work belonging to judges alone. Against this backdrop, the geofence warrant in *Chatrie* cannot stand.

# Argument

## I. English common law and colonial America reviled general warrants, which permitted blanket exploratory searches and seizures absent real judicial review.

"General warrants" were one of the "immediate evils" that led the Framers to adopt the Fourth Amendment. *Payton v. New York*, 445 U.S. 573, 583 (1980). This history matters in weighing the Fourth Amendment validity of the geofence warrants in *Chatrie* on remand from the Supreme Court. *See Chatrie v. United States*, 146 S. Ct. 2193, 2216 (2026). To appreciate why, it helps to begin at the beginning: with the historical innovation and exercise of general warrants in England from "the time of the Tudors, through the Star Chamber … and beyond." *Stanford v. Texas*, 379 U.S. 476, 482 (1965).

During the mid-1500s, Tudor-era monarchs strictly controlled speech and the press. *See Marcus v. Search Warrant*, 367 U.S. 717, 724 (1961). The Tudors exercised this censorship through the Stationers' Company—a corporation to which the Tudors granted a monopoly over printing. *See id.* The Tudors authorized the Company "to make search whenever it shall please" for all unauthorized publications.[1] Later called a general warrant, this power-to-search encompassed "any place, shop, house, chamber, or building of any printer, binder or bookseller" and allowed seizures of unlicensed papers.[2]

---

1 1 TRANSCRIPT OF THE REGISTERS OF THE COMPANY OF STATIONERS xxvii, xxxi (E. Arber ed., 1875), https://tinyurl.com/4kkh5a82.

2 *Id.*

The Court of the Star Chamber fortified the Stationers' power. The Star Chamber was a "mixed executive and judicial" institution that lasted until 1641, adjudicating "'political' offenses" under rules that disregarded "basic individual rights." *Faretta v. California*, 422 U.S. 806, 822–23 (1975). In 1637, the Star Chamber decreed that "the Company of Stationers … shall have power … to search … houses and shops … especially printing-houses … and to view what is in printing."[3] The decree authorized the Stationers "to seize" all found unlicensed material along "with the … offenders."[4]

Yet even the Star Chamber had its limits. Sometime between 1587 and 1588, the Star Chamber "fined" a justice-of-the-peace who "sen[t] his warrant" to a party "with a blank," allowing the party "to put in the name of one [the justice] knew not" for purposes of "attach[ing] … suspicion of felony."[5] Other justices-of-the-peace heeded this Star Chamber lesson, observing that it was "not safe" for justices "to grant … warrant[s] with a blank."[6]

Parliament also had its limits. In 1680, the House of Commons impeached Chief Justice Scroggs of the King's Bench for his issuance

---

3 *See* 3 HISTORICAL COLLECTIONS App'x pp.306, 313 (Item XXV) (J. Rushworth ed. 1680), https://tinyurl.com/2e6e9yem.

4 *Id.*

5 STAR-CHAMBER CASES 29–30 (M. Crompton ed. 1630) (cleaned up), https://tinyurl.com/36pdf5h9.

6 MICHAEL DALTON, THE COUNTRY JUSTICE 439–40 (1690), https://tinyurl.com/mhbpvmc9.

of general warrants.[7] Concerned with "ill-disposed persons who … publish many seditions," Chief Justice Scroggs authorized a royal messenger (censor) to invade "any book-sellers' or printers' shops or warehouses" based on just the messenger's own suspicion ("[as] he shall be informed").[8] Chief Justice Scroggs separately authorized all royal officials, as they "shall be informed," to arrest the "authors, printers, or publishers" of seditious papers.[9] A House of Commons inquiry into these decisions prompted the House to impeach Justice Scroggs for issuing "arbitrary and illegal" warrants.[10]

Leading common law jurists and scholars joined Parliament's reprobation of general warrants. In a posthumously published 1644 treatise, Sir Edward Coke—who on his deathbed was the victim of a general warrant[11]—declared "justices of [the] peace cannot make a warrant upon a bare surmise to break any man's house to search for

---

7 House of Commons Resolutions for the Impeachment of Sir Wm. Scroggs (1680), https://tinyurl.com/2rydktuw.

8 *Id.* at 154–55 (cleaned up).

9 *Id.*

10 *See id.* at 155, 158–59.

