**No. 22-4489**

**In the**
**United States Court of Appeals for the Fourth Circuit**

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

OKELLO T. CHATRIE,
*Defendant-Appellant*.

**On Remand from the**
**United States Supreme Court**

Brief *Amicus Curiae* of
America's Future,
Gun Owners of America, Gun Owners Foundation,
Virginia Citizens Defense League, Virginia Citizens Defense Foundation,
Tennessee Firearms Association, Tennessee Firearms Foundation, and
Conservative Legal Defense and Education Fund
in Support of Defendant-Appellant

RICK BOYER
INTEGRITY LAW FIRM
P.O. Box 10953
Lynchburg, VA 24506

JOHN I. HARRIS III
SCHULMAN, LEROY &
BENNETT, P.C.
3310 West End Avenue
Suite 460
Nashville, TN 37203

WILLIAM J. OLSON*
ROBERT J. OLSON
WILLIAM J. OLSON, P.C.
370 Maple Ave. W., Ste. 4
Vienna, VA 22180
(703) 356-5070
wjo@mindspring.com
**Counsel of Record*
Attorneys for *Amici Curiae*
September 8, 2026

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, *amici* do not have parent corporations, they are not publicly traded companies, and no publicly held corporation owns 10% or more of their stocks.

# TABLE OF CONTENTS

Page

DISCLOSURE STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

INTEREST OF *AMICI CURIAE* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT

I. THIS COURT'S RESPONSE TO THE QUESTIONS POSED BY THE SUPREME COURT ARE FACILITATED BY THE FOURTH AMENDMENT BEING UNDERSTOOD AS PROTECTING DIGITAL PROPERTY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

A. The Fourth Amendment Protects Property First, Not "Reasonable Expectations of Privacy" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

B. Under the Supreme Court's Historic Mere Evidence Rule, the Search Was *Per Se* Unreasonable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

II. THE SEARCH CONDUCTED HERE WAS THE POLAR OPPOSITE OF A PARTICULARIZED SEARCH . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

A. The Warrant Here was a General Warrant . . . . . . . . . . . . . . . . . . . . . 8

B. The Characteristics of a General Warrant Were Well Known During the Revolutionary Era . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

C. A Geofence Warrant Is a General Warrant . . . . . . . . . . . . . . . . . . . . . 12

D. The Fourth Amendment Applies to Digital Data . . . . . . . . . . . . . . . . 13

E. The Fourth Amendment Should Prohibit the Use of General Warrants to Search and Seize Digital Property . . . . . . . . . . . . . . . . . . . . . . . . 16

CONCLUSION . . . . . . . . . . 22

# TABLE OF AUTHORITIES

Page

U.S. CONSTITUTION
Fourth Amendment . . . . . . . . 1-22

CASES
*Boyd v. United States*, 116 U.S. 616 (1886) . . . . . . . . 5
*Gouled v. United States*, 255 U.S. 298 (1921) . . . . . . . . 5
*Katz v. United States*, 389 U.S. 347 (1967) . . . . . . . . 2, 5, 14
*Marron v. United States*, 275 U.S. 192 (1927) . . . . . . . . 10
*People v. Defore*, 150 N.E. 585 (Ct. App. N.Y. 1926) . . . . . . . . 4
*Riley v. California*, 573 U.S. 373 (2014) . . . . . . . . 10, 15
*Steagald v. United States*, 451 U.S. 204 (1981) . . . . . . . . 8
*Stanford v. Texas*, 379 U.S. 476 (1965) . . . . . . . . 11
*United States v. Ackerman*, 831 F.3d 1292 (10th Cir. 2016) . . . . . . . . 21
*United States v. Jones,* 565 U.S. 400 (2012) . . . . . . . . 2, 7, 14, 15, 18, 21
*United States v. Rahimi*, 602 U.S. 680 (2024) . . . . . . . . 15, 20
*United States v. Smith*, 110 F.4th 817 (5th Cir. 2024) . . . . . . . . 9, 17
*Warden v. Hayden*, 387 U.S. 294 (1967) . . . . . . . . 5

