No. 22-4489

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FOURTH CIRCUIT**

---

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

OKELLO T. CHATRIE,
Defendant-Appellant.

---

ON REMAND FROM THE SUPREME COURT OF THE UNITED STATES

---

**BRIEF OF AMICUS CURIAE BRIAN L. OWSLEY**
**IN SUPPORT OF DEFENDANT-APPELLANT AND REVERSAL**

---

Elizabeth A. Franklin-Best
ELIZABETH FRANKLIN-BEST, P.C.
3710 Landmark Drive, Suite 113
Columbia, South Carolina 29204
(803) 445-1333
elizabeth@franklinbestlaw.com

Counsel for Amicus Curiae
Brian L. Owsley

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Local Rule 26.1, amicus curiae Brian L. Owsley states that he is an individual. He is not a corporation, has no parent corporation, and no publicly held corporation owns any stock in him. He has no financial interest in the outcome of this litigation, and he is not aware of any publicly held corporation or publicly held entity that has a direct financial interest in the outcome of this litigation by reason of a franchise, lease, other profit sharing agreement, insurance, or indemnity agreement.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ....................................................... i

TABLE OF AUTHORITIES ....................................................................... iii

IDENTITY AND INTEREST OF AMICUS CURIAE ......................................... 1

SUMMARY OF ARGUMENT ....................................................................... 1

ARGUMENT ........................................................................................... 1

I. The warrant in this case violates the Fourth Amendment because the Founders would have classified it as a general warrant. ................................ 2

A. The Fourth Amendment constitutionalized the English common law prohibition of general warrants. ........................................................ 3

B. Under English common law, a general warrant was one that (1) failed to specify the person suspected of a crime, (2) failed to specify the building to be searched, or (3) failed to specify the items to be searched for. ........................................................................ 4

C. Early American authorities defined general warrants the same way. ..8

D. This warrant is a general warrant, as the term was understood at the Founding, because it fails to specify the person suspected of a crime and because it fails to specify the building to be searched. ...............13

CONCLUSION ........................................................................................ 15

CERTIFICATE OF COMPLIANCE ............................................................ 17

CERTIFICATE OF SERVICE .................................................................... 18

# TABLE OF AUTHORITIES

## CASES

*Berger v. New York*, 388 U.S. 41 (1967) ....................3
*Carpenter v. United States*, 585 U.S. 296 (2018) ....................3, 15
*Commonwealth v. Dana*, 43 Mass. 329 (1841) ....................6, 12
*Commonwealth v. Murray*, 4 Va. 504 (1826) ....................6
*Coolidge v. New Hampshire*, 403 U.S. 443 (1971) ....................12
*Entick v. Carrington*, 95 Eng. Rep. 807 (K.B. 1765) ....................6, 7
*Frisbie v. Butler*, 1 Kirby 213 (Conn. 1787) ....................10
*Grumon v. Raymond*, 1 Conn. 40 (1814) ....................11
*Huckle v. Money*, 95 Eng. Rep. 768 (C.P. 1763) ....................5, 13
*Larthet v. Forgay*, 2 La. Ann. 524 (1847) ....................11
*Maryland v. King*, 569 U.S. 435 (2013) ....................9
*Mead v. Young*, 19 N.C. 521 (1837) ....................12
*Money v. Leach*, 97 Eng. Rep. 1075 (K.B. 1765) ....................7, 13
*Payton v. New York*, 445 U.S. 573 (1980) ....................3
*Steagald v. United States*, 451 U.S. 204 (1981) ....................8
*United States v. Smith*, 110 F.4th 817 (5th Cir. 2024) ....................3
*Wakely v. Hart*, 6 Binn. 316 (Pa. 1814) ....................4, 12
*Wells v. Jackson*, 17 Va. 458 (1811) ....................10
*Wilkes v. Wood*, 98 Eng. Rep. 489 (C.P. 1763) ....................5, 13

## CONSTITUTIONAL PROVISION

U.S. Const. amend. IV ....................passim

## RULES

Fed. R. App. P. 26.1 ....................i
Fed. R. App. P. 29 ....................1
Fed. R. App. P. 32 ....................17

**OTHER AUTHORITIES**

4 Edward Barry, *The Present Practice of a Justice of the Peace* (1790) .................6

James Bayard, *A Brief Exposition of the Constitution of the United States* (1834) ..........13

