IN THE
UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 22-4489

UNITED STATES OF AMERICA,

*Appellee*,

v.

OKELLO T. CHATRIE,

*Appellant*.

Appeal from the United States District Court
for the Eastern District of Virginia at Richmond
*The Honorable M. Hannah Lauck, District Judge*

# SUPPLEMENTAL BRIEF OF THE UNITED STATES


Todd W. Blanche
Attorney General

Theophani K. Stamos
First Assistant United States Attorney

Peter S. Duffey
Assistant United States Attorney
United States Attorney's Office
Eastern District of Virginia
919 East Main St., Suite 1900
Richmond, VA 23219
(804) 819-5400

A. Tysen Duva
Assistant Attorney General

Josh A. Goldfoot
Deputy Assistant Attorney General

Nathan Judish
Senior Counsel, Computer Crime and Intellectual Property Section
United States Department of Justice
1301 New York Ave., NW
Washington, DC 20530
(202) 616-7203

*Attorneys for the United States of America*

**Table of Contents**


Table of Authorities .................................................................................... ii

Introduction ..................................................................................................1

Background ..................................................................................................2

Argument......................................................................................................7

I. The geofence warrant complied with the Fourth Amendment. ......................7

A. The geofence affidavit established probable cause. ..............................8

B. The geofence warrant was sufficiently particular. ..............................14

II. The good-faith exception precludes suppression. .......................................27

III. This Court Should Not Remand to the District Court. ..................................30

Conclusion ..................................................................................................30

Certificate of Compliance .............................................................................32

## Table of Authorities

**Cases**

*Andresen v. Maryland*, 427 U.S. 463 (1976) ........................................................12

*Carpenter v. United States*, 585 U.S. 296 (2018) ..............................................20

*Chatrie v. United States*, ___ S. Ct. ___, 2026 WL 120676 (Jan. 16, 2026) ........................................................................................................6

*Chatrie v. United States*, 146 S. Ct. 2193 (2026) ......................................... passim

*Coolidge v. New Hampshire*, 403 U.S. 443 (1971) ...........................................26

*Davis v. United States*, 564 U.S. 229 (2011) ......................................................27

*Foley v. Connelie*, 435 U.S. 291 (1978) ..............................................................22

*Illinois v. Gates*, 462 U.S. 213 (1983) ..................................................................8

*Illinois v. Lidster*, 540 U.S. 419 (2004) ..............................................................10

*Leaders of a Beautiful Struggle v. Baltimore Police Department*, 2 F.4th 330 (4th Cir. 2021) (en banc).......................................... 20, 28, 29, 30

*Mancusi v. DeForte*, 392 U.S. 364 (1968)............................................................13

*Messerschmidt v. Millender*, 565 U.S. 535 (2012) ........................................... 8, 10

*Riley v. California*, 573 U.S. 373 (2014) ..............................................................20

*Scott* v. *United States*, 436 U.S. 128 (1978) ........................................................18

*Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602 (1989) .......................23

*Smith v. Maryland*, 442 U.S. 735 (1979) ...............................................................21

*United States v. Chatrie*, 107 F.4th 319 (4th Cir. 2024)..........................................6

*United States v. Chatrie*, 136 F.4th 100 (4th Cir. 2025) (en banc)... 6, 20, 21, 26, 28

*United States v. Hodge*, 354 F.3d 305 (4th Cir. 2004) ..............................................8

*United States v. James*, 3 F.4th 1102 (8th Cir. 2021)..............................................9

*United States v. Karo*, 468 U.S. 705 (1984) ..........................................................25

*United States v. Kimble*, 855 F.3d 604 (4th Cir. 2017) ..........................................14

*United States v. Leon*, 468 U.S. 897 (1984) ..................................................... 29, 30

*United States v. McLamb*, 880 F.3d 685 (4th Cir. 2018) .......................................28

*United States v. Smith*, 110 F.4th 817 (5th Cir. 2024) .......................................27

*United States v. Zelaya-Veliz*, 94 F.4th 321 (4th Cir. 2024) .......................................27

*Ybarra v. Illinois*, 444 U.S. 85 (1979) ....................................... 13, 14

*Zurcher v. Stanford Daily*, 436 U.S. 547 (1978) ....................................... 8, 12, 14, 29

**Constitution and Statutes**

U.S. Const. Amend. IV ....................................... passim

U.S. Const. Amend. V .......................................23

18 U.S.C. § 924 .......................................5

18 U.S.C. § 2113 .......................................5

18 U.S.C. § 2518(5) .......................................18

18 U.S.C. § 2703 .......................................26

18 U.S.C. § 2711(3) .......................................26

18 U.S.C. § 2713 .......................................26

**Miscellaneous**

Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* (6th ed. 2020) ....................................... 18, 23, 24

Orin S. Kerr, *Data Scanning and the Fourth Amendment*, 67 B.C. L. Rev. 431 (2026) .......................................24

## Introduction

Defendant Okello Chatrie robbed a bank at gunpoint and got away with $195,000. Investigators identified him as the robber using a Google geofence warrant that required Google to disclose location information for devices near the bank during the hour of the robbery.

The district court denied Defendant's suppression motion based on the good-faith exception to the exclusionary rule. A divided panel of this court affirmed, holding that the government had not conducted a search when it obtained Defendant's location information. This Court granted rehearing en banc (thereby vacating the panel opinion) and again affirmed the district court's denial of Defendant's suppression motion in a one-sentence per curiam opinion with eight concurring opinions and a solo dissent. Nine judges joined opinions stating that the good-faith exception precluded suppression.