11 *See* Oliver R. Barrett, *A Brief for Sir Edward Coke*, 28 A.B.A. J. 609, 611 (1942) ("Coke's home was searched as Coke lay dying and all his papers … were seized and carried to the King for his inspection to prevent the publication of any work Coke might have written that could be considered prejudicial to the [King's] prerogatives …. lest the people 'might be misled by anything that carried such authority as all things do that [Coke] either speaks or writes.'").

a felon or stolen goods."[12] In 1721, Sir William Hawkins built on Coke's teaching, pronouncing the illegality of "a general warrant to search for felons or stolen goods" because the warrant left to "the discretion of a common officer to arrest what persons, and search what houses, he thinks fit."[13] Hawkins also noted that "if a justice cannot legally grant a blank warrant," then a justice "cannot grant … a general warrant," which carried "the effect of a hundred blank warrants."[14] Sir Matthew Hale concurred, explaining in 1736 that a "general warrant upon a complaint of a robbery to apprehend all persons suspected" was "void."[15] Hale observed that a justice "may grant his warrant to apprehend" based on sworn witness testimony of "probable cause" specific to a named individual.[16]

Despite these admonitions, general warrants lacking judicially-approved specifics (i.e., names, locations, etc.) persisted throughout the mid-1700s, reaching the American colonies. Colonial governors issued "writs of assistance" that gave royal tax collectors the power to "enter … and search" all "vaults, cellars, warehouses, shops, and

---

12 4 E. COKE, INSTITUTES OF THE LAWS OF ENGLAND 176–77 (1644) (cleaned up), https://tinyurl.com/mwzte4pf.

13 2 W. HAWKINS, TREATISE OF THE PLEAS OF THE CROWN 82 (1721) (cleaned up), https://tinyurl.com/5xpuaet2.

14 *Id.*

15 1 M. HALE, HISTORY OF PLEAS OF THE CROWN 580 (1736), https://tinyurl.com/2rx3mmpc.

16 *Id.* at 579–80.

other places" that a collector might "suspect[] to be conceal[ing]" untaxed goods.[17] Sixty-three Boston merchants petitioned against "continued issuance of the writs." *Commw. v. Haynes*, 116 A.3d 640, 649–50 (Pa. Super. Ct. 2015). American patriot and attorney James Otis "resigned … as advocate general to the vice-admiralty court … to avoid defending the writ." *Id.* The merchants hired Otis to plead in a Boston court their case for ending the writs. *Id.*

In February 1761, Otis delivered a courtroom oratory that redefined American history. *Id.* "Otis's 1761 speech condemning writs of assistance was 'the first act of opposition to the arbitrary claims of Great Britain' and helped spark the Revolution itself." *See Carpenter*, 585 U.S. at 303–04. A young John Adams saw Otis's speech and later said: "[t]hen and there the child Independence was born." *Riley v. California*, 573 U.S. 373, 403 (2014). Otis spoke after the Crown's advocate, Jeremiah Gridley.[18] Gridley admitted that the writs violated "the common privileges of Englishmen" but insisted effective tax collection was of "infinitely greater moment to the whole than the liberty of any individual"—"more important" than "the imprisonment of thieves, or even murderers."[19]

---

17 Thomas Hutchinson's Draft of a Writ of Assistance (Dec. 1761), FOUNDERS ONLINE, https://perma.cc/M6TX-42RM.

18 *See* Editorial Note—Legal Papers of John Adams, vol. 2, MASS. HIST. SOC'Y, https://perma.cc/QR3E-6BQ8.

19 *See* John Adams's 'Abstract of the Argument' (ca. Apr. 1761), FOUNDERS ONLINE, https://perma.cc/8Y4X-NWXX.

Otis answered Gridley's argument by asking the court "to tear into rags this remnant of Star [C]hamber tyranny."[20] Otis identified three aspects of the writs of assistance that distinguished them from permissible "special warrants."[21] **First**, the writs had "no return."[22] "[A] warrant return notifies the court when an officer executes a search warrant, and the officer reports back to the court what items he or she gathered during the search." *United States v. Chatrie*, 590 F. Supp. 3d 901, 920 (E.D. Va. 2022) (cleaned up). Lacking any return, the writs disseminated a power to search that was "accountable to no person," putting every person's liberty "in the hands of every petty officer."[23] **Second**, the writs were universal, granting blanket authority to search "all houses, shops, [etc.]" without limitation.[24] **Third**, the writs allowed searches based on "bare suspicion without oath."[25] So even if a tax collector admitted that his use of the writ in a particular case was based on simple "malice or revenge," the writs and their breadth meant "no court … [could] inquire."[26]

---

20 Adams's 'Abstract of the Argument,' *supra* note 19.

21 *Id.*

22 *Id.*

23 *Id.* Oxenbridge Thacher—another advocate for the Boston merchants at the hearing—equally emphasized that the writs were "not returnable." *Id.* Were a return required, Thacher predicted the court would "often find a wanton exercise of power." *Id.*

24 *Id.*

25 *Id.*

26 *Id.*

Otis provided the court with a concrete example of this reality. Nathaniel Ware possessed a writ of assistance as the "Comptroller of Customs for the Port of Boston."[27] One day, a justice of the peace called on Ware to answer for "profane swearing."[28] Ware responded by invoking his writ and "search[ing] [the justice's] house from the garret to the cellar."[29] Otis argued such incidents confirmed that the writs were "the worst instrument of arbitrary power."[30]