MISCELLANEOUS
William J. Cuddihy, The Fourth Amendment: Origins and Original Meaning, 602-1791 (2009) . . . . . . . . 11
Andrew Ferguson, "Digital Rummaging," 101 Wash. U. L. Rev. 1473 (2024) . . . . . . . . 17, 18
Maureen Brady, "The Lost 'Effects' of the Fourth Amendment: Giving Personal Property Due Protection," 125 Yale L.J. 946 (Feb. 2016) . . . . . . 20
Jim Harper, "Escaping Fourth Amendment Doctrine After Jones: Physics, Law, and Privacy Protection," Cato Sup. Ct. Rev. 219 (2011-2012) . . . . . . . . . 20
Mary Leary, "The Missed Opportunity of *United States v. Jones*: Commercial Erosion of Fourth Amendment Protection in a Post Google Earth World," U. Pa. J. Const. L. 331 (Nov. 2012) . . . . . . . . 17
Carrie Leonetti, "Bigfoot: Data Mining, The Digital Footprint, and the Constitutionalization of Inconvenience," 15 J. High Tech. L. 260 (2015) 17
Carrie Leonetti, "A Grand Compromise for the Fourth Amendment," 12 J. Bus. & Tech. L. 1 (2016) . . . . . . . . 19

Herbert Titus & William Olson, "*United States v. Jones*: Reviving the Property Foundation of the Fourth Amendment," Case Western Reserve J. of Law, Tech. & The Internet, vol. 3, no. 2 (Spring 2012) . . . . . . . . . . . . . . . . . . . . . 7
Virginia Declaration of Rights, Section 10 (1776) . . . . . . . . . . . . . . . . . . . . . . . . . 10
Jeff Ziegler, "A 'Flame of Fire' for Every Age: James Otis and the Writs of Assistance," *The Daily Economy* (Oct. 8, 2023) . . . . . . . . . . . . . . . . . . . . 10

## INTEREST OF *AMICI CURIAE*[1]

The interest of the *amici curiae* is set out in the motion for leave to file brief *amicus curiae*.

## STATEMENT OF THE CASE

When this case was previously before this Court, it issued a *per curiam en banc* opinion, accompanied by eight concurring opinions and one dissent, addressing different aspects of the application of the Fourth Amendment. *U.S. v. Chatrie*, 136 F.4th 100 (4th Cir. Apr. 30, 2025) ("*Chatrie I*"). The Supreme Court granted certiorari to address one question: "Whether the execution of the geofence warrant violated the Fourth Amendment." The case is now before the court on remand from the Supreme Court. *See Chatrie v. United States*, 225 L. Ed. 2d 793 (2026) ("*Chatrie II*"). There, the High Court reversed this Court's decision that the government had not conducted a search under the Fourth Amendment, but did not address other aspects of the Fourth Amendment challenge. The case has been remanded to consider: (1) whether the search was sufficiently particularized to avoid being a general warrant; (2) whether the probable cause requirement was

[1] No party's counsel authored the brief in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting the brief. No person other than these *amici curiae*, their members, or their counsel contributed money that was intended to fund preparing or submitting this brief.

met; and (3) whether the good faith exception should be applied. *See Chatrie II* at 820.

## ARGUMENT

### I. THIS COURT'S RESPONSE TO THE QUESTIONS POSED BY THE SUPREME COURT ARE FACILITATED BY THE FOURTH AMENDMENT BEING UNDERSTOOD AS PROTECTING DIGITAL PROPERTY.

#### A. The Fourth Amendment Protects Property First, Not "Reasonable Expectations of Privacy."

In the High Court's decision remanding certain questions to this court, Justice Kagan wrote for the Court: "[t]hose who drafted the Amendment could not have imagined such a technology." *Chatrie II* at 821. Based primarily on the "reasonable expectation of privacy" approach established in *Katz v. United States*, 389 U.S. 347 (1967), the Court ruled: "The Fourth Amendment must, as ever, protect against unjustified governmental intrusion on the privacy of the individual." *Id*. at 820.

Justice Gorsuch concurred in the judgment, but disagreed with the application of the "reasonable expectation of privacy" test. In its stead, he urged application of the property principle on which the Fourth Amendment was based:[2] "[T]he Fourth Amendment speaks in ... concrete terms, protecting an individual's

[2] See *United States v. Jones*, 565 U.S. 400, 405 (2012) (discussing the Fourth Amendment's close connection to property).

person, house, papers, and effects from unreasonable searches and seizures." *Id.* at 823 (Gorsuch, J., concurring). Justice Gorsuch explained how the historic property-based approach would apply here:

> I would consult its terms, asking first **whether Location History qualifies as one of Mr. Chatrie's papers or effects**, and then asking whether the government **searched** those papers or effects. This traditional approach remains very much part of our law. [*Id.* (Gorsuch J., concurring) (citing, *inter alia*, *United States v. Jones* and *Florida v. Jardines*, 569 U.S. 1 (2013)) (emphasis added).]