4 William Blackstone, *Commentaries on the Laws of England* (1769) ...................4

William J. Cuddihy, *The Fourth Amendment: Origins and Original Meaning, 602-1791* (2009) ..........10

7 Nathan Dane, *A General Abridgment and Digest of American Law* (1824) .........9

Thomas Y. Davies, *Recovering the Original Fourth Amendment*, 98 Mich. L. Rev. 547 (1999) ..........8

Daniel Davis, *A Practical Treatise Upon the Authority and Duty of Justices of the Peace in Criminal Prosecutions* (1824) ..........10

Laura K. Donohue, *The Original Fourth Amendment*, 83 U. Chi. L. Rev. 1181 (2016) ..........8

John A. Dunlap, *The New-York Justice* (1815) ..........11

1 Matthew Hale, *Historia Placitorum Coronae: The History of the Pleas of the Crown* (1778) ..........4

2 William Hawkins, *A Treatise of the Pleas of the Crown* (1762) ..........6

2 *Legal Papers of John Adams* (L. Kinvin Wroth & Hiller B. Zobel eds. 1965) ....8, 14

Francois-Xavier Martin, *A Treatise on the Powers and Duties of a Constable: According to the Law of North-Carolina* (1806) ..........11

Brian L. Owsley, *The Best Offense is a Good Defense: Fourth Amendment Implications of Geofence Warrants*, 50 Hofstra L. Rev. 829 (2022) .........1, 9

3 Joseph Story, *Commentaries on the Constitution of the United States* (1833) .....4

2 Zephaniah Swift, *A System of the Laws of the State of Connecticut* (1796) .......11

## IDENTITY AND INTEREST OF AMICUS CURIAE

Brian L. Owsley is Associate Professor of Law at the University of North Texas at Dallas. He is the author of many articles on criminal procedure, including *The Best Offense is a Good Defense: The Fourth Amendment Implications of Geofence Warrants*, 50 Hofstra L. Rev. 829 (2022). Professor Owsley reviewed countless search warrants when he was a United States Magistrate Judge in the United States District Court for the Southern District of Texas from 2005 to 2013. He files this brief to share the results of his research with the Court.

Amicus curiae files this brief together with a motion for leave to file. Fed. R. App. P. 29(a)(3).

No party's counsel authored this brief in whole or in part. No party, no party's counsel, and no person other than amicus curiae and his counsel contributed money that was intended to fund preparing or submitting this brief. Fed. R. App. P. 29(a)(4)(E).

## SUMMARY OF ARGUMENT

The Fourth Amendment constitutionalized the English common law prohibition of general warrants. At common law, a warrant was "general" if it failed to specify the person suspected of a crime, the building to be searched, or the

items to be searched for. Early American authorities adopted the same definition of general warrants.

The Founders would have classified the geofence warrant in this case as a general warrant. Rather than authorizing the search of a specific person *suspected* of a crime, this warrant authorizes the search of many people to determine whether any of them *might* have committed a crime. And rather than authorizing the search of a specific building, this warrant authorizes the search of an entire urban area.

## ARGUMENT

### I. The warrant in this case violates the Fourth Amendment because the Founders would have classified it as a general warrant.

Geofence warrants may have been unimaginable in the late eighteenth century, but the Founders had considerable experience with overbroad warrants. They knew very well that English common law prohibited general warrants—warrants that failed to specify the person suspected of a crime, the building to be searched, or the items to be searched for. They ratified the Fourth Amendment to constitutionalize this prohibition, so that the English abuses of the then-recent past could not be repeated in the new United States.

The Founders would have understood the geofence warrant in this case to be a general warrant. Rather than naming a specific person suspected of a crime, it calls for a search of many people in the hope of finding a suspect. And rather than

identifying a specific building to be searched, it calls for a search encompassing a busy urban area. As the Fifth Circuit correctly recognized, *United States v. Smith*, 110 F.4th 817, 836-38 (5th Cir. 2024), the Founders would have classified this kind of warrant as a general warrant.