The Supreme Court granted certiorari regarding whether the execution of the geofence warrant violated the Fourth Amendment, but not on the application of the good faith exception. In *Chatrie v. United States*, 146 S. Ct. 2193, 2215 (2026), the Supreme Court held "that police officers invade a cell-phone user's reasonable expectation of privacy when they access his Location History." Supplemental Appendix at 131 (ECF 125, hereinafter "SA"). The Court remanded to this Court to address whether the geofence warrant in this case complied with the Fourth

Amendment, and it also noted that this Court was free to revisit whether the good-faith exception precludes suppression.

This Court should affirm the district court's denial of Defendant's suppression motion for two reasons. First, the geofence warrant satisfied the Fourth Amendment's requirements of probable cause and particularity. Second, the good-faith exception to the exclusionary rule precludes suppression because officers reasonably relied on the warrant in good faith.

**Background**

At approximately 4:50 p.m. on May 20, 2019, Defendant walked into the Call Federal Credit Union in Midlothian, Virginia, appearing to be talking on a cellphone. JA112, JA1025, JA1444.[1] He approached a counter and handed a teller a note that read, in part, "I got your family as hostage and I know where you live, If you or your coworker alert the cops or anyone your family and you are going to be hurt." JA112. The note continued: "I got my boys on the lookout out side. The first cop car they see am going start hurting everyone in sight, hand over all the cash, I need at least 100k." JA112. After the teller replied that she did not have access to that amount of money, Defendant pulled out a firearm, forced everyone to the ground, escorted the manager and others to the vault, and forced

[1] The offense conduct in this case is set forth more fully in the initial brief of the United States, and the United States incorporates that Statement of the Case here. *See* Brief of United States at 4-15 (ECF 40, hereinafter "U.S. Br.").

the manager to open the vault and place $195,000 into a bag. JA112, JA1026. Defendant then fled with the money. JA112, JA1026-JA1027.

FBI Task Force Officer (TFO) Josh Hylton responded to the scene of the robbery to investigate. JA1024. He interviewed witnesses and reviewed surveillance camera footage. JA1024. Based on the robber's use of a phone, TFO Hylton recognized that the robber might have been working with a lookout or a driver, and that Google could have information placing him in the area of the bank at the time of the robbery. JA1027. He also learned that the robber had approached the bank from the southwest corner of the nearby church. JA1025.

On June 14, 2019, TFO Hylton sought and obtained a Google geofence warrant from a state magistrate. JA107-JA117. His affidavit described the facts of the robbery. JA112. The application explained that most American adults own smartphones and that, if location services were enabled, Google stored location data from those devices. JA113. The affidavit also explained how location could be evidence of crime, including "identify[ing] potential witnesses and/or suspects," "inculpating or exculpating persons of interest," and "assist[ing] investigators in forming a fuller geospatial understanding and timeline" of the robbery. JA113. A state magistrate issued the warrant upon a finding of probable cause. JA114.

The geofence warrant defined the geographical bounds of the geofence as a circle of radius 150 meters around a specific point near the bank, and it included a

picture showing the covered area. JA117. The circle covered the bank and nearby parking areas, some of which belonged to a church, and it did not reach major roads. JA117. The warrant authorized disclosure of information from Google through a three-step process. JA116-JA117.

At step 1, the warrant directed Google to disclose anonymized location information for devices present in the target area during the hour of the robbery, from 4:20 p.m. to 5:20 p.m. JA116. This information included "a numerical identifier for the account, the type of account, time stamped location coordinates and the data source that this information came from if available." JA116.

Step 2 set forth a procedure directing law enforcement to review the anonymized location information from step 1 and "attempt to narrow down the list" by comparing "the time stamped location coordinates for each account" with "the known time and location information" of the robbery. JA116. For the updated list of accounts, the warrant directed Google to disclose anonymized location information from 3:50 p.m. to 5:50 p.m., both within and outside the geofence. JA116-JA117.

Step 3 included a similar narrowing procedure and a third disclosure by Google. JA117. For the accounts that remained after that procedure, step 3 directed Google to disclose "identifying account information," including username and email addresses. JA117.

Investigators followed this three-step procedure in executing the warrant. JA950-JA967. In the first step, Google disclosed anonymized location data within the geofence for 19 accounts during the hour of the robbery. JA2002, JA2098-JA2104. In the second step, investigators followed the warrant's narrowing procedure and reduced the step 2 production to nine accounts. JA2006, JA2109-JA2129. For the remaining nine accounts, Google produced the specified two hours of anonymized location data. JA2109-JA2129. In step 3, TFO Hylton followed the warrant's narrowing procedure and reduced his focus to three accounts, including Defendant's. JA960-JA967. Google disclosed identifying information for these accounts. JA2134-JA2137.

Information from the warrant led to Defendant's arrest, and he was indicted on two counts. JA22-JA24. Following his indictment, Defendant moved to suppress the fruits of the geofence warrant. JA1071. The district court held that the geofence warrant violated the Fourth Amendment, but it denied the suppression motion based on the good-faith exception. JA1327-JA1389. Following a conditional guilty plea, Defendant was convicted on one count of armed robbery of a credit union, in violation of 18 U.S.C. §§ 2113(a) and (d), and one count of brandishing a firearm in relation to a crime of violence, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i) and (ii). JA1449.