The Boston court ultimately rejected Otis's case for terminating all writs of assistance. *Haynes*, 116 A.3d at 650. But royal authorities soon found it "difficult" to enforce the writs, even with the benefit of "direct parliamentary authorization." *Id.* Otis's courtroom oratory inspired "[e]very man of a crowded audience" to oppose the writs. *See Riley*, 573 U.S. at 403. And in the years that followed, courts in colonial Pennsylvania, Connecticut, and Virginia would each refuse to grant the writs under various circumstances.[31]

---

27 Adams's 'Abstract of the Argument,' *supra* note 19.

28 *Id.*

29 *Id.*

30 *Id.*

31 *See* J. QUINCY, REPORTS OF CASES ARGUED & ADJUDGED IN THE SUPERIOR COURT OF JUDICATURE OF THE PROVINCE OF MASSACHUSETTS BAY BETWEEN 1761 & 1772, at 509–10 (1865), https://tinyurl.com/yp9ehmhb; *see also id.* at 395–540 (providing a comprehensive legal discussion and collection of primary-source texts related to writs of assistance, including examples of the broad search powers codified by the writs as granted in England and the colonies).

England underwent its own Otis-like reckoning with general warrants just a few years later as a result of *The North Briton*—an anonymous journal critical of Prime Minister Bute.[32] On April 23, 1763, *The North Briton* published its 45th issue, which "lambasted Bute as usual" but then "cast[] aspersions on [King] George [III]."[33] Against the King's praise for an unpopular peace treaty, No. 45 declared its "lament" that King George could "give the sanction of his sacred name to the most odious measures."[34]

The King's ministers "knew not" who wrote No. 45 and were unwilling to wait "to inquire" through "accustomed forms of law."[35] Lord Halifax (one of the King's ministers) quickly issued a warrant authorizing royal messengers "to make a strict and diligent search for the authors, printers, and publishers of … The North Briton, No. 45."[36] The warrant empowered the messengers "to apprehend and seize" the listed entities "together with their papers."[37]

---

32 THE NORTH BRITON (1763), https://tinyurl.com/2zbzbu7c.

33 *Treaty of Paris, John Wilkes, & North Briton Number 45*, HISTORY OF PARLIAMENT (Apr. 23, 2013), https://tinyurl.com/mv8kk6b7.

34 THE NORTH BRITON, *supra* note 32, at PDF p.331.

35 THOMAS MAY, THE CONSTITUTIONAL HISTORY OF ENGLAND 246 (1863), https://tinyurl.com/2f436uwj.

36 *In re Wilkes* (C.P. 1763) (habeas corpus case), *as reported in:* 19 COMPLETE COLLECTION OF STATE TRIALS 981, 981 (T. B. Howell ed., 1816), https://tinyurl.com/wyabucw9.

37 MAY, *supra* note 35, at 246.

"[N]o one was named in this dread instrument."[38] Halifax's warrant identified "[t]he offence only … not the offender," allowing the warrant-holders to invade "the liberty of every man whom they were pleased to suspect."[39] The royal messengers fully exploited this power. "In three days, they arrested no less than forty-nine persons on suspicion—many as innocent as Lord Halifax himself."[40] Those arrested included Dryden Leach, a printer who helped disseminate earlier issues of *The North Briton* but had nothing to do with No. 45. Messengers took Leach "from his bed at night."[41]

This "roving commission … in quest of unknown offenders" eventually yielded author John Wilkes, a member of Parliament.[42] A royal messenger tried to arrest Wilkes on the street.[43] Later, at Wilkes's home, the messenger produced a copy of Lord Halifax's warrant that Wilkes declared "absolutely illegal and void" based on the warrant's general terms—in essence, "a ridiculous warrant against the whole English nation."[44] Taken to Lord Halifax, Wilkes stood firm, condemning his arrest "under a general warrant, which

---

38 MAY, *supra* note 35, at 246.

39 *Id.*

40 *Id.*

41 *Id.*

42 *Id.*

43 *See* 1 J. WILKES, ENGLISH LIBERTY: OR, THE BRITISH LION ROUSED 245–46 (1769), https://tinyurl.com/2vtjfz4f.

44 *Id.*

named nobody, in violation of the laws."[45] Meanwhile, messengers directed by Halifax deputy Robert Wood seized Wilkes's "private papers, including even his will and pocketbook," which they carried off "in a sack, without taking any list or inventory."[46]

Wilkes sued Wood for trespass.[47] Lord Camden (then known as Chief Justice Pratt) explained to the jury that Wood's defense hinged on "a general warrant," meaning a warrant where "no inventory is made" and where "no offenders' names are specified," making for a "discretionary power" to search "wherever [one's] suspicions may chance to fall."[48] Camden warned that "[i]f such a power [was] truly invested" in the King's ministers, then this power stood to "affect the person and property of every man."[49] After a mere 30 minutes of deliberation, the jury awarded 1,000 pounds to Wilkes.[50]

Wilkes became an English folk hero, inspiring others.[51] London clockmaker Matt Darly reported his own experience with a general

---

45 1 WILKES, *supra* note 43, at 250.