Applying that traditional property approach to resolving Fourth Amendment challenges, Justice Gorsuch stated his view that: "Mr. Chatrie's Location History data qualifies as his personal property." *Id.* at 825 (Gorsuch, J., concurring).[3] Although Justice Kagan focused on *Katz*, Justice Gorsuch stated that the Court's opinion contained "hints of" the property approach. *Id.* at 827 (Gorsuch, J., concurring). Using the historic property approach makes this case exceedingly easy to resolve, as no judgments about the "reasonableness" of an expectation of privacy are involved. The remanded questions of "particularity" and "probable cause" are contextualized and clarified when viewed from the standpoint of the Fourth Amendment's protections of property interests.

[3] Lastly, Justice Gorsuch observed that Mr. Chatrie had "not forfeited" such a property-based approach. *See id.* at 825 (Gorsuch, J., concurring).

These *amici* agree with the Supreme Court's outcome in *Chatrie II*, but believe it should be reached applying property principles according to the approach taken by Justice Gorsuch, and only "hinted" at in Justice Kagan's opinion. Accordingly, they urge that to reach a decision in this case consistent with the original meaning of the Fourth Amendment, the searched for and seized digital information be viewed as the modern equivalent of paper records maintained by a third party. The approach these *amici* recommend here includes the following five steps:

> 1. Chatrie's Location History is his protected personal property — his "**papers or effects**."
>
> 2. Chatrie's Location History, together with those of untold others, was **searched** and **seized**.
>
> 3. There was no "**particularity**" to the search. It was a general search of an untold number of records.
>
> 4. There was no "**probable cause**" supporting the search, and thus no meaningful "**Oath or affirmation**."
>
> 5. The search here was carefully planned by lawyers and law enforcement — a situation completely unlike that described by Judge Benjamin N. Cardozo as a circumstance where "the constable has blundered." *See People v. Defore*, 242 N.Y. 13, 21 (Ct. App. N.Y. 1926).

### B. Under the Supreme Court's Historic Mere Evidence Rule, the Search Was *Per Se* Unreasonable.

There is another reason to view the search as unconstitutional: it was "unreasonable" as the Amendment was originally understood. As this Court seeks to apply the Fourth Amendment as originally crafted and understood, it is important to address the "mere evidence rule," which defined which searches were *per se* unreasonable.

For most of the nation's history, the type of warrant at issue here which empowers police to search a person's "papers and effects" to determine the historical whereabouts of every American was a search for "mere evidence." On the first occasion on which the U.S. Supreme Court addressed the Fourth Amendment, *Boyd v. United States*, 116 U.S. 616 (1886), it focused on a threshold question which has long since been forgotten: are the "papers" sought by the government subject to seizure at all? Under the "mere evidence rule," searches were unreasonable *per se*, unless the government had a superior property interest in the property searched.

Again, in *Gouled v. United States*, 255 U.S. 298 (1921), this Court explained that search warrants "may not be used as a means of gaining access to a man's house or office and papers solely for the purpose of making search to secure evidence to be used against him in a criminal or penal proceeding...." *Id.* at 309.

Then, in *Warden v. Hayden*, 387 U.S. 294 (1967), this Court jettisoned longstanding Fourth Amendment jurisprudence based upon property rights in favor of what was then an emerging right of "privacy." Justice William J. Brennan — writing for a bare majority of five Justices — rejected the time-honored "mere evidence" rule due to his dissatisfaction with the "fictional and procedural barriers rest[ing] on property concepts." *Hayden* at 304. Justice Brennan claimed that the distinction between (i) "mere evidence" and (ii) "instrumentalities [of crime], fruits [of crime] and contraband" was "based on premises no longer accepted as rules governing the application of the Fourth Amendment." *Id.* at 300-01. Concurring on other grounds, Justice Fortas warned: "I fear that in gratuitously striking down the 'mere evidence' rule, which distinguished members of this Court have acknowledged as essential to enforce the Fourth Amendment's prohibition against general searches, the Court today needlessly destroys, root and branch, a basic part of liberty's heritage." *Id.* at 312 (Fortas, J., concurring).