### A. The Fourth Amendment constitutionalized the English common law prohibition of general warrants.

"The Founding generation crafted the Fourth Amendment as a response to the reviled general warrants … of the colonial era." *Carpenter v. United States*, 585 U.S. 296, 303 (2018) (internal quotation marks omitted). The Fourth Amendment "repudiated these general warrants." *Berger v. New York*, 388 U.S. 41, 58 (1967). *See Payton v. New York*, 445 U.S. 573, 583 (1980) ("It is familiar history that indiscriminate searches and seizures conducted under the authority of 'general warrants' were the immediate evils that motivated the framing and adoption of the Fourth Amendment.").

The Fourth Amendment merely constitutionalized preexisting common law, which already prohibited general warrants. "The search-and-seizure practices that the Founders feared most—such as general warrants—were already illegal under the common law." *Carpenter*, 585 U.S. at 356 (Thomas, J., dissenting). The constitutional prohibition of general warrants

> was nothing more than an affirmance of the common law, for general warrants have been decided to be illegal;

> but as the practice of issuing them had been ancient, the abuses great, and the decisions *against them* only of modern date, the agitation occasioned by the discussion of this important question had scarcely subsided, and it was thought prudent to enter a *solemn veto* against this powerful engine of despotism.

*Wakely v. Hart*, 6 Binn. 316, 319 (Pa. 1814). As Justice Story explained, the Fourth Amendment "is little more than the affirmance of a great constitutional doctrine of the common law." 3 Joseph Story, *Commentaries on the Constitution of the United States* 748 (1833).

The Fourth Amendment thus prohibited "general warrants" as that term was understood in English common law.

### B. Under English common law, a general warrant was one that (1) failed to specify the person suspected of a crime, (2) failed to specify the building to be searched, or (3) failed to specify the items to be searched for.

Under Founding-era English common law, a warrant was impermissibly "general" if it suffered from one of three defects.

First, a warrant was general if, rather than directing the officer to search or apprehend a named person, it directed the officer to search or apprehend all the people suspected of a given offense. 4 William Blackstone, *Commentaries on the Laws of England* 288 (1769) ("A *general* warrant to apprehend all persons suspected, without naming or particularly describing any person in special, is illegal and void."); 1 Matthew Hale, *Historia Placitorum Coronae: The History of*

*the Pleas of the Crown* 580 (1778) ("[A] general warrant upon a complaint of a robbery to apprehend all persons suspected, and to bring them before, &c. was ruled void.").

The best-known example in the Founding era was *Wilkes v. Wood*, 98 Eng. Rep. 489 (C.P. 1763). The search warrant in *Wilkes* authorized officers "to force persons['] houses, break open escrutores [escritoires, i.e., small desks with drawers], seize their papers, &c. upon a general warrant, … where no offenders['] names are specified in the warrant, and therefore a discretionary power given to messengers to search 5 wherever their suspicions may chance to fall." *Id.* at 498. The King's Bench called this warrant "totally subversive of the liberty of the subject." *Id. See also Huckle v. Money*, 95 Eng. Rep. 768, 769 (C.P. 1763) ("To enter a man's house by virtue of a nameless warrant, in order to procure evidence, is worse than the Spanish Inquisition; a law under which no Englishman would wish to live an hour; it was a most daring public attack made upon the liberty of the subject.").

*Wilkes* was well known in the early United States. As the Virginia Supreme Court explained, referring to the state constitution's prohibition of general warrants, "[t]here can be little doubt, that this article grew out of the discussions in England, in *Wilkes'* Case, and it establishes a most important safeguard to the

rights of the people, against the abuse of power by our own State officers." *Commonwealth v. Murray*, 4 Va. 504, 508 (1826).

Second, a warrant was general if, rather than directing the officer to search a particular building, it directed the officer to search wherever he suspected evidence might be found. 2 William Hawkins, *A Treatise of the Pleas of the Crown* 82 (1762) ("[I]t seems to be very questionable, Whether a Constable can justify the Execution of a general Warrant to search for Felons or stolen Goods, because such Warrant seems to be illegal in the very Face of it; for that it would be extremely hard to leave to the Discretion of a common Officer to … search what Houses he thinks fit."); 4 Edward Barry, *The Present Practice of a Justice of the Peace* 26 (1790) ("[A] general warrant to search in all suspected places, is not good; but only to search in such particular places, where the party assigns before the justice his suspicion, and the probable cause thereof.").