A divided panel of this Court affirmed, holding that "the government did not

conduct a search when it obtained two hours' worth of [Defendant]'s location information." SA4. This Court granted rehearing en banc and affirmed the judgment of the district court in a one-sentence per curiam opinion, with eight concurring opinions and a solo dissent. SA57. Nine judges joined opinions finding that the good-faith exception precludes suppression in this case. SA62-SA64 (Diaz, C.J., concurring); SA70 (Niemeyer, J., concurring); SA71 (King, J., concurring); SA71 n.1 (Wynn, J., concurring in the judgment); SA97-SA99 (Heytens, J., concurring).

Defendant petitioned for certiorari, asking the Supreme Court to review two questions: (1) "Whether the execution of the geofence warrant violated the Fourth Amendment," and (2) "Whether the exclusionary rule should apply to the evidence derived from the geofence warrant." Cert. Pet., *Chatrie v. United States*, S. Ct. No. 25-112 (filed July 28, 2025). The Supreme Court granted certiorari only on Defendant's first question. *See Chatrie v. United States*, ___ S. Ct. ___, 2026 WL 120676 (Jan. 16, 2026).

Following briefing and argument, the Supreme Court vacated the judgment of this Court and remanded "for further proceedings consistent with [its] opinion." SA133. The Court held "that police officers invade a cell-phone user's reasonable expectation of privacy when they access his Location History," remanded for further consideration of whether the geofence warrant in this case "satisfied the

Fourth Amendment's requirements of particularity and probable cause," and noted that this Court "may now consider anew, after review of our opinion, how the good-faith exception applies here." SA131, SA132, SA145 n.4.

## Argument

This Court should affirm the denial of Defendant's suppression motion for two reasons. First, the geofence warrant complied with the Fourth Amendment because it was supported by probable cause and specified its objects with particularity. Second, suppression of the fruits of the geofence warrant is not appropriate in any event because investigators reasonably relied on the warrant in good faith, and the good-faith exception to the exclusionary rule therefore applies. The United States made these arguments in its initial brief in this case, and the United States incorporates those arguments here. *See* U.S. Br. at 29-56.

### I. The geofence warrant complied with the Fourth Amendment.

The Fourth Amendment's Warrant Clause provides for the issuance of warrants, "upon probable cause," that "particularly describ[e] the place to be searched, and the persons or things to be seized." U.S. Const. Amend. IV. As discussed below, the geofence warrant complied with the Fourth Amendment's requirements because it was supported by probable cause and specified its objects with particularity.

### A. The geofence affidavit established probable cause.

The "duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed." *United States v. Hodge*, 354 F.3d 305, 309 (4th Cir. 2004) (quoting *Illinois v. Gates*, 462 U.S. 213, 238–39 (1983)). In this case, the Supreme Court described the principles that a magistrate follows when evaluating the existence of probable cause:

> [A] magistrate must always determine that there is a "fair probability that contraband or evidence of a crime will be found" in the place searched. That means determining, to the requisite "fair probability," both that the place searched will have the materials sought and that those materials will contain evidence "aid[ing]" in a criminal's "apprehension or conviction." *Messerschmidt v. Millender*, 565 U.S. 535, 551, 552, n. 7 (2012); *see Zurcher v. Stanford Daily*, 436 U.S. 547, 556 (1978) ("The critical element" is whether there is the requisite "cause to believe that the specific 'things' to be searched for and seized are located" in the targeted place).

SA132 (internal citation omitted). Here, there was a substantial basis for the magistrate to conclude that the geofence affidavit established, to a fair probability, both of the requirements that the Supreme Court described: (1) that the place searched, *i.e.*, servers maintained or controlled by Google, contained information sought by the warrant, and (2) that the information would aid in a criminal's apprehension and conviction.

1. The application provided a "fair probability" that Google would have the information sought by the warrant—location and identifying information about people who were within 150 meters of the credit union around the time that it was

robbed. The affidavit explained, *inter alia*, that most American adults own smartphones, that they could have Google accounts associated with their smartphones, that Google could collect and store location information from those smartphones when the user enabled that storage, and that Google would store that data in perpetuity unless the user deleted it. JA113. The affidavit directly confirmed that the robber had a cellphone within the geofence, and the robber's use of his cellphone and his claim to have lookouts supported a reasonable inference that an accomplice also had a cellphone within the geofence. JA112. In addition, the affidavit explained that the purpose of the warrant included identifying "potential witnesses," and the affidavit mentioned a teller, a manager, and "several patrons." JA112-JA113. Although the affidavit did not specifically address whether potential witnesses had cellphones, the magistrate could infer that there was a fair probability that they did, because a magistrate need not "check . . . common sense at the door and ignore the fact that most people compulsively carry cell phones with them all the time." *United States v. James*, 3 F.4th 1102, 1105 (8th Cir. 2021) (internal quotation marks omitted) (finding probable cause for cell tower dump warrants even though there was no direct evidence that the robber had a cell phone). In sum, the affidavit established that there were likely suspects and potential witnesses within the geofence, and it supported the magistrate's

determination that there was a "fair probability" that Google would have the information sought by the warrant for the accounts of those individuals.