46 MAY, *supra* note 35, at 247–48.

47 *Wilkes v. Wood* (C.P. 1763), *as reported in:* 19 COMPLETE COLLECTION OF STATE TRIALS 1153, 1153 (T. B. Howell ed., 1816), https://tinyurl.com/52tnxhcx.

48 *Id.* at 1167.

49 *Id.*

50 *See id.* at 1168.

51 *See* BATTLE OF THE QUILLS; OR WILKES ATTACKED & DEFENDED 5, 7 (1768), https://tinyurl.com/2z2t3f6t.

warrant.[52] Darly praised Wilkes for establishing to "the people of England, that their persons, cabinets, and property, were not to be taken away by arbitrary and nameless general warrants."[53]

More legal victories against general warrants followed. Printer Dryden Leach won 400 pounds against the royal messengers who seized him.[54] Affirming this judgment, Lord Mansfield and three fellow judges agreed upon the "illegal" nature of general warrants in leaving to the "discretion" of officers what "magistrate[s] ought to judge."[55] Lord Camden similarly upheld a 300-pound award to another victim of Halifax's general warrant, finding that the King's agents tried "to destroy the liberty of the kingdom by insisting upon the legality of this general warrant before [the jury]."[56]

John Entick put the final nail in the coffin of general warrants as the suspected author of the allegedly seditious *Monitor* newspaper.[57]

---

52 BATTLE OF THE QUILLS, *supra* note 51, at 50–51.

53 *Id.*

54 *Leach v. Money* (K.B. 1765), *as reported in:* 19 COMPLETE COLLECTION OF STATE TRIALS 1001, 1003–06, 1028 (T. B. Howell ed., 1816), https://tinyurl.com/3t8ptzbx.

55 *Id.* at 1027.

56 *Huckle v. Money* (C.P. 1763), *as reported in:* 2 G. WILSON, REPORTS OF CASES ARGUED & ADJUDGED IN THE KING'S COURTS AT WESTMINSTER 205 (1799), https://tinyurl.com/4wfts7wv.

57 *See Entick v. Carrington* (C.P. 1765), *as reported in:* 19 COMPLETE COLLECTION OF STATE TRIALS 1029, 1029–76 (T. B. Howell ed., 1816), https://tinyurl.com/3but93m5.

Lord Halifax issued a warrant directing "a strict and diligent search for John Entick" and to seize Entick "with his books and papers."[58] Entick sued the royal messengers who executed Halifax's warrant and won.[59] Lord Camden found the warrant afforded no defense. Though limited to just one party (Entick), the warrant remained "general" (and therefore illegal) because this "search for evidence" covered "all the party's papers" as the officer saw fit.[60] Without "particulars … explained and proved" to a neutral judge, officers stood to "confound[] [innocents] with the guilty."[61]

<u>In sum</u>: the common law reviled general warrants.[62] Because these legal tools used open-ended terms to enable blanket searches and seizures, general warrants improperly allowed royal officers to assume "the duty of the magistrate" to be "judge of the ground of suspicion."[63] In England, general warrants "received [their] death-blow from the boldness of [John] Wilkes and the wisdom of Lord Camden."[64] In America, the architects of the Constitution cemented this death-blow by adopting the Fourth Amendment.

---

58 *Entick*, *supra* note 57, at 1034.

59 *See id.* at 1030–36.

60 *See id.* at 1064.

61 *See id.* at 1072–73.

62 *See* 4 W. BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 287–88 (1769), https://tinyurl.com/3upxsz8f.

63 *Id.* at 288.

64 MAY, *supra* note 35, at 246.

## II. Post-revolution America banned general warrants through the Fourth Amendment, state constitution analogues, and many state court decisions.

James Otis's challenge to the writs of assistance in Boston and the *Wilkes* and *Entick* cases in London were "fresh in the memories" of those who fought the American Revolution. *Boyd v. United States*, 116 U.S. 616, 625 (1886). So when the Framers sent the Constitution to the states for ratification, certain states raised the issue of general warrants. For example, New York agreed to ratification presuming the Constitution was "consistent with" an understanding that "all general warrants, (or such in which the place or person suspected are not particularly designated), are dangerous, and ought not to be granted."[65] Rhode Island agreed to ratify on like terms.[66]

Maryland went a step further. Denouncing "general warrants" as a "great engine by which power may destroy," the state ratifying convention advocated for post-ratification adoption of the following constitutional amendment: "all general warrants to search suspected places, or to apprehend any person suspected, without naming or describing the place or person in special, are dangerous, and ought not to be granted."[67] The ratifying conventions of Virginia[68] and

---

[65] 1 DEBATES IN THE SEVERAL STATE CONVENTIONS 360, 362–63 (J. Elliot ed. 1836), https://tinyurl.com/j5eprhxh.

[66] *See id.* at 369–72 (art. XIV).

[67] 2 DEBATES IN THE SEVERAL STATE CONVENTIONS 549, 551–52 (J. Elliot ed. 1836), https://tinyurl.com/2whpn8tx.