Shortly after *Hayden* delinked the Fourth Amendment from its property foundation, this Court decided *Katz v. United States*, 289 U.S. 347 (1967), where it expressly embraced the "reasonable expectation of privacy" test, which has proven wholly inadequate to the task of protecting the American people against unreasonable searches and seizures.

It was not until *United States v. Jones,* 565 U.S. 400 (2012), that the property right was restored as the primary basis of the Fourth Amendment's protection.[4] Justice Scalia explained that "Fourth Amendment rights do not rise or fall with the *Katz* formulation.... *Katz* did not repudiate th[e] understanding" that the Fourth Amendment protects against "government trespass upon the areas ... it enumerates." *Jones* at 406-07. As Justice Sotomayor explained in concurrence, "*Katz*'s reasonable-expectation-of-privacy test augmented, but did not displace or diminish, the common-law trespassory test that preceded it." *Id.* at 414 (Sotomayor, J., concurring). Respect for the property principle underlying the Amendment's protection of "persons, houses, papers, and effects" was restored, although the mere evidence rule was not brought back. Although the courts have strayed so far from the mere evidence rule, that will seem strange, but a faithful restoration of the Fourth Amendment requires its return. Here, the government did not have a superior property interest in Mr. Chatrie's Location History, and therefore the search was "per se" unreasonable.

[4] *See generally* Herbert Titus & William Olson, "*United States v. Jones*: Reviving the Property Foundation of the Fourth Amendment," Case Western Reserve J. of Law, Tech. & The Internet, vol. 3, no. 2 (Spring 2012).

## II. THE SEARCH CONDUCTED HERE WAS THE POLAR OPPOSITE OF A PARTICULARIZED SEARCH.

### A. The Warrant Here was a General Warrant.

The High Court described the issue for this Court to address on remand: "[i]t is therefore now up to the Court of Appeals to decide whether, at each step of the search process, the warrant satisfied the Fourth Amendment's requirements of particularity and probable cause." *Chatrie II* at 820. A general warrant is the polar opposite of the type of warrant that is permitted under the Fourth Amendment, and it is a general warrant that was used here.

Judge Wynn cited the Supreme Court's decision in *Steagald v. United States*, 451 U.S. 204 (1981) to define what a general warrant is:

> The general warrant **specified only an offense** ... and left to the discretion of the executing officials the decision as to which persons should be arrested and which places should be searched. [*U.S. v. Chatrie*, 107 F.4th 319, 353 (4th Cir. 2024) (Wynn, J., dissenting), citing *Steagald* at 220 (emphasis added).]

Here, the warrant's character as a general warrant was not improved by the three-step process devised by Google's lawyers to facilitate its cooperation with law enforcement. Judge Wynn added that the majority would have gone even further — to "eliminate[] the warrant requirement [so] police do not even need to 'specif[y] ... an offense' before they can conduct a geofence intrusion." *Id.* (Wynn, J., dissenting).

Although the technology employed in responding to a geofence warrant is novel, it has attributes which make it a type of general warrant which the Fourth Amendment was designed to prevent. The district court referenced a brief but useful description of a general warrant — an "exploratory rummaging in a person's belongings." *United States v. Chatrie*, 590 F. Supp. 3d 901, 928, n.33 (E.D. Va. 2022) (citing *United States v. Dargan*, 738 F.3d 643, 647 (4th Cir. 2013)). At the *en banc* stage, Judge Wynn's concurrence asserted that geofence intrusions are "uncomfortably akin to the 'reviled' general warrants that the Framers intended the Fourth Amendment to forbid." *Chatrie I* at 122, n.7 (Wynn, J., concurring).

The Fifth Circuit has recently noted that "the quintessential problem with [geofence] warrants is that they *never* include a specific user to be identified, only a temporal and geographic location where any given user *may* turn up post-search. That is constitutionally insufficient." *United States v. Smith*, 110 F.4th 817, 837 (5th Cir. 2024). Based on this characteristic, the Fifth Circuit ruled that "geofence warrants are general warrants categorically prohibited by the Fourth Amendment." *Id.* at 838.