Third, a warrant was general if, rather than directing the officer to search for specific items, it directed the officer to search for any evidence of guilt. Such a warrant was at issue in the famous case of *Entick v. Carrington*, 95 Eng. Rep. 807 (K.B. 1765), a case "well known, and warmly cherished" by the Founders. *Commonwealth v. Dana*, 43 Mass. 329, 336 (1841). The warrant in *Entick* provided that officers "were to seize all papers, bank bills, or any other valuable papers" that might be incriminating. 95 Eng. Rep. at 817. The King's Bench

concluded that "we are all of opinion that this warrant is wholly illegal and void." *Id.* at 818.

English courts disapproved of general warrants because they conferred too much discretion on the officers who executed them, discretion that could easily be abused. "It is not fit, that the receiving or judging of the information should be left to the discretion of the officer," Lord Mansfield explained. *Money v. Leach*, 97 Eng. Rep. 1075, 1088 (K.B. 1765). "The magistrate ought to judge; and should give certain directions to the officer." *Id. Money* involved a search warrant that failed to name a person, but merely instructed officers to search and seize the papers of anyone suspected of a stated offense. *Id.* at 1076. "Hale and all others hold such an uncertain warrant void," Mansfield concluded, "and there is no case or book to the contrary." *Id.* at 1088.

English courts were also concerned that general warrants licensed significant invasions of privacy, because they authorized officials to rummage through the intimate information of people who were not suspected of any crime. "[R]ansacking a man's secret drawers and boxes to come at evidence against him, is like racking his body to come at his secret thoughts," declared the winning lawyer in *Entick v. Carrington*. 95 Eng. Rep. at 812. "[W]hat? [H]as a Secretary of State a right to see all a man's private letters of correspondence, family concerns,

trade and business? [T]his would be monstrous indeed; and if it were lawful, no man could endure to live in this country." *Id.*

Thus, on the eve of the American Revolution, "[t]he general warrant was reviled as a source of arbitrary power," because it lacked "clear directions to the officer as to whom to arrest or where to search." Thomas Y. Davies, *Recovering the Original Fourth Amendment*, 98 Mich. L. Rev. 547, 657 (1999). *See also Steagald v. United States*, 451 U.S. 204, 220 (1981) (noting that "[t]he central objectionable feature of [general] warrants was that they provided no judicial check on the determination of the executing officials that the evidence available justified an intrusion into any particular home.").

### C. Early American authorities defined general warrants the same way.

Colonial Americans were outraged when the Crown issued general warrants in North America despite their illegality. Laura K. Donohue, *The Original Fourth Amendment*, 83 U. Chi. L. Rev. 1181, 1240-64 (2016). The most famous example, the Writs of Assistance Case of 1761, involved a general warrant that authorized the search of "any Vaults, Cellars, Warehouses, shops, or other Places" for evidence of goods on which import duties had not been paid. 2 *Legal Papers of John Adams* 133 (L. Kinvin Wroth & Hiller B. Zobel eds. 1965). Arguing that the warrant was unlawful, James Otis declared that general warrants are "the worst

instrument of arbitrary power [and] the most destructive of English liberty." *Id.* at 140. He insisted that only "writs of one kind, may be legal, that is, *special writs*," which direct officers "to search *certain houses*" rather than all the houses in a broad geographic area. *Id.* at 141. Reflecting on the case years later, John Adams asserted that "[t]hen and there was the first scene of the first Act of Opposition to the arbitrary Claims of Great Britain. Then and there the child Independ[e]nce was born." *Id.* at 107.

The Fourth Amendment and its state constitutional analogues were intended to prevent the recurrence of this abuse. Brian L. Owsley, *The Best Offense is a Good Defense: Fourth Amendment Implications of Geofence Warrants*, 50 Hofstra L. Rev. 829, 857-63 (2022). They reestablished the English common law's ban on general warrants as part of American constitutional law. They prohibited the same general warrants that had been illegal under the common law.