Second, for each step in the warrant, the affidavit established a substantial basis for the magistrate's finding that there was a fair probability that the information produced by Google constituted evidence of crime, in the sense that it would aid "in a criminal's 'apprehension or conviction.'" SA132 (quoting *Messerschmidt v. Millender*, 565 U.S. 535 (2012)). At step 1, the warrant authorized disclosure of anonymized location information within the geofence during the hour of the robbery. JA116. There was a fair probability that this information would aid in a criminal's apprehension or conviction. The affidavit explained that location data could "identify potential . . . suspects." JA113. Step 1 information could, and did, identify a device likely to belong to the robber when compared with information investigators obtained about the robber's location from witness testimony and surveillance video. JA966-JA967. It could also identify devices of possible lookouts outside. In addition, the affidavit explained that the location data could "identify potential witnesses," and it mentioned the presence of patrons. JA112-JA113. The identification of witnesses could lead to trial testimony or other avenues for investigation. S*ee Illinois v. Lidster*, 540 U.S. 419, 427 (2004) (finding that identifying witnesses to a crime "fit important criminal investigatory needs").

At step 2, the warrant authorized disclosure of "contextual" location information for the accounts identified in step 1: anonymized location information over a two-hour interval, both within and outside the geofence. JA116. Again, there was a fair probability that this information would aid in apprehension or conviction. Contextual location information could distinguish suspects from witnesses, thereby enabling investigators "to identify potential witnesses and/or suspects." JA113, JA956. For example, step 2 information distinguishes a suspect who arrives at the bank just before the robbery and turns off his phone from a potential witness who passes through the parking lot and leaves the area just before the robbery. JA963. In addition, the affidavit explained that location data could aid in "inculpating . . . persons of interest," JA113, and step 2 information showing the movements of the robber and any accomplices before and after the bank robbery would be useful evidence at trial. Thus, there was a fair probability that step 2 information would aid in the apprehension or conviction of a criminal.

At step 3, the warrant authorized disclosure of specified subscriber identifying information associated with devices within the geofence. JA117. By "identify[ing] potential witnesses and/or suspects," JA113, step 3 information would aid in the apprehension and conviction of a criminal. In sum, there was a substantial basis for the magistrate's finding of probable cause.

2. Defendant argues that a geofence warrant could satisfy the Fourth Amendment only if there was probable cause that all persons within the geofence were involved in criminal activity, *see* Appellant's Supplemental Brief at 17-19 (ECF 123, hereinafter "Def. Supp. Br."), an argument which would foreclose nearly all geofence warrants. But *Zurcher v. Stanford Daily*, 436 U.S. 547, 567-68 (1978), makes clear that a warrant to search property allows seizure, from a third party not suspected of crime, of evidence to identify perpetrators and others present at the scene of a crime. In *Zurcher*, the Supreme Court approved a search warrant that authorized the search of a newspaper's office to seize photographs of a crime scene at which unidentified individuals had assaulted police officers. The Court recognized that a search warrant "may be issued when it is satisfactorily demonstrated to the magistrate that fruits, instrumentalities, or evidence of crime is located on the premises" to be searched. *Id.* at 559. *Zurcher* sets the standard for a geofence warrant because, like the *Zurcher* warrant, a geofence warrant authorizes seizure from a third party of evidence that could identify suspects and witnesses of a crime. A geofence warrant is analogous to a warrant to seize, from an innocent third party, crime scene surveillance video. *See also Andresen v. Maryland*, 427 U.S. 463, 482 (1976) (stating that even "[i]n searches for papers" conducted by law enforcement itself, "it is certain that some innocuous documents will be examined,

at least cursorily, in order to determine whether they are, in fact, among those papers authorized to be seized.").

Defendant suggests that it is important that the Supreme Court in this case recognized that individual users have a Fourth Amendment privacy interest in their Location History. Def. Supp. Br. at 6. But under *Zurcher*, individual privacy interests in the place to be searched do not constrain a warrant that authorizes the search of a place for evidence of crime. Each Stanford Daily reporter would have had a protected privacy interest in the reporter's own workplace materials, but the warrant to search the newspaper still complied with the Fourth Amendment. *See Mancusi v. DeForte*, 392 U.S. 364, 368-69 (1968) (holding that worker had protected privacy interest in his papers in a shared office space).

Defendant's argument that there must be probable cause of guilt for all persons within the geofence is based on *Ybarra v. Illinois*, 444 U.S. 85 (1979), and its progeny. *See* Def. Supp. Br. at 18-19. In *Ybarra*, the Supreme Court held that a warrant to search a bar at which a bartender was dealing drugs did not authorize officers to search every patron of the bar based on their mere "propinquity to others independently suspected of criminal activity." *Id.* at 91. The Court stated that "[w]here the standard is probable cause, a search or seizure *of a person* must be supported by probable cause particularized with respect to that person." *Id.* (emphasis added); U.S. Br. at 33-34. The warrant here, however, did not purport

to authorize a bodily search of suspects based on suspicion that they were involved in a crime. It sought evidence from a third party that could identify suspects and witnesses of a crime—a commonplace step in criminal investigation. *See, e.g.*, *Zurcher*, 436 U.S. at 551.

Although Defendant has argued that *Zurcher* does not apply to geofence warrants, *see* ECF 48, Reply Brief of Appellant at 14-15, the Supreme Court in this case invoked *Zurcher*'s determination that the "critical element" for probable cause is "whether there is the requisite cause to believe that the specific things to be searched for and seized are located in the targeted place." SA132 (internal quotation marks omitted) (quoting *Zurcher*, 436 U.S. at 556). In contrast, the Supreme Court in this case made no mention of *Ybarra* or any requirement that there be probable cause of guilt for those whose location data is disclosed.