North Carolina[69] took the same step, urging the adoption of post-ratification constitutional amendments to ban general warrants on the federal level as part of a guaranteed 'bill of rights.'

These efforts reinforced pre-existing state constitutional bans on general warrants. Maryland's constitution declared "all general warrants … are illegal."[70] So did Delaware's constitution.[71] North Carolina's constitution proclaimed general warrants "dangerous to liberty" and anticipated ways that this danger might occur, such as "an officer or messenger … [being] commanded to search suspected places, without evidence of the fact committed."[72] In its declaration of rights, Virginia condemned "general warrants" as "grievous and oppressive" and spoke in similar terms about how such oppression might occur—e.g. "[an] officer or messenger may be commanded … to seize any person or persons not named [in the warrant]."[73]

---

68 *See* 3 DEBATES IN THE SEVERAL STATE CONVENTIONS 657–58, 661 (J. Elliot ed. 1836), https://tinyurl.com/wwedhjs4 (14th provision of proposed bill-of-rights: "general warrants").

69 *See* 4 DEBATES IN THE SEVERAL STATE CONVENTIONS 242–244, 251 (J. Elliot ed. 1836), https://tinyurl.com/y3n6b23e (14th provision of proposed declaration-of-rights: "all warrants").

70 A COLLECTION OF THE CONSTITUTIONS OF THE THIRTEEN UNITED STATES 131, 135 (J. Bryce ed., 1783) (MD. CONST. DECL. OF RIGHTS §23 (1776)), https://tinyurl.com/yhp8jauk.

71 *Id.* at 117, 119 (DEL. CONST. DECL. OF RIGHTS §17 (1776)).

72 *Id.* at 166–67 (N.C. CONST. DECL. OF RIGHTS §11 (1776)).

73 VA. DECL. OF RIGHTS §10 (1776), as reproduced by Yale's Avalon Project, https://perma.cc/S8KV-XJ2Q.

State court decisions at the time of ratification provided another bulwark against general warrants. Take *Frisbie v. Butler*, 1 Kirby 213 (Conn. Super. Ct. 1787). Josiah Butler applied for a warrant based on his sworn attestation to a theft of "twenty pounds of good pork" that he "suspect[ed]" was taken by Benjamin Frisbie. *See id.* at 213. A justice of the peace granted Butler's application, issuing a warrant "to search all suspected places and persons that … [Butler] thinks proper, to find his lost pork" and to make arrests on the same terms. *Id.* at 213–14. Reviewing Frisbie's conviction based on the warrant, the Superior Court of Connecticut found the warrant to be "clearly illegal" given the warrant's "general" mandate to "search all places, and arrest all persons" that Butler suspected. *Id.* at 215.

From this rich historical resistance to general warrants sprang the Fourth Amendment. Indeed, James Madison's first proposed version of the Amendment was "one clause" about "the issuance of warrants." *Payton*, 445 U.S. at 583–84. Madison presumed that the danger of "unreasonable searches and seizures" stemmed entirely from warrants lacking "probable cause" or that did not "particularly describ[e] the places to be searched, or the persons or things to be seized." 1 ANNALS OF CONG. 452 (1789). Citing state prohibitions of "general warrants," Madison argued that: "[i]f there was reason for restraining the state governments from exercising this power, there is like reason for restraining the federal government." *Id.* at 456. The Fourth Amendment's protectiveness only grew from here.

Following adoption of the Fourth Amendment, common-law and constitutional prohibitions against general warrants took center stage. In 1814, Connecticut's Supreme Court of Errors enforced these mandates against a justice-of-the-peace and a constable. *See Grumon v. Raymond*, 1 Conn. 40 (1814). The case arose from an alleged theft. *Id.* at 40–41. The justice (Raymond) issued a warrant covering Aaron Hyatt's home and "other suspected places, houses, stores or barns" in the town of Wilton. *See id.* The constable "arrested five suspected persons," one of whom was Grumon. *Id.* Grumon then successfully sued the justice and constable for unlawful arrest. *Id.*

The state high court rebuffed the justice and the constable's effort to obtain a new trial. Citing Lord Camden and the common law, the court held: "this warrant was such as no justice ought to have issued." *Id.* at 43, 45–47. Judicial authorization to "[s]earch every house, store or barn within the town of Wilton … and all persons who are suspected" was "a general search-warrant, which has always been … illegal." *See id.* That the warrant named Aaron Hyatt's home made no difference: saying "Hyatt's or somewhere else" was "equivalent" to the warrant saying "somewhere." *Id.* at 46. This kind of warrant "could not [then] be issued by any magistrate … without making that magistrate liable." *Id.* at 47–48. Likewise for the constable involved, who was "bound to know the law." *Id.* With these holdings, the state high court made clear that general warrants were "an idea not to be endured for a moment." *Id.* at 44.