### B. The Characteristics of a General Warrant Were Well Known during the Revolutionary Era.

One of the triggers for the American Revolution was the use of general warrants (and writs of assistance) in the colonies under the authority of the Crown. General warrants were widely considered to be abusive, and they were perhaps the central type of warrant which the Framers designed the Fourth Amendment to prevent. These warrants often did not provide a particular description of the place to be searched or the persons or things to be seized, allowing roving searches and seizures.[5] These warrants empowered agents of the crown, including customs officers, to "rummage" through private property to enforce revenue laws through "fishing expeditions" rather than targeted investigations.[6] In one of the most famous speeches of the Revolutionary Era, Massachusetts lawyer James Otis argued in 1761:

> I will to my dying day oppose with all the powers and faculties God has given me, all such instruments of slavery on the one hand, and villainy on the other, as this Writ of Assistance is. It appears to me the worst instrument of arbitrary power, the most destructive of English liberty and the fundamental principles of law, that ever was found in an English lawbook.[7]

---

[5] *See Marron v. United States*, 275 U.S. 192, 195-96 (1927).

[6] *See Riley v. California*, 573 U.S. 373, 403 (2014).

[7] Jeff Ziegler, "A 'Flame of Fire' for Every Age: James Otis and the Writs of Assistance," *The Daily Economy* (Oct. 8, 2023).

Demonstrating the significance of the colonists' hatred of general warrants, John Adams, after witnessing Otis' speech, observed, "[t]hen and there the child Independence was born."[8] In Virginia, George Mason ensured that this protection against general warrants was placed into the Virginia Declaration of Rights:

> That general warrants, whereby an officer or messenger may be commanded to search suspected places without evidence of a fact committed, or to seize any person or persons not named, or whose offense is not particularly described and supported by evidence, are grievous and oppressive and ought not to be granted. [Virginia Declaration of Rights, Section 10 (1776).]

The Supreme Court has explained why these general warrants were despised. "The hated writs of assistance had given customs officials blanket authority to search where they pleased for goods imported in violation of the British tax laws.... [T]hey placed 'the liberty of every man in the hands of every petty officer.'" *Stanford v. Texas*, 379 U.S. 476, 481 (1965).

Particularity in warrants was required to negate the abuses that occurred during the colonial period. In his scholarly history of the Fourth Amendment, legal scholar William J. Cuddihy explains:

> when Congress called for warrants "particularly describing" one "place," they wanted to restrict the resulting search not only to a single building, but, if possible, to a segment of it or to a unique area of space. [William J. Cuddihy, The Fourth Amendment: Origins and Original Meaning, 602-1791 (2009) at 742.]

---

[8] *Riley* at 403.

The government's position must be that a search of all of the millions of customer location data files contained across all of the Google servers wherever located across the country is particularized. But a warrant requiring that type of search applied to a paper, rather than to a digital file, is more analogous to a general search of all the buildings in Silicon Valley than to a search of a particular "segment" of a "single building."

### C. A Geofence Warrant Is a General Warrant.

In the Supreme Court, Petitioner correctly argued that the warrant requiring Google to search its vast trove of location data obtained from millions of users of Google services constituted a classic "general warrant." U.S. Supreme Court Petitioner's Brief ("Pet. Br.") at 32. "Because the warrant did not identify the 'place to be searched' with particularity but instead authorized the search of millions of distinct 'places,' it was an unconstitutional general warrant." *Id*. This is exactly how all such searches for location data operate and why they cannot be sanctioned by this Court.

The Fourth Amendment requires that warrants "**particularly** describ[e] the **place** to be searched, **and** the **persons or things** to be seized." Pet. Br. at 32 (emphasis added). Lawful warrants do just that. They authorize an official first to conduct a search of a "particular" place, and secondly to authorize the seizure of

the particular "persons or things" to be seized. In this case, having no idea who may have committed the crime, Detective Hylton asked the court to require Google to "search *every* user's account" — millions of accounts — to identify all those persons who were within the radius during the specified time. *Id*.

An analogy to a search occurring outside the digital world helps to demonstrate the inadequacy and unconstitutionality of the warrant issued here. If we assume that Detective Hylton knew Petitioner's identity, could he properly have sought a warrant to search every house in the vicinity of Midlothian, Virginia to discover if Petitioner was hiding there? Certainly not. Detective Hylton's not knowing Petitioner's identity does not somehow abolish the requirement that the search "particularly describe" the place to be searched, to permit the government's agent (Google) to rummage through the digital records of millions of Americans to narrow down its search.