First, a warrant was impermissibly general if it failed to name the person suspected of the offense. *Maryland v. King*, 569 U.S. 435, 466 (2013) (Scalia, J., dissenting) ("At the time of the Founding, Americans despised the British use of so-called 'general warrants'—warrants not grounded upon a sworn oath of a specific infraction by a particular individual."). *See* 7 Nathan Dane, *A General Abridgment and Digest of American Law* 248 (1824) ("A warrant must particularly name and describe the person against 9 whom it is issued, and also the offence

charged, or it is bad."); Daniel Davis, *A Practical Treatise Upon the Authority and Duty of Justices of the Peace in Criminal Prosecutions* 26 (1824) ("A general warrant to apprehend all persons suspected, without naming of describing any person in particular, is illegal.").

For instance, in *Frisbie v. Butler*, 1 Kirby 213, 213 (Conn. 1787), a warrant commanded the "search [of] all suspected places and persons." The court found the warrant, "being general," to be "clearly illegal." *Id.* at 215.

Likewise, in *Wells v. Jackson*, 17 Va. 458, 472 (1811), a warrant instructed officers to arrest two named people "and their associates." The court held that "[a]s to the part which relates to the associates, nothing can be more general." *Id.* at 473. Because the warrant gave the officers discretion to decide who was an associate, there was "no description … of any person, but only of the offence." *Id.* In a warrant, the court explained, there must be "no doubt who is the person intended." *Id.* at 475.

Second, a warrant was impermissibly general if it failed to specify the building to be searched. When, in the Fourth Amendment, "Congress called for warrants 'particularly describing' one 'place,' they wanted to restrict the resulting search not only to a single building, but, if possible, to a segment of it or to a unique area of space, even if it did not constitute a fully enclosed structure." William J. Cuddihy, *The Fourth Amendment: Origins and Original Meaning, 602-*

*1791*, at 742 (2009). *See* 2 Zephaniah Swift, *A System of the Laws of the State of Connecticut* 387 (1796) ("[A] general warrant to search all suspected places and houses … without any particular description, is illegal."); Francois-Xavier Martin, *A Treatise on the Powers and Duties of a Constable: According to the Law of North-Carolina* 28 (1806) (noting that a search warrant may not allow the officer "to search what houses he thinks fit").

For example, *Grumon v. Raymond*, 1 Conn. 40, 43 (1814), involved "a warrant to search all suspected places, stores, shops and barns in *Wilton*" for stolen goods. The court concluded that "[t]his is a general search-warrant, which has always been determined to be illegal, not only in cases of searching for stolen goods, but in all other cases." *Id.*

Likewise, *Larthet v. Forgay*, 2 La. Ann. 524, 525 (1847), involved stolen jewelry alleged to be hidden in a cabaret. The search warrant authorized a search "in and about said premises" for the jewelry. *Id.* The court held that while the warrant permitted officers to search *in* the cabaret, it could not be interpreted to permit a search in neighboring buildings, despite being worded as "in and about" the cabaret, because then it would be an impermissible general warrant. *Id.* at 525-26.

Third, a warrant was impermissibly general if it failed to specify the items to be searched for. John A. Dunlap, *The New-York Justice* 368 (1815) ("A warrant

must particularly describe the place to be searched, and the things to be seized."); *Commonwealth v. Dana*, 43 Mass. 329, 336 (1841) (approving of a search warrant because "[t]he articles seized are described, and the place in which they were concealed is designated, with sufficient certainty.").

Early American courts shared English courts' concern that general warrants delegated too much abusable discretion to the officers who conducted searches. General warrants "put it in the power of the officers who execute them, to harass innocent persons under pretence of suspicion," the Pennsylvania Supreme Court worried. *Wakely v. Hart*, 6 Binn. 316, 318 (Pa. 1814). The purpose of prohibiting general warrants was to lodge all the discretion with the magistrate, leaving none to the officer. As the North Carolina Supreme Court explained, "[t]he magistrate who acts upon the information laid before him is to *judge* whether a warrant shall issue, and against whom it shall issue. The authority of the officer, or person acting under the warrant is purely ministerial." *Mead v. Young*, 19 N.C. 521, 524-25 (1837).

Americans also shared the English worry that general warrants could result in serious invasions of privacy by licensing "a general, exploratory rummaging in a person's belongings." *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971). Because a general warrant "is an intolerable engine of oppression," one expositor of the Fourth Amendment explained, it was "right to prevent the possibility of such

a practice here." James Bayard, *A Brief Exposition of the Constitution of the United States* 148 (1834).