**B. The geofence warrant was sufficiently particular.**

"[A] valid warrant must particularly describe the place to be searched, and the persons or things to be seized." *United States v. Kimble*, 855 F.3d 604, 610 (4th Cir. 2017) (internal quotation marks omitted). The Supreme Court in this case described principles that a magistrate follows when evaluating the existence of particularity, including explicitly stating that particularity may be dependent on a search warrant's "geographic and durational" scope:

> The particularity requirement, for its part, ensures that the search will be of an appropriate scope—that it is carefully tailored to its

> justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit. That requirement typically looks to such matters as the geographic and durational expanse of the search.

SA132 (internal citations and quotation marks omitted). The Court further explained that the particularity requirement "must take account of particular factual contexts, including in surveillance cases the nature of the technology to be used." SA132 (internal quotation marks omitted). Consistent with these principles, the geographical and durational limits of the geofence warrant were clearly defined and based on the facts of the investigation and the nature of geofence warrants. The warrant did not authorize a "wide-ranging exploratory" search and accordingly satisfied the particularity requirement.

1. The warrant described the place to be searched and the things to be seized. It stated that evidence "may be found within computer servers maintained or controlled by Google, Inc. or Google Payment Corp.," "stored at premises controlled by Google, Inc." JA116. And it described the things to be seized in three detailed steps: (1) at step one, "anonymized information" with specified attributes (e.g., numerical account identifier and time-stamped location information) for each mobile-device location update within the given time and distance from the credit union; (2) at step two, anonymized information in a similar form for any location updates for the two hours of the robbery for a law-enforcement-minimized subset of the anonymous devices from step one; and (3) at

step three, specific "identifying account information[]" (e.g., "user name and subscriber information") for devices that remained relevant even after further law-enforcement minimization efforts. JA116-JA117.

Step 1 information—"anonymized information," including "time stamped location coordinates," for devices within 150 meters of the bank during the hour of the robbery—was precisely defined and sufficiently limited. JA116. The warrant appropriately set geographical boundaries based on the facts of the robbery. The geofence covered the bank and nearby parking areas toward which the robber fled after the robbery, but it did not reach major roads. JA112, JA117. And its time frame began at 4:20 p.m., JA116, only a half hour before the robbery, a reasonable time to expect the robber and any accomplices to arrive on scene. The time frame extended only to 5:20 p.m., JA116, a half hour after the robbery began, meaning the second half of the warrant's span covered just the robbery itself and a brief subsequent period during which criminals would flee. These geographical and temporal bounds were appropriately tailored to the needs of the investigation.

The warrant likewise described with particularity exactly what the step 2 and step 3 information would look like. Step 2 information was "anonymized information" for devices within the geofence, including two hours of "contextual data points with points of travel outside" the geofence. JA116. Step 3 information was "identifying account information," including "user name" and "email

addresses." JA117. The scope of this information took into account the "particular factual contexts . . . of the technology to be used." SA132. In order to advance a geofence-based investigation, officers executing the warrant need sufficient information to distinguish suspects from potential witnesses. Step 2 contextual location information serves that function: investigators "use the second stage . . . to make sure that [they're] looking at the person that's actually responsible for committing [the] crime." JA956. For example, step 2 information distinguishes a phone that has been turned off from one that has left the geofence. JA963. Or it could reveal if the robber and accomplices met up away from the bank shortly before or after the robbery. The temporal bounds of step 2—an hour of location information before and after the start of the robbery—were appropriately limited but consistent with this important investigatory need. Similarly, step 3 identifying information also served its investigatory purpose. Geofence information would be of little value if device owners could not be identified, and step 3 information supplied that identifying information. The warrant did not authorize the sort of "wide-ranging exploratory" search prohibited by the Fourth Amendment.

The warrant-authorized procedure here included explicit minimization measures before both step 2 and step 3. Only anonymized information was returned at step one. The investigators were then required to "attempt to narrow down the list" of potentially relevant accounts between steps one and two (which

likewise revealed only anonymized data). JA116. The investigators were then required to do so again between steps two and three. JA116-JA117. Defendant, however, would turn that salutary feature of the warrant into a bug, on the theory that the minimization measures gave law enforcement too much discretion in the narrowing of the limited information that it was authorized to obtain. *See* Def. Supp. Br. at 21-22. That theory is misconceived.

As a general matter, warrants inherently leave officers some "room to make a judgment as to what particular documents or things are subject to seizure under the warrant which he is executing." 2 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 4.6(a), at 750-751 (6th ed. 2020) ("LaFave") (citation omitted). A warrant's validity does not turn on cabining that discretion to the nth degree. A federal wiretap warrant, for example, must specify that the wiretap be "conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter." 18 U.S.C. § 2518(5). But given the practical realities, the validity of the warrant-based search turns on the reasonableness of law enforcement's minimization steps under the circumstances—not the absence of any discretion as to how to minimize. *See Scott* v. *United States*, 436 U.S. 128, 139-143 (1978).

Here, the probable cause that supported investigators' acquisition of Google data at step one did not cease to exist at steps two and three. The magistrate could

reasonably find that the facts supported the acquisition of two hours of identifiable location information from accounts satisfying the stated geofencing criteria. And the warrant described with particularity exactly what that information would look like. *See* JA116-JA117. Requiring law enforcement to repeatedly make efforts to narrow the scope of the information to be disclosed—with Google able to, as it did, object to the reasonableness of the government's efforts, *see* JA1584—was a protective measure, not a constitutional flaw.[2]

2. Defendant argues that the warrant was invalid from start to finish, on theories that would preclude law enforcement from ever obtaining even anonymized information about potential suspects and witnesses near the scene of a crime. These arguments lack merit.