The Supreme Court of Massachusetts stated a similar concern for judicial vigilance against general warrants in *Sandford v. Nichols*, 13 Mass. 286 (1816). A warrant authorized a "search" for smuggled "goods, wares, and merchandise" in "the houses or stores of Messrs. Thomas Sandford & Company"—a private business. *Id.* at 286–87. Tax collectors used the warrant to search Thomas Sandford's private home (not Sandford's business). *Id.* Sandford sued the collectors for trespass and lost. *Id.* On appeal, Sandford argued that the collectors' search warrant afforded no defense to liability. *See id.*

The state high court held that Sandford was "entitled to a new trial" as the warrant should "not have been admitted in evidence." *Id.* at 288–89. The court explained that "the precept under which the officer acts in … seizing [goods] … should be lawful on [its] face." *Id.* The *Sandford* warrant failed this test, maintaining a "deficient … description" of "the houses … to be entered" and "the goods" that were "the object of search." *Id.* For instance, the warrant's use of the words "goods, wares, and merchandise" failed to give "character, quality, number, or weight, or any other circumstance" that would "distinguish" lawful seizures from unlawful ones. *Id.* Such "wholly uncertain" terms then denied the "particular description [that] the Constitution requires." *Id.* The court refused to see smuggling cases as an exception. *Id.* Particulars remained necessary so that an officer executing a search "might not conceive himself at liberty to rifle the house, and disturb the arrangements of the family." *Id.*

State courts reinforced norms against general warrants through cases like *Bell v. Clapp*, 10 Johns. 263 (N.Y. Sup. Ct. 1813), upholding sufficiently particular warrants. Upon sworn testimony that stolen "barrels of flour" were "concealed … in a cellar of Gideon Jaques," a justice of the peace issued a warrant "to enter into the cellar of … Gideon" and "search for the … flour." *Id.* at 263, 265. The warrant also authorized Gideon's arrest "or the person in whose custody" the flour might be found. *Id.* Gideon's cellar was located in Bell's house. *Id.* Two officers executed the warrant over Bell's objection, entering Bell's house and seizing flour barrels from Gideon's cellar. *Id.* at 263–64. When Bell sued the officers for trespass, the officers cited the warrant as a complete justification. *Id.* at 264.

The New York Supreme Court of Judicature held in the officers' favor, finding "a valid warrant duly executed by these officers." *Id.* at 265. The court explained that "[t]he warrant had all the essential qualities of a legal warrant," being "founded on oath" and "specific as to place and object." *Id.* The court noted that "[i]t was impossible" for the warrant "to be more explicit and particular," considering the warrant's identification of Gideon, his cellar, and the flour barrels. *See id.* Additional information—like "in whom the property of the flour resided"—was "[not] essential to [the warrant's] validity." *Id.* Across this analysis, the court remained mindful of "[a]ll the checks which the English law, and … even the [C]onstitution of the United States, have imposed upon … warrants." *Id.* at 266.

State courts refused to soften these checks. A good example is *Conner v. Commonwealth*, 3 Binn. 38 (Pa. 1810), which vindicated an officer's refusal to enforce an illegal warrant. A local judge issued an arrest warrant for persons suspected of forgery. *See id.* at 43. The judge's warrant issued "without any previous oath or affirmation" establishing probable cause of forgery. *See id.* The judge settled for a "common report" (rumor) that "strong reason" existed to "suspect" forgery and an intent to flee the jurisdiction. *See id.* Local constable Joseph Conner declined to make the arrest given the absence of any oath or affirmation. *See id.* Conner was subsequently indicted and convicted for "refusing to execute a warrant." *See id.*

The Pennsylvania Supreme Court reversed. *Id.* at 44. The court determined that constables "had a right to judge" the facial validity of warrants given their duty not to execute "illegal" warrants. *Id.* at 43. And in this case, no doubt existed that "the [arrest] warrant was illegal on the face of it" given the state constitution's plain mandate that "a warrant shall not be issued without oath, which is more than common report." *Id.* at 44. The court admitted that "by insisting on an oath, felons [might] sometimes escape." *See id.* at 43. But the court equally recognized that this possibility "must have been very well known to the framers" of the Pennsylvania Constitution. *Id.* at 43–44. The court was bound to uphold the framers' judgment: "better that the guilty should sometimes escape, than that every individual should be subject to vexation and oppression." *Id.* at 44.

State courts treated warrant-authorizing laws the same way. In 1854, the Supreme Court of Massachusetts invalidated a liquor law to the extent the law authorized general warrants. *See Fisher v. McGirr*, 67 Mass. 1, 21–22, 28 (1854). The liquor law required judicial issuance of a warrant whenever "three persons" under oath pointed to a "store, shop, warehouse, or … vessel" and claimed "reason to believe" unlicensed liquor was being "kept" in the identified place. *Id.* at 22–23. The liquor law also required sheriffs to execute these warrants and to "search the premises described." *Id.* at 23. Taken together, these requirements dictated that all liquors "found in … [a suspected] place" had to be "taken into the custody of the law," leaving the question of whether all of the seized liquor was in fact unlicensed "to be decided afterwards." *Id.* at 23–24.