### D. The Fourth Amendment Applies to Digital Data.

The Fourth Amendment has suffered greatly in the modern digitized world, where virtually every move Americans make, every purchase, every call, every email, is subjected to tracking, scanning, sale to advertisers, and, most concerning here, search and seizure by government. The data collected is centralized, but not in the hands of the individual whose behavior caused it to be generated. Thinking

that this data belonged exclusively to the internet service provider, or the search engine, or the big tech company, the courts have struggled to protect the right against unreasonable search and seizure of these centralized records, due to judicial tests unrooted in the text or history of the Amendment itself. The decisions across circuits are all over the map. There is no reason not to treat the data in the hands of these "Big Tech" firms as being "property" which is owned, or at least co-owned, by the individual creating it. Often, the individual whose behavior created the data is not even advised when the warrant is served on the Big Tech company.

After its decision in *Katz*, the Supreme Court focused exclusively on the issue of "reasonable expectation of privacy," forgetting the property protections of the Fourth Amendment. Decisions rendered after *Katz* and before *Jones* do not recognize all the protections offered by the Fourth Amendment. An *amicus* brief filed in this Court by some of these *amici* in *Jones* argued that: "[b]y outlawing general warrants, government officials would be stopped from engaging in the practice of rummaging through one's private property looking for incriminating information or evidence."[9] Those *amici* argued that the Fourth Amendment should be viewed through a lens of property rights, not limited to the *Katz* "expectation of

[9] *U.S. v. Jones*, No. 10-1259, Brief *Amicus Curiae* of Gun Owners of America, Inc., et al. (Oct. 3, 2011) at 26.

privacy" test, which in practice had proven to provide little protection at all against the unreasonable searches and seizures the Fourth Amendment was designed to prevent. These *amici* repeat that argument here. When one thinks of the data being sought as tangible property, the ways that it is abused with a geofence warrant are clearly illustrated. The Framers, of course, could not conceive of bitcoin, cellular phones, the internet, or Google location data. But as the Supreme Court noted in *Jones*, "it is quite irrelevant whether there was an 18th-century analog. Whatever new methods of investigation may be devised, our task, at a minimum, is to decide whether the action in question would have constituted a 'search' within the original meaning of the Fourth Amendment." *Jones* at 406, n.3.

As the Supreme Court made clear in *Rahimi*, the Second Amendment does not extend "only to muskets and sabers." *United States v. Rahimi*, 602 U.S. 680, 692 (2024). By the same principle, the Fourth Amendment's protection of "papers and effects" cannot only extend to letters written on paper with quill pens, but must also cover electronic mail and text messages, as well as location data. This principle was applied in *Riley v. California*, 573 U.S. 373 (2014) with respect to digital contents of a cell phone which holds "the privacies of life." *Id*. at 403.

These *amici* argue that this Court should make clear that, just as the Fourth Amendment protected the Framers' property rights against unreasonable search and seizure of their tangible personal papers, letters, and correspondence, it likewise protects the property rights of today's Americans in their digital email, text messages, and location data. The mere fact that a citizen may share some of this data with Big Tech companies — including location data with Google to assist in navigation — does not waive that citizen's right to shield that intangible property from prying government eyes. This Court should make clear that, at least *vis a vis* the government, a citizen's digital footprint is the property of the citizen, the citizen's "effects," just as her written physical "papers" are, and that the Fourth Amendment protects both equally.

### E. The Fourth Amendment Should Prohibit the Use of General Warrants to Search and Seize Digital Property.

George Washington University Law School Professor Andrew Ferguson has explained that the Supreme Court's "reasonable expectation of privacy" test was "confusing enough in a physical, analog world where people could at least intuitively understand the limits of human surveillance," but "becomes completely

unmoored in a digital age with technologies providing superhuman surveillance powers that can literally see, hear, and sense things in new ways."[10]

> Geofence warrants present the exact sort of "general, exploratory rummaging" that the Fourth Amendment was designed to prevent.... While the *results* of a geofence warrant may be narrowly tailored, the *search* itself is not. A general warrant cannot be saved simply by arguing that, after the search has been performed, the information received was narrowly tailored to the crime being investigated. [*United States v. Smith* at 837.]