### D. This warrant is a general warrant, as the term was understood at the Founding, because it fails to specify the person suspected of a crime and because it fails to specify the building to be searched.

The Founders would have classified the warrant in this case as a general warrant, for two reasons.

First, the warrant fails to identify the person suspected of a crime. Rather than authorizing the search of a specific person who is thought to have committed a crime, the warrant authorizes the search of many people to determine whether any of them might have some connection to a crime. Just as the general warrants in *Wilkes v. Wood* and *Money v. Leach* allowed officers to go door-to-door looking for unspecified ostensibly seditious printers, the warrant in this case allowed officers to go phone-to-phone looking for an unspecified robber.

Today's technology is more sophisticated than that of the eighteenth century, but the principle is the same. The government does not know who committed the offense, so the government searches many people in the hope of finding a suspect. This is the kind of "nameless warrant," *Huckle v. Money*, 95 Eng. Rep. 768, 769 (C.P. 1763), that Founding-era common law condemned as "totally subversive of the liberty of the subject," *Wilkes v. Wood*, 98 Eng. Rep. 489, 498 (C.P. 1763), and that the Fourth Amendment was meant to prohibit.

Second, the warrant fails to specify the building to be searched. Rather than authorizing the search of a particular building where evidence is thought to be located, the warrant authorizes (at step one) the search of a circular area with a diameter of three hundred meters, covering multiple buildings. And at step two, even this capacious boundary is removed.

Again, the technology is new, but the principle is old. The government does not know where it might find evidence of a crime, so it searches a wide area in the hope of finding some. This was the strategy the British colonial government used to search for smuggled goods, the strategy castigated by James Otis in the Writs of Assistance Case as "the worst instrument of arbitrary power." *Legal Papers of John Adams*, at 140. It was searches like these that prompted the particularity requirement of the Fourth Amendment.

The Founders would have been concerned that this warrant, like the general warrants of their era, delegates too much discretion to the officer who applies for the warrant and who executes it. How and why did the officer narrow the initial list of suspects down to nine people? He never had to explain to a magistrate. How and why did he further whittle the list down to three? Again, he never had to explain. The point of the Fourth Amendment was to take such broad discretion away from officers and give it to judges.

The Founders would likewise have been concerned that this warrant, like the general warrants of their era, invades the privacy of people who are not suspected of any crime. Many innocent people had their movements scrutinized, just in case any one of them happened to be a robber. The point of the Fourth Amendment was to require the government to identify a suspect before obtaining a warrant, rather than allowing the government to search many people in the hope of finding a suspect.

Some warrants for searches of a phone's location history would not be general warrants. If the police have probable cause to believe that John Smith committed bank robbery, a warrant to search his phone's location history, to determine whether he was at the bank during the robbery, would not be a general warrant. *Cf. Carpenter v. United States*, 585 U.S. 296 (2018). Such a warrant would identify a specific person and a specific building.

The warrant in this case, by contrast, is not specific about the person or the building to be searched. The Founders would have considered it a general warrant.

## CONCLUSION

For the foregoing reasons, this Court should hold that the geofence warrant that led law enforcement to Okello Chatrie was a general warrant, and that it therefore violated the Fourth Amendment.

Respectfully submitted,

/s/ Elizabeth A. Franklin-Best
Elizabeth A. Franklin-Best
ELIZABETH FRANKLIN-BEST, P.C.
3710 Landmark Drive, Suite 113
Columbia, South Carolina 29204
(803) 445-1333
elizabeth@franklinbestlaw.com

Counsel for Amicus Curiae
Brian L. Owsley

## CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 3,551 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

/s/ Elizabeth A. Franklin-Best
Elizabeth A. Franklin-Best
Counsel for Amicus Curiae

Dated: September 8, 2026

**CERTIFICATE OF SERVICE**

I certify that on September 8, 2026, I electronically filed the foregoing Brief of Amicus Curiae Brian L. Owsley with the Clerk of the United States Court of Appeals for the Fourth Circuit using the CM/ECF system, which will send notification of the filing to all counsel of record, each of whom is a registered CM/ECF user.

/s/ Elizabeth A. Franklin-Best
Elizabeth A. Franklin-Best
Counsel for Amicus Curiae