---

[2] TFO Hylton applied the warrant's minimization procedures in an entirely reasonable manner. In "an effort to rule out possible co-conspirators" and noting that the step 1 set of devices was "fairly low in number," he initially sought step 2 information on all devices. JA2037. Google was nonresponsive, and TFO Hylton was concerned about the danger that the robber posed to the public. JA1039, JA2042. Investigators also recognized that devices that remained at the bank "several minutes after the bank robbery" likely belonged to potential witnesses. JA963. Thus, as shown by the summaries of the location data the government received from Google, TFO Hylton ultimately did not seek contextual location information for the ten accounts associated with devices that remained at the bank beyond 5:03 p.m., several minutes after the robber had fled. JA2002, JA2006, JA2008. TFO Hylton's implementation of the step 3 minimization was also reasonable: he obtained identifying information only for the account of the robber and two other individuals whose paths suggested that they could have dropped off or picked up an accomplice. JA960-JA967.

a. Defendant argues that the warrant violated the Fourth Amendment because it required a search of every Google account, *see* Def. Supp. Br. at 7-12, but this Court's decision in *Leaders of a Beautiful Struggle v. Baltimore Police Department*, 2 F.4th 330 (4th Cir. 2021) (en banc) ("*Leaders*"), and the Supreme Court's decision in this case make clear that a search takes place when law enforcement officials access Location History, not when Google scans it. In *Leaders*, this Court held that under the Supreme Court's reasoning in *Carpenter v. United States*, 585 U.S. 296 (2018), "a search took place 'when *the Government* accessed CSLI from the wireless carriers.'" *Leaders*, 2 F.4th at 344 (quoting *Carpenter*, 585 U.S. at 313) (emphasis added and omitted). In the now-vacated en banc decision in this case, twelve judges of this Court joined opinions that found that *Leaders*' reasoning applied to Location History—that "[a] search can occur only when *the government* accesses the requested information, not when a company begins looking through its internal database." SA111 (Berner, J., concurring) (emphasis in original); SA95 n.17 (Richardson, J., concurring).

This result makes sense. In contrast to "the reviled 'general warrants' and 'writs of assistance' of the colonial era, which allowed British officers to rummage through homes in an unrestrained search for evidence of criminal activity," *Riley v. California*, 573 U.S. 373, 403 (2014), law enforcement here did not have free rein to rummage through Google's database. Instead, the government saw only what

Google disclosed. Were Defendant's theory correct, many search warrants and third-party subpoenas—including, potentially, some cell phone location warrants—could be characterized as overbroad general warrants, because they would authorize some third-party recipient to "search" a broader set of its own files to find responsive documents. *See* SA111 (Berner, J., concurring). Such an approach would destabilize established Fourth Amendment practice.

Moreover, the reason that Google itself had to query across all Location History data to respond to the geofence warrant is because of Google's own internal design choices about how it organized its database. If Google had indexed the information by location, it could have retrieved the information responsive to the warrant more efficiently. But the constitutional analysis cannot turn on the technical details of Google's private decisions about its specific data structure. *Cf. Smith v. Maryland*, 442 U.S. 735, 745 (1979) (explaining that phone company's internal storage practices did not "make any constitutional difference").

Three statements from the Supreme Court's opinion in this case buttress this understanding of when a search takes place. First, in the introductory portion of its opinion, the Court held that "*the police* conducted a search when *they* gained access to Location History data." SA122 (emphasis added). Second, at the end of its background section, the Court restated its holding in a question-and-answer format that emphasized that the Fourth Amendment search occurred when "law

enforcement officials" obtained Location History from Google: "[D]id law enforcement officials conduct a search under the Fourth Amendment when they *acquired* Chatrie's location data from Google? We hold that they did." SA125 (emphasis added).

Finally, at the end of its analysis of whether the government conducted a search, the Court stated its holding in a manner that again emphasized that the search occurs when the police or government accesses Location History:

> [W]e hold that *police officers* invade a cell-phone user's reasonable expectation of privacy *when they access his Location History.* It does not matter if the time period scrutinized was only two hours. Nor does it matter that the materials obtained were handed over by a third-party tech company. *When the government "accesses historical cell phone" location information*—Location History as much as CSLI—it "conducts a search under the Fourth Amendment."

SA131 (emphasis added).[3] In sum, the Supreme Court stated clearly and repeatedly that a search takes place when police or law enforcement officials access Location History disclosed by Google. TFO Hylton is a police officer; Google and its employees are not. *See Foley v. Connelie*, 435 U.S. 291, 293

[3] Defendant points to the sentence in the Supreme Court's holding that states, "[n]or does it matter that the materials obtained were handed over by a third-party tech company," SA131 (quoted by Def. Supp. Br. at 9), but that sentence means only that users retain their reasonable expectation of privacy in their Location History even though the government obtains it from Google (*i.e.*, that the third party doctrine does not apply). It does not mean that Google is the equivalent of the government.

(1978) (stating that police officers are "charged with the prevention and detection of crime" and have powers "generally described in the relevant statutes").