The state high court determined that these provisions violated the guarantees of the Massachusetts constitution "respecting general warrants and unreasonable searches." *Id.* at 28–29. These guarantees included an express mandate that any "warrant" to "make search in suspected places" had to be accompanied by "a special designation of the persons or objects of search, arrest, or seizure." *Id.* at 29. The liquor law violated this mandate in multiple respects:

**First**, the liquor law allowed warrants without any specially-named suspect. *Id.* The complaint underlying the warrant affected "the place only, and the belief of the complainants that liquors are

kept [there]." *Id.* The warrant was then "general," failing to "affect[] any person, even by way of belief … of [an] unlawful act." *Id.*

**Second**, the liquor law did not limit warrant execution to "the articles described" in the warrant ("by quantity, quality, or marks"). *Id.* The law did "[not] even restrict the officer's power of seizure to liquors kept and intended to be sold." *Id.* And even if one assumed this restriction existed, a new constitutional problem emerged: the law left it to the officer's "mere discretion … to judge" which liquors in a searched place were legal property and which liquors were not. *Id.* at 30. The officer would be free "to decide what to take and what to leave," and that decision would be "conclusive." *Id.*

**Third**, the liquor law enabled blanket liquor seizures. With a warrant in hand, an officer might "remove the whole stock of [a] warehouse"—including all legally-owned liquor—even if the basis for the warrant was "a few [suspected] kegs, demijohns, or bottles." *See id.* The law authorized warrants that reached "greatly beyond [prohibited] articles," regardless of how "clearly" it appeared to an officer that he was seizing legal property. *Id.* at 30–31.

The state high court thus struck down the liquor law's warrant provisions, rejecting the proposition that the provisions rested upon as much "certainty" as "the nature of the case" would allow. *See id.* Even if the law pursued "a laudable purpose," the Court could not ignore "a violation of the constitution." *Id.* The legislature instead had to devise "other means" not open to objection. *Id.*

State courts maintained this vital rejection of general warrants (and other blanket searches) throughout the 1800s. *See, e.g.*, *Larthet v. Forgay*, 2 La. Ann. 524, 525 (1847) ("[T]he … search of the plaintiff's shop and dwelling [was] not authorized by the warrant. The search should have been confined to the cabaret …. Such warrants must be construed strictly."); *People v. Holcomb*, 3 Park. Crim.[74] 656, 666–67 (N.Y. Sup. Ct. 1858) ("The constable is directed 'to search the place where … property is suspected to be concealed.' This direction … would authorize search in any … place where the officer … might suspect the property to be concealed. It is a general warrant …."); *Ashley v. Peterson*, 25 Wis. 621, 624 (1870) ("[T]he warrant … [is] void for not particularly describing the place to be searched ….").

In sum: general warrants found no home in post-revolution America or the century that followed. To the contrary, the nation hardened its opposition to general warrants through the Fourth Amendment, state constitution analogues, and state court rulings. The Framers and their successors remained on guard for "insidious disguises" of the "old grievance" that they "so deeply abhorred." *See Boyd*, 116 U.S. at 630. That grievance has now returned to the nation's doorstep in the "stealthy" guise of geofence warrants—general warrants on an unprecedented scale. *Id.* at 635.

---

[74] *See* 3 A. PARKER, REPORTS OF DECISIONS IN CRIMINAL CASES IN THE COURTS OF OYER & TERMINER OF THE STATE OF NEW YORK 656 (1858), https://tinyurl.com/4h3djyhn.

## III. The geofence warrant in *Chatrie* is an impermissible general warrant and, in this regard, the Court should not lose sight of the step-zero problem here.

Geofence warrants allow police to try to identify an unknown suspect by searching the "time-stamped record[s] of every place a cell phone has been" for millions of Americans at a time. *Chatrie v. United States*, 146 S. Ct. 2193, 2200–01 (2026). Geofence warrants thus allow police today to do what general warrants allowed royal messengers to do two centuries ago to identify the true authors of anonymous tracts: search everyone's papers at will with no real judicial oversight. *Id.* The geofence warrant in *Chatrie* cements this reality through the warrant's "three-step protocol." *Id.*

At **step one**, the *Chatrie* geofence warrant authorized the police (working through Google) to identify a suspect through a blanket search of hundreds of millions of individual accounts. *See Chatrie*, 146 S. Ct. at 2199–200, 2216. Step one echoes Lord Halifax's general warrant authorizing royal messengers to locate the mystery author of *North Briton* No. 45 through a blanket search of every Londoner. At **steps two and three**, the *Chatrie* geofence warrant authorized the police to decide for themselves which Google accounts to unmask. *See Chatrie*, 590 F. Supp. 3d at 920–22. Steps two and three echo Lord Halifax's general warrant authorizing royal messengers to decide for themselves which of John Entick's papers to search without any "particulars" first "explained and proved" to a judge.[75]

[75] *Entick*, *supra* note 57, at 1034.