Commentators and Justices of the Supreme Court have noted that the courts, including the High Court, have repeatedly seen their Fourth Amendment caselaw outstripped by the pace of technology, leaving Fourth Amendment freedoms at risk. Professor Ferguson notes that "current Fourth Amendment [caselaw] offers little clarity," calling it "a muddled doctrine that does not address larger-scale surveillance harms created by digital technologies."[11] "[A]dvances in technology are rapidly outpacing the state of the law."[12]

As Catholic University Professor Mary Leary notes, "The problem is really who *owns* a person's 'digital dossier' or 'digital identity.'"[13] Although as between

---

[10] Andrew Ferguson, "Digital Rummaging," 101 Wash. U. L. Rev. 1473, 1499 (2024) (hereinafter "Ferguson").

[11] Ferguson at 1475.

[12] Carrie Leonetti, "Bigfoot: Data Mining, The Digital Footprint, and the Constitutionalization of Inconvenience," 15 J. High Tech. L. 260, 265 (2015).

[13] Mary Leary, "The Missed Opportunity of *United States v. Jones*: Commercial Erosion of Fourth Amendment Protection in a Post Google Earth World," U. Pa. J. Const. L. 331, 365

Google and a phone customer, the question may be a legislative one, as between the customer and the government, this Court can and should make clear that the question is a constitutional one. "At bottom, [this Court] must assur[e] preservation of that degree of privacy **against government** that existed when the Fourth Amendment was adopted." *Jones* at 406 (emphasis added) (internal quotation omitted). It is not always the case that a citizen consents to invasions of his privacy by commercial third parties; in many cases, the consumer may have little understanding of the actual degree of privacy he has sacrificed. Regardless, even if a citizen consents to giving up privacy in a relationship with a private entity, the Fourth Amendment cannot countenance an assumption that this implies consent to share the same information with the government.

As Professor Ferguson notes, "at the time of the Founding, ideas, creations, and expressions (that might find their way into papers) were considered a form of property to be protected. Influenced by the ideas of John Locke who influenced James Madison's draft of the Fourth Amendment, papers were considered a form of 'dearest property.'"[14]

(Nov. 2012).

[14] Ferguson at 1517-18.

Professor Carrie Leonetti argues that a "property-based Fourth Amendment test should include intellectual and informational, as well as traditional categories of real and (tangible and intangible) personal property. It should prohibit not just warrantless physical intrusions, but technological intrusions, recognizing high-tech versions of trespass, nuisance, and conversion."[15] Leonetti argues, "Under this robust property-based test, residents would have protection not only in their homes, their curtilage, and their tangible personal property for which they took steps deemed by courts to be sufficient to protect their expectations of privacy in them, but also in all of their real, personal, and intellectual property." *Id.* at 15. Thus:

> [p]hone records, bank records, commercial consumer data, the contents of cell phones and other electronic devices, a hacked or fraudulently accessed Facebook page ...: these could all be protected as private "property," for the invasion of which the police would need a warrant issued on probable cause (or circumstances amounting to an exception to the warrant requirement). [*Id.* at 16-17.]

The Fourth Amendment protects the "papers and effects" of citizens. Harvard Professor Maureen Brady notes that at least one contemporary dictionary includes intangible property such as commercial paper in its definition of

---

[15] Carrie Leonetti, "A Grand Compromise for the Fourth Amendment," 12 J. Bus. & Tech. L. 1, 12 (2016).

"effects."[16] Jim Harper, a fellow at the American Enterprise Institute and former counsel for the Senate Committee on Government Affairs, argues persuasively:

> [t]he same information about each American's life that once resided in a desk drawer or simply in one's memory is now recorded on digital media. The subject matter held in digital documents and communications is at least as extensive and intimate as what is held on paper records, and probably much more so. Courts should treat digital representations of information as constitutional papers or digital effects that the Fourth Amendment secures.... Constitutional ... protections should not erode because the Framers failed to anticipate digital technologies.[17]

Courts of appeals have begun to recognize that the Fourth Amendment's protections for physical "papers," *i.e.,* written communication on physical paper, are essentially worthless today unless applied to electronic communications that function as "electronic papers." The Supreme Court recognized in *Rahimi* that the Second Amendment is not limited to the protection of single-shot muskets just because these were the primary weapon available to the Framers. Likewise, a Fourth Amendment limited only to communications on physical "papers" would