Nor was Google a government agent when its computers filtered Location History in response to the warrant. The subject of a subpoena or judicial order is far from being the agent of the other side in litigation. The subject of a subpoena or judicial order may, for example, assert Fourth or Fifth Amendment rights of its own. *See* 2 LaFave § 4.13, at 1051.

Defendant cites *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602 (1989), to support his claim that Google was acting as a government agent when it scanned its databases for responsive data. *See* Def. Supp. Br. at 9-10. But *Skinner* involved bodily searches required by statute and regulation, rather than judicial process, and even then, it recognized that agency issues "necessarily turn[] on the degree of the Government's participation in the private party's activities." *Id.* at 614. Akin to a subpoena, the warrant here provided directions only as to *what* Google would provide, not *how* it might do so. Google's returns revealed nothing about any accounts other than the 19 that were inside the geofence. The government learned nothing about other accounts—how many there were, to whom they corresponded, whether they even had Location History enabled at that time, or whether they had paused it or requested deletion after the fact.

Nor is it clear how much (if anything) Google itself even learned about other users when it "r[a]n a computation" to match data in its database to the parameters of the warrant. JA620. "When a filter scans through data" in that manner, "blindly check[ing] for a match," "the filter does not 'see' the data in a Fourth Amendment sense." Orin S. Kerr, *Data Scanning and the Fourth Amendment*, 67 B.C. L. Rev. 431, 459 (2026). And any information that might have been exposed was information that Google itself could already access and use for its own advertising purposes. JA612-JA614, JA1555.[4]

b. Defendant's argument that the geofence warrant was insufficiently particular because it failed to "point to a particular account," Def. Supp. Br. at 20, is misplaced. As an initial matter, the Supreme Court in this case stated that the particularity requirement "typically looks to such matters as *the geographic and*

[4] Defendant compares Google's filtering of Location History to a manager searching, at the direction of police, a storage locker facility for a weapon, but Defendant's comparison is inapt in multiple respects. *See* Def. Supp. Br. at 7. Google itself accesses its Location History database to provide services to its users and advertisers (including through measurement of "store visit conversions," which are similar to geofences), making the database an appropriate Fourth Amendment "place to be searched." JA612-JA614, JA1552-JA1555; *see* 4 LaFave § 8.6(a), at 322 (a "bailee" can generally consent to a government search of the portions of bailed property that the bailee "could be expected to make use of" under the bailment). In addition, as discussed above, Google is not an agent of the government, and computer filtering of data lacks the Fourth Amendment significance of human review. *See supra* at pp. 23-24.

*durational expanse* of the search," which is precisely how geofence warrants specify their scope. SA132 (emphasis added).

In addition, the Warrant Clause generally does not require the specificity demanded by Defendant even in more analog contexts. In *United States v. Karo*, 468 U.S. 705 (1984), for example, the Supreme Court explained that the government could obtain a valid warrant to track the location of a beeper—even inside "private premises"—notwithstanding that the government could not know in advance where the beeper would end up, let alone whose (if anyone's) private premises they might be. *Id.* at 718. As *Karo* illustrates, when there is probable cause for a search, the impossibility of further specification does not present an insurmountable hurdle to the issuance of a lawful warrant.

*Karo*'s principle that the particularity requirement depends on the nature of the technology used also answers Defendant's assertion that a search warrant "cannot declare 'Google' as the 'place to be searched.'" Def. Supp. Br. at 14. The government lists "computer servers maintained or controlled by Google" as the place to be searched (*see* JA116) because when the government obtains any warrant directed to Google (a geofence warrant or a warrant targeting a specific account), the government cannot know where Google's relevant data centers are located. Congress has explicitly given courts jurisdiction to issue warrants directed to a provider without knowing where the provider's data centers are located. *See*

18 U.S.C. §§ 2703, 2711(3), 2713. For a geofence warrant, the government then satisfies the particularity requirement by targeting specified location data within Google's Location History database. Nothing in the Fourth Amendment's particularity requirement suggests that only specified accounts can serve as the place to be searched for a warrant seeking Location History information.

c. Finally, Defendant's argument that the geofence warrant was a general warrant fails because the warrant sought highly particularized information: location and identifying information associated with devices that were in the vicinity of a specific robbery during a limited timeframe. Such a warrant is far removed from the "general, exploratory rummaging" prohibited by the Fourth Amendment. *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971). The Fourth Amendment does not completely foreclose a valuable "tool[]" to catch "modern-day criminal[s]" like Defendant, who chose to use a cellphone as an instrument of his crime. SA66 (Wilkinson, J. concurring). Although Defendant argued to the Supreme Court that geofence warrants were general warrants, SA132, the Supreme Court did not embrace Defendant's categorical theory. Instead, it directed this Court "to decide whether, at each step of the search process, the warrant satisfied the Fourth Amendment's requirements of particularity and probable cause." SA132.

Defendant relies heavily on *United States v. Smith*, 110 F.4th 817 (5th Cir. 2024), which held that geofence warrants are inherently general warrants, but *Smith*'s holding improperly focused on Google's filtering of its own records. *See id.* at 837-38. For the reasons set forth *supra* at pp. 20-23, both *Leaders* and the Supreme Court's decision in this case confirm that a search takes place when the government accesses information disclosed by a service provider.