The *Chatrie* geofence warrant's three-step protocol leaves no doubt that those "who proposed" the Fourth Amendment would not "have approved" this general warrant. *Boyd*, 116 U.S. at 630–31. The *Chatrie* geofence warrant also raises a bigger general-warrant difficulty outside the warrant's three-step protocol. This "step zero" difficulty stems from the geofence warrant authorizing a search of Google based on surveillance footage of a suspect with a cell phone without any "probable cause" to believe the phone was a Google-affiliated device. *See* Joint App'x 132–33, *Chatrie v. United States*, 146 S. Ct. 2193 (2026) (No. 25-112). The warrant application spoke only in general assertions about cell-phone usage and Google usage, like saying "91% of American adults own a cellular phone." *Id.*

But if a cell phone's mere existence suffices to direct a warrant to Google, then what about Apple, Facebook, and other ubiquitous collectors of cell-phone location data? Or what about surveillance footage of a suspect wearing nondescript sunglasses—would this entitle the police to direct a warrant to Ray-Ban because millions of people own Ray-Bans? The *Chatrie* geofence warrant "unleash[es] a principle of constitutional law with no obvious stopping place." *Luis v. United States*, 578 U.S. 5, 20–21 (2016). And that danger especially matters in the Fourth Amendment context because "officers … will push to the limit" any search-and-seizure power that courts allow. *See Brinegar v. United States*, 338 U.S. 160, 181–82 (1949) (Jackson, J., dissenting). This step-zero problem merits close attention.

## Conclusion

Over 250 years ago, royal messengers attempting to ascertain the identity of an anonymous author (John Wilkes) used a general warrant to raid the private papers of 49 innocent persons. Here, to learn a bank robber's identity, the police used a geofence warrant to raid the private data of over 590 million persons. That one search was physical and the other digital makes no difference, for it is not "the breaking of … doors" or "the rummaging of … drawers" that is "the essence of the offence." *Boyd*, 116 U.S. at 630. Rather, it is the "invasion" of "indefeasible right[s]" to liberty and private property. *Id*. Geofence warrants invade rights older than the Constitution—fundamental "privacies of life" worth preserving. *Id.*

Respectfully submitted,

By: /s/Mahesha P. Subbaraman
Dated: September 8, 2026

Tom McBrien**
Megan Iorio**
ELECTRONIC PRIVACY INFORMATION CENTER
1519 New Hampshire Ave., N.W.
Washington, DC 20036
(202) 483-1140
mcbrien@epic.org
iorio@epic.org

Mahesha P. Subbaraman*
SUBBARAMAN PLLC
80 S. 8th Street, Suite 900
Minneapolis, MN 55402
(612) 315-9210
mps@subblaw.com

*Counsel for Amici Curiae*
*Restore the Fourth, Inc.* & Electronic Privacy Information Center***

**UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT**

**No.** 22-4489 **Caption:** United States of America v. Okello T. Chatrie

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**

Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

**Type-Volume Limit for Briefs if Produced Using a Computer:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 13,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 15,300 words or 1,500 lines. A Reply or Amicus Brief may not exceed 6,500 words or 650 lines. Amicus Brief in support of an Opening/Response Brief may not exceed 7,650 words. Amicus Brief filed during consideration of petition for rehearing may not exceed 2,600 words. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include headings, footnotes, and quotes in the count. Line count is used only with monospaced type. See Fed. R. App. P. 28.1(e), 29(a)(5), 32(a)(7)(B) & 32(f).

**Type-Volume Limit for Other Documents if Produced Using a Computer:** Petition for permission to appeal and a motion or response thereto may not exceed 5,200 words. Reply to a motion may not exceed 2,600 words. Petition for writ of mandamus or prohibition or other extraordinary writ may not exceed 7,800 words. Petition for rehearing or rehearing en banc may not exceed 3,900 words. Fed. R. App. P. 5(c)(1), 21(d), 27(d)(2) & 40(d)(3).

**Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch). Fed. R. App. P. 32(a)(5), 32(a)(6). Sans-serif type, such as Arial, may not be used except in captions and headings.

This brief or other document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

☑ this brief or other document contains 6,495 [*state number of*] words

☐ this brief uses monospaced type and contains ____________ [*state number of*] lines

This brief or other document complies with the typeface and type style requirements because:

☑ this brief or other document has been prepared in a proportionally spaced typeface using
Microsoft Word 2010 [*identify word processing program*] in
14-point Book Antiqua [*identify font, size, and type style*];

**or**

☐ this brief or other document has been prepared in a monospaced typeface using
____________________ [*identify word processing program*] in
____________________ [*identify font, size, and type style*].

**NOTE: The Court's preferred typefaces are Times New Roman, Century Schoolbook, and Georgia. The Court discourages the use of Garamond.**

(s) /s/Mahesha P. Subbaraman

Party Name Amici Curiae RT4 & EPIC Date: Sept. 8, 2026