---

[16] Maureen Brady, "The Lost 'Effects' of the Fourth Amendment: Giving Personal Property Due Protection," 125 Yale L.J. 946, 986 n.179 (Feb. 2016) (noting that Timothy Cunningham, Attachment, Bankruptcy, A New and Complete Law-Dictionary, or, General Abridgment of the Law (1764) "quot[es] in the definition for champarry the earlier directive of the Lord Commissioners providing rules for transfers and custody of 'sum[s] of money, tallies, orders, bonds, deposites, securities, and other effects'").

[17] Jim Harper, "Escaping Fourth Amendment Doctrine After *Jones*: Physics, Law, and Privacy Protection," Cato Sup. Ct. Rev. 219, 246 (2011-2012).

have little to no value in a world where the vast majority of communication occurs electronically, not via physical methods.

The Tenth Circuit has noted that "rummaging through private papers or effects would seem obviously a 'search.' After all, if opening and reviewing 'physical' mail is generally a 'search' ... why not 'virtual' mail too?" *United States v. Ackerman*, 831 F.3d 1292, 1304 (10th Cir. 2016).

In her *Jones* concurrence, Justice Sotomayor admitted that the "reasonable expectation of privacy" test has not worked well in the digital world:

> [T]he premise that an individual has no reasonable expectation of privacy in information voluntarily disclosed to third parties ... is ill suited to the digital age, in which people reveal a great deal of information about themselves to third parties in the course of carrying out mundane tasks. People disclose the phone numbers that they dial or text to their cellular providers; the URLs that they visit and the e-mail addresses with which they correspond to their Internet service providers; and the books, groceries, and medications they purchase to online retailers. [*Jones* at 417 (Sotomayor, J., concurring).]

Justice Sotomayor quite properly "doubt[s] that people would accept without complaint the warrantless disclosure to the government of a list of every Web site they had visited in the last week, or month, or year." *Id.* at 418. Regardless, even if the people would permit such an intrusion, the Fourth Amendment does not.

In practice, the "reasonable expectation of privacy" test, untethered from any root in the text and history of the Fourth Amendment, has proven utterly unable to preserve the Fourth Amendment's promise in the digital world.

If this Court properly views a citizen's digital footprint as his property, carrying the right to exclude and requiring a valid, particularized warrant supported by probable cause before it may be searched or seized, much of the confusion among the courts below, and much of the weakening of the Fourth Amendment by focusing on "reasonable expectation of privacy," can be remedied.

## CONCLUSION

For the reasons set out above, these *amici* urge this Court to determine that the geofence warrant was unconstitutional and that the good-faith exception does not apply.

Respectfully submitted,

/s/ *William J. Olson*

WILLIAM J. OLSON*
ROBERT J. OLSON
WILLIAM J. OLSON, P.C.
370 Maple Ave. W., Ste. 4
Vienna, VA 22180
(703) 356-5070
wjo@mindspring.com
**Counsel of Record*
Attorneys for *Amici Curiae*
September 8, 2026

RICK BOYER
INTEGRITY LAW FIRM
P.O. Box 10953
Lynchburg, VA 24506

JOHN I. HARRIS III
SCHULMAN, LEROY & BENNETT, P.C.
3310 West End Avenue
Suite 460
Nashville, TN 37203

**CERTIFICATE OF COMPLIANCE WITH RULE 32(a)**

IT IS HEREBY CERTIFIED:

1. That the foregoing Brief *Amicus Curiae* of America's Future, et al., in Support of Defendant-Appellant contains 4,831 words, excluding the parts of the brief exempted by Rule 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using WordPerfect version 21.0.0.194 in 14-point Times New Roman.

/s/ *William J. Olson*
William J. Olson
Attorney for *Amici Curiae*

## CERTIFICATE OF SERVICE

IT IS HEREBY CERTIFIED that service of the foregoing Brief *Amicus Curiae* of America's Future, *et al.*, in Support of Defendant-Appellant, was made, this 8th day of September, 2026, by the Court's Case Management/Electronic Case Files system upon the attorneys for the parties.

/s/ *William J. Olson*
William J. Olson
Attorney for *Amici Curiae*