**II. The good-faith exception precludes suppression.**

Suppression is a remedy of "last resort," to be used for the "sole purpose" of deterring future Fourth Amendment violations, and only when the deterrence benefits of suppression "outweigh its heavy costs." *Davis v. United States*, 564 U.S. 229, 236-37 (2011). In this Court's now-vacated en banc decision, nine judges joined opinions that found that the good-faith exception precludes suppression in this case. *See supra* at p. 6. For the reasons set forth in the government's principal brief in this case, the good-faith exception applies, both because TFO Hylton relied on the warrant in good faith and because he acted reasonably when employing a new investigative technique. *See* U.S. Br. at 45-56; *see also United States v. Zelaya-Veliz*, 94 F.4th 321, 341 (4th Cir. 2024) (applying the good-faith exception and stating that "[c]ourts should not punish law enforcement officers who are on the frontiers of new technology simply because

they are at the beginning of a learning curve and have not yet been apprised of the preferences of courts on novel questions" (internal quotation marks omitted)).

The Supreme Court's decision in this case states that "the Fourth Circuit is free to revisit the exclusionary rule issue in light of our opinion." SA145 n.4. But the Supreme Court's opinion and holding—that police conducted a search when they obtained Location History from Google, *see* SA131—has no bearing on the good-faith analysis. The good-faith exception applies here because TFO Hylton reasonably relied on the geofence warrant. *See* SA62-SA64 (Diaz, C.J., concurring); SA70 (Niemeyer, J., concurring); SA97-SA99 (Heytens, J., concurring); U.S. Br. at 45-56; *see also United States v. McLamb*, 880 F.3d 685, 691 (4th Cir. 2018) ("We are disinclined to conclude that a warrant is 'facially deficient' where the legality of an investigative technique is unclear and law enforcement seeks advice from counsel."). And that conclusion remains unchanged by the Supreme Court's determination that the acquisition of Defendant's Location History constituted a search. Indeed, the distinction between the two issues is clear from the Supreme Court's own conduct in this case: the Court expressly "excluded the good-faith issue from its grant of certiorari" and did not address it in its opinion. SA138 (Alito, J., dissenting).

Defendant argues that the good-faith exception should not apply because the warrant "authorized the search of millions of individual accounts," *see* Def. Supp.

Br. at 25, but as discussed *supra* at pp. 20-23, the Supreme Court's opinion in this case bolsters this Court's determination in *Leaders* that a search occurred only when law enforcement officers received and accessed Location History, not when Google filtered it. The Supreme Court thus reinforced that officers reasonably relied on the geofence warrant because the warrant was not "so facially deficient" in particularity "that the executing officers [could] not reasonably presume it to be valid." *United States v. Leon*, 468 U.S. 897, 923 (1984). Similarly, the Supreme Court's recitation of the probable cause standard of *Zurcher*, *see supra* at pp. 12-14, further demonstrates that the affidavit was not "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Leon*, 468 U.S. at 923. Thus, the Court endorsing *Zurcher* further supports application of *Leon*'s good faith exception here.

Finally, Defendant recycles his argument that the good-faith exception should not apply because the warrant was a general warrant. *See* Def. Supp. Br. at 24-27. The United States previously addressed the argument, and it incorporates its response here. *See* U.S. Br. at 52-53. In sum, not only is the premise of Defendant's argument unsound—the warrant is not a general warrant—but also *Leon* makes clear that there is no categorical rule that the good faith exception does not apply to an insufficiently particular warrant. Under *Leon*, the good-faith exception applies unless the warrant is "so facially deficient" in particularity that

officers cannot reasonably rely on it. *Leon*, 468 U.S. at 923. Where suppression is inappropriate under *Leon*, it would be inconsistent with *Leon* to suppress evidence because the court characterizes the warrant as a "general warrant."

**III. This Court Should Not Remand to the District Court.**

This Court should reject Defendant's alternative suggestion for remand to the district court. *See* Def. Supp. Br. at 28-30. Defendant states that this Court can remand if there are "factual issues that are not clear on the record," Def. Supp. Br. at 28, but he identifies no factual issues for the district court to address, much less disputed and relevant factual issues. Defendant points to the district court's determination that the warrant involved the search of the 19 accounts whose data was disclosed, rather than the accounts scanned by Google, *see* Def. Supp. Br. at 29, but that is a legal question that has been effectively resolved in favor of the United States by *Leaders* and buttressed by the Supreme Court's holding in this case, *see supra* at pp. 20-23, not a factual question to be revisited by the district court. The district court made extensive findings of fact, *see* JA1328-JA1359, and this Court may resolve the remaining legal issues based on the current record.

**Conclusion**

This Court should affirm the denial of Defendant's motion to suppress.

Respectfully submitted,

By: /s/

Nathan Judish
Senior Counsel, Computer Crime
and Intellectual Property Section
United States Department of
Justice
1301 New York Ave., NW
Washington, DC 20530
(202) 616-7203
nathan.judish@usdoj.gov

Peter S. Duffey
Assistant United States Attorney
United States Attorney's Office
Eastern District of Virginia
919 E. Main Street, Suite 1900
Richmond, VA 23219
(804) 819-5400

**Certificate of Compliance**

I certify that this brief was written using 14-point Times New Roman typeface and Microsoft Word Version 2608.

I further certify that this brief complies with the 30-page limit set by this Court's order of July 16, 2026, because the brief contains no more than 30 pages, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

I understand that a material misrepresentation can result in the Court's striking the brief and imposing sanctions.

/s/

Nathan Judish
Senior Counsel, Computer Crime
and Intellectual Property Section